ARCHER & GREINER, P.C.
Stephen M. Packman
Mariam Khoudari
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
Phone: (215) 963-3300
Fax: (215) 963-9999
spackman@archerlaw.com
mkhoudari@archerlaw.com

*Proposed Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LOBSTER BOYS LLC,<br><br>Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11986 |
| In re:<br><br>LOBSTER SH LTD,<br><br>     Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11987 |
| In re:<br><br>LOBSTERBOYS LTD,<br><br>     Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11989 |
| In re:<br><br>LOBSTERBOYS DH REALTY LTD,<br><br>     Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11990 |

| | |
|---|---|
| In re:<br><br>LOBSTERBOYS CHICAGO LLC,<br><br>    Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11991 |
| In re:<br><br>LINDY INC.,<br><br>    Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11992 |
| In re:<br><br>LB LOGISTICS, LLC,<br><br>    Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11993 |
| In re:<br><br>100 SHORE RD LTD,<br><br>    Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11994 |
| In re:<br><br>L.B. LAND TRUST INC.,<br><br>    Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case Number: 23-11995 |

## <u>DECLARATION OF TAYLOR COX</u>

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury, under the laws of the

United States of America, that the foregoing is true and correct.

1. I am a Canadian CPA and I provide consultancy accounting and finance services in the ordinary course for the Debtors[1] as their accounting and financial advisor on a contract basis (the Canadian equivalent of a 1099 contractor in the U.S.).

2. I submit this "Declaration" in support of the Debtors' Motion for Use of Cash Collateral ("Cash Collateral Motion") and to consolidate the proceedings for administrative purposes ("Consolidation Motion").

3. I have been consulting for the Debtors since November 13, 2022. As part of my consultancy for the Debtors, I have overseen and provided guidance to the Debtors in the preparation and maintenance of accounting records, financial statements, tax returns, reconciliation of bank statements, refinancing efforts, prepared projections, obtaining valuations and provided the Debtors with financial and accounting advice, with reliance placed on the Debtor's internal resources, staff and systems.

4. The Debtors are in the business of purchasing lobsters on a wholesale basis in Canada and distributing them for sale in North America and overseas. The Debtors distribution center is in Huntington, New York.

5. The Debtors business operations are as follows:

   a. Lobster SH Ltd ("Lobster SH")-main operating company with intake facilities in Nova Scotia Canada and distribution facilities in Huntington, New York; sells lobsters in Canada and the US through its US distribution facilities in Huntington, New York; owns machinery, equipment and inventory (lobsters) in Huntington, New York and Nova Scotia Canada;

---

[1] The Debtor are Lobster SH Ltd., Lobster Boys LLC, Lobsterboys Ltd., L.B. Land Trust Inc., 100 Shore Road Ltd., Lobsterboys DH Realty Ltd., LB Logistics Inc., Lobsterboys Chicago LLC and Lindy Inc. (collectively, the "Debtors").

b. Lobster Boys LLC ("Lobsterboys LLC") distributes lobsters to Lobster SH's customers in the United States with operations on leased property located in Huntington, New York; owns machinery and equipment in Huntington, New York;

c. Lobsterboys Ltd ("Lobsterboys Ltd.")-owns real property and improvements thereon known as 5523-25 Highway #3, Shag Harbour, Nova Scotia, Canada ("Shag Harbour Property");

d. L.B. Land Trust Inc. (LB Land Trust")-owns the residential property (land) located at 49 Dipper Harbour Road (49 Dipper Harbour Property");

e. 100 Shore Road Ltd. ("100 Shore Road")-owns a real property located in Port Saxon, Nova Scotia Canada ("100 Shore Road Property");

f. Lobsterboys DH Realty Ltd ("Lobsterboys DH Realty")-owns real property at 61-67 Dipper Harbour Road, Dipper Harbour, New Brunswick Canada ("61 Dipper Harbour Property");

g. LB Logistics Inc. ("LB Logistics")-owns a truck that is used to transport lobster between Canada and the US;

h. Lobsterboys Chicago, LLC ("Lobsterboys Chicago")-formerly leased a distribution location in Chicago, Illinois; and,

i. Lindy Inc ("Lindy")-predecessor entity to Lobsterboys LLC, no longer in business.

6. The Debtors, Lobsterboys, LLC, Lobsterboys Chicago, LB Logistics and Lindy ("US Debtors") remain indebted to Bank of America ("BofA") under certain loan and security documents and agreements ("BofA Loan Documents") in the approximate amount of

$2,400,000 (US Dollars) ("BofA Loan Balance"). The BofA Loan Documents are filed herewith as Exhibit "A".

7. The Debtors, Lobster SH, Lobsterboys Ltd., L.B. Land Trust, Lobsterboys DH Realty and 100 Shore Road ("Canadian Debtors") remain indebted to The Toronto-Dominion Bank ("TD Bank") under certain loan and security documents and agreements ("TD Loan Documents") in the approximate amount of $1,550,000 (US Dollars) ("TD Loan Balance"). Under the TD Documents (which accompany this Declaration as Exhibit "B"), TD Bank may assert a lien or other interest in some or all of the Canadian Debtors' Cash Collateral (the "TD Cash Collateral"), resulting from the sales of Lobsters to customers in Canada and the US.

8. The Canadian Debtors remain indebted to The Business Development Bank of Canada ("BDC") under certain loan and security documents and agreements ("BDC Loan Documents") in the approximate amount of $2,175,000 (US Dollars) ("BDC Loan Balance"). The BDC Loan Documents accompany this Declaration as Exhibit "C."

9. The Debtors believe there are unsecured claims of approximately $1,300,000.00.

10. The Debtors require the use of the TD Cash Collateral in order to operate in Chapter 11.

11. The Debtors' thirteen (13) week cash flow projections ("Projections") accompany this Declaration as Exhibit "D."

12. Valuations of the US Debtor's real and personal property accompany this Declaration as Exhibit "E".

13. Valuations of the Canadian Debtors' real and personal property accompany this Declaration as Exhibits "F-I."

14. The Canadian Debtors have accounts receivable due and cash as of the Petition Date as reflected on Exhibit "J."

15. The Debtors propose to grant TD Bank replacement liens and other protections as more fully set forth in the accompanying Cash Collateral Motion in return for use of the TD Cash Collateral on an interim and final basis.

Dated: December 12, 2023

*Taylor Cox*

Taylor Cox
Vanguard Real Estate Advisors Inc.

228157275 v4

**Exhibit A**

**Bank of America Loan Documents**



 **Bank of America**

**NOTE**

| TRANSACTION SUMMARY | | | | | |
|---|---|---|---|---|---|
| **Credit Limit:** | $750,000.00 | **Date of Note:** | | December 21, 2018 | |
| **Interest Rate:** | LIBOR Daily Floating Rate plus 3 percentage points | | | | |
| **Expiration Date:** | December 21, 2019 | | | | |
| **Loan Fee:** | $1,875.00 | **Loan Account Number:** | | 90665 | |
| **Name(s) of Borrower:** | Lindy Inc. | | | | |
| **Location of Borrower:** | 298 Elm Street | | | | |
| **City:** | Stonington | **State:** | CT | **Zip:** | 06378-2925 |
| **Direct Debit?** | | Yes | | | |
| **Bank of America Deposit Account No.:** | | CT-385018273696 | | | |
| **Owner of Account:** | | Lindy Inc. | | | |

This Note, dated and effective as of December 21, 2018, is entered into between Lindy Inc. (collectively and individually, the "<u>Borrower</u>") and Bank of America, N.A. (the "<u>Bank</u>") to govern the Credit Facility, in connection with the Master Credit Agreement, dated as of December 21, 2018 (as amended from time to time, the "<u>Master Credit Agreement</u>"), between the Borrower, each other "Borrower" party thereto, and the Bank, the Covenant Agreement executed in connection therewith and each Related Guaranty and Collateral Agreement executed in connection herewith.

**1.    DEFINITIONS.**

    **1.1    General**. Unless otherwise defined herein, capitalized terms used in this Note shall have the respective meanings ascribed thereto in <u>Section 1</u> of the Master Credit Agreement and as otherwise may be provided in other provisions of the Credit Documents.

    **1.2    In this Note**:

    "<u>Expiration Date</u>" means the date set forth in the Transaction Summary.

    "<u>Guarantor</u>" means, collectively and individually, each person or entity (if any) who signs as a Guarantor under the Related Guaranty and Collateral Agreement.

    "<u>Note</u>" means this Note between the Borrower and the Bank, as amended from time to time.

    "<u>Obligations</u>" means all loans, advances, debts, principal, interest, and other obligations now or hereafter existing, of the Borrower and the Guarantor to the Bank arising under (i) this Note, (ii) each Related Guaranty and Collateral Agreement as they relate to the Credit Facility, (iii) the Master Credit Agreement and the Covenant Agreement, in each case, as they relate to the Credit Facility (including under <u>Sections 2</u>, and <u>6</u> of the Master Credit Agreement), and (iv) under any other agreement or instrument executed in connection with the Credit Facility.

"Related Guaranty and Collateral Agreement" means the Guaranty and Collateral Agreement among the Borrower, each Guarantor and the Bank executed in connection with the Credit Facility, as amended from time to time.

"Transaction Summary" means the summary of terms relating to the Credit Facility set forth on page one of this Note.

## 2.    CREDIT FACILITY.

### 2.1    Credit Facility Amount.

(a)    During the availability period described below, the Bank will provide a line of credit (the "Credit Facility") to the Borrower. The amount of the Credit Facility (the "Credit Limit") is the amount stated in the Transaction Summary.

(b)    This is a revolving line of credit. During the availability period, the Borrower may repay principal amounts and reborrow them.

(c)    The Borrower agrees not to permit the principal balance outstanding to exceed the Credit Limit. If the Borrower exceeds this limit, the Borrower will immediately pay the excess to the Bank upon the Bank's demand.

### 2.2    Availability Period.

The Credit Facility is available between the date of this Note and the Expiration Date, or such earlier date as the availability may terminate as provided in this Note or any other Credit Document.

The availability period for the Credit Facility will be considered renewed if and only if the Bank has sent to the Borrower a written notice of renewal for the Credit Facility (the "Renewal Notice"). If the Credit Facility is renewed, it will continue to be subject to all the terms and conditions set forth in this Note except as modified by the Renewal Notice. If the Credit Facility is renewed, the term "Expiration Date" shall mean the date set forth in the Renewal Notice as the Expiration Date, and all outstanding principal plus all accrued interest shall be paid on the Expiration Date. The same process for renewal will apply to any subsequent renewal of the Credit Facility. A renewal fee may be charged at the Bank's option. The amount of the renewal fee will be specified in the Renewal Notice.

### 2.3    Repayment Terms.

(a)    The Borrower will make payments monthly on the day of the month specified in the billing statement, until payment in full of all principal outstanding under this Note. The amount of each interest payment shall be the amount of accrued interest on the Credit Facility as of the interest payment date or such earlier accrual date as indicated on the billing statement for such interest payment.

(b)    The Borrower will repay in full all principal, interest, charges and other Obligations outstanding under this Note and the other Credit Documents no later than the Expiration Date.

(c)    The Borrower may prepay the Credit Facility in full or in part at any time. Each prepayment, whether voluntary, by reason of acceleration or otherwise, will be accompanied by the amount of accrued interest on the amount prepaid through, but not including, the date of prepayment.

### 2.4    Interest Rate.

(a)    The interest rate is a rate per year equal to the LIBOR Daily Floating Rate plus the number of percentage points stated in the Transaction Summary (as modified under Section 2.4 of the Master Credit Agreement at the option of the Bank).

(b)    The LIBOR Daily Floating Rate is a fluctuating rate of interest which can change on each banking day. The rate will be adjusted on each banking day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date. The Bank will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days prior to

Ref #: 1002932229: - Lindy Inc.
Note

the date in question, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by the Bank. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Note.

**2.5    Use of Proceeds.** The proceeds of the Credit Facility shall be used solely for general corporate purposes.

## 3.    LOAN FEE; INTEREST AND FEE CALCULATION.

**3.1    Loan Fee.** The Borrower agrees to pay a loan fee in the amount specified in the Transaction Summary. This fee is due on the date of this Note and will be paid as provided in the Disbursement and Fee Statement provided by the Bank.

**3.2    Late Fee.** To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed four percent (4%) of any payment that is more than fifteen (15) days late. The imposition and payment of a late fee shall not constitute a waiver of the Bank's rights with respect to the Default.

**3.3    Returned Payment Fee.** The Bank, in its discretion, may collect from the Borrower a returned payment fee each time a payment is returned or if there are insufficient funds in the designated account when a payment is attempted through automatic payment.

**3.4    Default Rate.** Upon the occurrence of any Default or after maturity or after judgment has been rendered on any Obligation under any Note, all amounts outstanding under the Credit Documents, including any unpaid interest, fees, or costs, will at the option of the Bank bear interest at a rate which is 6.0 percentage points (6.0%) higher than the rate of interest otherwise applicable to the applicable Credit Facility. This may result in compounding of interest. This will not constitute a waiver of any Default.

**3.5    Interest and Fee Calculation.** Except as otherwise stated in the Credit Documents, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Note or any other Credit Document shall continue to bear interest until paid. To the extent that any calculation of interest or any fee required to be paid under any Credit Document shall be less than zero, such rate shall be deemed zero for purposes of the Credit Documents. Any payments of principal shall be accompanied by interest accrued through, but not including, the date of such payment.

## 4.    CONDITIONS PRECEDENT.

Before the Bank is required to extend any credit to the Borrower under this Note, the following conditions precedent must be satisfied and the Bank must receive any documents and other items it may reasonably require, in form and content acceptable to the Bank, including any items specifically listed below.

**4.1    Note.** The Borrower shall have executed this Note.

**4.2    Master Credit Agreement.** The Borrower and each other "Borrower" party thereto shall have executed the Master Credit Agreement.

**4.3    Covenant Agreement.** The Borrower shall have executed the Covenant Agreement and thereby shall have agreed to be bound by the terms contained therein.

**4.4    Guaranty and Collateral Agreement.** The Borrower and each Guarantor, if applicable, shall have executed a Related Guaranty and Collateral Agreement, each Guarantor thereby shall have agreed to be bound by the terms of the Continuing and Unconditional Guaranty contained therein, this Note, the Master Credit Agreement and the Covenant Agreement and each applicable Obligor thereby shall have agreed to be bound by the terms of the Security Agreement contained therein.

**4.5    KYC Information.**

Ref #: 1002932229: - Lindy Inc.
Note
- 3 -

(a)     Upon the request of the Bank, the Borrower shall have provided to the Bank, and the Bank shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act.

(b)     If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall have provided a Beneficial Ownership Certification to the Bank if so requested.

**4.6     Perfection and Evidence of Priority**.  Evidence that the security interests and liens in favor of the Bank securing the Credit Facility (including those in each Related Guaranty and Collateral Agreement), if any, are valid, enforceable, properly perfected in a manner acceptable to the Bank and prior to all others' rights and interests, except those the Bank consents to in writing.

**4.7     Payment of Fees**.  All fees, expenses and other amounts due and owing to the Bank shall be paid.  If any fee is not paid in cash, the Bank may, in its discretion, treat the fee as a principal advance under this Note or deduct the fee from the loan proceeds.

**4.8     No Default**.  No Default or Event of Default shall exist or will result from the signing of this Note, the Master Credit Agreement or any other Credit Document or the extension of credit under this Note.

**4.9     Representations and Warranties**.  The representations and warranties of each Obligor in each Credit Document shall be true and correct on the date hereof and immediately before and after giving effect to any extension of credit under this Note (except for representations and warranties that expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date).

**5.     GOVERNING LAW**.  Except to the extent that any law of the United States may apply, this Note shall be governed and interpreted according to the laws of New York, without regard to any choice of law, rules or principles to the contrary.  Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.  This Note is subject to the venue, jurisdiction and dispute resolution provision clauses set forth in the Master Credit Agreement.

This Note is executed as of the date first written above.

Bank:

**Bank of America, N.A.**

By: _____
Authorized Signer, Officer
Amy Wall, Sr. Vice President

Borrower:

**Lindy Inc.**

By: _Travis Maderia_____
Travis L. Maderia, President

By: _Justin Maderia_____
Justin M. Maderia, Vice President



**Bank of America** 

# FINANCIAL COVENANT AGREEMENT

This Financial Covenant Agreement, dated and effective as of December 21, 2018, is entered into between Lindy Inc. (collectively and individually, the "Borrower") and Bank of America, N.A. (the "Bank") to govern each Credit Facility, in connection the Master Credit Agreement, dated as of December 21, 2018 (as amended from time to time, the "Master Credit Agreement"), between the Borrower and the Bank and each Note and each Guaranty and Collateral Agreement executed in connection therewith.

## 1.    DEFINITIONS.

**1.1    General**. Unless otherwise defined herein, capitalized terms used in this Covenant Agreement shall have the respective meanings ascribed thereto in Section 1 of the Master Credit Agreement and as otherwise may be provided in other provisions of the Credit Documents.

## 2.    COVENANTS.

The Borrower agrees that each Borrower and each Guarantor, to the extent applicable, so long as any credit is available under any Credit Document and until all Obligations are repaid in full:

**2.1    Other Debts.** With respect to the Borrower, not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank or to any affiliate of the Bank), or become liable for the liabilities of others, without the Bank's written consent. This does not prohibit:

    (i)    Acquiring goods, supplies, or merchandise on normal trade credit.

    (ii)    Liabilities, lines of credit and leases in existence on the date of the Master Credit Agreement disclosed in writing to the Bank and other debt disclosed in writing to, and approved in writing by, the Bank.

**2.2    Other Liens.** Not to create, assume, or allow any security interest or any voluntary or involuntary lien (including judicial liens) on (x) property the Borrower now or later owns or (y) any Collateral owned by a Guarantor, in each case, without the Bank's written consent. This does not prohibit:

    (i)    Liens and security interests in favor of the Bank or any affiliate of the Bank.

    (ii)    Liens for taxes not yet due.

    (iii)    Liens outstanding on the date of the Master Credit Agreement disclosed in writing to the Bank and other liens disclosed in writing to, and approved in writing by, the Bank.

### 2.3    Financial Information.

To provide financial statements and other information in form and content acceptable to the Bank relating to the affairs of the Borrower and any Guarantor as requested by the Bank from time to time. Any financial statements or other information requested by the Bank will be due within 30 days of request, and failure to deliver the same shall constitute an event of default hereunder.

**3.    GOVERNING LAW.** Except to the extent that any law of the United States may apply, this Covenant Agreement shall be governed and interpreted according to the laws of New York, without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law. This Covenant Agreement is subject to the venue, jurisdiction and dispute resolution provision clauses set forth in the Master Credit Agreement.

This Covenant Agreement is executed as of the date first written above.

Bank:

**Bank of America, N.A.**

By: _____
Authorized Signer, Officer
Amy Walsh, Sr. Vice President

Borrower:

**Lindy Inc.**

By: _Travis Maderia_____
Travis L. Maderia, President

By: _Justin Maderia_____
Justin M. Maderia, Vice President





## MASTER CREDIT AGREEMENT

This Master Credit Agreement, dated and effective as of December 21, 2018, is entered into between Lindy Inc. (collectively and individually, the "<u>Borrower</u>") and Bank of America, N.A. (the "<u>Bank</u>"). This Master Credit Agreement, together with the Covenant Agreement (as defined below), each Note (as defined below) and each Guaranty and Collateral Agreement (as defined below) sets forth the general terms and conditions for each Credit Facility (as defined below). For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and the Bank agree as follows:

## 1.    DEFINITIONS.

**1.1    General**. Capitalized terms used in each Credit Document shall have the respective meanings ascribed thereto in <u>Section 1</u> of this Master Credit Agreement, as supplemented or modified by <u>Section 1</u> of each other Credit Document, and as otherwise may be provided in other provisions of the Credit Documents.

**1.2    In the Credit Documents:**

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Civil Asset Forfeiture Reform Act</u>" means the Civil Asset Forfeiture Reform Act of 2000 (18 U.S.C. Sections 983 et seq.), as amended from time to time, and any successor statute.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Collateral</u>" means, collectively, "Collateral" as defined in each Guaranty and Collateral Agreement.

"<u>Controlled Substances Act</u>" means the Controlled Substances Act (21 U.S.C. Sections 801 et seq.), as amended from time to time, and any successor statute.

"<u>Covenant Agreement</u>" means the Financial Covenant Agreement, dated as of the date hereof, between the Borrower and the Bank, as amended from time to time.

"<u>Credit Documents</u>" means this Master Credit Agreement and the Covenant Agreement, together with any and all Notes, Guaranty and Collateral Agreements.

"<u>Credit Facility</u>" means, collectively, each "Credit Facility" as defined in each Note.

"<u>Default</u>" means an Event of Default or any event or condition that, with the lapse of time or giving of notice or both, would constitute an Event of Default.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code.

"<u>Plan</u>" means a plan within the meaning of Section 3(2) of ERISA maintained or contributed to by the Borrower or any ERISA Affiliate, including any multiemployer plan within the meaning of Section 4001(a)(3) of ERISA.

"<u>Guarantor</u>" means each Guarantor identified in any Guaranty and Collateral Agreement.

"Guaranty and Collateral Agreement" means each Guaranty and Collateral Agreement among each Borrower party thereto, each Guarantor party thereto and the Bank, as amended from time to time.

"Note" means each Note between each Borrower party thereto and the Bank, as amended from time to time.

"Obligor" shall mean the Borrower, each Guarantor, and, if the Borrower or any Guarantor is comprised of the trustees of a trust, any trustor.

"Obligations" means, collectively, "Obligations" as defined in each Note.

"Proceeds" means, collectively, "Proceeds" as defined in each Guaranty and Collateral Agreement.

"Master Credit Agreement" means this Master Credit Agreement between the Borrower and the Bank, as amended from time to time.

"Transaction Summary" means the "Transaction Summary" box on page 1 of each Note.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any lien, the Uniform Commercial Code of such jurisdiction.

**1.3    Uniform Commercial Code.**  As used in the Credit Documents, the following terms are defined in accordance with the Uniform Commercial Code in effect in the State of New York from time to time: Accessions, Accounts, Chattel Paper, Deposit Account, Documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letters of Credit, Letter-of-Credit Rights, Money, and Supporting Obligations.

## 2.    DISBURSEMENTS, PAYMENTS AND COSTS

**2.1    Borrower's Authorized Representatives.**  The individuals who sign this Master Credit Agreement or any other Credit Document on behalf of the Borrower (the "Authorized Representatives") will represent the Borrower in the administration of each Credit Facility. The Authorized Representatives are authorized to act on behalf of the Borrower and bind the Borrower in connection with any matter involving any Credit Facility. The Bank may act on oral requests from an Authorized Representative, but may require that an oral request be confirmed in writing. The Bank may rely on the instructions from an Authorized Representative, or someone the Bank reasonably believes to be an Authorized Representative, until the Bank receives written notice from the Borrower to the contrary and has a reasonable period of time to act on that notice. The Bank may also rely on the email addresses of the Authorized Representatives provided by the Borrower in order to deliver communications to and, in its sole discretion, receive communications from, each of the Authorized Representatives until the Bank receives written notice that any such email address has been cancelled or changed and the Bank has a reasonable period of time to act on that notice. If the Bank receives conflicting instructions from the Authorized Representatives, the Bank will take no action and may terminate borrowing privileges on the Credit Facility until the Bank receives written instructions from the Borrower resolving the conflict.

**2.2    Disbursements and Payments.**

(a)    Each payment by an Obligor will be made in U.S. Dollars and immediately available funds, without setoff or counterclaim. Payments will be made by debit to a deposit account, if direct debit is provided for in the applicable Note or is otherwise authorized by the Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on the Borrower's statement, or by such other method as may be permitted by the Bank.

(b)    For any payment under the Credit Documents made by debit to a deposit account, the Borrower will maintain sufficient immediately available funds in the deposit account to cover each debit. If there are insufficient immediately available funds in the deposit account on the date the Bank enters any such debit authorized by the Credit Documents, the Bank may reverse the debit.

(c)    Each disbursement by the Bank and each payment by an Obligor will be evidenced by records kept by the Bank.

(d)     Prior to the date each payment of principal and interest and any fees from the Borrower under any Note or other Credit Document becomes due (each, a "Due Date"), the Bank may send to the Borrower statement(s) of the amounts that will be due on that Due Date under each Note (each, a "Billed Amount").

### 2.3     Borrower's Instructions.

(a)     The Bank may honor instructions for advances or repayments given by the Borrower (if an individual), or by any one of the Authorized Representatives, or any other individual designated by any one of the Authorized Representatives (a "Delegated Individual"). The Bank may honor any such instructions made by any one of the Authorized Representatives or Delegated Individuals, whether such instructions are given in writing or by telephone, telefax or Internet and intranet websites designated by the Bank with respect to separate products or services offered by the Bank. The Bank's obligation to act on such instructions is subject to the terms, conditions and procedures stated elsewhere in the Credit Documents.

(b)     In following instructions from an Authorized Representative or Delegated Individual for advances or repayments, the Bank shall have the right, but not the obligation, to require that any advances be deposited in and repayments be withdrawn from a deposit account owned by the Borrower and held at the Bank. The Bank may require additional written authorization from the Borrower before processing advances or repayments except as provided in this subparagraph.

(c)     The Borrower will indemnify and hold the Bank harmless from all liability, loss, and costs in connection with any act resulting from instructions the Bank reasonably believes are made by any individual authorized by the Borrower to give such instructions, whether such instructions are given in writing or by telephone, telefax or electronic communications (including e-mail, Internet and intranet websites). This paragraph will survive termination of the Credit Documents, and will benefit the Bank and its officers, employees, and agents.

### 2.4     Direct Debit.

(a)     If, in the Transaction Summary for any Note, the question "Direct Debit" is marked "Yes," then the Borrower (and the owner of the deposit account, if different) agree that on the applicable Due Date the Bank will debit the Billed Amount for such Note from such deposit account as indicated in such Transaction Summary, or as otherwise designated by the Borrower to the Bank from time to time. If the deposit account is not with the Bank, then a voided copy of a check on the deposit account has been, or will be, provided to the Bank. Any debits made by ACH shall be subject to the operating rules of the National Automated Clearing House Association, as in effect from time to time.

(b)     The Borrower or the owner of the deposit account may terminate this direct debit arrangement with respect to any Note at any time by sending written notice to the Bank. If this direct debit arrangement is terminated, then the principal amount outstanding under the applicable Note will at the option of the Bank bear interest at a rate per annum which is one (1.0) percentage point higher than the rate of interest otherwise provided under such Note and the amount of each payment will be increased accordingly.

### 2.5     Banking Days.    Unless otherwise provided in the Credit Documents, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. All payments and disbursements which would be due on a day which is not a banking day will be due on the next banking day. All payments received on a day which is not a banking day will be applied to the credit on the next banking day.

### 2.6     Taxes.    All payments of Obligations by Obligors shall be made without deduction or withholding for any taxes, except as required by applicable law. For the avoidance of doubt, if any payments to the Bank under any Credit Document are made from outside the United States, no Obligor will deduct any foreign taxes from any payments it makes to the Bank. If any such taxes are imposed on any payments made by an Obligor (including payments under this paragraph), such Obligor will pay the taxes and will also pay to the Bank, at the time interest is paid, any additional amount which the Bank specifies as necessary to preserve the after-tax yield the Bank would have received if such taxes had not been imposed. Each Obligor will confirm that it has paid the taxes by giving the Bank official tax receipts (or notarized copies) within thirty (30) days after the due date.

### 3.     REPRESENTATIONS AND WARRANTIES

The Borrower, with respect to itself and each other Obligor, makes the following representations and warranties as of the date of this Master Credit Agreement, on the date of each request for an extension of credit and on the date of each extension of credit:

**3.1    Formation.** If such Obligor is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

**3.2    Authorization.** Each Credit Document, and any instrument or agreement required under the Credit Documents to which such Obligor is a party, are within such Obligor's powers, have been duly authorized, and do not conflict with any of its organizational papers. The individual signing each Credit Document to which such Obligor is a party on behalf of such Obligor is authorized to sign such documents on behalf of such Obligor.

**3.3    Beneficial Ownership Certification.** The information included in the Beneficial Ownership Certification most recently provided to the Bank, if applicable, is true and correct in all respects.

**3.4    Good Standing.** In each state in which such Obligor does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name (e.g. trade name or d/b/a) statutes.

**3.5    Financial Information.** All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of such Obligor's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of such Obligor. If any Obligor is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

**3.6    Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against any Obligor which, if lost, would impair such Obligor's financial condition or ability to pay the Obligations, except as has been disclosed in writing to the Bank prior to the date of this Master Credit Agreement or otherwise disclosed in writing to, and approved in writing by, the Bank.

**3.7    Other Obligations.** No Obligor is in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as has been disclosed in writing to the Bank prior to the date of this Master Credit Agreement or otherwise disclosed in writing to, and approved in writing by, the Bank.

**3.8    Tax Matters.** No Obligor has any knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Bank prior to the date of this Master Credit Agreement or otherwise disclosed in writing to, and approved in writing by, the Bank.

**3.9    PACE Financing.** The Borrower has not entered into any Property Assessed Clean Energy ("PACE") or similar energy efficiency or renewable energy financing and has no knowledge of any pending assessments or adjustments in connection therewith.

**3.10    No Event of Default.** There is no Default or Event of Default.

**3.11    Collateral.** All Collateral securing the Obligations is owned by the grantor of the security interest in such Collateral free of any title defects or any liens or interests of others, except those which have been disclosed in writing to, and approved in writing by, the Bank or are permitted by the section of the Covenant Agreement entitled Other Liens.

**3.12    Location of Obligor.** If such Obligor is an individual (sole proprietorship), such Obligor's principal residence is located, as applicable, at the address specified in the Location of Borrower section in each applicable Transaction Summary or the Location of Guarantor section on the signature page to each applicable Guaranty and Collateral Agreement, which is the same address set forth on such Obligor's driver's license or special identification card issued by the state of such Obligor's principal residence. If such Obligor is not an individual, then the place of business of such Obligor (or, if such Obligor has more than one place of business, its chief executive office) is located, as applicable, at the address specified in the Location of Borrower section in each applicable Transaction Summary or the Location of Guarantor section on the signature page to each applicable Guaranty and Collateral Agreement.

### 3.13   ERISA Plans.

(a)   Each Plan (other than a multiemployer plan) is in compliance in all material respects with ERISA, the Code and other federal or state law, including all applicable minimum funding standards and there have been no prohibited transactions with respect to any Plan (other than a multiemployer plan), which has resulted or could reasonably be expected to result in a material adverse effect.

(b)   With respect to any Plan subject to Title IV of ERISA:

(i)   No reportable event has occurred under Section 4043(c) of ERISA which requires notice.

(ii)   No action by the Borrower or any ERISA Affiliate to terminate or withdraw from any Plan has been taken and no notice of intent to terminate a Plan has been filed under Section 4041 or 4042 of ERISA.

### 3.14   No Plan Assets.
As of the date hereof and throughout the term of this Agreement, no Borrower or Guarantor, if any, is (1) an employee benefit plan subject to Title I of ERISA, (2) a plan or account subject to Section 4975 of the Code, (3) an entity deemed to hold "plan assets" of any such plans or accounts for purposes of ERISA or the Code, or (4) a "governmental plan" within the meaning of ERISA.

### 3.15   Environmental.
No Obligor is in violation of any health, safety, or environmental law or regulation regarding hazardous substances or the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "Hazardous substances" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

### 3.16   Sanctions.
No Obligor, nor any of their respective affiliated entities, including in the case of any Obligor that is not a natural person, subsidiaries nor, to the knowledge of any Obligor, any owner, trustee, director, officer, employee, agent, affiliate or representative of any Obligor is an individual or entity currently the subject of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor is any Obligor located, organized or resident in a country or territory that is the subject of Sanctions.

## 4.   AGREEMENTS OF THE BORROWER

The Borrower agrees that each Borrower and each Guarantor, to the extent applicable, so long as any credit is available under the Credit Documents and until all Obligations are repaid in full:

### 4.1   Use of Proceeds.
The Borrower will use the proceeds of any Credit Facility only for business purposes. For the avoidance of doubt, the proceeds must not be used to: repay commercial paper debt, backstop a commercial paper program, support a variable rate demand obligation, or backstop an industrial revenue bond. The Borrower may not use proceeds of any Credit Facility to make payments due under the Credit Documents or to repay any other obligation of the Borrower to the Bank or any affiliate of the Bank except for the payment of any fees owing under the Credit Documents or the refinancing of any loans with the Bank. The Borrower may not use proceeds of any Credit Facility to engage in any transaction that is illegal (including any transaction that violates the Controlled Substance Act). The Borrower will not, directly or indirectly, use the proceeds of any Credit Facility, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person, to fund any activities of or business with any person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any person (including the Bank) of Sanctions. The Obligors shall indemnify the Bank for any liability if any Obligor engages in an illegal transaction or violates Sanctions in any way.

### 4.2   Maintenance of Assets and Collateral.

(a)      Not to sell, assign, lease, transfer or otherwise dispose of (i) any part of the Borrower's business or the Borrower's assets except inventory in the ordinary course of the Borrower's business or (ii) any Collateral owned by any Guarantor, except as agreed in writing by the Bank.

(b)      Not to sell, assign, lease, transfer or otherwise dispose of any of the Borrower's assets for less than fair market value, or enter into any agreement to do so.

(c)      Not to enter into any sale and leaseback agreement covering any of the Borrower's assets.

(d)      To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e)      To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

(f)      To execute and deliver such documents as the Bank deems necessary to create, perfect and continue the security interests contemplated by the Credit Documents, if any.

(g)      To permit the Bank to inspect any Collateral at any time.

(h)      If requested by the Bank, to receive and use reasonable diligence to collect Collateral (if any) consisting of Accounts and other rights to payment and Proceeds, in trust and as the property of the Bank, and to immediately endorse as appropriate and deliver such Collateral to the Bank daily in the exact form in which they are received together with a collection report in form satisfactory to the Bank.

(i)      To give only normal allowances and credits and to advise the Bank immediately in writing if they affect any rights to payment or Proceeds in any material respect.

(j)      If requested by the Bank, to assign in writing and deliver to the Bank all Accounts, contracts, leases and other Chattel Paper, Instruments, and Documents constituting Collateral and if requested by the Bank, to prepare and deliver a schedule of all Collateral subject to the Credit Documents.

(k)      To keep, in accordance with generally accepted accounting principles, complete and accurate records regarding all Collateral (if any).

(l)      Not to attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof without first obtaining the written consent in form and substance acceptable to the Bank of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by the Bank of the Collateral from such real property or fixture.

(m)      Not to commingle any Collateral, or collections with respect to any Collateral, with any other property.

**4.3      Compliance with Laws.** To comply with the laws (including any fictitious or trade name statute and the Controlled Substances Act), regulations, and orders of any government body with authority over the Borrower's or any Guarantor's business. The Bank shall have no obligation to make any advance to the Borrower except in compliance with all applicable laws and regulations and the Borrower shall fully cooperate with the Bank in complying with all such applicable laws and regulations.

**4.4      Books and Records.** To maintain adequate books and records such that the Borrower and each Guarantor is able to produce, among other things, interim financial statements in form acceptable to the Bank within 30 days of request.

**4.5      Audits.** To allow the Bank and its agents to inspect the Borrower's properties and examine, audit, and make copies of books and records at any reasonable time. If any of the Borrower's properties, books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform inspections or audits and to respond to the Bank's requests for information concerning such properties, books and records.

**4.6      Perfection of Liens.** To the extent any Collateral is pledged under the Credit Documents, to help the Bank perfect and protect its security interests and liens, to obtain such agreements from third parties as the Bank deems necessary in connection with the preservation, perfection or enforcement of any of its rights

Ref #: 1002932226: - Lindy Inc.
Master Credit Agreement

under the Credit Documents and to reimburse the Bank for related costs it incurs to protect its security interests and liens. Each Obligor agrees that the Bank is authorized to file financing statements in the name of such Obligor identifying the Collateral to perfect the Bank's security interest in the Collateral and that the Bank is authorized to notify any account debtors, any buyers of the Collateral, or any other persons of the Bank's interest in the Collateral.

    **4.7**    **Additional Agreements.** Not to, without the Bank's written consent:

    (a)    Enter into any consolidation, merger, or other combination, or, with respect to the Borrower, become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

    (b)    With respect to the Borrower, acquire or purchase a business or its assets.

    (c)    With respect to the Borrower, engage in any business activities substantially different from the Borrower's present business.

    (d)    Liquidate or dissolve the Borrower's or any Guarantor's business.

    (e)    Change its name (including, for an individual (sole proprietorship), its name on any driver's license or special identification card issued by any state), and as applicable, its chief executive office, its principal residence or the jurisdiction in which it is organized and/or registered or its business structure.

    (f)    Change the places where such Obligor keeps any Collateral or such Obligor's records concerning any Collateral.

    (g)    Remove any Collateral from such Obligor's premises except in the ordinary course of such Obligor's business.

    (h)    Apply for or accept any PACE or similar energy efficiency or renewable energy financing.

    **4.8**    **Notices to Bank.** To promptly notify the Bank in writing of:

    (a)    Any Default or Event of Default under any Credit Document.

    (b)    Any change in the Borrower's or any Guarantor's name, legal structure, principal residence (for an individual (sole proprietorship)), or name on any driver's license or special identification card issued by any state, state of registration (for a registered entity), place of business, or chief executive office if the Borrower or any Guarantor has more than one place of business.

    (c)    Any notice, order, or other communication received by the Borrower or any Guarantor regarding (i) any enforcement action by any governmental authority relating to health, safety, the environment, any hazardous substances or any illegal activity, including violations of the Controlled Substances Act, with regard to the Borrower's or any Guarantor's property, activities, or operations, or (ii) any claim against the Borrower or any Guarantor regarding hazardous substances or violations of the Controlled Substances Act.

    **4.9**    **Insurance**.

    (a)    <u>General Business Insurance</u>. With respect to the Borrower, to maintain insurance as is usual for the business it is in.

    (b)    <u>Insurance Covering Collateral</u>. To maintain all risk property damage insurance policies (including without limitation flood coverage, windstorm coverage, and hurricane coverage as applicable) covering the tangible property comprising any Collateral and to cause each such policy to be endorsed to name the Bank as lender loss payee and additional insured in a form acceptable to the Bank. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to the Bank, shall require losses to be paid on a replacement cost basis, and shall be issued by insurance companies acceptable to the Bank.

    (c)    <u>Evidence of Insurance</u>. Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, other evidence of insurance listing all insurance in force.

**4.10    Bank as Principal Depository.**  With respect to the Borrower, to maintain the Bank or one of its affiliates as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts, unless otherwise agreed in writing by the Bank.

**4.11    Loans.**  With respect to the Borrower, not to make any loans, advances or other extensions of credit to any individual or entity except for extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities and other loans, advances or other extensions of credit disclosed in writing to, and approved in writing by, the Bank.

**4.12    Change of Management.**  Not to make any substantial change in the present management of any Obligor unless otherwise agreed in writing by the Bank.

**4.13    Change of Ownership.**  If the Borrower or any Guarantor is anything other than a natural person, not to, without the Bank's written consent, cause, permit, or suffer any change in capital ownership such that there is a material change, as determined by the Bank in its sole discretion, in the direct or indirect capital ownership of the Borrower or such Guarantor.

**4.14    Cooperation.**  To take any action reasonably requested by the Bank to carry out the intent of the Credit Documents.

**4.15    Patriot Act; Beneficial Ownership Regulation.**  Promptly following any request therefor, to provide information and documentation reasonably requested by the Bank for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation.

## 5.    DEFAULT AND REMEDIES

**5.1    Events of Default.**  Each of the following shall be an "Event of Default" if it occurs for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise:

(a)    **Failure to Pay.**  Any Obligor fails to make a payment of principal under any Note when due or any Obligor fails to make a payment of any interest, fees or other Obligations when due and such failure continues for three (3) days.

(b)    **Other Bank Agreements.**  Any default occurs under any other agreement any Obligor has with the Bank or any affiliate of the Bank

(c)    **Cross-default.**  Any default occurs under any agreement in connection with any credit any Obligor has obtained from anyone else or which any Obligor or any of an Obligor's related entities or affiliates has guaranteed.

(d)    **False Information.**  The Borrower or any Obligor has given the Bank false or misleading information or representations.

(e)    **Inaccuracy of Representations or Warranties**.  Any representation or warranty of any Obligor contained in any Credit Document or in any other instrument, document, certificate or statement executed and delivered to Bank in connection with the Credit Documents proves to have been incorrect or inaccurate in any material respect.

(f)    **Failure to Furnish Information.**  Any Obligor fails to deliver financial statements or tax returns as required under the Credit Documents, or any Obligor fails to deliver any other information that the Bank requests from time to time as permitted under the Credit Documents within 30 days of the request.

(g)    **Bankruptcy.**  Any Obligor, or any general partner of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties, or any Obligor, or any general partner of any Obligor makes a general assignment for the benefit of creditors.

(h)    **Receivers.**  A receiver or similar official is appointed for any portion of any Obligor's business, or the business is terminated, or, if any Obligor is anything other than a natural person, such Obligor is liquidated or dissolved.

(i)     **Revocation or Termination.** If any Obligor is comprised of the trustee(s) of a trust, the trust is revoked or otherwise terminated or all or a substantial part of the Obligor's assets are distributed or otherwise disposed of.

(j)     **Lien Priority.** If a lien is granted to the Bank pursuant to any Guaranty and Collateral Agreement, the Bank fails to have an enforceable first priority lien (except for any prior liens to which the Bank has consented in writing) on or security interest in the Collateral or in any other property given as security for the Obligations (as defined in such Guaranty and Collateral Agreement).

(k)     **Judgments.** Any material judgments or arbitration awards are entered against any Obligor. Materiality will be determined in the Bank's sole discretion.

(l)     **Forfeiture.** (1) An Obligor or any of its officers is criminally indicted or convicted for (x) a felony committed in the conduct of the Obligors' business, or (x) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act) that could lead to forfeiture of any property of any Obligor or any part thereof, or (2) a judicial or nonjudicial forfeiture or seizure proceeding is commenced by a government authority and remains pending with respect to any property of any Obligor or any part thereof, on the grounds that the property or any part thereof had been used to commit or facilitate the commission of a criminal offense by any person, including any tenant, pursuant to any law, including under the Controlled Substances Act or the Civil Asset Forfeiture Reform Act, regardless of whether or not the property shall become subject to forfeiture or seizure in connection therewith.

(m)     **Uninsured Loss.** The occurrence of any material, uninsured casualty loss with respect to any assets of the Borrower.

(n)     **Death.** If any Obligor is a natural person, such Obligor dies or becomes legally incompetent; if any Obligor is a trust, a trustor dies or becomes legally incompetent; if any Obligor is a partnership, any general partner dies or becomes legally incompetent.

(o)     **Material Adverse Change.** A material adverse change occurs, or is reasonably likely to occur, in any Obligor's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the Obligations.

(p)     **Government Action.** Any government authority takes action that the Bank believes materially adversely affects any Obligor's financial condition or ability to repay.

(q)     **ERISA.** A reportable event occurs under Section 4043(c) of ERISA, or any Plan termination (or commencement of proceedings to terminate a Plan) or the full or partial withdrawal from a Plan under Section 4041 or 4042 of ERISA occurs; provided such event or events could reasonably be expected, in the judgment of the Bank, to have a material adverse effect.

(r)     **Default Under Related Documents.** Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with the Credit Documents or any such document is no longer in effect, or any Guarantor purports to revoke or disavow the guaranty.

(s)     **Other Breach Under Agreement.** (i) A default occurs under any term or condition of the Covenant Agreement (including any failure or anticipated failure by any Obligor to comply with any financial covenants set forth in the Covenant Agreement, whether such failure is evidenced by financial statements delivered to the Bank or is otherwise known to an Obligor or the Bank) or Sections 4.1, 4.2, 4.5, 4.7, 4.8, 4.11, 4.12 and/or 4.13 of this Master Credit Agreement or (ii) a default occurs under any other term or condition of any Credit Document not specifically referred to in this Article and such default continues for thirty (30) days.

**5.2     Remedies.** Without limiting any of the Bank's rights and remedies in the Credit Documents, if any of the foregoing Events of Default occurs, the Bank may do one or more of the following without prior notice: declare the Borrower in default, stop making any additional credit available to the Borrower, or require the Borrower to repay its entire debt immediately. If a Default has occurred and is continuing, the Bank has no obligation to make advances or extend additional credit under any Note. In addition, if any Event of Default occurs, the Bank shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with the Credit Documents, as well as all rights and remedies available at

law or in equity. Without limiting any other rights the Bank may have, upon the occurrence of an Event of Default, the Bank may enforce the security interest in any Collateral pursuant to the Uniform Commercial Code and any other applicable law, notify and direct all account debtors to forward all payments and Proceeds of the Collateral to a post office box under the Bank's exclusive control, give notice to others of the Bank's rights in the Collateral, enter upon the property where any Collateral, including any books and records are located and take possession of such Collateral, use or transfer any of the Obligors' rights and interests in any General Intangibles constituting Collateral now owned or hereafter acquired by an Obligor, have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral, require the Obligors to obtain the Bank's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory, require any Obligor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to the Bank in kind, grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without notice to the Obligors, receive, open and read mail addressed to the Obligors, resort to the Collateral under the Credit Documents, and any other collateral related to the Obligations, in any order, release persons liable on the Collateral, give receipts and acquittances and compromise disputes, and release or substitute security. The Bank may take such measures as the Bank may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and each Obligor irrevocably constitutes and appoints the Bank as such Obligor's attorney-in-fact to perform all acts and execute all documents.

If an Event of Default occurs under Section 5.1(g) or (h) above with respect to any Obligor, then the entire debt outstanding under the Credit Documents will automatically be due immediately.

Notwithstanding anything herein to the contrary, (i) the Proceeds of any Collateral shall only be applied to the Obligations secured by such Collateral pursuant to the applicable Guaranty and Collateral Agreement(s) and (ii) nothing in this Master Credit Agreement shall cause the Collateral under any Guaranty and Collateral Agreement (if any) to secure any Obligations not constituting "Obligations" as defined in such Guaranty and Collateral Agreement.

## 6.   ENFORCING THIS AGREEMENT; MISCELLANEOUS

**6.1      GAAP.** Except as otherwise stated in the Credit Documents, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied or another basis acceptable to the Bank.

**6.2      Bank Rights**. Each Obligor appoints the Bank its attorney in fact to perform any of the following rights, which are coupled with an interest, are irrevocable until termination of the Credit Documents and may be exercised from time to time by the Bank's officers and employees, or any of them:

(a)        to perform any obligation of such Obligor under each Credit Document in such Obligor's name or otherwise;

(b)        to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like documents to perfect, preserve or release the Bank's interest in any Collateral;

(c)        to take cash, instruments for the payment of money and other property to which the Bank is entitled;

(d)        to verify facts concerning any Collateral by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name;

(e)        to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to any Collateral;

(f)        to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by the Bank, at the Bank's sole option, toward repayment of the Obligations or, where appropriate, replacement of any Collateral;

(g)     to enter onto such Obligor's premises to inspect any Collateral;

(h)     to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which proceeds of any Credit Facility may have been deposited, and to apply funds so withdrawn to payment of the Obligations (as defined in the Note governing such Credit Facility);

(i)     to preserve or release the interest evidenced by chattel paper to which the Bank is entitled and to endorse and deliver any evidence of title; and

(j)     to do all acts and things and execute all documents in the name of the Borrower or otherwise, deemed by the Bank as necessary, proper and convenient in connection with the preservation, perfection or enforcement of the Bank's rights;

provided that the Bank will not exercise any rights under clauses (a), (c), (d), (e), (f) or (h) unless an Event of Default has occurred and is continuing.

**6.3     Change of Terms**. The Bank and the Borrower may, from time to time, enter into mutually agreed amendments to any Credit Document. Such a mutually agreed amendment may be effected by a writing signed by the Bank, the Borrower and any other Obligor party thereto, or by an electronic record that has been electronically signed by the relevant parties thereto and has been rendered tamper-evident as part of the signing process; provided, however, the exchange of email or other electronic communications discussing such an amendment to any Credit Document, even if such communications are signed, does not constitute a signed electronic record agreeing to such an amendment.

**6.4     Successors and Assigns.** Each Credit Document is binding on each Obligor's and the Bank's successors and assignees. Each Obligor agrees that it may not assign any Credit Document without the Bank's prior written consent. The Bank may sell participations in or assign any Credit Facility and the related Credit Documents, and may exchange information about the Obligors (including, without limitation, any information regarding any hazardous substances) with actual or potential participants or assignees.

**6.5     Severability; Waivers.** If any part of any Credit Document is not enforceable, the rest of the Credit Documents may be enforced. The Bank retains all rights, even if it makes a loan after Default. If the Bank waives a Default, it may enforce a later Default. Any consent or waiver under any Credit Document must be in writing.

**6.6     Fees and Expenses**. The Borrower shall reimburse the Bank for any reasonable costs and expenses, including attorneys' fees incurred by the Bank in connection with the Credit Documents, including (i) the negotiation and preparation of the Credit Documents and any related agreements, the Bank's continued administration of the Credit Documents and such related agreements, and the preparation of any amendments and waivers related to the Credit Documents or such related agreements, (ii) the enforcement or preservation of any rights or remedies under the Credit Documents and any other documents executed in connection with the Credit Documents, and in connection with any amendment, waiver, "workout" or restructuring under the Credit Documents, (iii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any Collateral and books and records of the Borrower or any Obligor, and (iv) taxes, costs or expenses incurred in connection with providing any Credit Facility or otherwise required to be paid by the Borrower or any Obligor that are paid, incurred or advanced by the Bank.

**6.7     Individual Liability.** If the Borrower or any Guarantor is a natural person, the Bank may proceed against the Borrower's or such Guarantor's business and non-business property in enforcing the Credit Documents and other agreements relating to the Credit Facility. If the Borrower or any Guarantor is a partnership, the Bank may proceed against the business and non-business property of each general partner of the Borrower or such Guarantor in enforcing the Credit Documents and other agreements relating to the Credit Facility

**6.8     Set-Off**.

(a)     In addition to any rights and remedies of the Bank provided by law, upon the occurrence and during the continuance of any Event of Default, the Bank is authorized, at any time, to set off and apply any and all Deposits of the Borrower or any Obligor held by the Bank or its affiliates against any and all Obligations owing to the Bank. The set-off may be made irrespective of whether or not the Bank shall have made demand

under any Credit Document or any guaranty, and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable Deposits and without regard for the availability or adequacy of any Collateral. Any Deposits may be converted, sold or otherwise liquidated at prevailing market prices in order to effect such set-off.

(b)      The set-off may be made without prior notice to the Borrower or any other person, any such notice being waived by the Borrower (on its own behalf and on behalf of each Obligor) to the fullest extent permitted by law. The Bank agrees promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application.

(c)      For the purposes of this Section 6.8, "Deposits" means any deposits (general or special, time or demand, provisional or final, individual or joint) as well as any money, instruments, securities, credits, claims, demands, income or other property, rights or interests owned by the Borrower or any Obligor which come into the possession or custody or under the control of the Bank or its affiliates. **TO THE EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL THAT SECURES THE OBLIGATIONS PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS, OR OTHER PROPERTY OF THE BORROWER, ARE HEREBY VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVED.**

**6.9      One Agreement.** The Credit Documents and any related security or other agreements required by the Credit Documents, collectively:

(a)      Represent the sum of the understandings and agreements between the Bank, the Borrower and each Guarantor concerning each Credit Facility;

(b)      Replace any prior oral or written agreements between the Bank, the Borrower and each Guarantor concerning each Credit Facility; and

(c)      Are intended by the Bank, the Borrower and each Guarantor as the final, complete and exclusive statement of the terms agreed to by them.

In the event of any conflict between this Master Credit Agreement on one hand, and any other Credit Document, on the other hand, such other Credit Document will prevail. In the event of any conflict between any Credit Document and any other agreements or documents signed in connection with the Credit Documents, the applicable Credit Document will prevail.

**6.10      Indemnification.** The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) the Credit Documents or any document required under the Credit Documents or signed in connection with the Credit Documents, (b) any Credit Facility extended or committed by the Bank to the Borrower under the Credit Documents, (c) any litigation or proceeding related to or arising out of the Credit Documents, any such document, or any such Credit Facility, and (d) any loss or liability the Bank incurs in connection with or as a result of the Credit Documents, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity includes but is not limited to attorneys' fees. This indemnity extends to the Bank, its parent, subsidiaries, affiliates and all of their directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of the Obligations to the Bank. All sums due to the Bank hereunder shall be Obligations of the Obligors, due and payable immediately without demand.

**6.11      Notices.** Notices required under the Credit Documents and other information concerning the Credit Documents sent by any Obligor to the Bank shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier. Notices to the Bank shall be sent to the following address, or such other address for notices that the Bank may specify in a written notice to the Borrower:

> Bank of America, N.A.
> NC1-001-05-13
> One Independence Center
> 101 North Tryon Street
> Charlotte, NC 28255-0001

Notices required under the Credit Documents and other information concerning the Credit Documents, and billing statements, sent by the Bank to any Obligor, shall be personally delivered or sent by first class mail, postage prepaid or by overnight courier to such Obligor's address as recorded in the Bank's records.

Such notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise, when delivered. Each Obligor shall promptly notify the Bank of any change in such Obligor's name, address, employment, or ownership. Any notices and/or disclosures sent by the Bank under the Credit Documents to any Obligor shall constitute notice to all Obligors.

In addition, communications from the Bank to any Obligor may also be sent electronically (i) by transmitting the communication to the electronic address provided by such Obligor or to such other electronic address as such Obligor may specify from time to time in writing, or (ii) by any other means agreed between the Bank and the Obligors.  Communications sent electronically to any Obligor will be effective when the communication, or a notice advising of its posting to a website, is sent to such Obligor's electronic address.

**6.12 Headings.** Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of any Credit Document.

**6.13 Borrower/Obligor Information; Reporting to Credit Bureaus.** Each of the Borrower and each Obligor executing any Credit Document authorizes the Bank at any time to verify or check any information given by the Borrower and/or any Obligor to the Bank, check the Borrower's or Obligor's credit references, verify employment, and obtain credit reports. Each of the Borrower and each Obligor agrees that the Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Borrower and/or all Obligors as is consistent with the Bank's policies and practices from time to time in effect.

**6.14 Collection.** Each Obligor agrees that if any payment is not made when due, such Obligor will accept calls from the Bank or the Bank's agent regarding collection of the outstanding balance. The calls could be automatically dialed and a recorded message may be played. Each Obligor agrees that such calls will not be "unsolicited" calls for purposes of local, state or federal law.

**6.15 Telephone Monitoring.** The Bank may monitor and record all telephone calls between an Obligor and the Bank.

**6.16 Counterparts.** Each Credit Document may be executed in multiple counterparts, including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically, and each such executed counterpart (and any copy of an executed counterpart that is an electronic record) shall be deemed an original of such Credit Document.

**6.17 Consent to Electronic Records and Signatures.** Electronic records and signatures may be used in connection with the execution of any Credit Document and all other disclosures and documents related to the transaction(s) described in the Credit Documents. If executed electronically by one or more parties to a Credit Document, such Credit Document or one or more of its signed counterparts is an electronic record and is just as legally valid and enforceable as if such parties had signed it on paper using a handwritten signature.

**6.18 Conversion to Paper Original.**

(a) At the Bank's discretion the authoritative electronic copy of each Credit Document ("Authoritative Copy") may be converted to paper and marked as the original by the Bank (the "Paper Original").

(b) Unless and until the Bank creates a Paper Original, the Authoritative Copy of each Credit Document:

(i) shall at all times reside in a document management system designated by the Bank for the storage of authoritative copies of electronic records, and

(ii) is held in the ordinary course of business.

(c) In the event the Authoritative Copy is converted to a Paper Original, the parties hereto acknowledge and agree that:

(i)      the electronic signing of each Credit Document also constitutes issuance and delivery of the Paper Original,

(ii)     the electronic signature(s) associated with each Credit Document, when affixed to the Paper Original, constitutes legally valid and binding signatures on the Paper Original, and

(iii)    the respective obligations of each Obligor will be evidenced by the Paper Original after such conversion.

**6.19     Limitation of Interest and Other Charges**.  If, at any time, the rate of interest, together with all amounts that constitute interest and are reserved, charged or taken by the Bank as compensation for fees, services or expenses incidental to the making, negotiating or collection of the Credit Facility, shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Bank to the applicable Obligor under applicable law, then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal.  As used in the Credit Documents, the term "applicable law" shall mean the law in effect as of the date hereof; provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then each Credit Document shall be governed by such new law as of its effective date.

**6.20     Customary Advertising Material.**  The Borrower consents to the publication by the Bank of customary advertising material relating to the transactions contemplated by this Master Credit Agreement and the other Credit Documents using the name, product photographs, logo or trademark of the Borrower.

**6.21     Governing Law.**  Except to the extent that any law of the United States may apply, each Credit Document shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary.  Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.  Notwithstanding the foregoing, if the laws of the Governing Law State are found not to apply, the charging and calculating of interest on the obligations under the Credit Documents shall be governed by, construed and enforced in accordance with the laws of the State of North Carolina and applicable federal law.

**6.22     Venue and Jurisdiction.**  Each Obligor agrees that any action or suit against the Bank arising out of or relating to any Credit Document shall be filed in federal court or state court located in either (i) the city of New York, borough of Manhattan or (ii) the state in which the Borrower is located (the "Selected Venues").  Each Obligor agrees that the Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against the Borrower or any Guarantor in a venue outside of the Selected Venues.  If the Bank does commence an action or suit arising out of or relating to any Credit Document, each Obligor agrees that the case may be filed in the Selected Venues.  The Bank reserves the right to commence an action or suit in any other jurisdiction where any Obligor, or any Collateral has any presence or is located.  Each Obligor consents to personal jurisdiction and venue in such forum selected by the Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum.  The provisions of this section are material inducements to the Bank's acceptance of the Credit Documents.

**6.23     Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MASTER CREDIT AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MASTER CREDIT AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

**6.24    Waiver of Class Actions**.  The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to the Credit Documents, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties").  Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action.  Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action.  **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

This Master Credit Agreement is executed as of the date first written above.

Bank:

**Bank of America, N.A.**

By: _____
Authorized Signer, Officer
Borrower: *Amy C. Walsh, Sr. Vice President*

**Lindy Inc.**

By: *Travis Maderia*
Travis L. Maderia, President

By: *Justin Maderia*
Justin M. Maderia, Vice President

*Federal law requires Bank of America, N.A. (the "Bank") to provide the following notice.  The notice is not part of the foregoing agreement or instrument and may not be altered.  Please read the notice carefully.*

**(1)    USA PATRIOT ACT NOTICE**

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan.  The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information.  The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.





## GUARANTY AND COLLATERAL AGREEMENT

| TRANSACTION SUMMARY | |
|---|---|
| **Date of Related Note:** | December 21, 2018 |
| **Credit Limit of Related Note:** | $750,000.00 |
| **Loan Account Number:** | 90665 |
| **Name(s) of Borrower:** | Lindy Inc. |
| **Name(s) of Guarantor:** | Travis L. Maderia and Justin M. Maderia |

This Guaranty and Collateral Agreement, dated and effective as of December 21, 2018, is entered into among the Borrower, each Guarantor and Bank of America, N.A. (the "Bank") to govern the Continuing and Unconditional Guaranty and the Security Agreement set forth herein, in connection with the Note, dated as of December 21, 2018 (as amended from time to time, and as set forth in more detail in the Transaction Summary above, the "Related Note"), between the Borrower and the Bank, the Master Credit Agreement, dated as of December 21, 2018 (as amended from time to time, the "Master Credit Agreement"), between the Borrower and the Bank, and the Covenant Agreement executed in connection therewith.

1.    **DEFINITIONS.**

1.1    **General.** Unless otherwise defined herein, capitalized terms used in this Guaranty and Collateral Agreement shall have the respective meanings ascribed thereto in Section 1 of the Master Credit Agreement and as otherwise may be provided in other provisions of the Credit Documents. Except as otherwise expressly set forth herein, each reference herein to "herein," "hereunder" or "hereof" shall be deemed a reference to this Guaranty and Collateral Agreement.

1.2    **In this Guaranty and Collateral Agreement:**

"Borrower" means, collectively and individually, each person set forth in the Transaction Summary as the "Borrower".

"Credit Facility" means "Credit Facility" as defined in the Related Note.

"Guarantor" means each person or entity (if any) set forth in the Transaction Summary as the "Guarantor", and "Guarantors" means all such persons and entities collectively.

"Guaranty and Collateral Agreement" means this Guaranty and Collateral Agreement among the Borrower, each Guarantor and the Bank, as amended from time to time.

"Obligations" means "Obligations" as defined in the Related Note.

"Transaction Summary" means the summary of terms set forth on page one of this Guaranty and Collateral Agreement.

2.    **CONTINUING AND UNCONDITIONAL GUARANTY.**

**BY SIGNING BELOW, EACH GUARANTOR: (i) CONSENTS TO, JOINS IN AND AGREES TO BE BOUND BY THIS GUARANTY AND COLLATERAL AGREEMENT, (ii) CONSENTS TO, JOINS IN AND**

AGREES TO BE BOUND BY THE RELATED NOTE, THE MASTER CREDIT AGREEMENT AND THE COVENANT AGREEMENT, INCLUDING ANY AND ALL AMENDMENTS THERETO (ALL WITHOUT NOTICE TO OR CONSENT BY SUCH GUARANTOR); (iii) AGREES TO BE BOUND BY THE TERMS OF THE CONTINUING AND UNCONDITIONAL GUARANTY SET FORTH BELOW (THE "<u>GUARANTY</u>"); (iv) HEREBY MAKES EACH OF THE REPRESENTATIONS AND WARRANTIES AND AGREES TO EACH OF THE COVENANTS IN THIS GUARANTY AND COLLATERAL AGREEMENT, THE RELATED NOTE, THE MASTER CREDIT AGREEMENT AND THE COVENANT AGREEMENT THAT ARE APPLICABLE TO SUCH GUARANTOR OR ALL OBLIGORS, (v) WARRANTS AND COVENANTS TO THE BANK THAT, EXCEPT TO THE EXTENT PREVIOUSLY DISCLOSED TO THE BANK IN WRITING, ALL REPRESENTATIONS AND WARRANTIES PREVIOUSLY MADE BY IT TO THE BANK ARE TRUE, COMPLETE AND ACCURATE AS OF THE DATE OF THIS GUARANTY AND COLLATERAL AGREEMENT; AND (vi) ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED AND HAD THE OPPORTUNITY TO REVIEW COPIES OF EACH OF THE RELATED NOTE, THE MASTER CREDIT AGREEMENT AND THE COVENANT AGREEMENT.

      **2.1**    **Continuing and Unconditional Guaranty**. In consideration of the Bank extending the Credit Facility to the Borrower each person and entity signing below as a Guarantor unconditionally guarantees to the Bank and its successors and assigns, the prompt payment and performance of (a) all Obligations and (b) all obligations under any deposit, treasury management or similar transaction or arrangement of any Borrower with the Bank (collectively, the "<u>Guaranteed Obligations</u>"). EACH GUARANTOR'S LIABILITY HEREUNDER SHALL COMMENCE UPON SUCH GUARANTOR'S EXECUTION OF THIS GUARANTY AND COLLATERAL AGREEMENT AND SHALL BE UNLIMITED IN AMOUNT. This Guaranty shall operate as a continuing, unconditional and absolute guaranty. Each Guarantor waives all requirements of notice, demand, presentment or protest, any right such Guarantor may have to require the Bank first to proceed against the Borrower or any other person or entity, to marshal assets or first to realize on any collateral (including the Collateral) before proceeding against such Guarantor hereunder, or to give notice of the terms, time and place of any public or private sale or other disposition of any Collateral. Further, each Guarantor waives all other defenses that may be available to a surety, including but not limited to those based upon or arising by reason of (i) any disability or other defense of the Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Guaranteed Obligations; (iii) any lack of authority of any person acting or purporting to act on behalf of the Borrower which is an entity, or any defect in the formation of the Borrower; (iv) the application by the Borrower of the proceeds of any Guaranteed Obligations for purposes other than the purposes represented by the Borrower to, or intended or understood by, the Bank or such Guarantor; (v) any act or omission by the Bank which directly or indirectly results in or aids the discharge of the Borrower or any portion of the Guaranteed Obligations by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of the Bank against the Borrower; (vi) any impairment of the value of any interest in any Collateral, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any Collateral, the release of any Collateral without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any Collateral; (vii) any modification of the Guaranteed Obligations, in any form whatsoever, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Guaranteed Obligations, including increase or decrease of the rate of interest and any amendment or modification to any Credit Document; (viii) any requirement that the Bank give any notice of acceptance of this Guaranty; (ix) any defense based on any claim that such Guarantor's obligations exceed or are more burdensome than those of the Borrower; (x) the benefit of any statute of limitations affecting such Guarantor's liability under this Guaranty; or (xi) any election of remedies by the Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Guaranteed Obligations, destroys such Guarantor's rights of subrogation or such Guarantor's rights to proceed against the Borrower for reimbursement. Each Guarantor waives all rights of setoff and exoneration, or subrogation until the Guaranteed Obligations shall have been paid and/or performed in full. Each Guarantor agrees that the Bank may renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Obligations or any part thereof, including increase or decrease of the rate of interest, modify or extend the terms of the Related Note, the Master Credit Agreement, the Covenant Agreement or of any other Guaranteed Obligations, or compromise, settle or release any other obligor under the Guaranteed Obligations, all without notice to or consent by such Guarantor and without affecting such Guarantor's liability hereunder. Additionally, the Bank may receive and hold security for the payment of this Guaranty or any Guaranteed Obligations under this Guaranty and Collateral Agreement and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security. Any obligations of the Borrower to each Guarantor, now or hereafter existing, including but not limited to any obligations to any Guarantor as subrogee of Bank or resulting

from such Guarantor's performance under this Guaranty, are hereby subordinated to the Guaranteed Obligations. Each Guarantor shall not demand, take, or receive from the Borrower, by setoff or in any other manner, payment of any other obligations of the Borrower to such Guarantor until the Guaranteed Obligations have been paid in full and any commitments of the Bank or facilities provided by the Bank with respect to the Guaranteed Obligations have been terminated. If any payments are received by any Guarantor in violation of such waiver or agreement, such payments shall be received by such Guarantor as trustee for the Bank and shall be paid over to the Bank on account of the Guaranteed Obligations, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that each Guarantor may now or hereafter have on any property of the Borrower is hereby subordinated to any security interest, lien, or other encumbrance that the Bank may have on any such property. Each Guarantor grants the Bank the right of setoff for all matured and unmatured Guaranteed Obligations against all deposits and property of such Guarantor now or hereafter in the possession or control of the Bank or its affiliates without regard to the adequacy of Collateral. Each Guarantor grants the Bank a security interest in all such property to secure such Guarantor's obligations. Until the Guaranteed Obligations have been paid in full and any commitments of the Bank to provide further extensions of credit have been terminated, each Guarantor waives any right of subrogation, reimbursement, indemnification and contribution. This Guaranty shall be binding upon each Guarantor's successors and assigns. This Guaranty may be modified only by a written agreement signed by the Bank and each Guarantor. THIS GUARANTY IS SUBJECT TO THE VENUE, JURISDICTION AND DISPUTE RESOLUTION PROVISION CLAUSES SET FORTH IN THE MASTER CREDIT AGREEMENT. EACH GUARANTOR ACKNOWLEDGES THAT ANY CONTROVERSIES OR CLAIMS RELATING TO THIS GUARANTY ARE SUBJECT TO ARBITRATION, JUDICIAL REFERENCE, AND/OR JURY TRIAL WAIVER AS PROVIDED FOR IN THE MASTER CREDIT AGREEMENT. EACH GUARANTOR ACKNOWLEDGES THIS IS A COMMERCIAL TRANSACTION AND NOT A CONSUMER TRANSACTION. Each Guarantor agrees that the Bank may rely on a facsimile of this Guaranty. Each Guarantor acknowledges that it has had the opportunity to consult with counsel of its own choosing with respect to this Guaranty. This Guaranty is intended to take effect as an instrument under seal. If any Guarantor is an entity other than an individual, the individuals signing on behalf of such Guarantor represent and warrant that they are duly authorized to execute this Guaranty on behalf of such Guarantor. Each Guarantor agrees to pay all reasonable attorneys' fees and all other costs and expenses that may be incurred by the Bank in the enforcement of this Guaranty or in connection with the preservation or protection of the Bank's rights under this Guaranty. In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Obligations existing at the date of death, and any renewals or extensions, and (ii) loans or advances made to or for the account of the Borrower after the date of death of the deceased Guarantor pursuant to a commitment made by Bank to the Borrower prior to the date of such death. As to any surviving Guarantor, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to Obligations existing at that time but also as to the Obligations later incurred by Borrower to Bank. This guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of each Guarantor under this Guaranty and Collateral Agreement is exclusive of such Guarantor's liability under any other guaranties signed by such Guarantor.

**2.2    Indemnity**. Each Guarantor, jointly and severally, will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) this Guaranty and Collateral Agreement, the Related Note or any document required hereunder or signed in connection herewith, (b) the Credit Facility extended or committed by the Bank to the Borrower under the Related Note, (c) any litigation or proceeding related to or arising out of this Guaranty and Collateral Agreement, the Related Note, or the Credit Facility, and (d) any loss or liability the Bank incurs in connection with or as a result of entering into the Related Note or this Guaranty and Collateral Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity includes but is not limited to attorneys' fees (including the allocated cost of in-house counsel). This indemnity extends to the Bank, its parent, subsidiaries, affiliates and all of their directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of the Obligations to the Bank. All sums due to the Bank hereunder shall be Obligations of each Guarantor, due and payable immediately without demand.

**2.3    Information Relating to Borrower**. Each Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Credit Documents as such Guarantor deems necessary and appropriate, and shall have sole responsibility to obtain from the Borrower any information required by such Guarantor about any modifications to the Credit Documents. Each Guarantor further

acknowledges that the Bank has no duty, and no Guarantor is relying on the Bank, at any time to disclose to such Guarantor any information relating to the business operations or financial condition of the Borrower. For purposes of this Section 2.3 "Credit Documents" shall mean all agreements, documents, and instruments evidencing any of the Obligations, including but not limited to the Master Credit Agreement, the Covenant Agreement, the Related Note, and all deeds of trust, mortgages, security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Obligations, all as now in effect and as hereafter amended, restated, renewed, or superseded.

## 3.   SECURITY AGREEMENT.

Lindy Inc. hereby assigns and grants to the Bank, and to the Bank's subsidiaries and affiliates, a continuing security interest in the following described property now owned or hereafter acquired by such Obligor (collectively, "Collateral"), which does and shall secure all Obligations:

All (a) Accounts; (b) Chattel Paper; (c) Deposit Accounts; (d) Documents; (e) General Intangibles; (f) Goods, including Equipment; (g) Instruments; (h) Inventory; (i) Investment Property; (j) Letters of Credit and Letter-of-Credit Rights; (k) Money and other assets of such Obligor that now or later come into the possession, custody, or control of the Bank; (l) all negotiable and nonnegotiable documents of title covering any of the foregoing; (m) all Accessions, attachments and other additions to, or substitutions and replacements for, the foregoing, and all tools, parts and equipment used in connection with the foregoing; (n) all books and records relating to the foregoing whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory; and (o) all proceeds (as such term is defined in the Uniform Commercial Code), all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the foregoing, and all income, benefits and property receivable on account of the foregoing, and all Supporting Obligations covering any of the foregoing (all such proceeds, collectively, "Proceeds").

Except as otherwise agreed in writing by the Bank and the Obligors, if the Obligations include, now or hereafter, any Special Flood Zone Loan, then the following shall apply: The Special Flood Zone Loan shall not be secured under this Guaranty and Collateral Agreement by any Collateral which would constitute "contents" located within the Flood Zone Improvements. For the purposes of this subparagraph, (a) "Flood Zone Improvements" means any "improved" real property that is located within a Special Flood Hazard Area; (b) a "Special Flood Zone Loan" means a loan or line of credit which is secured by Flood Zone Improvements; and (c) the terms "improved" real property, "Special Flood Hazard Area," and "contents" shall have the meaning ascribed to them by the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4001 *et seq.*, and implementing regulations, 44 C.F.R. Parts 59 *et seq.*, and/or the Federal Emergency Management Agency ("FEMA").

Each Obligor agrees that the Collateral may be sold as provided for in any Credit Document and to the extent permitted by applicable law, expressly waives any rights of notice of sale, advertisement procedures, or related provisions granted under applicable law, including the UCC. This Guaranty and Collateral Agreement does not supersede any outstanding security agreement that covers liabilities of any Obligor not included in the Related Note.

**4.    GOVERNING LAW.** Except to the extent that any law of the United States may apply, this Guaranty and Collateral Agreement shall be governed and interpreted according to the laws of New York, without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.

## 5.   ELECTRONIC RECORDS AND SIGNATURES.

**5.1    Consent to Electronic Records and Signatures.** Electronic records and signatures may be used in connection with the execution of any Credit Document and all other disclosures and documents related to the transaction(s) described in the Credit Documents. If executed electronically by one or more parties to a Credit Document, such Credit Document or one or more of its signed counterparts is an electronic record and is just as legally valid and enforceable as if such parties had signed it on paper using a handwritten signature.

**5.2    Conversion to Paper Original**.

(a)     At the Bank's discretion the authoritative electronic copy of each Credit Document ("Authoritative Copy") may be converted to paper and marked as the original by the Bank (the "Paper Original").

(b)     Unless and until the Bank creates a Paper Original, the Authoritative Copy of each Credit Document:

        (i)     shall at all times reside in a document management system designated by the Bank for the storage of authoritative copies of electronic records, and

        (ii)    is held in the ordinary course of business.

(c)     In the event the Authoritative Copy is converted to a Paper Original, the parties hereto acknowledge and agree that:

        (i)     the electronic signing of each Credit Document also constitutes issuance and delivery of the Paper Original,

        (ii)    the electronic signature(s) associated with each Credit Document, when affixed to the Paper Original, constitutes legally valid and binding signatures on the Paper Original, and the respective obligations of each Obligor will be evidenced by the Paper Original after such conversion.

This Guaranty and Collateral Agreement is executed as of the date first written above.

Bank:

**Bank of America, N.A.**

By: _____
    Authorized Signer, Officer
    Amy C. Walsh, Sr Vice President

Borrower:

**Lindy Inc.**

By: _____
    Travis L. Maderia, President

By: _____
    Justin M. Maderia, Vice President

Guarantor:


*Travis Maderia*
_____
Travis L. Maderia, Individually

**Location of Guarantor:**
Travis L. Maderia
298 Elm Street
Stonington, CT  06378-2925


*Justin Maderia*
_____
Justin M. Maderia, Individually

**Location of Guarantor:**
Justin M. Maderia
600 NE 27th Street, Unit #1703
Miami, FL  33137

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

***These notices apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank (Obligors):***

**(1)    AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with

Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below.  The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000.  To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor.  This request will apply to information from applications, consumer reports and other outside sources only.  Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2)    AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.

- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.

- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal

Ref #: 1002932228: - Lindy Inc.
Guaranty and Collateral Agreement

information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.

- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.

- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.

- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.

- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:

Bank of America
Banc of America
U.S. Trust
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies.

In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.





September 5, 2019

Travis L. Maderia
Lindy Inc.
298 Elm St
Stonington, Connecticut 06378-2925

Re: Revolving Line of Credit provided by Bank of America, N.A. (the "Bank") to Lindy Inc., loan number ending in 0665 (the "Credit Facility").

Dear Travis L. Maderia,

Effective as of the current expiration date of December 21, 2019, the Bank has renewed the Credit Facility described above. The availability period of the Credit Facility will now end on December 31, 2020, on which date all outstanding principal and accrued interest will be due and payable unless renewed hereafter.

The current commitment amount of the Credit Facility is $750,000.00.

This letter shall not constitute a commitment to extend the Credit Facility beyond the date specified above. All other terms and conditions of the loan documents evidencing the Credit Facility (the "Loan Documents") shall remain in full force and effect during the extended availability period, including, without limitation, the obligation to make periodic interest payments as stated in the Loan Documents.

Notice Regarding LIBOR Rate. Effective as of February 1, 2014, the ICE Benchmark Administration ("ICE") took over administration of the London Interbank Offered Rate ("LIBOR") from the British Bankers Association ("BBA"). As a result, on that date, Bank of America began using the LIBOR established by ICE as reported on Bloomberg.

Except as set forth above, nothing in this letter shall constitute a waiver or amendment of any of the terms and conditions of the Loan Documents.

As permitted by the Loan Documents, there is a renewal fee of $1,875.00, which shall be debited from your checking account with the Bank on December 21, 2019.

Thank you for your business. We look forward to our continued relationship and the opportunity to provide exceptional customer service and expertise.

Please feel free to call me at 401-278-3012 if you have any questions.

Bank of America, N.A.


Amy C Walsh
Senior Vice President



**BANK OF AMERICA**

January 25, 2021

Travis L. Maderia
Lindy Inc.
298 Elm St
Stonington, Connecticut  063782925

Re: Revolving Line of Credit provided by Bank of America, N.A. (the "Bank") to Lobster Boys LLC and Lindy Inc., loan number ending in 00021516 (the "Credit Facility").

Dear Travis L. Maderia,

Effective as of the current expiration date of December 31, 2020, the Bank has extended the Credit Facility described above.  The availability period of the Credit Facility will now end on March 31, 2021, on which date all outstanding principal and accrued interest will be due and payable, unless renewed hereafter.

The current commitment amount of the Credit Facility is $2,000,000.00.

This letter shall not constitute a commitment to extend the Credit Facility beyond the date specified above. All other terms and conditions of the loan documents evidencing the Credit Facility (the "Loan Documents") shall remain in full force and effect during the extended availability period, including, without limitation, the obligation to make payments as stated in the Loan Documents.

Notice Regarding LIBOR Rate.  Effective as of February 1, 2014, the ICE Benchmark Administration ("ICE") took over administration of the London Interbank Offered Rate ("LIBOR") from the British Bankers Association ("BBA"). As a result, on that date, Bank of America began using the LIBOR established by ICE as reported on Bloomberg.

Except as set forth above, nothing in this letter shall constitute a waiver or amendment of any of the terms and conditions of the Loan Documents.

Thank you for your business.  We look forward to our continued relationship and the opportunity to provide exceptional customer service and expertise.

Please feel free to call me at 401-278-3012 if you have any questions.

Bank of America, N.A.


Amy Walsh
Senior Vice President

## CERTIFICATION AND LOAN AGREEMENT

In order to induce **BANK OF AMERICA, N.A.** ("**Bank**") to make a U.S. Small Business Administration ("**SBA**") guaranteed Loan ("**Loan**") to **Lobster Boys LLC and Lobsterboys Chicago LLC** ("**Borrower**"), evidenced by an SBA Note dated of even date herewith ("**Note**") and in consideration therefor, Borrower and **LB Logistics LLC and Lindy Inc. and Justin M. Maderia and Travis L. Maderia** (collectively, "**Guarantor**") (Borrower and Guarantor being hereinafter referred to singularly or collectively, as "**Obligor**") hereby certifies to, and agrees and covenants with, the Bank and the SBA and their respective successors and assigns, as follows ("**Agreement**" means this Certification and Loan Agreement):

### I.    CERTIFICATIONS

The Obligor hereby certifies:

1.   **Receipt of Authorization.** Obligor has received a copy of the Authorization for this Loan from Bank, and acknowledges that:

   (a)    The Authorization is not a commitment by Bank to make a Loan to Borrower.

   (b)    The Authorization is between Bank and SBA and creates no third party rights or benefits to Borrower.

   (c)    The Note will require Borrower to give Bank prior notice of intent to prepay.

   (d)    If Borrower defaults on Loan, SBA may be required to pay Bank under the SBA guarantee. SBA may then seek recovery of these funds from Borrower. Under SBA regulations, 13 CFR Part 101, Borrower may not claim or assert against SBA any immunities or defenses available under local law to defeat, modify or otherwise limit Borrower's obligation to repay to SBA any funds advanced by Bank to Borrower.

   (e)    Payments by SBA to Bank under SBA's guarantee will not apply to the Loan account of Borrower, or diminish the indebtedness of Borrower under the Note or the obligations of any personal guarantor of the Note.

2.   **Adverse Change.** That there has been no material adverse change in Obligor's financial condition, organization, operations or fixed assets or mortgaged real estate since the date the Loan application was signed.

3.   **Child Support.** That no principal who owns at least 50% of the ownership or voting interest of any Obligor is delinquent more than sixty (60) days under the terms of any (a) administrative order, (b) court order, or (c) repayment agreement requiring payment of child support.

4.   **Current Taxes.** That Obligor is current on all federal, state and local taxes, including, but not limited to, income taxes, payroll taxes, real estate taxes and sales taxes.

5.   **Immigration Laws – (Mandatory for Loans made under Section 502 of the Recovery Act of 2009).** Neither Borrower nor Operating Company has been determined by the Secretary of Homeland Security or the Attorney General to have engaged in a pattern or practice of hiring an alien, recruiting an alien, or referring an alien for a fee for employment in the United States, knowing that the person is an unauthorized alien.

6.   **Mandatory for Loans made under Sections 501 and 502 of the Recovery Act of 2009).** No working capital loan proceeds from this loan will be used for any costs or expenses associated with a swimming pool, aquarium, zoo and/or golf course.

7.    **Mandatory for Loans made under Sections 501 and 502 of the Recovery Act of 2009).** If any proceeds from this loan will be used for the construction, acquisition, addition, renovation, leasehold improvements or the payoff of an interim construction loan for the construction, addition, renovation or leasehold improvements for a business that has a swimming pool, aquarium, zoo and/or golf course, then alternate funding, which may come from Borrower's Injection, has been obtained to pay all costs reasonably and in good faith estimated to be allocable to the construction, acquisition, addition, renovation or leasehold improvements of the swimming pool, aquarium, zoo and/or golf course.

8.    **Environmental.** For any real estate pledged as collateral for the Loan or where the Borrower is conducting business operations (collectively, the "Property"):

    (a)    At the time Obligor submitted the Loan application, Obligor was in material compliance with all local, state and federal environmental laws and regulations pertaining to reporting or clean-up of any hazardous substance, hazardous waste, petroleum product, or any other pollutant regulated by state or federal law as hazardous to the environment (Contaminant), and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant;

    (b)    Obligor will continue to comply with these laws and regulations;

    (c)    Obligor, and all of its principals, have no knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Property, including groundwater, other than what was disclosed in connection with the Environmental Investigation of the Property;

    (d)    Until full repayment of the Loan, Obligor will promptly notify Bank and SBA if it knows or suspects that there has been, or may have been, a release of a Contaminant in, at, or under the Property, including groundwater, or if Obligor or such Property are subject to any investigation or enforcement action by any federal, state, or local environmental agency (Agency) pertaining to any Contaminant on, at, or under such Property, including groundwater;

    (e)    As to any Property owned by Obligor, Obligor indemnifies, and agrees to defend and hold harmless, Bank and SBA, and any assigns or successors in interest which take title to the Property, from and against all liabilities, damages, fees, penalties or losses arising out of any demand, claim or suit by any Agency or any other party relating to any Contaminant found on, at, or under the Property, including groundwater, regardless of whether such Contaminant resulted from Obligor's operations (Bank or SBA may require Obligor to execute a separate indemnification agreement).

9.    **Bankruptcy.** That no petition in bankruptcy has been filed by, or to the undersigneds' knowledge, against any Obligor.

10.    **Liens.** That within the preceding thirty (30) days, no Obligor has granted a security interest in any of the collateral given as security for the Loan, nor has any Obligor suffered the imposition of any involuntary and/or judicial liens or encumbrances upon the loan collateral.

11.    **Legal Proceedings.** That there are no pending, or to the undersigneds' knowledge, threatened legal proceedings to which any Obligor is a party, or to which the loan collateral or mortgaged real estate are subject, nor any contingent liabilities of any Obligor which will adversely affect the transactions contemplated in connection with the Loan, except as may be disclosed in the Loan application or in an addendum hereto.

12. **Obligations.** That the financial obligations of each Obligor are current and not in material default. Each Obligor is not in material default under any current agreement or obligations binding upon such Obligor, and the Loan will not violate or be in conflict with or constitute a default under any guaranty, obligation or agreement to which any Obligor is bound.

13. **No Breach.** That neither the execution and delivery of the Loan Documents, the consummation of the transactions contemplated thereby, nor the fulfillment of or compliance with the terms and conditions of such agreements is prevented by, limited by, or conflicts with or results in a breach of the terms, conditions or provisions of any restriction or any evidence of indebtedness, agreement or instrument of whatever nature to which any Obligor is now a party or by which any Obligor is bound, or constitutes a default under any of the foregoing.

14. **Mechanics Liens.** That within the last ninety (90) days, including the date hereof, no person, firm or corporation has furnished any labor, services or materials in connection with the construction or repair of any buildings or improvements on any of the mortgaged real estate, or on any adjoining property of the mortgagor, the obligations for which have not been paid, and that no person, firm or corporation is entitled to any mechanic's lien on said mortgaged real estate.

15. **Execution.** That all parties to the Loan Documents have executed the documents freely and voluntarily, after due examination and study of the terms and conditions thereof, for good and fair consideration received by them as of the date of execution.

16. **Capacity.** That no party to the Loan Documents is presently under legal, physical, mental or contractual disability, so as to be prohibited from, or incapable of, consummating the Loan transaction and/or performing their obligations and duties in accordance with the terms and provisions of the Loan Documents.

17. **Mortgaged Premises.** That the mortgagor of any mortgaged real estate has good and indefeasible right, title and interest in fee simple in and to the premises, and that all necessary governmental permits and approvals for the present use thereof, including, without limitation, subdivision and occupancy approval, have been obtained.

18. **SBA Regulations.** That all parties are familiar with the nondiscrimination requirements of 13 CFR Parts 112, 113 and 117 of the regulations issued by the Small Business Administration, and to the best of their knowledge are now in compliance with and will use their best efforts to remain in compliance with said provisions and any amendments thereto.

19. **Commercial Transaction.** That the Loan is a commercial transaction, and the documents delivered to the Bank in connection with the Loan, including, without limitation, the Note, the Mortgage(s) and Security Agreement, are executed and delivered as part of a commercial transaction.

20. **ERISA.** That the Obligor and each Subsidiary or Affiliate of Obligor is in compliance in all material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as it may be amended from time to time.

21. **Organization.** That Lobster Boys LLC is a limited liability company duly organized under the laws of the State of Alaska with a principal place of business at 6620 W Dakin St, Chicago, IL 60634-2413.

That Lobsterboys Chicago LLC is a limited liability company duly organized under the laws of the State of Illinois with a principal place of business at 6620 W Dakin St, Chicago, IL 60634-2413.

That LB Logistics LLC is a limited liability company duly organized under the laws of the State of Alaska with a principal place of business at 6620 W Dakin St, Chicago, IL 60634-2413.

That Lindy Inc. is a corporation duly organized under the laws of the State of Connecticut with a principal place of business at 6620 W Dakin St, Chicago, IL 60634-2413.

22. **Receipt of Authorization.** That Obligor has received a copy of the Authorization issued by the SBA to Bank in connection with the Loan (the "Authorization") and SBA Form 722, Equal Opportunity Notice and acknowledges that:

    (a)    The Authorization is not a commitment by Bank to make a loan to Borrower;

    (b)    The Authorization is between Bank and SBA and creates no third party rights or benefits to Borrower;

    (c)    The Note will require Borrower to give Bank prior notice of intent to prepay;

    (d)    If Obligor defaults on the Loan, SBA may be required to pay Bank under the SBA guarantee. SBA may then seek recovery of these funds from Obligor. Under SBA regulations, 13 CFR Part 101, Obligor may not claim or assert against SBA any immunities or defenses available under local law to defeat, modify or otherwise limit Obligor's obligation to repay to SBA any funds advanced by Bank to Borrower; and

    (e)    Payments by SBA to Bank under SBA's guarantee will not apply to the Loan account of Obligor, or diminish the indebtedness of Borrower under the Note or the obligations of any personal guarantor of the Note.

23. **Flood Insurance.** That the Obligor will acquire flood insurance for any business premises, if such insurance becomes available and if the area in which such business premises and loan collateral are located is now or in the future designated as a special flood insurance hazard area by the Secretary of Housing and Urban Development while the Loan is outstanding.

24. **Insurance.** That the Obligor has obtained evidence of insurance coverage, as required in the "Affirmative Covenants" section of this Agreement

25. **Compliance.** That the Obligor is not in default with respect to or in violation of any order, writ, injunction or decree of any court or of any federal, state, municipal or other governmental department, commission, board, bureau, agency, authority or official, or in violation of any law, statute, rule or regulation to which Obligor or Obligor's properties is or are subject, where such default or violation would materially and adversely affect the financial condition of the Obligor. The Obligor represents that Obligor has not received notice of any such default or violation from any party. The Obligor is not in default in the payment or performance of any of Obligor's obligations to any third parties or in the performance of any mortgage, indenture, lease, contract or other agreement to which Obligor is a party or by which any of Obligor's assets or properties are bound, where such default would materially and adversely affect the financial condition of the Obligor.

26. **Licenses.** That the Obligor has all licenses, permits and other permissions required by any government, agency or subdivision thereof, or from any licensing entity necessary for the conduct of Obligor's business, all of which the Obligor represents to be in good standing and in full force and effect.

27. **Contingent Liabilities.** That the Obligor is not a party to any suretyship, guarantyship, or other similar type agreement; nor has Obligor offered its endorsement to any individual, concern, corporation or other entity or acted or failed to act in any manner which would in any way create a contingent liability (except for endorsement of negotiable instruments in the ordinary course of business).

28. **Formation.** If the Obligor is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

29. **Authorization.** This Agreement, and any instrument or agreement required under this Agreement, are within the Obligor's powers, have been duly authorized, and do not conflict with any of its organizational papers.

30. **Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower or any other Obligor which, if lost, would impair the Borrower's financial condition or ability to repay its obligations as contemplated by this Agreement or any other agreement contemplated hereby, except as have been disclosed in writing to the Bank prior to the date of this Agreement.

## II.   AFFIRMATIVE COVENANTS

The Obligor shall, and hereby agrees and covenants to:

1. **Reimbursable Expenses.** Reimburse Bank for expenses incurred in the making and administration of the Loan.

2. **Books, Records and Reports.**

    (a)   Keep proper books of account in a manner satisfactory to Bank;

    (b)   Furnish Annual Consolidating Certified Reviewed Statement for Lobster Boys LLC to include common date financial information of Lobster Boys LLC, Lobsterboys Chicago LLC and LB Logistics LLC to Bank within 120 Days after Period End;

    (c)   Furnish Annual Business Tax Return for Lobster Boys LLC to Bank within 120 Days after Period End;

    (d)   Furnish Annual Consolidating Business Debt Schedule for Lobster Boys LLC to include common date financial information of Lobster Boys LLC, Lobsterboys Chicago LLC and LB Logistics LLC to Bank within 120 Days after Period End;

    (e)   Furnish Annual Consolidating Compliance Certificate for Lobster Boys LLC to include common date financial information of Lobster Boys LLC, Lobsterboys Chicago LLC and LB Logistics LLC to Bank within 120 Days after Period End;

    (f)   Furnish Annual Business Tax Return for Lindy Inc. to Bank within 120 Days after Period End;

    (g)   Furnish Annual Business Tax Return for Lobsterboys Chicago LLC to Bank within 120 Days after Period End;

    (h)   Furnish Annual Business Tax Return for LB Logistics LLC to Bank within 120 Days after Period End;

    (i)   Furnish Annual Personal Tax Return for Travis L. Maderia to Bank within 120 Days after Period End;

    (j)   Furnish Annual Personal Financial Statement for Travis L. Maderia to Bank within 120 Days after Period End;

    (k)   Furnish Annual Personal Tax Return for Justin M. Maderia to Bank within 120 Days after Period End;

    (l)   Furnish Annual Personal Financial Statement for Justin M. Maderia to Bank within 120 Days after Period End;

  (m) Furnish additional financial statements or reports whenever Bank requests them;

  (n) Allow Bank and/or SBA, at Obligor's or Operating Company's expense, to:

    (i) Inspect and audit books, records and papers relating to Obligor's financial or business condition; and

    (ii) Inspect and appraise any of Obligor's assets; and

    (iii) Allow all government authorities to furnish reports of examinations, or any records pertaining to Obligor, upon request by Bank or SBA.

3 **Basic Fixed Charge Coverage Ratio.** Lobster Boys LLC to maintain on a consolidated basis a Basic Fixed Charge Coverage Ratio of at least 1.25:1.0.

"Basic Fixed Charge Coverage Ratio" means the ratio of (a) the sum of EBITDA plus lease expense and rent expense, minus income tax, minus dividends, withdrawals, loans to shareholders, loans to non-guarantying related affiliates, investments in non-guarantying related affiliates and other distributions, to (b) the sum of interest expense, lease expense, rent expense, the current portion of long term debt and the current portion of capitalized lease obligations.

"EBITDA" means net income, less income or plus loss from discontinued operations and extraordinary items, plus income taxes, plus interest expense, plus depreciation, depletion, and amortization.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the last day of the calculation period.

4. **Bank as Principal Depository.** Maintain the Bank or one of its affiliates as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts.

5. **Equal Opportunity.** Post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public.

6. **American-Made Products.** The extent practicable, purchase only American-made equipment and products with the proceeds of the Loan.

7 **Taxes.** Pay all federal, state and local taxes, including, without limitation, income, payroll, real estate and sales taxes of the Obligor's business when they come due.

8. **Life Insurance.** Obtain and collaterally assign to Bank life insurance in form and type satisfactory to the Bank, as follows:

  (a) On the life of <u>**Justin M. Maderia**</u> in the amount of **$1,027,000.00**.

  (b) On the life of <u>**Travis L. Maderia**</u> in the amount of **$1,027,000.00**.

Such collateral assignment in favor of the Bank shall be acknowledged by the Home Office of the Insurer. Obligor agrees to maintain such life insurance as required by the Bank for the term of the Loan.

9.     **Other Documents.** Provide Bank with all additional certifications, documents or other information Bank is required to obtain from Obligor or any third party pursuant to the Authorization.

10.    **Execution.** Execute a note and any other documents required by Bank.

11.    **Compliance with Authorization.** Do everything necessary for Bank to comply with the terms and conditions of the Authorization, including, without limitation, acquire and maintain for the term of the Loan all insurance required by the Bank for such amounts and in such forms as the Bank may require, including, without limitation, real estate hazard insurance, personal property hazard insurance, flood insurance, life insurance and liability insurance. Any and all such policies shall contain all endorsements or special clauses as may be required by the Authorization.

Unless the Borrower provides the Bank with satisfactory evidence of the insurance coverage required hereby, the Bank may purchase insurance at the Borrower's expense to protect the Bank's interest in the collateral. This insurance may, but need not, protect the interests of the Borrower. The coverage that the Bank purchases may not pay any claim that the Borrower makes or any claim that is made against the Borrower in connection with the collateral. The Borrower may later cancel any insurance purchased by the Bank, but only after providing the Bank with satisfactory evidence that the Borrower has obtained insurance as required hereby. If the Bank purchases insurance of the collateral, the Borrower will be responsible for the costs of that insurance, including interest thereon at the Default Rate and any other charges which the Bank may impose in connection with the placement of the insurance until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the outstanding principal balance of the advances, shall bear interest at the Default Rate as provided above, and shall be payable upon demand. The costs of the insurance may be more than the cost of insurance the Borrower may be able to obtain on its own.

12.    **Compliance with Laws.** To comply with the requirements of all laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to cause a material adverse change in any Obligor's business condition (financial or otherwise), operations or properties, or ability to repay the credit, or, in the case of the Controlled Substances Act, result in the forfeiture of any material property of any Obligor.

13.    **Notices to Bank.** Promptly notify the Bank in writing of:

       (a)    Any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

       (b)    Any substantial dispute between any governmental authority and the Borrower or any other Obligor.

14.    **Insurance.**

       (a)    General Business Insurance. To maintain insurance satisfactory to the Bank as to amount, nature and carrier covering property damage (including loss of use and occupancy) to any of the Obligor's properties, business interruption insurance, public liability insurance including coverage for contractual liability, product liability and workers' compensation, and any other insurance which is usual for such Obligor's business. Each policy shall include a cancellation clause in favor of the Bank.

       (b)    Insurance Covering Collateral. To maintain all risk property damage insurance policies (including without limitation windstorm coverage, flood coverage, and hurricane coverage as applicable) covering the tangible property comprising the collateral. Each insurance

policy must be for the full replacement cost of the collateral and include a replacement cost endorsement. The insurance must be issued by an insurance company acceptable to the Bank and must include a lender's loss payable endorsement in favor of the Bank in a form acceptable to the Bank.

(c) Evidence of Insurance. Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

## III. NEGATIVE COVENANTS

The Obligor shall not, without Bank's prior written consent:

1. **Distributions.** Make any distribution of company assets that will adversely affect the financial condition of the Obligor.

2. **Ownership Changes.** Change the ownership structure or interests in the Obligor during the term of the Loan.

3. **Transfer of Assets.** Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of Obligor's property or assets, except in the ordinary course of business.

4. **Other Debts.** Have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank or to any affiliate of the Bank), or become liable for the liabilities of others. This does not prohibit:

   (a) Acquiring goods, supplies, or merchandise on normal trade credit.

   (b) Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Bank in the Borrower's most recent financial statement.

5. **Investments.** Have any existing, or make any new, investments in any individual or entity, or make any capital contributions or other transfers of assets to any individual or entity, except for:

   (a) Existing investments disclosed to the Bank in writing prior to the date of this Agreement.

   (b) Investments in any of the following:

       (i)    certificates of deposit;
       (ii)   U.S. treasury bills and other obligations of the federal government;
       (iii)  readily marketable securities (including commercial paper, but excluding restricted stock and stock subject to the provisions of Rule 144 of the Securities and Exchange Commission).

6. **Loans.** Make any loans, advances or other extensions of credit to any individual or entity, except for:

   (a) Existing extensions of credit disclosed to the Bank in writing prior to the date of this Agreement.

   (b) Extensions of credit to the Borrower's current subsidiaries or affiliates.

   (c) Extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

7.    **Change of Management.** Make any substantial change in the present executive or management personnel of the Borrowers.

8.    **Additional Negative Covenants.**

   (a)    Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

   (b)    Acquire or purchase a business or its assets.

   (c)    Engage in any business activities substantially different from the Borrower's present business.

   (d)    Liquidate or dissolve any Obligor's business.

   (e)    With respect to any Obligor which is a business entity, adopt a plan of division or divide itself into two or more business entities (pursuant to a "plan of division" under Section 18-217 of the Delaware Limited Liability Company Act or a similar arrangement under any other applicable state statute).

   (f)    Change its name or legal structure (including, for an individual (sole proprietorship), its name on any driver's license or special identification card issued by any state), and as applicable, its chief executive office, its principal residence or the jurisdiction in which it is organized and/or registered or its business structure.

## IV.    EVENTS OF DEFAULT

The occurrence of any of the following will be deemed to be an Event of Default:

1.    **Covenant Default.** Any Obligor shall default in the performance of any of the covenants or agreements contained in this Agreement.

2.    **Breach of Warranty.** Any Financial Statement, representation, warranty or certificate made or furnished by any Obligor to the Bank in connection with this Agreement shall be false, incorrect or incomplete when made.

3.    **Other Default.** The occurrence of an Event of Default as defined in the Note or any of the Loan Documents.

   Upon the occurrence of an Event of Default, the Bank will have all rights and remedies specified in the Note and the Loan Documents and all rights and remedies (which are cumulative and not exclusive) available under applicable law or in equity.

4.    **Failure to Pay.** The Borrower fails to make a payment under this Agreement when due.

5.    **False Information.** The Borrower or any other Obligor has given the Bank false or misleading information or representations.

6.    **Revocation or Termination.** If the Obligor is comprised of the trustee(s) of a trust, the trust is revoked or otherwise terminated or all or a substantial part of the Obligor's assets are distributed or otherwise disposed of.

7.    **Lien Priority.** The Bank fails to have an enforceable first lien (except for any prior liens to which Bank has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

8.     **Judgments.** Any judgments or arbitration awards are entered against any Obligor in an
       aggregate amount of Two Hundred Fifty Thousand Dollars ($250,000.00) or more.

9.     **Death.** If any Obligor is a natural person, such Obligor dies or becomes legally incompetent; if
       any Obligor is a trust, a trustor dies or becomes legally incompetent; if any Obligor is a
       partnership, any general partner dies or becomes legally incompetent.

## V.     MISCELLANEOUS

1.     The terms and conditions hereof shall be binding upon each and every Obligor and shall inure to
       the benefit of the Bank and its successors and assigns.

2.     The terms and conditions hereof shall survive the closing of the Loan.

3.     If any Obligor fails to abide by any of the agreements and/or covenants contained herein or in the
       Authorization (as it applies to any such Obligor), and/or if any of the certifications made herein
       proves at any time to be incorrect or untrue, it shall constitute an event of default under the
       documents evidencing, securing and/or governing the Loan, immediately entitling the Bank to any
       and all rights and remedies it may have thereunder, including without limitation, the right to
       accelerate all sums due under the Loan.

4.     **LIEN AND RIGHT OF SET OFF.** The Obligors hereby grant the Bank a lien and right of setoff for
       all of Obligors' liabilities upon and against all the deposits, credits, collateral and property of any of
       the Obligors, now or hereafter in the possession or control of the Bank or in transit to it.  Bank
       may, at any time, apply or setoff the same, or any part thereof, to any liability of the Obligors
       whether or not matured or demanded.

5.     **WAIVER.** IN ANY ACTION TO COLLECT THE LOAN OR TO COLLECT A DEFICIENCY AFTER
       THE FORECLOSURE OF ANY MORTGAGE, LIEN OR SECURITY INTEREST, THE OBLIGOR
       HEREIN SPECIFICALLY WAIVES ITS RIGHT TO ANY NOTICE OF HEARING OR HEARING,
       OR THE ESTABLISHMENT OF A BOND, WITH OR WITHOUT SURETY, WHICH THE
       OBLIGOR WOULD OTHERWISE BE ENTITLED TO UNDER STATE OR FEDERAL LAW
       PRIOR TO AN ATTACHMENT BEING PLACED AGAINST ANY REAL OR PERSONAL
       PROPERTY OWNED BY THE OBLIGOR IN THE STATE OF **ILLINOIS**, OR PRIOR TO BANK'S
       RESORT TO ANY OTHER PREJUDGMENT REMEDY ALLOWED BY LAW.  THE
       UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCES A COMMERCIAL
       TRANSACTION.

6.     **WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO
       THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A
       TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT
       OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN
       CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR
       THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  THE
       BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE BANK OR
       ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF
       LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE
       DAMAGES. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR
       ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE,
       THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO
       ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER
       PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE
       OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE**

MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.

7.   **Waiver of Class Actions.** The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Agreement, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

8.   The Obligor hereby acknowledges its understanding that federal and State Truth-in-Lending disclosures are not required for transaction in which the Loan proceeds are used solely for business and commercial purposes. The Obligor further acknowledge its understanding that by certifying that the Loan is entirely and solely for business and commercial purposes and not at all for any personal, family, household or other noncommercial or any farming or other agricultural purposes, the Obligor is waiving all rights to Federal and State Truth-in-Lending disclosures to which it might otherwise have had if any part of the proceeds were to have been used for any personal, family, household or other noncommercial or any farming or other agricultural purposes.

9.   **PUBLICITY.** The Bank may post notice of this transaction in trade publications, advertisements, or by other means including any and all media, including through the use of "tombstones." Such notice may include Obligor's name and other selected data about the transaction of a general nature. Obligor shall not use the name of Bank, or use any "logo," trade style, trade name or other likeness or image of Bank in any advertising, publication or other public disclosures except with Bank's prior written consent or where required to do so by applicable law (in which latter event, however, Obligor first shall consult with Bank in regard thereto and limit, as directed by Bank, such publication to the extent permissible to do so under applicable law).

10.  **COMPELLED DISCLOSURES.** If Bank receives a subpoena or other administrative or judicial process demanding any information in connection with the Loan, Bank shall be entitled to comply with any such subpoena or other administrative or judicial process to the extent required by law.

11.  **GOVERNING LAW.** When the Bank is the holder of the Note, except to the extent that any law of the United States may apply, this Agreement shall be governed and interpreted according to the laws of **Illinois** (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law. When the SBA is the holder of the Note, the Note shall be interpreted and enforced under federal law, including SBA regulations.

12.  **VENUE AND JURISDICTION.** THE BORROWER AGREES THAT ANY ACTION OR SUIT AGAINST THE BANK ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE FILED IN FEDERAL COURT OR STATE COURT LOCATED IN THE GOVERNING LAW STATE. THE BORROWER AGREES THAT THE BANK SHALL NOT BE DEEMED TO HAVE WAIVED ITS RIGHTS TO ENFORCE THIS SECTION BY FILING AN ACTION OR SUIT AGAINST THE BORROWER IN A VENUE OUTSIDE OF THE GOVERNING LAW STATE. IF THE BANK DOES COMMENCE AN ACTION OR SUIT ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE BORROWER AGREES THAT THE CASE MAY BE FILED IN FEDERAL COURT OR STATE COURT IN THE GOVERNING LAW STATE. THE BANK RESERVES THE RIGHT TO COMMENCE AN ACTION OR SUIT IN ANY OTHER JURISDICTION WHERE THE BORROWER, ANY GUARANTOR, OR ANY COLLATERAL HAS

ANY PRESENCE OR IS LOCATED. THE BORROWER CONSENTS TO PERSONAL JURISDICTION AND VENUE IN SUCH FORUM SELECTED BY THE BANK AND WAIVES ANY RIGHT TO CONTEST JURISDICTION AND VENUE AND THE CONVENIENCE OF ANY SUCH FORUM. THE BORROWER WAIVES PERSONAL SERVICE OF PROCESS UPON THE BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE BORROWER AT THE ADDRESS STATED ON THE SIGNATURE PAGE HEREOF AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT. THE PROVISIONS OF THIS SECTION ARE MATERIAL INDUCEMENTS TO THE BANK'S ACCEPTANCE OF THIS AGREEMENT.

13.    **GAAP.** Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied; provided, however, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the financial statements of the Borrower for the most recently ended fiscal year prior to the date of this Agreement for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes.

14.    **Borrower's Instructions.** Subject to the terms, conditions and procedures stated elsewhere in this Agreement, the Bank may honor instructions for advances or repayments and any other instructions under this Agreement given by the Borrower (if an individual), or by any one of the individuals the Bank reasonably believes is authorized to sign loan agreements on behalf of the Borrower, or any other individual(s) designated by any one of such authorized signers (each an "Authorized Individual"). The Bank may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, telefax or Internet and intranet websites designated by the Bank with respect to separate products or services offered by the Bank.

15.    **Expenses.**

(a)    The Borrower shall pay to the Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Bank in connection with (i) the negotiation and preparation of this Agreement and any related agreements, the Bank's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any collateral and books and records of the Borrower or any Obligor (iii) the Bank's costs or losses arising from any changes in law which are allocated to this Agreement or any credit outstanding under this Agreement, and (iv) costs or expenses required to be paid by the Borrower or any other Obligor that are paid, incurred or advanced by the Bank.

(b)    The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement, the Note or any document required hereunder, (ii) any credit extended or committed by the Bank to the Borrower hereunder and under the Note, and (iii) any litigation or proceeding related to or arising out of this Agreement, the Note, any such document, or any such credit, including, without limitation, any act resulting from the Bank complying with instructions the Bank reasonably believes are made by any Authorized Individual. This paragraph will survive this Agreement's termination, and will benefit the Bank and its officers, employees and agents.

(c)    The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with (a) the enforcement or preservation of the Bank's rights and remedies and/or the collection of any obligations of the Borrower which

become due to the Bank and in connection with any "workout" or restructuring, and (b) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by the Bank or any other person) relating to the Borrower or any other person or entity.

## SIGNATURE PAGE IMMEDIATELY FOLLOWS

This Certification and Loan Agreement is executed this **22nd day of May, 2020**.

**BORROWER:**

**Lobster Boys LLC**

Bank of America, N.A.

By: _____
Travis L. Maderia, Manager/Member

By: Tammie Meetze, VP
Tammie Meetze, Vice President

By: _____
Justin M. Maderia, Manager/Member

**Lobsterboys Chicago LLC**

By: _____
Travis L. Maderia, Manager/Member

By: _____
Justin M. Maderia, Manager/Member

**GUARANTORS:**

**LB Logistics LLC**

By: _____
Travis L. Maderia, Manager/Member

By: _____
Justin M. Maderia, Manager/Member

**Lindy Inc.**

By: _____
Travis L. Maderia, Co-President

By: _____
Justin M. Maderia, Co-President

_____
Travis L. Maderia, Individually

_____
Justin M. Maderia, Individually

**Witnesses**
(as to all):

_____

**Exhibit B**

**TD Loan Documents**

**TD Commercial Banking**

1791 Barrington St., Suite 200
Halifax, NS B3J 3K9

Telephone No.: (902) 420 2595
Fax No.: (902) 420 8061

May 24, 2022

LOBSTER SH LTD.
5525 HIGHWAY 3
SHAG HARBOUR, NS  B0W 3B0

Attention: Travis Maderia & Justin Maderia

Dear Travis and Justin,

---

| **Demand Operating Facility Agreement** |
| --- |

This Agreement between: **The Toronto-Dominion Bank** (The "Bank").

and

Borrower's Legal Name: LOBSTER SH LTD. (herein called the "Borrower")

Borrower's Address:

5525 HIGHWAY 3
SHAG HARBOUR, NS
B0W 3B0

Whereas:

    (i)    the Bank has agreed to establish a revolving demand credit facility (the "Facility");

    (ii)    the Facility is uncommitted and made available at the sole discretion of the Bank. The Facility may be cancelled at any time even if the Borrower complies with all of the terms and conditions;

    (iii)    the Facility will operate on the basis established in this Demand Operating Facility Agreement including without limitation the Standard Terms and Conditions attached as Schedule "A" (the "Agreement"), the terms of which may be changed by the Bank from time to time at the Bank's sole discretion.

In consideration of the Bank establishing the Facility, the Borrower hereby agrees with the Bank to the following terms and conditions:

1

**CREDIT LIMIT**

1)        Outstanding advances on Facility 01 will at all times the lesser of:

(a) CDN $5,000,000 or its US$ Equivalent and,

(b) the total of:

(i) USD account balances held at TD Bank in Canada (converted to CAD), capped at $500,000, and

(ii) 90% of LOBSTER SH LTD. EDC insured accounts receivable value less over 90 day accounts, related accounts, contra accounts, receivables and accounts not valued at the Bank's sole discretion, and

(iii) 75% of the Borrower's Canadian and U.S.A. based account receivable value less over 90 day accounts, related accounts, contra accounts and accounts not valued at the Bank's sole discretion, and

(iv) 50% of the Inventory Value, excluding packaging material, less accounts payable to fisherman under 15 days, capped at $2,500,000

For purposes of calculating the Credit Limit, no value will be given to any uninsured foreign accounts receivables and any insured trade account receivable exceeding (i) any individual receivable / buyer / credit limit; (ii) any country term / liability limit; or (iii) the policy amount / maximum liability, each as set out in the applicable policy.

The Bank may from time to time advise the Borrower on reasonable notice that the accounts receivable insurer is no longer approved by the Bank, in its sole discretion, and this may result in a reduction in the Operating Loan.

**PURPOSE**

The Borrower will use the Facility to fund working capital.

**BORROWING OPTIONS**

The Bank will make the Facility available by way of:
   - Prime Rate Based Loans in CAD$ ("Prime Based Loans")
   - United States Base Rate Loans in USD$ ("USBR Loans")

**AVAILABILITY OF THE FACILITY**

The Borrower acknowledges that the Facility is uncommitted and is not automatically available upon satisfaction of the terms and conditions, including without limitation the Representations & Warranties, Positive Covenants, Negative Covenants, or Financial Covenants set out herein.

The Bank can demand repayment and/or cancel the availability of the Facility at any time in its sole discretion.

**<u>INTEREST RATES
AND STAMPING
FEES</u>**

For the Borrowing Options available to the Borrower, interest rates and fees are as follows:
-        Prime Based Loans:  Prime Rate + 1.000 % per annum
-        USBR Loans:  USBR + 1.000 % per annum

Information on Interest Rate Definitions, Interest Calculations and Payment is set out in the Schedule "A" attached hereto.

**<u>ARRANGEMENT
FEE</u>**

 The Borrower has paid a non-refundable arrangement fee of CAD $6,500 prior to the first drawdown hereunder.

**<u>MANAGEMENT
FEE</u>**

 The Borrower will pay Management Fee of CAD $250 per month.

**<u>EXCESS MONITORING FEE</u>**

The Borrower may, at the Bank's discretion, be charged an Excess Monitoring Fee of $250.00, payable in the currency of the Facility, each time that the Credit Limit of the Facility is exceeded. Any extension of credit above the Credit Limit will be at the Bank's sole and absolute discretion.

**<u>RENEWAL FEE</u>**

 CAD$ 3,500 per annum

**<u>DRAWDOWN</u>**

The Borrower can use the Facility on a revolving basis.

The Borrower will follow the provisions set out in this Agreement with respect to notice periods, minimum amounts of draws, interest periods, and applicable terms.

**DISBURSEMENT
CONDITIONS**

The Borrower will not avail itself of the Facility nor will the Bank make the Facility available to the Borrower until the Borrower has fulfilled the standard Disbursement Conditions contained in Schedule "A" and the following disbursement conditions:

a)        1) All security to be in place prior to advance. Any required legal work to be completed or vetted by Bank's solicitor at borrower' s cost.

2) Signed Demand Operating Facility Agreement

3) Most current aged accounts receivable, accounts payable, inventory listings, and EDC ARI coverage statements showing borrowing base coverage at step off.

4) Receipt and satisfactory review of BDC Letter Agreement, and confirmation that $3,000,000 of BDC financing has been advanced as contemplated

5) Bank Site visit to be completed on Shag Habour and Dipper Harbour locations

6) Confirmation that Miami Condo sale has closed, and $1,500,000 has been invested into LOBSTER SH LTD. by shareholders

7) Receipt and satisfactory review of EDC export guarantee program and accounts receivable insurance policies. EDC guarantee must be effective prior to funding

8) Confirmation that RYDER SYSTEMS INC collections claim on TRAVIS MADERIA has been paid, or removed if in error

**BUSINESS CREDIT
SERVICE**

The Borrower will have access to Prime Based Loans via Loan Account Number 9276604 - 5420 (The "Loan Account") up to the Credit Limit, by withdrawing funds from the Borrower's Current Account Number **To Be Obtained** (The "Current Account"). The Borrower agrees that each advance from the Loan Account will be in an amount equal to $10,000 (The "Transfer Amount") or a multiple thereof. If the Transfer Amount is NIL, the Borrower agrees that an advance from its Loan Account may be in an amount sufficient to cover the debits made to the Current Account. The Borrower agrees that:

a)  All other overdraft privileges which have governed the Current Account are hereby cancelled.
b)  All outstanding overdraft amounts under any such other agreements are now included as indebtedness under the Facility.

The Bank may, but is not required to, automatically advance the Transfer Amount or a multiple thereof or any other amount from the Loan Account to the Current Account in order to cover the debits made to the Current Account if the amount in the Current Account is insufficient to cover the debits. The Bank may, but is not required to, automatically and without notice apply the funds in the Current Account in amounts equal to the Transfer Amount or any multiple thereof or any other amount to repay the outstanding amount in the Loan Account.

**OVERDRAFTS**

The Borrower will have access to United States Base Rate Loans under the Facility via overdraft from Current Account Number **(To Be Obtained)** at Branch **5420** (The "Current Account") up to the Credit Limit.

4

## REPAYMENT

The Borrower agrees to repay the Bank on demand. If the Bank demands repayment, the Borrower will pay to the Bank all amounts outstanding under the Facility, including without limitation, as applicable, the amount of all unmatured B/As and the amount of all drawn and undrawn L/Gs and L/Cs. All costs to the Bank and all loss suffered by the Bank in re-employing the amounts so repaid will be paid by the Borrower.

## SECURITY

The following security shall be provided, shall, unless otherwise indicated, support all present and future indebtedness and liability of the Borrower and the grantor of the security to the Bank including without limitation indebtedness and liability under guarantees, foreign exchange contracts, cash management products, and derivative contracts, shall be registered in first position, and shall be on the Bank's standard form, supported by resolutions and solicitor's opinion, all acceptable to the Bank:

a) - General Security Agreement ("GSA") in favor of LOBSTER SH LTD. with Resolution and Solicitor Letter of Opinion representing a first-place security position over Account Receivables and Inventory (BDC will have a first-place security position on Equipment)
- **To Be Obtained**

b) Section 427 Bank Act Security with Solicitor Letter of Opinion from LOBSTER SH LTD. representing a First charge on:
- Inventory
- **To Be Obtained**

c) Evidence of General Liability Insurance for LOBSTER SH LTD. - **To Be Obtained**

e) Assignment of Fire Insurance for LOBSTER SH LTD. with THE TORONTO-DOMINION BANK named as Loss Payee in the amount of CAD $5,000,000. - **To Be Obtained**

f) Guarantee of Advances in support of LOBSTER SH LTD. with Solicitors Legal Opinion.
- Unlimited
- Executed by TRAVIS L MADERIA and JUSTIN M MADERIA (The "Guarantors")
- **To Be Obtained**

i) Postponement of Shareholder loans executed by TRAVIS L MADERIA - **To Be Obtained**

j) Postponement of Shareholder loans executed by LOBSTERBOYS DH REALTY, LOBSTERBOYS LTD. and LOBSTERBOYS LLC
**To Be Obtained**

k) Postponement of Shareholder loans executed by JUSTIN M MADERIA - **To Be Obtained**

l) Subordination Agreement/Priorities Agreement (inter-creditor agreement) between TD Canada Trust, BDC, and LOBSTER SH LTD. whereby TD will have a first-place security position over Accounts Receivables and Inventory for LOBSTER SH LTD. and BDC will be first on Equipment - **To Be Obtained**

m) Assignment of EDC Account Receivable Insurance in the amount of CAD $2,500,000 - **To Be Obtained**

n) Export Development Canada Guarantee in support of LOBSTER SH LTD. for 50% (CAD $2,500,000) of the loan amount.
- **To Be Obtained**

o) Landlord's Letter of Non-Disturbance / Landlord's Waiver for inventory located at 61-67 Dipper Harbour Road, Dipper Harbour, New Brunswick - **To Be Obtained**

p) Landlord's Letter of Non-Disturbance / Landlord's Waiver for inventory located at 5523-5525 Highway #3, Shag Harbour, Nova Scotia - **To Be Obtained**

All persons and entities required to provide a guarantee shall be referred to herein individually as a "Surety" and/or "Guarantor" and collectively as the "Guarantors".

All of the above security and guarantees shall be referred to collectively in this Agreement as "Bank Security".

5

**REPRESENTATIONS**
**& WARRANTIES**

The Borrower makes the Standard Representations and Warranties set out in Schedule "A", and in addition represents and warrants that:

a)    The Declaration executed by the borrower in favor of EDC in connection with the EDC guarantee is accurate and complete in all aspects

All representations and warranties shall be deemed to be continually repeated so long as the Borrower has any dealings with the Bank.


**POSITIVE COVENANTS**

The Borrower will observe the Standard Positive Covenants set out in Schedule "A" and in addition will:

| Assigned Facilities | Description |
|---|---|
| All) | All day-to-day banking to transition to TD within 60 days |
| All) | Any financial covenant breaches shall be cured by way of an equity injection to bring onside. |
| 1) | The borrower agrees and instructs the Bank to provide to EDC all information requested by EDC in connection with the EDC Guarantee under the Export Guarantee Program. Such information may include, without limitation, personal and business information the Bank is aware of and documents in its possession regarding the borrower's financial situation, operations, business or the borrower's accounts with the Bank. |


**Reporting Requirements:**

The Borrower will provide:

a)    Provide annual review engagement financial statements for LOBSTER SH LTD. within 120 calendar days of fiscal year end

b)    Provide a monthly aged accounts payable, accounts receivable, and inventory summary for LOBSTER SH LTD. within 25 days of month end accompanied by a Borrower's Compliance Certificate from a senior officer. Accounts Payable statement to indicate amounts due to fishers that are under 15 days payable.

c)    Delivery of a Personal Financial Statement and Privacy Agreement from the Guarantor(s) and such supporting documentation as the Bank may reasonably request, typically every 3 years.

d)    Provide annual EDC Insurance policy outlining the terms and conditions and any amendments as they occur

e)    Provide combined financial statements from US operating entities- including Lobsterboys LLC, Lobsterboys Chicago LLC,. LB Logistics LLC, and Lobsterboys Ltd.

f)    Provide annual compilation engagement financial statements for LOBSTERBOYS DH REALTY within 120 calendar days of fiscal year end


**NEGATIVE**
**COVENANTS**

The Borrower will observe the Standard Negative Covenants set out in Schedule "A".

**EVENTS OF**
**DEFAULT**

| Assigned Facilities | Description |
|---|---|
| 1) | The bank is permitted to accelerate payment in the event that any part of the Declaration executed by the borrower in favour of EDC in connection with the EDC Guarantee is false or misleading |

**ANCILLARY**
**FACILITIES**

As at the date of this Agreement, the following uncommitted ancillary products are made available. These products may be subject to other agreements.

1)       TD Visa Business card (or cards) for an aggregate amount of $100,000.

**SCHEDULE "A"**
**TERMS AND**
**CONDITIONS**

Schedule "A" sets out the Standard Terms and Conditions ("Standard Terms and Conditions") which are applicable to the Borrower and which apply to this Facility. The Standard Terms and Conditions, including the defined terms set out therein, form part of this Agreement, unless this letter states specifically that one or more of the Standard Terms and Conditions do not apply or are modified.

We trust you will find these Facilities helpful in meeting your ongoing financing requirements.  We ask that you acknowledge this offer of financing (which includes the Standard Terms and Conditions) by signing and returning the attached duplicate copy of this agreement to the undersigned by June 7th, 2022.

Yours truly,


**THE TORONTO-DOMINION BANK**


_Chris Penny_
Chris Penny
Relationship Manager

Jarrod Pettipas
Manager Commercial Credit

7

**TO THE TORONTO-DOMINION BANK:**

LOBSTER SH LTD. hereby accepts the foregoing offer this 24_____ day of May_____ , 2022. The
Borrower confirms that, except as may be set out above, the credit facility(ies) detailed herein shall not be used
by or on behalf of any third party.

*Justin Maderia*
_____
Signature

*Travis Maderia*
_____
Signature

Justin Maderia CEO
_____
Print Name & Position

Travis Maderia President
_____
Print Name & Position

24 5 2022
_____
Date:

24 5 2022
_____
Date:

**cc. Guarantor(s)**

The Bank is providing the guarantor(s) with a copy of this letter as a courtesy only.  The delivery of a copy of this
letter does not create any obligation of the Bank to provide the guarantor(s) with notice of any changes to the
credit facilities, including without limitation, changes to the terms and conditions, increases or decreases in the
amount of the credit facilities, the establishment of new credit facilities or otherwise.  The Bank may, or may not,
at its option, provide the guarantor(s) with such information, provided that the Bank will provide such information
upon the written request of the guarantor.

8

## SCHEDULE "A" - STANDARD TERMS AND CONDITIONS

## 1. DEFINITIONS

Capitalized Terms used in this Agreement shall have the following meanings:

*"All-in Rate" m*eans the highest of the interest rates that the Borrower pays for Floating Rate Loans.

*"Business Day"* means any day (other than a Saturday or Sunday) that the Branch/Centre is open for business.

*"Branch / Centre"* means the Bank branch or banking centre noted on the first page of the Letter, or such other branch or centre as may from time to time be designated by the Bank.

*"Daily Simple SOFR"* means, for any day, SOFR, with the conventions for this rate (which will include a lookback being established by the Bank in accordance with the conventions for this rate recommended by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto, for determining "Daily Simple SOFR" for bilateral business loans; provided, that if the Bank decides that any such convention is not administratively feasible for the Bank, then the Bank may establish another convention in its reasonable discretion.

*"Early Opt-in Effective Date"* means, with respect to any Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Borrower.

*"Early Opt-in Election"* means the occurrence of:

| | |
|---|---|
| (i) | a determination by the Bank that at least five currently outstanding U.S. dollar-denominated syndicated or bilateral credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate, and |
| (ii) | the election by the Bank to trigger a fallback from LIBOR and the provision by the Bank of written notice of such election to the Borrower. |

*"Face Amount"* means in respect of:

| | |
|---|---|
| (i) | a B/A, the amount payable to the holder thereof on its maturity; |
| (ii) | a L/C or L/G, the maximum amount payable to the beneficiary specified therein or any other Person to whom payments may be required to be made pursuant to such L/C or L/G. |

*"Floating Rate Loans"* means any loan drawn down or extended under this Agreement at an interest rate which is referenced to a variable rate of interest, such as Prime Rate.

*"Inventory Value"* means, at the time of determination, the total value (based on the lower of cost or market) of the Borrower's inventories that are subject to the Bank Security (other than (i) those inventories supplied by trade creditors who at that time have not been fully paid and would have a right to repossess all or part of such inventories if the Borrower were then either bankrupt or in receivership, (ii) those inventories comprising work in process and (iii) those inventories that the Bank may from time to time designate in its sole discretion) minus the total amount of any claims, liens or encumbrances on those inventories having or purporting to have priority over the Bank.

*"Letter"* means the letter from the Bank to the Borrower to which this Schedule "A" - Standard Terms and Conditions is attached.

*"Letter of Credit"* or *"L/C"* means a documentary letter of credit or similar instrument in form and substance satisfactory to the Bank.

*"Letter of Guarantee"* or *"L/G"* means a stand-by letter of guarantee or similar instrument in form and substance satisfactory to the Bank.

*"LIBOR Replacement Conforming Changes"* means any technical, administrative or operational changes (including changes to applicable definitions, timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Bank decides may be appropriate to reflect the adoption and implementation of the LIBOR Successor Rate and the Bank's administration thereof in a manner substantially consistent with market practice (or, if the Bank decides that adoption of any portion of such market practice is not administratively feasible or determines that no market practice for the administration of the LIBOR Successor Rate exists, in such other manner of administration as the Bank decides is reasonably necessary in connection with the administration of this Agreement and the other documents required hereunder).

*"LIBOR Successor Rate"* means, for any interest period as of the applicable date of determination, the first alternative set forth below that can be determined by the Bank:

(i)     the sum of: (a) Term SOFR and (b) 0.11448% (11.448 basis points) for an interest period of 1 month, 0.26161% (26.161 basis points) for an interest period of 3 months, and 0.42826% (42.826 basis points) for an interest period of 6 months, or

(ii)    the sum of: (x) Daily Simple SOFR and (y) the spread adjustment selected or recommended by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto, for the replacement of the contract maturity of LIBOR with a SOFR-based rate having approximately the same length as the interest payment period specified in the "LIBOR Discontinuation" clause in Section 3 of this Schedule A.

*"Purchase Money Security Interest"* means a security interest on asset which is granted to a lender or to the seller of such asset in order to secure the purchase price of such asset or a loan incurred to acquire such asset provided that the amount secured by the security interest does not exceed the cost of the asset and provided that the Borrower provides written notice to the Bank prior to the creation of the security interest, and the creditor under the security interest has, if requested by the Bank, entered into an inter-creditor agreement with the Bank, in a format acceptable to the Bank.

*"Receivable Value"* means, at any time of determination, the total value of those of the Borrower's trade accounts receivable that are subject to the Bank Security other than (i) those accounts then outstanding for 90 days, (ii) those accounts owing by persons, firms or corporations affiliated with the Borrower, (iii) those accounts that the Bank may from time to time designate in its sole discretion, (iv) those accounts subject to any claim, liens, or encumbrance having or purporting to have priority over the Bank, (v) those accounts which are subject to a claim of set-off by the obligor under such account, MINUS the amount of all the Borrower's unremitted source deductions and unpaid taxes.

*"Receivables / Inventory Summary"* means a summary of the Borrower's trade account receivables and inventories, in form as the Bank may require and certified by the Borrower's senior officer or authorized representative.

*"SOFR"* means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured financing rate from time to time), on the immediately succeeding Business Day.

*"Term SOFR"* means, for the applicable corresponding interest period, the forward-looking term rate based on SOFR that has been selected or recommended by the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

*"US$" or "USD Equivalent"* means, on any date, the equivalent amount in United States Dollars after giving effect to a conversion of a specified amount of Canadian Dollars to United States Dollars at the exchange rate determined by the Bank at the time of the conversion.

## 2. INTEREST RATE DEFINITIONS

Prime Rate means the rate of interest per annum (based on a 365 day year) established and reported by the Bank to the Bank of Canada from time to time as the reference rate of interest for determination of interest rates that the Bank charges to customers of varying degrees of creditworthiness in Canada for Canadian dollar loans made by it in Canada.

The Stamping Fee rate per annum for CDN$ B/As is based on a 365 day year and the Stamping Fee is calculated on the Face Amount of each B/A presented to the Bank for acceptance. The Stamping Fee rate per annum for US$ B/As is based on a 360 day year and the Stamping Fee is calculated on the Face Amount of each B/A presented to the Bank for acceptance.

CDOR means, for any day, the annual rate for B/As denominated in Canadian Dollars for a specified term that appears on the Reuters Screen CDOR Page as of 10:00 a.m. (Toronto time) on such day (or, if such day is not a Business Day, then on the immediately preceding Business Day).

LIBOR means the rate of interest per annum (based on a 360 day year) as determined by the Bank (rounded upwards, if necessary to the nearest whole multiple of 1/16th of 1%) at which the Bank may make available United States dollars which are obtained by the Bank in the Interbank Euro Currency Market, London, England at approximately 11:00 a.m. (Toronto time) on the second Business Day before the first day of, and in an amount similar to, and for the period similar to the interest period of, such advance.

USBR means the rate of interest per annum (based on a 365 day year) established by the Bank from time to time as the reference rate of interest for the determination of interest rates that the Bank charges to customers of varying degrees of creditworthiness for US dollar loans made by it in Canada.

Interest rates will never be less than zero. If Prime Rate, CDOR, LIBOR, USBR or any other applicable base rate changes, resulting in a variable or floating annual interest rate that is a negative number, the interest rate will be 0.00%.

Any interest rate based on a period less than a year expressed as an annual rate for the purposes of the Interest Act (Canada) is equivalent to such determined rate multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by the number of days in the period upon which it was based.

## 3. INTEREST CALCULATION AND PAYMENT

Interest on Prime Based Loans and USBR Loans is calculated daily (including February 29 in a leap year) and payable monthly in arrears based on the number of days for which the subject loan is outstanding. Interest is charged on February 29 in a leap year.

The Stamping Fee is calculated based on the amount and the term of the B/A and is payable upon acceptance by the Bank of the B/A. The net proceeds received by the Borrower on a B/A advance will be equal to the Face Amount of the B/A discounted at the Bank's then prevailing B/A discount rate for CDN$ B/As or US$ B/As as the case may be, for the specified term of the B/A less the Stamping Fee. If the B/A discount rate (or the rate used to determine the B/A discount rate) is less than zero, it shall instead be deemed to be zero for purposes of this Agreement.

Interest on LIBOR Loans and CDOR Loans is calculated and payable on the earlier of contract maturity or quarterly in arrears, for the number of days in the LIBOR or CDOR interest period, as applicable.

L/C and L/G fees are payable at the time set out in the Letter of Credit Indemnity Agreement applicable to the issued L/C or L/G.

Interest is payable both before and after maturity or demand, default and judgment.

Each payment under this Agreement shall be applied to any indebtedness or amounts owing in any order at the sole discretion of the Bank.

For loans not secured by real property, all overdue amounts of principal and interest and all amounts outstanding in excess of the Credit Limit shall bear interest from the date on which the same became due or from when the excess was incurred, as the case may be, until the date of payment or until the date the excess is repaid at the Bank's standard rate charged from time to time for overdrafts, or such lower interest rate if the Bank agrees to a lower interest rate in writing. Nothing in this clause shall be deemed to authorize the Borrower to incur loans in excess of the Credit Limit.

If any provision of this Agreement would oblige the Borrower to make any payment of interest or other amount payable to the Bank in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by the Bank of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by the Bank of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows: first, by reducing the amount or rate of interest, and, thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the Bank which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

## 4. DRAWDOWN PROVISIONS

Prime Based and USBR Loans
There is no minimum amount of drawdown by way of Prime Based Loans and USBR Loans, except as stated in this Agreement. The Borrower shall provide the Bank with 3 Business Days' notice of a requested Prime Based Loan over $1,000,000.

B/As
The Borrower shall advise the Bank of the requested term or maturity date for B/As issued hereunder.  The Bank shall have the discretion to restrict the term or maturity dates of B/As. Except as otherwise stated in this Agreement, the minimum amount of a drawdown by way of B/As is $1,000,000 and in multiples of $100,000 thereafter. The Borrower shall provide the Bank with 3 Business Days' notice of a requested B/A drawdown.  The Borrower will pay to the Bank the Face Amount of the B/A at the maturity of the B/A.

The Borrower appoints the Bank as its attorney to and authorizes the Bank to (i) complete, sign, endorse, negotiate and deliver B/As on behalf of the Borrower in handwritten form, or by facsimile or mechanical signature or otherwise, (ii) accept such B/As, and (iii) purchase, discount, and/or negotiate B/As.

LIBOR and CDOR
The Borrower shall advise the Bank of the requested LIBOR or CDOR contract maturity or interest period.  The Bank shall have the discretion to restrict the LIBOR or CDOR contract maturity. Except as otherwise stated in this Agreement, the minimum amount of a drawdown by way of a LIBOR Loan or a CDOR Loan is $1,000,000, and shall be in multiples of $100,000 thereafter. The Borrower will provide the Bank with 3 Business Days' notice of a requested LIBOR Loan or CDOR Loan.

L/C and/or L/G
The Bank shall have the discretion to restrict the maturity date of L/Gs or L/Cs.

B/A, LIBOR and CDOR - Conversion
Any portion of any B/A, LIBOR or CDOR Loan that is not repaid, rolled over or converted in accordance with the applicable notice requirements hereunder shall be converted by the Bank to a Prime Based Loan effective as of the maturity date of the B/A or the last day in the interest period of the LIBOR or CDOR contract, as applicable. The Bank may charge interest on the amount of the Prime Based Loan at the rate of 115% of the rate applicable

to Prime Based Loans for the 3 Business Day period immediately following such maturity. Thereafter, the rate shall revert to the rate applicable to Prime Based Loans.

B/A, LIBOR and CDOR – Market Disruption
If the Bank determines, in its sole discretion, that a normal market in Canada for the purchase and sale of B/As or the making of CDOR or LIBOR Loans does not exist, any right of the Borrower to request a drawdown under the applicable borrowing option shall be suspended until the Bank advises otherwise. Any drawdown request for B/As, LIBOR or CDOR Loans, as applicable, during the suspension period shall be deemed to be a drawdown notice requesting a Prime Based Loan in an equivalent amount.

**LIBOR Discontinuation**
On the earliest of:

        (a)    the date that the administrator of LIBOR has permanently or indefinitely ceased to make LIBOR available;

        (b)    the governmental authority having jurisdiction over the administrator of LIBOR has made a public statement or publication of information announcing LIBOR is no longer representative; and

        (c)    the Early Opt-in Effective Date,

the LIBOR Successor Rate will replace LIBOR for all purposes hereunder and under any other documents (other than any swap agreement, but including any other Bank Security) required in connection herewith, in respect of any interest period and contract maturity of such benchmark on such day and all subsequent interest periods and contract maturities without any amendment to, or further action or consent of any party to this Agreement. If the LIBOR Successor Rate is Daily Simple SOFR, all interest payments will be payable on a monthly basis unless otherwise agreed by the Bank. Notwithstanding anything else herein, any definition of the LIBOR Successor Rate (exclusive of any margin) shall provide that in no event shall such LIBOR Successor Rate be less than zero for the purposes of this Agreement.

The Bank does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to LIBOR or the LIBOR Successor Rate including without limitation, whether the composition or characteristics of the LIBOR Successor Rate, will be similar to, or produce the same value or economic equivalence of, LIBOR or have the same volume or liquidity as did LIBOR prior to its discontinuance or unavailability.

In connection with the implementation and administration of the LIBOR Successor Rate, the Bank will have the right to make LIBOR Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary in this Agreement or in any Bank Security or other document provided in connection herewith, any amendments implementing such LIBOR Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.
The Bank will promptly notify the Borrower of (i) the occurrence of an Early Opt-in Election, (ii) the implementation of the LIBOR Successor Rate and (iii) the effectiveness of any LIBOR Replacement Conforming Changes. Any determination, decision or election that may be made by the Bank pursuant to this Section, including any determination with respect to a interest period, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section.

Cash Management
The Bank may, and the Borrower hereby authorizes the Bank to, drawdown under the Facility to satisfy any obligations of the Borrower to the Bank in connection with any cash management service provided by the Bank to

the Borrower. The Bank may drawdown under the Facility even if the drawdown results in amounts outstanding in excess of the Credit Limit.

## 5. STANDARD DISBURSEMENT CONDITIONS

The Bank shall have received the following documents which should be in form and substance satisfactory to the Bank:

1. a copy of a duly executed resolution of the Borrower's Board of Directors empowering the Borrower to enter into this Agreement;
2. all of the Bank Security and supporting resolutions and solicitors' letters of opinion required under this Agreement;
3. all operation of account documentation;
4. a completed Environmental Questionnaire and/or if requested by the Bank, an audit inspection report from auditors or inspectors acceptable to the Bank;
5. for drawdowns under the Facility by way of L/C or L/G, the Bank's standard form Letter of Credit Indemnity Agreement; and
6. a copy of any necessary or desirable government approvals authorizing the Borrower to enter into this Agreement.

## 6. STANDARD REPRESENTATIONS AND WARRANTIES

The Borrower hereby represents and warrants, which representations and warranties shall be deemed to be repeated each day hereafter, that:

1. The Borrower is a duly incorporated corporation, a limited partnership, partnership, or sole proprietorship, duly organized, validly existing and in good standing under the laws of the jurisdiction where the Branch/Centre is located and each other jurisdiction where the Borrower has property or assets or carries on business and the Borrower has adequate corporate power and authority to carry on its business, own property, borrow monies and enter into agreements therefore, execute and deliver the Agreement, the Bank Security, and documents required hereunder, and observe and perform the terms and provisions of this Agreement.
2. There are no laws, statutes or regulations applicable to or binding upon the Borrower and no provisions in its charter documents or in any by-laws, resolutions, contracts, agreements, or arrangements which would be contravened, breached, violated as a result of the execution, delivery, performance, observance, of any terms of this Agreement.
3. No event of default has occurred nor has any event occurred which, with the passage of time or the giving of notice, would constitute an event of default under any other agreement for borrowed money.
4. There are no actions, suits or proceedings, including appeals or applications for review, or any knowledge of pending actions, suits, or proceedings against the Borrower and its subsidiaries, before any court or administrative agency which would result in any material adverse change in the property, assets, financial condition, business or operations of the Borrower.
5. All material authorizations, approvals, consents, licenses, exemptions, filings, registrations and other requirements of governmental, judicial and public bodies and authorities required to carry on its business have been or will be obtained or effected and are or will be in full force and effect.
6. The financial statements and forecasts delivered to the Bank fairly present the present financial position of the Borrower, and have been prepared by the Borrower and its auditors in accordance with the International Financial Reporting Standards or GAAP for Private Enterprises. .
7. All of the remittances required to be made by the Borrower to the federal government and all provincial and municipal governments have been made, are currently up to date and there are no outstanding arrears.  Without limiting the foregoing, all employee source deductions (including income taxes, Employment Insurance and Canada Pension Plan), sales taxes (both provincial and federal), corporate income taxes, corporate capital taxes, payroll taxes and workers' compensation dues are currently paid and up to date.
8. If the Bank Security includes a charge on real property, the Borrower or Guarantor, as applicable, is the legal and beneficial owner of the real property with good and marketable title in fee simple thereto, free from

14

all easements, rights-of-way, agreements, restrictions, mortgages, liens, executions and other encumbrances, save and except for those approved by the Bank in writing.

9.  All information that the Borrower has provided to the Bank is accurate and complete respecting, where applicable:

      I.    the names of the Borrower's directors and the names and addresses of the Borrower's beneficial owners;

      II.   the names and addresses of the Borrower's trustees, known beneficiaries and/or settlors; and

      III.  the Borrower's ownership, control and structure.

## 7. STANDARD POSITIVE COVENANTS

In addition to all of the other obligations in this Agreement the Borrower will:

(i)     pay all amounts outstanding to the Bank when due or demanded,

(ii)    maintain its existence as a sole proprietorship, corporation, partnership or limited partnership, as the case may be, and keep all material agreements, rights, franchises, licenses, operations, contracts or other arrangements in full force and effect,

(iii)   pay all taxes,

(iv)   maintain its property, plant and equipment in good repair and working condition,

(v)    continue to carry on the business now being carried on,

(vi)   maintain adequate insurance on all of its assets, undertakings, and business risks,

(vii)  permit the Bank and its authorized representatives full access to its premises, business, financial and computer records and allow the duplication or extraction of pertinent information therefrom, and

(viii) comply with all applicable laws.

## 8. STANDARD NEGATIVE COVENANTS

The Borrower will not:

(i)     create, incur, assume, or suffer to exist, any mortgage, deed of trust, pledge, lien, security interest, assignment, charge, or encumbrance (including without limitation, any conditional sale, or other title retention agreement, or finance lease) of any nature, upon or with respect to any of its property, now owned or hereafter acquired except for those Permitted Liens set out in the Letter.

(ii)    merge or amalgamate with any other entity or permit any change of ownership or change its capital structure, and

(iii)   sell, lease, assign, or otherwise dispose of all or substantially all of its assets.

Compliance by the Borrower with these Positive Covenants and Negative Covenants shall not automatically entitle the Borrower to the continued availability of the Facility and shall not restrict or limit the Bank's ability to demand repayment of all or any part of amounts outstanding under the Facility.

## 9. ADDITIONAL INFORMATION AND SECURITY

The Borrower will provide, or cause to be provided, whatever information the Bank may request from time to time, including, without limitation, such updated information and/or additional supporting information as the Bank may require with respect to any or all the matters in the Borrower's representation and warranty made in paragraph 8 of the above Section 6. The Borrower will provide, or cause to be provided, any security or guarantees required by the Bank from time to time.

## 10. INDEMNITY

The Borrower agrees to indemnify the Bank from and against any and all claims, losses and liabilities arising or resulting from this Agreement. US$ loans must be repaid with US$ and CDN$ loans must be repaid with CDN$ and the Borrower shall indemnify the Bank for any loss suffered by the Bank if US$ loans are repaid with CDN$ or vice versa, whether such payment is made pursuant to an order of a court or otherwise. In no event will the Bank be liable to the Borrower for any direct, indirect or consequential damages arising in connection with this Agreement.

## 11. TAXATION ON PAYMENTS

All payments made by the Borrower to the Bank will be made free and clear of all present and future taxes (excluding the Bank's income taxes), withholdings or deductions of whatever nature.  If these taxes, withholdings or deductions are required by applicable law and are made, the Borrower shall, as a separate and independent obligation, pay to the Bank all additional amounts as shall fully indemnify the Bank from any such taxes, withholdings or deductions.

## 12. FX CLOSE OUT

The Borrower hereby acknowledges and agrees that in the event any of the following occur: (i) Default by the Borrower under any forward foreign exchange contract("FX Contract"); (ii) Default by the Borrower in payment of monies owing by it to anyone, including the Bank; (iii) Default in the performance of any other obligation of the Borrower under any agreement to which it is subject; or (iv) the Borrower is adjudged to be or voluntarily becomes bankrupt or insolvent or admits in writing to its inability to pay its debts as they come due or has a receiver appointed over its assets, the Bank shall be entitled without advance notice to the Borrower to close out and terminate all of the outstanding FX Contracts entered into hereunder, using normal commercial practices employed by the Bank, to determine the gain or loss for each terminated FX contract. The Bank shall then be entitled to calculate a net termination value for all of the terminated FX Contracts which shall be the net sum of all the losses and gains arising from the termination of the FX Contracts which net sum shall be the "Close Out Value" of the terminated FX Contracts. The Borrower acknowledges that it shall be required to forthwith pay any positive Close Out Value owing to the Bank and the Bank shall be required to pay any negative Close Out Value owing to the Borrower, subject to any rights of set-off to which the Bank is entitled or subject.

## 13. ENVIRONMENTAL REPRESENTATION AND UNDERTAKINGS

The Borrower represents, warrants and covenants (which representation, warranty and covenant shall continue each day hereafter) that its property and business is being operated in compliance with applicable environmental, health and safety laws and regulations and that there are no judicial or administrative proceedings in respect thereto.

The Borrower shall, when asked by the Bank, at the Borrower's expense, obtain and provide to the Bank an appraisal, environmental audit or inspection report of any of its property from appraisers, auditors or inspectors acceptable to the Bank.

The Borrower will defend, indemnify and hold harmless the Bank, its officers, directors, employees, agents and shareholders, against all loss, costs, claims, damages and expenses (including legal, audit and inspection expenses) which may be suffered or incurred in connection with the breach of this environmental representation, warranty and covenant and against environmental damage occasioned by the Borrower's activities or by contamination of or from any of the Borrower's property.

## 14. REPRESENTATION

No representation or warranty or other statement made by the Bank concerning the Facility shall be binding on the Bank unless made by it in writing as a specific amendment to the Agreement.

## 15. BANK MAY CHANGE AGREEMENT

The Bank may change the provisions of this Agreement from time to time. These changes include, without limitation, changes to the Credit Limit, interest rate, or fees payable by the Borrower. The Bank will notify the Borrower of any change in this Agreement by mail, hand delivery, electronic mail or facsimile transmission or for a change in any interest rates or interest rate definitions by posting a notice in all of the Bank's branches.  The Bank is not required to notify a Guarantor of any change in the Agreement, including without limitation, any increase in the Credit Limit, Overdraft Limit or Loan Amount. If more than one Person signs this Agreement, communication with any one Person will serve as notice to all.

## 16. METHOD OF COMMUNICATION

The Bank may communicate with the Borrower by ordinary, uninsured mail or other means, including hand delivery, electronic mail or facsimile transmission. Mailed information is deemed to be received by the Borrower

five days after mailing. Delivered information is deemed to be received when delivered or left at the Borrower's address. Electronically delivered information is deemed to be received when sent. Messages sent by facsimile are deemed to be received when the Bank receives a fax confirmation.

## 17. EXPENSES

The Borrower shall pay all fees and expenses (including but not limited to all legal fees) incurred by the Bank in connection with the preparation, registration and ongoing administration of this Agreement and the Bank Security and with the enforcement of the Bank's rights and remedies under this Agreement and the Bank Security whether or not any amounts are advanced under the Agreement. These fees and expenses shall include, but not be limited to, all outside counsel expenses and all in-house legal expenses, if in-house counsel are used, and all outside professional advisory expenses. The Borrower shall pay interest on unpaid amounts due pursuant to this paragraph at the All-In Rate plus 2% per annum.

Without limiting the generality of Section 24, the Bank or the Bank's agent, is authorized to debit any of the Borrower's accounts with the amount of the fees and expenses owed by the Borrower hereunder, including the registration fee in connection with the Bank Security, even if that debiting creates an overdraft in any such account. If there are insufficient funds in the Borrower's accounts to reimburse the Bank or it's agent for payment of the fees and expenses owed by the Borrower hereunder, the amount debited to the Borrower's accounts shall be deemed to be a Prime Based Loan under the Facility.

The Borrower will, if requested by the Bank, sign a Pre-Authorized Payment Authorization in a format acceptable to the Bank to permit the Bank's agent to debit the Borrower's accounts as contemplated in this Section.

## 18. NON WAIVER

Any failure by the Bank to object to or take action with respect to a breach of this Agreement or any Bank Security shall not constitute a waiver of the Bank's right to take action at a later date on that breach. No course of conduct by the Bank will give rise to any reasonable expectation which is in any way inconsistent with the terms and conditions of this Agreement and the Bank Security or the Bank's rights thereunder.

## 19. EVIDENCE OF INDEBTEDNESS

The Bank shall record on its records the amount of all advances made hereunder, payments made in respect thereto, and all other amounts becoming due to the Bank under this Agreement. The Bank's records constitute, in the absence of manifest error, conclusive evidence of the Borrower's indebtedness to the Bank pursuant to this Agreement.

The Borrower will sign the Bank's standard form Letter of Credit Indemnity Agreement for all L/Cs and L/Gs issued by the Bank.

With respect to chattel mortgages taken as Bank Security, this Agreement is the Promissory Note referred to in same chattel mortgage, and the indebtedness incurred hereunder is the indebtedness secured by the chattel mortgage.

## 20. ENTIRE AGREEMENTS

This Agreement replaces any previous agreements dealing specifically with the Facility. Agreements relating to other credit facilities made available by the Bank continue to apply for those other credit facilities. This Agreement, and if applicable, the Letter of Credit Indemnity Agreement are the entire agreements relating to the Facility described in this Agreement.

## 21. NON-MERGER

Notwithstanding the execution, delivery or registration of the Bank Security and notwithstanding any advances made pursuant thereto, this Agreement shall continue to be valid, binding and enforceable and shall not merge as a result thereof. Any default under this Agreement shall constitute concurrent default under the Bank Security. Any default under the Bank Security shall constitute concurrent default under this Agreement. In the event of an inconsistency between the terms of this Agreement and the terms of the Bank Security, the terms of this Agreement shall prevail and the inclusion of any term in the Bank Security that is not dealt with in this Agreement shall not be an inconsistency.

## 22. ASSIGNMENT

The Bank may assign or grant participation in all or part of this Agreement or in any loan made hereunder without notice to and without the Borrower's consent.

The Borrower may not assign or transfer all or any part of its rights or obligations under this Agreement.

## 23. RELEASE OF INFORMATION

The Borrower hereby irrevocably authorizes and directs its accountant, (the "Accountant") to deliver all financial statements and other financial information concerning the Borrower to the Bank and agrees that the Bank and the Accountant may communicate directly with each other.

## 24. SET-OFF

In addition to and not in limitation of any rights now or hereafter granted under applicable law, the Bank may at any time and from time to time without notice to the Borrower or any other person, any notice being expressly waived by the Borrower, set-off and apply any and all deposits, general or special, time or demand, provisional or final, matured or unmatured, in any currency, and any other indebtedness or amount payable by the Bank (irrespective of the place of payment or booking office of the obligation), to or for the Borrower's credit or for the Borrower's account, including without limitation, any amount owed by the Bank to the Borrower under any FX Contract or other treasury or derivative product, against and on account of the indebtedness and liability under this Agreement notwithstanding that any of them are contingent or unmatured or in a different currency than the indebtedness and liability under this Agreement.

When applying a deposit or other obligation in a different currency than the indebtedness under this Agreement to the indebtedness under this Agreement, the Bank will convert the deposit or other obligation to the currency of indebtedness under this Agreement using the exchange rate determined by the Bank at the time of the conversion.

## 25. SEVERABILITY

In the event any one or more of the provisions of this Agreement shall for any reason, including under any applicable statute or rule of law, be held to be invalid, illegal or unenforceable, that part will be severed from this Agreement and will not affect the enforceability of the remaining provisions of this Agreement, which shall remain in full force and effect.

## 26. MISCELLANEOUS

i)   The Borrower has received a signed copy of this Agreement;

ii)  If more than one person, firm or corporation signs this Agreement as the Borrower, each party is jointly and severally liable hereunder, and the Bank may require payment of all amounts payable under this Agreement from any one of them, or a portion from each, but the Bank is released from any of its obligations by performing that obligation to any one of them;

iii) Accounting terms will (to the extent not defined in this Agreement) be interpreted in accordance with accounting principles established from time to time by the Canadian Institute of Chartered Accountants (or any successor) consistently applied, and all financial statements and information provided to the Bank will be prepared in accordance with those principles;

iv)  This Agreement is governed by the law of the Province or Territory where the Branch/Centre is located.

v)   Unless stated otherwise, all amounts referred to herein are in Canadian dollars.

# Exhibit C

# BDC Loan Documents



BDCID: 10028464765

**Letter of Offer dated May 30, 2022**

**Lobster SH Ltd.**
5525 Highway 3
Shag Harbour, NS
B0W 3B0

**Attention of: Mr. Greg Smith**

**Re: Loan No. 230030-01**

In accordance with this letter of offer of credit as amended from time to time (the "**Letter of Offer**"), Business Development Bank of Canada ("**BDC**") is pleased to offer you the following loan(s) (hereinafter individually or collectively referred to as the "**Loan**"). The Letter of Offer is open for acceptance until June 9, 2022 (the "**Acceptance Date**") and must be received by BDC duly signed no later than the Acceptance Date otherwise it shall automatically be deemed withdrawn by BDC**.**

**LOAN PURPOSE AND FUNDING**

**Loan Purpose**

| | |
|---|---|
| Refinance RBC | $1,300,000.00 |
| Working Capital (unfunded capex) | $1,700,000.00 |
| | $3,000,000.00 |

**Funding**

| | |
|---|---|
| BDC 230030-01 | $3,000,000.00 |
| | $3,000,000.00 |

No change to the Loan Purpose or Funding may be made without BDC's prior written consent. The proceeds of the Loan may only be used for the Loan Purpose.

**DEFINITIONS**

In the Letter of Offer, capitalized terms have the meanings described in Schedule "A" – Section I or are defined elsewhere in the text of the Letter of Offer.

**LENDER**

BDC

Business Development Bank of Canada
Cogswell Tower - Scotia Square, 2000 Barrington Street, Suite 1400
Halifax, NS B3J3K1
www.bdc.ca
EN_LOO_V6.0

---

### BORROWER

Lobster SH Ltd. (the "**Borrower**")

### GUARANTOR

100 Shore Road, Ltd.

Lobsterboys Ltd.

Lobsterboys DH Realty Ltd.

L.B. Land Trust Inc.

Justin Manuel Maderia

Travis L. Maderia

(Hereinafter individually or collectively referred to as the "**Guarantor**"). The terms of each guarantee are set forth in the Security section below.

### LOAN AMOUNT

**Loan 230030-01:** $3,000,000.00

### INTEREST RATE

The Loan and all other amounts owing by the Borrower pursuant to the Loan Documents shall bear interest at the following rate:

**Loan 230030-01**

**Floating Rate**
BDC's Floating Base Rate plus a variance of 0.00% per year (the "**Variance 01**"). On the date hereof, BDC's Floating Base Rate is 5.30% per year.

### INTEREST CALCULATION

Interest shall be calculated monthly on the outstanding principal, commencing on the date of the first disbursement, both before and after maturity, Default and judgement.

Arrears of interest or principal and all other amounts owing by the Borrower pursuant to the Loan Documents shall bear interest at the rate applicable to the Loan and shall be calculated and compounded monthly.

---

## REPAYMENT

Principal of the Loan is repayable according to the following table. The balance of the Loan in principal and interest and all other amounts owing pursuant to the Loan Documents shall become due and payable in full on the Maturity Date indicated below.

**Loan 230030-01**

**Regular**

| Payments | | | Start Date | End Date |
|---|---|---|---|---|
| Number | Frequency | Amount ($) | | |
| 1 | Once | 17,860.00 | 01/06/2023 | 01/06/2023 |
| 179 | Monthly | 16,660.00 | 01/07/2023 | 01/05/2038 |

In addition, interest is payable monthly on the 1st day of the month (the "**Payment Date 01**") commencing on the next occurring Payment Date 01 following the first advance on the Loan.

Maturity Date: May 1, 2038 (the "**Maturity Date 01**").

## PREPAYMENT

**Annual Prepayment Privilege:** Provided that the Borrower is not in default of any of its obligations to BDC, the Borrower may, once in any 12 month period, prepay up to 15% of the outstanding principal on any Loan without indemnity. The first prepayment can be made at any time more than one year after May 30, 2022. The prepayment privilege is not cumulative and each prepayment on an individual Loan must be at least 12 months subsequent to the last prepayment on that same loan. The prepayment privilege is not transferable from one individual Loan to another and is not applicable if any Loan is being repaid in full. If the loan is prepaid in full within 30 days following receipt of the amount paid as a prepayment privilege, BDC will calculate a prepayment indemnity, effective the day the full balance is repaid, on the amount of the last received prepayment privilege and add it to the prepayment indemnity calculated on the full remaining balance being repaid.

**Prepayment Indemnity:** In addition to the annual prepayment privilege, the Borrower may prepay at any time all or part of the principal provided that the Borrower pays the interest owing up to the time of the prepayment together with an indemnity equal to:

If the interest rate on the Loan is a floating rate:
- three months further interest on the principal prepaid at the floating interest rate then applicable to the Loan.

If the interest rate on the Loan is a fixed rate:
- the sum of (a) three months further interest on the principal prepaid at the fixed interest rate then applicable to the Loan; and (b) the Interest Differential Charge.

Partial prepayments shall be applied regressively on the then last maturing instalments of principal.

---

## SECURITY

The Loan, interest on the Loan and all other amounts owing pursuant to the Loan Documents shall be secured by the following (the **"Security"**):

### Loan 230030-01

1.  General Security Agreement from Lobster SH Ltd. providing:
    1. A first security interest in all other present and after-acquired personal property, except consumer goods, subject only to

    - Priority on inventory and accounts receivable to the lender extending line of credit

2.  Guarantee of Lobsterboys DH Realty Ltd. for the full amount of the Loan supported by;

    1) A first readvanceable mortgage in the principal amount of $5,000,000 on land (approx. 1.09 acres) (legally described as PID's: 00275404, 55195762, 00275412, 55116131 and building(s) located at 61, 65 and 67 Dipper Harbour Road, Dipper Harbour, NB.  Property's owned by Lobsterboys DH Realty  Ltd. Building location survey or title insurance required. Assignment of rents required.

    2) A general security agreement providing a first rank in all present and after acquired personal property.

    The guarantor agrees that it is directly responsible for the payment of the cancellation, standby and legal fees.

3.  Guarantee of Lobsterboys Ltd. for the full amount of the Loan supported by:

    1. A first readvanceable mortgage in the principal amount of $5,000,000 on land (approx. 1.18 acres) (legally described as PID 80022197) and building(s) located at 5525 Highway 3, Shag Harbour.  Property owned by Lobsterboys Ltd. Building location survey or title insurance required. Assignment of rents required.

    2. A general security agreement providing a first rank in all present and after acquired personal property.

    The guarantor agrees that it is directly responsible for the payment of the cancellation, standby and legal fees.

4.  Guarantee of L.B. Land Trust Inc. for the full amount of the Loan. The guarantor agrees that it is directly responsible for the payment of the cancellation, standby and legal fees.

5.  Guarantee of 100 Shore Road, Ltd. for the full amount of the Loan supported by:
    1) a first readvanceable mortgage in the principal amount of $5,000,000 on land legally (Lawyer to confirm the legal description and lot size) described as PID 80082845 & 80082852 located on Lot 100 & 101 Shore Road, Port Saxton,  NS.  Property owned by 100 Shore Road, Ltd. Building location survey or title insurance required. Assignment of rents required.

    The guarantor agrees that it is directly responsible for the payment of the cancellation, standby and legal fees.

**LETTER OF OFFER** Lobster SH Ltd. - 230030, May 30, 2022

---

6.  Joint and Several Guarantee of Justin Manuel Maderia and Travis Lee Maderia for the loan balance outstanding. The guarantors agree that they are directly responsible for the payment of the cancellation, standby and legal fees.

7.  Postponement of shareholder(s) loan(s) totalling $ 1,500,000 from Justin Maderia and Travis Maderia to Lobster SH Ltd. Providing the BDC Loan is in good standing, interest may be paid at an annual rate not greater than the interest rate on the BDC Loan.

## DISBURSEMENT

The Loan funds shall be disbursed as follows:

**Loan 230030-01**

1.  Funds will be advanced to the appointed solicitor.

    For each loan being refinanced as described in the Loan Purpose, written confirmation of the payout balance must be obtained directly from the refinanced lender or from the external solicitor/notary and directed to retire the balance.

    Any remaining funds will be advanced to the borrower.

Unless otherwise indicated above, funds for each Loan account number shall be disbursed to BDC's solicitor or notary mandated by BDC for security taking for the Loan.

## CONDITIONS PRECEDENT

Any obligation to make any advance under the Letter of Offer is subject to the following conditions being fulfilled to the satisfaction of BDC:

1.  Receipt of the Security in form and substance satisfactory to BDC registered as required to perfect and maintain the validity and rank of the security, and such certificates, authorizations, resolutions and legal opinions as BDC may reasonably require.

2.  Satisfactory review of all financial information relating to each Loan Party and its business as BDC may reasonably require.

3.  No Default or Event of Default shall have occurred.

4.  No Material Adverse Change shall have occurred.

5.  Provision of documents evidencing expenditures under the Loan Purpose, if applicable.

6.  Satisfaction of all applicable disbursement conditions contained in the Disbursement section of this Letter of Offer.

7.  Prior to any advance under this loan the borrower is to provide the Bank with confirmation of closing of the sale of the shareholders residential property in Miami, the closing is to provide a minimum of $1,500,000 CAD equivilant net proceeds to be injected in Lobster SH Ltd.

8.  Provide satisfactory transmittal letter(s) for the Equipment Appraisal Reports prepared by Castle Appraisals Ltd. for the 65 Dipper Harbours Road, Dipper Harbour, NB Report dated Feb. 13, 2022 and the 5525 Hwy. 3, Shag Harbour, NS Report dated Feb. 10, 2022.

9.  Provide written confirmation that the TD Bank credit facility has been funded and that all advances owing to RBC have been or will be repaid.

**LETTER OF OFFER** Lobster SH Ltd. - 230030, May 30, 2022

10. Provide satisfactory written confirmation that RYDER SYSTEMS INC collections claim on Lobsterboys SH Ltd. (now o/a Lobster SH Ltd. since amalgamation) has been paid, or removed if in error.

11. Prior to the disbursement of the final amount of $150,000, submit a Phase I – Environmental Site Assessment Report prepared by an external consultant commissioned by / acceptable to BDC for the property located at Lot 100 & 101 Lake Shore Road, Port Saxton, NS. The contents and the conclusions of the Report(s) must all be acceptable to BDC. The Borrower is responsible for the payment of all charges relative to the preparation of the report(s).

## LAPSING DATE

**Loan 230030-01**

Lapsing Date: May 30, 2023 (the "**Lapsing Date 01**").

Any undisbursed portion of a Loan shall lapse and be cancelled on the occurrence of the earliest of the following events:

a) on the applicable Lapsing Date indicated above; or

b) on the date the Borrower notifies BDC of its intention to cancel the Loan; or

c) on the date BDC issues a notice to the Borrower that an Event of Default has occurred and that BDC has terminated its obligation to make any further advances under the Loan.

Each of the above is hereby considered a "Lapsing Event" and shall be subject to Cancellation Fees as provided for in this Letter of Offer.

## UNDERLYING CONDITIONS

The following conditions shall apply throughout the term of the Loan:

1. You agree to provide BDC, concurrently with the submission of your annual financial statements, written proof of your payment of the property taxes on lands mortgaged to BDC.

2. Based on the annual review engagement combined financial statements for Lobster SH Ltd. (combined with all listed corporate guarantors) and starting as of December 31, 2022: (i)      Maintain at all times a Fixed Charge Coverage Ratio (FCCR) equal to or greater than 1.10:1.00.

3. You agree to pay BDC $1,000 for any late reporting of financial information.

## REPRESENTATIONS AND WARRANTIES

The Loan Parties make the representations and warranties in Schedule "A" – Section II. These representations and warranties shall survive the execution of the Letter of Offer and shall continue in force and effect until the full payment and performance of all obligations of the Loan Parties pursuant to the Loan Documents.

## COVENANTS

Each Loan Party shall perform the covenants in Schedule "A" – Section III.  These covenants shall survive the execution of the Letter of Offer and shall continue in force and effect until the full

**LETTER OF OFFER** Lobster SH Ltd. - 230030, May 30, 2022

payment and performance of all obligations of the Loan Parties pursuant to the Loan Documents.

## REPORTING OBLIGATIONS

The Borrower shall provide to BDC the following financial statements and other documents:

| Company | Type | Frequency | Period Ending |
|---|---|---|---|
| Lobster SH Ltd. | Review Engagement | Annual | December |
| Lobsterboys Ltd. | Compilation Engagement prepared by a CPA | Annual | December |
| L.B. Land Trust Inc. | Compilation Engagement prepared by a CPA | Annual | December |
| 100 Shore Road, Ltd. | Compilation Engagement prepared by a CPA | Annual | December |
| Lobsterboys DH Realty Ltd. | Compilation Engagement prepared by a CPA | Annual | December |
| Lobster SH Ltd. | Combined Review Engagement | Annual | December |

The above annual financial statements and other documents indicated as required annually shall be provided to BDC within 90 days following the applicable Period Ending.

If financial statements or other documents are required more frequently than on an annual basis, same shall be provided to BDC within 30 days following each applicable Frequency.

In addition, the Borrower shall provide any other financial and operating statements and reports as and when BDC may reasonably require.

The Loan Parties also agree that the Reporting Obligations above shall apply to all other existing BDC loans to the same Borrower, if any, and the letter(s) of offer for such existing loans are deemed amended accordingly. Furthermore, such amended Reporting Obligations shall continue to be effective in respect of said existing letters of offer notwithstanding that this Letter of Offer may be reimbursed or cancelled.

## EVENTS OF DEFAULT

The occurrence of any of the events listed in Schedule "A" – Section IV constitutes an event of default under the Letter of Offer (each an "**Event of Default**"). If an Event of Default occurs, any obligation of BDC to make any advance, shall, at BDC's option, terminate and BDC may, at its option, demand immediate payment of the Loan and enforce any Security.  Notwithstanding any other provision of this Letter of Offer or any other Loan Document, the parties hereto agree that the time limited for commencement of any action to enforce the obligations of the Borrowers and

**LETTER OF OFFER** Lobster SH Ltd. - 230030, May 30, 2022

---

Guarantors, including the enforcement of any Security, shall not commence until BDC has issued a written demand for full payment of the Loan.

The exercise by BDC of any of its rights shall not preclude it from exercising any other rights resulting from this Letter of Offer or Loan Documents, as BDC's rights are cumulative and not alternative. No action or omission on the part of BDC shall constitute or imply a renunciation of its rights to determine that a Default or Event of Default has occurred or to avail itself of its rights resulting therefrom.

## FEES

### Cancellation Fee

If the Loan is not fully disbursed due to a Lapsing Event, regardless of the reason for the Lapsing Event, the Loan Parties shall pay BDC a cancellation fee in proportion to the percentage of the Loan that is cancelled, based on the amount below being the fee if 100% of the Loan is cancelled. No cancellation fee will be payable if less than 50% of the Loan is cancelled.  If the Loan includes funds to refinance an existing BDC Loan, those funds shall be excluded from the calculation of the percentage of the Loan that is cancelled.

The cancellation fee is payable on demand and is liquidated damages, not a penalty, and represents a reasonable estimate of BDC's damages should the Loan be cancelled or allowed to lapse in whole or in part.

### Loan 230030-01

Cancellation Fee: $90,000.00 (the "**Cancellation Fee 01**").

### Standby Fee

The Loan Parties shall pay BDC a non-refundable standby fee calculated at a rate as indicated below on the portion of the Loan which has not been advanced or cancelled. This fee shall be calculated daily and be payable in arrears commencing on the date indicated below and on each Payment Date thereafter.

### Loan 230030-01

Rate:   1.50% per annum
Date:   November 30, 2022

### Legal Fees and Other Expenses

The Loan Parties shall pay, on demand, all legal fees and expenses and other out-of-pocket costs of BDC, incurred in connection with the Loan and the Loan Documents, whether or not any documentation is entered into or any advance is made to the Borrower. All legal and other out-of-pocket expenses of BDC in connection with any amendment or waiver related to the Loan and the Loan documents shall also be for the account of the Loan Parties.

All costs, fees, expenses and protective disbursements incurred for the enforcement of the Loan and the Loan Documents are payable by the Loan Parties, including the full amount of all legal and professional fees and expenses paid by BDC at the rate at which those amounts are billed to BDC.

**LETTER OF OFFER** Lobster SH Ltd. - 230030, May 30, 2022

---

### Loan Management Fee

The Loan Parties shall pay BDC an annual management fee as indicated below. This management fee is payable annually on the Payment Date immediately following each anniversary of the first advance of the specific Loan account number. This fee is non-refundable and is subject to change at BDC's sole discretion, acting reasonably, effective upon the Borrower's receipt of written notification from BDC, to cover additional costs or fees incurred in the management of the Loan, including, but not limited to, resulting from the Borrower's failure to remit financial statements or other documents as required under the Letter of Offer.

### Loan 230030-01

$1,000.00 per year (the "**Management Fee 01**").

### Transaction Fees

The Borrower shall pay BDC loan amendment and Security processing fees charged for the administrative handling of the Loan.

### CONFLICTS

The Loan Documents constitute the entire agreement between BDC and the Loan Parties. To the extent that any provision of the Letter of Offer is inconsistent with or in conflict with the provisions of the other Loan Documents, such provision of the Letter of Offer shall govern.

### INDEMNITY

The Borrower shall indemnify and hold BDC harmless against any and all claims, damages, losses, liabilities and expenses incurred, suffered or sustained by BDC by reason of or relating directly or indirectly to the Loan Documents save and except any such claim, damage, loss, liability and expense resulting from the gross negligence or wilful misconduct of BDC.

### GOVERNING LAW

This Letter of Offer shall be governed by and construed in accordance with the laws of the jurisdiction in which the Business Centre of BDC is located as shown on the first page of this Letter of Offer.

### SUCCESSORS AND ASSIGNS

The Letter of Offer shall extend to and be binding on each Loan Party and BDC and their respective permitted successors and assigns. BDC, in its sole discretion, may assign, sell or grant participation in (a "**transfer**") all or any part of its rights and obligations under the Loan or the Loan Documents to any third party, and the Loan Parties agree to sign any documents and take any actions that BDC may reasonably require in connection with any such transfer. Upon completion of the transfer, the third party will have the same rights and obligations under the Loan Documents as if it were a party to them, with respect to all rights and obligations included in the transfer and BDC will be released to the extent of any interest under the Loan or Loan Documents it assigns. BDC may disclose information it has in connection with the Borrower or any Loan Party to any actual or prospective transferee. No Loan Party shall have the right to assign any of its rights or obligations

**LETTER OF OFFER** Lobster SH Ltd. - 230030, May 30, 2022

---

under or pursuant to the Loan Documents without BDC's prior written consent.

## ACCEPTANCE

The Letter of Offer and any modification of it may be signed and accepted by an original ink signature or by electronic signature as permitted by BDC, and may be delivered on paper, fax, or in an electronic format (PDF) through BDC's electronic client portal, or any other electronic means of communication acceptable to BDC. It may also be signed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same Letter of Offer.

## SCHEDULE

The Letter of Offer includes Schedule "A" which contains Definitions, Representations and Warranties, Covenants, Events of Default and General Terms and Conditions. Schedule "A" has been inserted after the signature page and forms an integral part of the Letter of Offer.

## LANGUAGE CLAUSE

The parties hereby confirm their express wish that the Letter of Offer and all related documents be drawn up in the English language. Les parties reconnaissent leur volonté expresse que la présente lettre d'offre ainsi que tous les documents qui s'y rattachent soient rédigés en langue anglaise.

Should you have any questions regarding the Letter of Offer, do not hesitate to communicate with one of the undersigned.


*James Dalziel*

James Dalziel
Director, Corporate Financing
Phone: (902) 426-4969
Fax: (902) 426-6783
James.DALZIEL@bdc.ca

*Mathieu Barbeau*

Mathieu Barbeau
Associate Manager,
Corporate Financing
Phone: (418) 722-1472
Mathieu.BARBEAU@bdc.ca

**LETTER OF OFFER** Lobster SH Ltd. - 230030, May 30, 2022

## ACCEPTANCE

Each Loan Party hereby accepts the terms and conditions set forth above and in the attached Schedule "A".

This  2nd  day of  June                                      20 22  .

**Lobster SH Ltd.**

*Travis Maderia*
_____ , Authorized Signing Officer

Name:  Travis Maderia
      _____
      *[Please print name of signing party]*

## GUARANTORS

**100 Shore Road, Ltd.**

*Travis Maderia*
_____ , Authorized Signing Officer

Name:  Travis Maderia
      _____
      *[Please print name of signing party]*

**Lobsterboys Ltd.**

*Travis Maderia*
_____ , Authorized Signing Officer

Name:  Travis Maderia
      _____
      *[Please print name of signing party]*

**Lobsterboys DH Realty Ltd.**

*Travis Maderia*
_____, Authorized Signing Officer

Name: Travis Maderia
*[Please print name of signing party]*

**L.B. Land Trust Inc.**

*Travis Maderia*
_____, Authorized Signing Officer

Name: Travis Maderia
*[Please print name of signing party]*

*Justin Maderia*
_____
**Justin Manuel Maderia**

*Travis Maderia*
_____
**Travis L. Maderia**

Lobster SH Ltd.                                                    SCHEDULE "A"

May 30, 2022

| SECTION I - DEFINITIONS |
| --- |

### A.  General Definitions:

**"BDC's Base Rate"** – means the annual rate of interest announced by BDC through its offices from time to time as its base rate and, as the case may be, subject to a discount for the duration, applicable to each of BDC's fixed interest rate plans then in effect for determining the fixed interest rates on Canadian dollar loans.

**"BDC's Floating Base Rate"** – means the annual rate of interest announced by BDC through its offices from time to time as its floating rate then in effect for determining the floating interest rates on Canadian dollar loans. The interest rate applicable to the Loan shall vary automatically without notice to the Borrower upon each change in BDC's Floating Base Rate.

**"BDC's US Dollar Floating Base Rate"** – means the 1-month US Dollar floating base rate set the last business day of each month for the following month for determining the floating interest rates on US Dollar loans. The interest rate applicable to the Loan shall vary automatically without notice to the Borrower upon each change in BDC's US Dollar Floating Base Rate. BDC's US Dollar Floating Base Rate for the period from the date of the first advance on the Loan to the first business day of the following month will be the 1-month US Dollar floating base rate as established by BDC on the first business day of the month in which the funds are disbursed. Thereafter, the 1-month US Dollar Floating Base Rate may vary on the first business day of each month.

"**Change of Control**" – means any operation or series of transactions pursuant to which the Control of a Person is transferred from one Person to another or required by a Person, or any binding undertaking to proceed with any such operations.

"**Control**" – means the power to, directly or indirectly, acting alone or together with other Persons, direct or cause the direction of the management, business, affairs or policies of a Loan Party, whether through ownership of partnership interests, trust interests, or voting securities, by contract or otherwise, including, but without limiting the generality of the foregoing, in the case of a corporation, a Person is deemed to control a corporation if such Person (or such Person and its affiliates) holds, directly or indirectly, more than fifty per cent (50%) of the voting rights of the corporation.  For the purposes of this definition, indirect control will include, without limitation, control that is exercised by one Person over another, through an intermediary that is controlled by the first.

**"Corresponding Fixed Interest Rate Plan"** – means, at any time in respect of a prepayment, the fixed interest rate plan then being offered by BDC to its clients equal to the number of years, rounded to the nearest year (minimum of one year), from the date such prepayment is received to the next scheduled Interest Adjustment Date (or the Maturity Date if earlier).

**"Default"** – means an Event of Default or any condition that, with the giving of notice, the passage of time or otherwise, is susceptible of being an Event of Default.

**"Equity Interests"** – means, with respect to any Person, any and all shares, interests, participations, rights in, or other equivalents (however designated) of such Person's capital, including any interest in a partnership, limited partnership or other similar Person and any beneficial interest in a trust, which carry the right to vote on the election of directors or individuals exercising similar functions in respect of such Person and/or which entitle their holder to participate in the profits of such Person.

**"Interest Adjustment Date"** – means, in respect of any fixed interest rate plan, the day after the Interest Expiration Date of such fixed interest rate plan.

**"Interest Differential Charge"** – means, in respect of the prepayment of the Loan for any portion of the Loan on a fixed interest rate plan or the selection by the Borrower of a new interest rate plan prior to the Interest Expiration Date, if, on the date of the prepayment or the selection of the new plan, as applicable, the BDC's Base Rate for the Corresponding Fixed Interest Rate Plan is lower than the BDC's Base Rate in effect when the Borrower entered or renewed the fixed interest rate plan, whichever is most recent, the amount calculated as follows:

    (i)  the difference between the two rates;
    (ii)  such interest differential is multiplied by the principal that would have been outstanding at each future Payment Date until the next Interest Adjustment Date (or the maturity of the principal if earlier);
    (iii) the Interest Differential Charge is the present value of those monthly amounts calculated using BDC's Base Rate for the Corresponding Fixed Interest Rate Plan as the discount rate. In the case of partial prepayment,

the Interest Differential Charge will be reduced in the same proportion as the amount prepaid bears to the principal outstanding on the Loan at the time prepayment is received. If the Loan is secured by a mortgage or a hypothec on real estate and the Loan is prepaid in full after 5 years from the date of the mortgage or hypothec, the Interest Differential Charge shall not be payable if the mortgage or hypothec is given by an individual and shall only be payable if permitted under the *Interest Act*.

**"Interest Expiration Date"** – means the date on which a fixed interest rate plan expires.

**"Loan"** – shall have the meaning indicated in the Letter of Offer, or, as the context may require, at any time the unpaid principal balance of the Loan.

**"Loan Documents"** – means, collectively, the application for financing, the Letter of Offer, the security contemplated by the Letter of Offer and all other documents, instruments and agreements delivered in connection with the foregoing.

**"Loan Party"** – means either the Borrower or the Guarantor and "Loan Parties" means collectively each of the Borrower and the Guarantor.

**"Material Adverse Change"** – means:

(i)   a material adverse change in, or a material adverse effect upon, the business, assets, properties, liabilities (actual or contingent), operations, condition (financial or otherwise), or prospects, of any Loan Party, or any Person who Controls a Loan Party;

(ii)  a material impairment of the ability of any Loan Party to perform any of their obligations under any Loan Document; or

(iii) a material adverse effect upon any substantial portion of the assets subject to security in favour of BDC or upon the legality, validity, binding effect, rank or enforceability of any Loan Document.

**"Person"** – includes any natural person, corporation, company, limited liability company, trust, joint venture, association, partnership, limited partnership, governmental authority or other entity, and a natural person in his or her capacity as trustee, executor, administrator, or other legal representative and any other form of organization or entity whatsoever.

**"Public Issuer"** – means any Loan Party whose Equity Interests are listed or posted for trading on the Toronto Stock Exchange or the TSX Venture Exchange or any other stock exchange or over-the-counter market acceptable to BDC.

**"Public Issuer Notice"** – means a written notice delivered by a Public Issuer to BDC as described in the Covenants section of this Schedule "A".


**B.   Financial Definitions – the following definitions apply if used in this Letter of Offer:**


**"Adjusted EBITDA"** – means EBITDA adjusted by gains/losses on disposal of assets, other non-cash adjustments presented in the statement of cash flow and all extraordinary items presented as per GAAP financial measures.

**"ASPE"** – means accounting standards for private enterprises. ASPE are the Canadian generally accepted accounting principles (GAAP) approved by the Accounting Standards Board for private enterprises in Canada who have not elected to adopt IFRS.

**"Available Funds"** – means in respect of any Loan Party for any period of 12 months, the sum of the net profits before non-recurring or non-operating items that are not related to normal operations (as designated by the external accountant) plus depreciation and amortization; plus deferred income taxes; and minus dividends.

**"Available Funds Coverage Ratio"** – means the ratio of Available Funds over the Current Portion of Term Debt.

**"Capital Expenditures"** – means, with respect to any period of 12 consecutive months, all payments or accruals for any (i) property, plant and equipment, (ii) intangible assets and (iii) development costs that are required to be capitalized under GAAP.

**"Current Portion of Term Debt"** or **CPTD** – means the scheduled principal payments on Term Debt and lease payments on capital leases over the next 12-month period.

**"Debt-to-capital ratio"** – means the ratio of (A) the sum of (i) outstanding operating line of credit and (ii) Term Debt; by (B) the sum of (i) outstanding operating line of credit, (ii) Term Debt, and (iii) Tangible Equity.

**"Distributions"** – means, for any period of 12 consecutive months, the total of the following:

Lobster SH Ltd.                                                                    SCHEDULE "A"

 

(i)   the payment or declaration of any dividend (or distribution in case of a partnership or trust);
(ii)  the purchase, redemption or other acquisition or retirement of any capital stock (including the premium paid);
(iii) the change in subordinated loans or advances from the shareholders, partners, directors, or other related entities; and
(iv) the change in loans or advances to the shareholders, partners, directors, or other related entities.
The sum of items (i), (ii), (iii) and (iv) cannot be negative.

**"EBITDA"** – means earnings before Interest Expenses, taxes, depreciation, and amortization.

**"Fixed Charge Coverage Ratio** or **FCCR"** – means the ratio of (A) Adjusted EBITDA for such period less (i) current income taxes during such period taken from the annual financial statements, (ii) Unfunded Capital Expenditures incurred during the applicable period, (iii) Distributions paid during such period; by (B) the sum of (i) CPTD and (ii) the Interest Expenses for such period.

**"GAAP"** – means Generally Accepted Accounting Principles, with respect to broad principles and conventions of general application as well as rules and procedures that determine accepted accounting practices at a particular time (including, without limitation, IFRS, ASPE, US GAAP, etc., as the case may be). Unless otherwise specifically provided herein, any accounting term used in this Letter of Offer shall have the meaning customarily given such term in accordance with GAAP and all financial computations hereunder shall be computed in accordance with GAAP consistently applied.

**"IFRS"** – means International Financial Reporting Standards. IFRS are the Canadian generally accepted accounting principles (GAAP) approved by the Accounting Standards Board for publicly accountable enterprises and other categories of reporting entities who are permitted, but not required, to apply this set of standards.

**"Interest Expenses"** – means financial expenses (i.e., bank charges as well as interest on short-term and long-term debt, on Subordinated Debt, and on capital leases) as reflected in the statement of earnings.

**"Subordinated Debt"** – means debt with or without a convertible feature and with or without a variable return that normally ranks behind that of the senior secured lenders. Depending on the structure, the instrument of return may include interest, fixed/variable bonuses, royalties, bonus equity, warrants, or dividends.

**"Tangible Equity"** – means the sum of the share capital (owners' capital for non-incorporated businesses); plus retained earnings (accumulated net income); plus contributed surplus; plus postponed loans or advances from the shareholders (owners) and related businesses; minus loans or advances to the shareholders (owners), directors, related or non-related entities; minus the book value of shares redeemable at the holder's option, or shares subject to a formal redemption agreement.

**"Term Debt"** – means the sum of the long-term debt, the Subordinated Debt, and the capital leases including the current portion to be paid over the next 12 months; plus the redemption amount of shares redeemable at the holder's option, or shares subject to a formal redemption agreement.

**"Term Debt to Tangible Equity Ratio"** – means the ratio of the Term Debt over the Tangible Equity.

**"Total Debt/Adjusted EBITDA Ratio"** – means the ratio of (A) the sum of (i) outstanding operating line of credit and (ii) Term Debt; by (B) Adjusted EBITDA.

**"Unfunded Capital Expenditures"** – means, with respect to any period of 12 consecutive months, the aggregate of all Capital Expenditures incurred less the sum of (i) net cash proceeds generated from the sales of tangible and intangible assets, (ii) issuance of net new Term Debt, and (iii) issuance of new equity.

**"Working Capital"** – means the total of current assets minus the total of current liabilities. Current assets includes, but is not limited to, the following: cash on deposit, accounts receivable (trade and other), inventory and prepaid expenses. Current liabilities includes, but is not limited to, the following: bank advances, cheques in transit, accounts payable (trade and other) and the Current Portion of Term Debt.

**"Working Capital Ratio"** – means the ratio of the total current assets over the total current liabilities. Current assets includes, but is not limited to, the following: cash on deposit, accounts receivable (trade and other), inventory and prepaid expenses. Current liabilities includes, but is not limited to, the following: bank advances, cheques in transit, accounts payable (trade and other) and the Current Portion of Term Debt.

Lobster SH Ltd.                                                                    SCHEDULE "A"

## SECTION II – REPRESENTATIONS AND WARRANTIES

Each Loan Party hereby represents and warrants to BDC that:

1. For any Loan Party other than an individual guarantor, it is a sole-proprietorship, partnership, trust or corporation, as the case may be, duly constituted, validly existing and duly registered or qualified to carry on business in each jurisdiction where it is required by applicable laws to be so registered or qualified.

2. The execution, delivery, and performance of its obligations under the Letter of Offer and the other Loan Documents to which it is a party have been duly authorized and constitute legal, valid and binding obligations enforceable in accordance with their respective terms.

3. It is not in violation of any applicable law, which violation could lead to a Material Adverse Change.

4. No Material Adverse Change exists and there are no circumstances or events that constitute or would constitute, with the lapse of time, the giving of notice or otherwise, a Material Adverse Change.

5. No Default or Event of Default exists.

6. All information provided by it to BDC is complete and accurate and does not omit any material fact and, without limiting the generality of the foregoing, all financial statements delivered by it to BDC fairly present its financial condition as of the date of such financial statements and the results of its operations for the period covered by such financial statements, all in accordance with GAAP.

7. There is no ongoing, pending or threatened claim, action, prosecution or proceeding of any kind before any court, tribunal, government board or agency including but not limited to non-compliance with environmental law or arising from the presence or release of any contaminant against it or its assets before any court or administrative agency which, if adversely determined, could lead to a Material Adverse Change.

8. Neither the Loan Party, nor any Person who Controls the Loan Party, nor any officer, director or shareholder of a Loan Party, has been charged with, pled guilty to, or has been convicted of, a criminal offence (other than a conviction for which a Pardon has been granted or other than a criminal offence which has been disclosed in writing to BDC prior to issuing this Letter of Offer).

9. In respect of properties and assets charged to BDC, it has good and marketable title, free and clear of any encumbrances, except those encumbrances which BDC has accepted in writing.

The foregoing representations and warranties shall remain in force and true until the Loan is repaid in full.

## SECTION III – COVENANTS

Each Loan Party shall:

1. Perform their obligations and covenants under the Loan Documents.

2. Maintain in full force and effect and enforceable the Security contemplated by this Letter of Offer.

3. Notify BDC immediately of the occurrence of any Default under the Letter of Offer or any other Loan Documents.

4. Comply with all applicable laws and regulations.

5. Observe BDC's insurance requirements:
   a. Keep all secured assets insured for physical damages and losses on an "All-Risks" basis, including Equipment Breakdown (or Boiler & Machinery) where applicable, for their full replacement value and cause all such insurance policies to name BDC as loss payee as its interests may appear. The policies shall also name BDC as mortgagee and include a standard mortgage clause in respect of buildings over which BDC holds Security;
   b. Maintain adequate Marine and/or Aviation insurance for all secured Aircraft or Marine vessels;
   c. If required as further Security, assign or hypothecate all insurance proceeds to BDC;
   d. If requested by BDC, maintain adequate Commercial General Liability insurance, and/or Environmental Liability and Clean-Up insurance, including BDC as additional insured to protect it against any losses or claims arising from pollution or contamination incidents, or other risks associated with the Borrower's business, or any other type of insurance BDC may reasonably require;
   e. Ensure that all insurance policies include a 30-days prior notice of cancellation clause in favour of BDC;
   f. Provide certificates of insurance for all such policies; and
   g. Maintain all insurance policies in effect to BDC's standards for the duration of the Loan.

Lobster SH Ltd.                                                            SCHEDULE "A"

6. Notify BDC immediately of any material loss or damage to their property.

7. Without limiting the generality of paragraph 4 above, in relation to their business operations, projects and all assets of any nature, operate in conformity with all environmental laws and regulations; make certain that their assets are and shall remain free of environmental damage; inform BDC immediately upon becoming aware of any environmental issue and promptly provide BDC with copies of all communications with environmental authorities and all environmental assessments; pay the cost of any external environmental consultant engaged by BDC to effect an environmental audit and the cost of any environmental rehabilitation or removal necessary to protect, preserve or remediate the assets, including any fine or penalty BDC is obligated to incur by reason of any statute, order or directive by a competent authority.

8. Promptly pay all government remittances, assessments and taxes and provide BDC with proof of payments as BDC may request from time to time.  Specifically regarding real estate property or other taxes on lands mortgaged to BDC, if a Loan Party fails to pay any instalment of such taxes when due, BDC may, in its sole discretion, provide written notice to the Borrower requiring the Loan Parties to pay BDC monthly payments as calculated by BDC to establish a tax reserve account, and in such event, the Loan Parties hereby authorize BDC to collect monthly pre-authorized payments and to pay the relevant taxing authority as required.  No further consent from the Loan Parties shall be required.  Should there be insufficient funds to satisfy the taxes owing, the Loan Parties will pay the shortfall.  BDC will not be responsible for funding the shortfall or any arrears, including interest and other charges. The Loan Parties shall either instruct the taxing authority to forward a copy of the tax notice to BDC or shall deliver a copy to BDC upon receipt.  Funds in this reserve account will earn interest in accordance with BDC's policy then in effect and will be held by BDC as Security for the Loan.  After Default, BDC will not have any ongoing responsibility to pay the taxes and any funds in the reserve account may be applied towards any amounts owing to BDC.

9. Promptly furnish to BDC such information, reports, certificates, and other documents concerning any Loan Party as BDC may reasonably request from time to time, including, but not limited to, information regarding the ownership and control of any Loan Party.

10. Not, without the prior written consent of BDC:

    a. Change the nature of their business;

    b. Change their jurisdiction of incorporation, formation or continuance, or the jurisdiction in which their chief place of business, chief executive office or registered office is located;

    c. Amalgamate, merge, acquire or otherwise restructure their business, or create an affiliated company, or sell or otherwise transfer a substantial part of their business or any substantial part of their assets, or grant any operating license; or

    d. Permit or allow any transaction, including but not limited to the sale, transfer, or issuance of an Equity Interest, that would result in a Person who is not a Loan Party acquiring:

        (i)  a direct Equity Interest in a Loan Party; or
        (ii) an indirect Equity Interest in a Loan Party of 25% or more.  For the purposes of this subparagraph (ii), an indirect Equity Interest means an Equity Interest held by a Person through one or more intermediaries.

        This paragraph (d) shall not apply to the sale, transfer, or issuance of any Equity Interests in a Public Issuer.

11. When a Loan Party is Public Issuer:

    a. deliver a notice to BDC for its review and approval, within 5 business days after any Person or group of Persons, acting jointly or in concert, directly or indirectly, acquire Equity Interests resulting in the ownership of 20% or more of the Equity Interests of such Public Issuer.  This Public Issuer Notice shall contain the names and addresses of any Person or group of Persons that acquired such Equity Interests together with the details of the Equity Interests so acquired; and

    b. repay the Loan in full, including accrued interest, costs and any other outstanding amounts, within 60 days from the date on which BDC notifies the Borrower in writing that BDC, in its sole discretion, is not satisfied with the issuance or transfer of Equity Interests identified in the notice required by paragraph (a) above.

**Additional Covenants: Ineligible Activities**

In addition to the above list of Covenants, no Loan Party shall engage in, or permit their respective shareholders, directors or officers to engage in, or permit their premises to be used by a tenant or other Person for, any activity which BDC, from time to time, deems ineligible, including without limitation any of the following ineligible activities:

    a. businesses that: 1) are engaged in or associated with illegal activities or fail to comply with applicable Canadian legislation  that restricts dealings,  including  trade, between  Canadians and governments  or

Lobster SH Ltd.                                                                                    SCHEDULE "A"

residents of countries that are proscribed by the Canadian government or illegally trade in proscribed goods; 2) violate applicable laws with respect to human rights, labour, the environment and anti-corruption; or 3) violate standards with respect to public health and safety or professional conduct, in each case as prescribed by applicable law or by a professional governing body;

b.   businesses that promote violence, incite hatred, or discriminate on any basis protected under the Canadian Human Rights Act; or

c.   businesses that operate any form of sexually exploitive business or disseminate media content that is sexually explicit.

BDC's finding that there is an ineligible activity shall be final and binding between the parties and will not be subject to review. The prohibitions set out in this section shall also apply to any entity that directly or indirectly controls, is controlled by, or that is under the common control with, any Loan Party.

## SECTION IV – EVENTS OF DEFAULT

1.  Any Loan Party fails to pay any amount owing under or pursuant to the Loan Documents.

2.  Any Loan Party fails to satisfy, comply with, or perform any covenant or other obligation under the Loan Documents.

3.  Any Loan Party is in default under any other agreement with BDC or any third party for the granting of a loan or other financial assistance and such default remains unremedied or unwaived after any cure period provided in such other agreement.

4.  Any representation or warranty made by any Loan Party herein or in any other Loan Document is breached, false or misleading in any material respect, or becomes at any time false.

5.  Any schedule, certificate, financial statement, report, notice or other writing furnished by or on behalf of any Loan Party to BDC in connection with the Loan is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified.

6.  The occurrence of a Material Adverse Change.

7.  Any Loan Party becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay its debts as they become due; or any Loan Party applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for such Loan Party or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for any Loan Party or for a substantial part of the property of such Loan party; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of any Loan Party; or any Loan Party takes any action to authorize, or in furtherance of, any of the foregoing.

8.  Any Loan Party ceases or threatens to cease to carry on all or a substantial part of its business.

9.  The death of any individual Loan Party or any person that Controls any Loan Party.

10. The occurrence of a Change of Control of a Loan Party without BDC's written consent.

11. Any Loan Party, who is a Public Issuer, fails to deliver a Public Issuer Notice when required to do so, or fails to repay the Loan in full, including accrued interest, costs and any other outstanding amounts, within 60 days after receiving written notice that BDC is not satisfied with the Public Issuer Notice.

12. Any Loan Party, any Person who Controls a Loan Party, or any officer, director, or shareholder of a Loan Party, is in violation of any applicable law relating to terrorism or money laundering, including the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada).

13. Any Loan Party, any Person who Controls a Loan Party, or any officer, director, or shareholder of a Loan Party, is in violation of trade and economic sanctions imposed by the Parliament of Canada.

Lobster SH Ltd.                                                                    SCHEDULE "A"

### SECTION V – GENERAL TERMS AND CONDITIONS

Each Loan Party agrees to the following additional provisions:

**Other Available Interest Rate Plans**

Upon acceptance of the Letter of Offer, the Borrower can select one of BDC's other available fixed or floating interest rate plans. If the selection is made before the Acceptance Date, there is no fee and the selected plan shall be based on BDC's Base Rate in effect on the Loan Authorization Date. If the selection is made after the initial Acceptance Date, there is a fee and an Interest Differential Charge may apply. The new rate shall become effective on the date on which the written request is received by BDC. However, in the event of a period of increased interest rate volatility, which will be determined by a fluctuation of greater than 0.5% during the same transaction day of the yield to maturity of the five-year Canada bond benchmark, BDC reserves the right to suspend the borrower's right to switch from a floating interest rate plan to a fixed interest rate plan.

**Standby Fee Date Change When Switching From Floating to Fixed Rate Plans – Not applicable to Equipment Line Loans**

If the Borrower selects a floating rate interest plan at the time the Letter of Offer is accepted and subsequently switches to a fixed interest rate plan, the Standby Fee applicable to the Loan shall become payable as follows:

    a.  if the change is made within 2 months after the Loan Authorization Date, the Standby Fee shall become payable 2 months after the Loan Authorization Date; or

    b.  if the change is made more than 2 months after the Loan Authorization Date, the Standby Fee shall become payable on the date the new fixed interest plan takes effect.

There will be no change to the Standby Fee payment schedule if the Borrower elects to switch from a fixed rate interest plan to a floating rate interest plan.

**Interest Adjustment Date**

Provided no Default has occurred and is continuing, prior to each Interest Adjustment Date, BDC shall advise the Borrower of BDC's Base Rates then in effect for the fixed interest rate plans available. Not later than on the current Interest Expiration Date, the Borrower shall select a new interest rate plan. If the Borrower selects a new fixed interest rate plan, effective on the Interest Adjustment Date, the interest rate for the Loan shall be BDC's Base Rate applicable to the fixed interest rate plan selected by the Borrower adjusted by the Variance which new rate shall be applicable until the next Interest Expiration Date. If the Loan is on a fixed interest rate plan with blended payments of principal and interest, the repayment schedule shall be adjusted on each Interest Adjustment Date. If the Borrower has not advised BDC in writing of its choice before an Interest Adjustment Date, the Loan shall automatically switch to BDC's floating interest rate plan on the Interest Adjustment Date with an interest rate being BDC's Floating Base Rate as adjusted by the Variance. Outstanding principal for blended payment loans shall then be divided in equal monthly instalments to be paid until Maturity Date.

In the event BDC should demand repayment of the Loan by reason of an Event of Default, any fixed interest rate applicable at the time of demand shall continue to apply to the Loan until full repayment and shall not be adjusted at the next Interest Adjustment Date.

**Pre-Authorized Payment**

All payments provided for in the Letter of Offer must be made by pre-authorized payments from the Borrower's bank account. The Borrower shall sign all documentation required to that effect and provide a sample cheque marked void.

**Application of Payments**

All payments shall be applied in the following order:

    1.  any prepayment indemnity (including the monthly interest and Interest Differential Charge)
    2.  protective disbursements;
    3.  standby fees (arrears and current);
    4.  arrears, in the following order: transaction fees, administration fees, management fees, interest and principal;
    5.  current balances, in the following order: transaction fees, management fees, interest and principal;
    6.  cancellation fees;
    7.  credits to the tax reserve account and asset maintenance and upgrade account, if applicable; and
    8.  other amounts due and payable.

Lobster SH Ltd.                                                                                          **SCHEDULE "A"**

Other than regular payments of principal and interest, BDC may apply any other monies received by it, before or after Default, to any debt the Borrower may owe BDC under or pursuant to the Letter of Offer or any other agreement and BDC may change those applications from time to time.

**Consent to Obtaining Information**

The Loan Parties hereby consent to BDC:

    a.  collecting personal and business information and using such information for business, analytics and marketing purposes as described in the *Policy on confidentiality and use of personal and business information* (the "Policy") available at bdc.ca/en/confidentiality;

    b.  sharing the personal and business information with BDC service providers only for them to provide the services BDC asks from them, such as processing credit verification, background checks and other matters explained in the Policy; and

    c.  sharing the personal and business information with authorities in case of fraud or suspected fraud, and with other financial institutions to prevent or control fraud or when there is a breach of a financing agreement with BDC.

**Notices**

Notices must be in writing and may be given in person, or by letter sent by fax, mail, courier or electronically; if to the Borrower, at the Borrower's address above or such other addresses as the Borrower may advise BDC in writing, or if to BDC, at BDC's address above.

**Joint and Several Liability**

Where in the Loan Documents, any covenant, agreement, warranty, representation or obligation is made or imposed upon two or more Persons or a party comprised of more than one Person, each such covenant, agreement, warranty, representation or obligation shall be deemed to be and be read and construed as a joint and several (solidary in Quebec) covenant, agreement, warranty, representation or obligation of each such Person or party, as the case may be. Without limiting the generality of the foregoing, each Loan Party shall be jointly and severally (solidarily) liable with each other to BDC for the full performance of all obligations under the Loan Documents in accordance with the provisions thereof.

**Anti-Money Laundering/Know Your Client**

Each Loan Party acknowledges that, pursuant to prudent banking practices in respect of "knowing your client", BDC, in compliance with its internal policies, is required to verify and record information regarding the Loan Parties, their directors, officers, Persons holding direct or indirect Equity Interests in a Loan Party, and other Persons in Control of each Loan Party. Each Loan Party shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by BDC or any prospective assignee or other financial institution participating in the Loan with BDC, in order to comply with internal policies and applicable laws on anti-money laundering and anti-terrorist financing.

**Confidentiality**

The Loan Parties shall not disclose the contents of this Letter of Offer to anyone except its professional advisors.

**Changes in Accounting Standards**

In the event that a Loan Party adopts any changes in its accounting standards which have an effect on any provision in the Letter of Offer relying on financial statement calculations, BDC may amend such provision to reflect the original intent of the provision.

# Exhibit D

## 13-Week Cash flow Projections

**13-Week Cash Flow ($CAD)**   1.33
Prepared December 12

| | Dec 15 | Dec 22 | Dec 29 | Jan 5 | Jan 12 | Jan 19 | Jan 26 | Feb 2 | Feb 9 | Feb 16 | Feb 23 | Feb 16 | Feb 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LBS Purchased | 12,346 | 15,432 | 18,519 | 17,442 | 20,349 | 20,349 | 23,256 | 23,256 | 26,163 | 26,163 | 29,070 | 29,070 | 31,977 |
| Purchase Price/LB | $ 11.50 | $ 11.50 | $ 12.00 | $ 12.00 | $ 12.25 | $ 12.25 | $ 12.50 | $ 12.50 | $ 13.00 | $ 13.00 | $ 13.00 | $ 13.00 | $ 13.00 |
| Purchase Price Process/LB | $ 8.75 | $ 9.00 | $ 9.00 | $ 9.00 | $ 9.00 | $ 9.00 | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 10.00 | $ 10.00 | $ 10.00 |
| LBS Sold A Grade | 10,000 | 12,500 | 15,000 | 15,000 | 17,500 | 17,500 | 20,000 | 20,000 | 22,500 | 22,500 | 25,000 | 25,000 | 27,500 |
| Sale Price/LB | $ 15.30 | $ 15.30 | $ 15.97 | $ 15.97 | $ 16.30 | $ 16.30 | $ 16.63 | $ 17.30 | $ 17.30 | $ 17.30 | $ 17.30 | $ 17.30 | $ 17.30 |
| Dead % | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| Dead Price | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 |
| Cull % | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| Cull Price | $ 12.00 | $ 12.00 | $ 12.50 | $ 12.50 | $ 12.75 | $ 12.75 | $ 13.00 | $ 13.50 | $ 13.50 | $ 13.50 | $ 13.50 | $ 13.50 | $ 13.50 |
| Process % | 10% | 10% | 10% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | | |
| Process Price | $ 9.52 | $ 9.86 | $ 9.86 | $ 10.20 | $ 10.88 | $ 10.88 | $ 10.88 | $ 10.88 | $ 10.88 | $ 10.88 | $ 10.88 | | |
| Process LBS Sold | 25,000 | 25,000 | 25,000 | 15,000 | 15,000 | 10,000 | 10,000 | 10,000 | 5,000 | | | | |
| FX Rate | 1.36 | 1.36 | 1.36 | 1.36 | 1.36 | 1.36 | 1.36 | 1.36 | 1.36 | 1.36 | 1.36 | 1.36 | |
| Packaging per LBS | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 | |
| Delivery (Pass-Through) | | | | | | | | | | | | | |

**Income Statement**

| | Opening | Dec 15 | Dec 22 | Dec 29 | Jan 5 | Jan 12 | Jan 19 | Jan 26 | Feb 2 | Feb 9 | Feb 16 | Feb 23 | Mar 1 | Mar 8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | | 414,605 | 467,781 | 522,756 | 418,815 | 492,851 | 480,238 | 478,246 | 492,480 | 540,441 | 503,918 | 479,601 | 479,601 | 535,671 |
| Storage | | | | | | | | | | | | | | |
| COGS | | 360,725 | 402,469 | 447,222 | 344,302 | 384,273 | 384,273 | 380,698 | 397,326 | 435,116 | 387,616 | 377,907 | 377,907 | 415,698 |
| | | 53,880 | 65,312 | 75,534 | 74,513 | 108,577 | 95,964 | 97,548 | 95,155 | 105,324 | 116,302 | 101,694 | 101,694 | 119,973 |
| Direct Labour SH | | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 |
| Direct Labour NY | | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 | 3,726 |
| Direct Labour DH | | 2,503 | 2,738 | 2,738 | 2,738 | 2,738 | 2,738 | 2,738 | 2,738 | 2,738 | 2,738 | 2,738 | 2,738 | 2,738 |
| Overhead Labour | | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 |
| Packaging | | 4,896 | 6,120 | 7,344 | 7,344 | 8,568 | 8,568 | 9,792 | 9,792 | 11,016 | 11,016 | 12,240 | 12,240 | 13,464 |
| Electricity | | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 8,040 | 8,040 | 8,040 | 8,040 | 8,040 | 8,040 | 8,040 | 8,040 |
| Internal Logistics | | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| Trucks, Forklifts & Equipment | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Maintenance | | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| Supplies | | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Propane | | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 | 165 |
| Insurance | | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 | 3,558 |
| Licenses and Fees | | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Waste Removal | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ERP | | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Rent | | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 |
| Internet/ Telephone | | 164 | 164 | 164 | 164 | 164 | 164 | 164 | 164 | 164 | 164 | 164 | 164 | 164 |
| Property Tax | | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 |
| Interest | | 11,604 | 13,058 | 13,075 | 13,091 | 13,107 | 13,124 | 13,140 | 13,157 | 13,173 | 13,190 | 13,206 | 13,223 | 13,242 |
| Legal | | 71,440 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Advisory | | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 | 4,442 |
| Depreciation | | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 |
| AR | | 134,746 | 81,219 | 82,459 | 82,476 | 83,716 | 89,823 | 91,063 | 91,079 | 92,320 | 92,336 | 93,577 | 93,594 | 94,834 |
| AP | | | | | | | | | | | | | | |
| **Net Income** | - | 80,866 | 15,907 | 6,926 | 7,963 | 24,861 | 6,142 | 6,485 | 4,075 | 13,004 | 23,966 | 8,117 | 8,100 | 25,139 | 8,228 |
| **EBITDA** | | 57,272 | 9,141 | 18,139 | 17,118 | 49,958 | 31,255 | 31,615 | 29,222 | 38,167 | 49,145 | 33,313 | 33,313 | 50,369 | 333,484 |

**Balance Sheet**

| | | Dec 15 | Dec 22 | Dec 29 | Jan 5 | Jan 12 | Jan 19 | Jan 26 | Feb 2 | Feb 9 | Feb 16 | Feb 23 | Mar 1 | Mar 8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | 230,242 | 532,521 | 940,852 | 964,144 | 899,014 | 875,558 | 861,440 | 818,454 | 798,959 | 716,051 | 719,040 | 658,053 | 645,210 | 601,279 |
| AR | 810,820 | 482,605 | 603,781 | 610,528 | 704,859 | 790,173 | 846,717 | 933,218 | 994,017 | 1,123,467 | 1,166,706 | 1,257,905 | 1,301,144 | 1,392,343 |
| Inventory | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 | 346,380 |
| Retainers | 116,473 | 116,473 | 101,473 | 86,473 | 71,473 | 56,473 | 41,473 | 26,473 | 11,473 | - | | | | |
| GIC | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Prepaids | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 | 51,643 |
| | 1,580,557 | 1,554,622 | 2,069,129 | 2,084,167 | 2,098,369 | 2,145,227 | 2,172,653 | 2,201,168 | 2,227,473 | 2,262,540 | 2,308,769 | 2,338,981 | 2,369,377 | 2,416,646 |
| Fixed Assets | 7,208,000 | 7,196,010 | 7,184,020 | 7,172,030 | 7,160,040 | 7,148,051 | 7,136,061 | 7,124,071 | 7,112,081 | 7,100,091 | 7,088,101 | 7,076,111 | 7,064,121 | 7,052,132 |
| Intangibles | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 | 925,544 |
| **ASSETS** | 9,714,102 | 9,676,177 | 10,178,693 | 10,181,742 | 10,183,954 | 10,218,822 | 10,234,257 | 10,250,783 | 10,265,098 | 10,288,175 | 10,322,414 | 10,340,637 | 10,359,043 | 10,394,321 |
| Accounts Payable | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 | 1,728,084 |
| Fishermen Payables | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 | 51,678 |
| CRA Payables (receivables) | - 48,000 | 13,746 | - | 5,464 | 5,648 | 5,831 | 6,745 | 6,928 | 7,112 | 7,112 | 7,295 | 7,479 | | |
| CEBA Loan | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| DIP | - | - | 501,442 | 502,889 | 504,339 | 505,794 | 507,253 | 508,716 | 510,184 | 511,656 | 513,132 | 514,612 | 516,096 | 517,585 |
| TD LOC | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 | 2,106,497 |
| | 3,878,259 | 3,912,513 | 4,422,237 | 4,423,500 | 4,424,951 | 4,426,222 | 4,426,768 | 4,428,047 | 4,429,515 | 4,430,803 | 4,432,279 | 4,433,575 | 4,435,060 | 4,436,365 |
| BoA | 3,264,000 | 3,268,523 | 3,273,052 | 3,277,587 | 3,282,129 | 3,286,677 | 3,291,231 | 3,295,792 | 3,300,359 | 3,304,932 | 3,309,512 | 3,314,098 | 3,318,690 | 3,323,289 |
| BDC Debt | 2,949,753 | 2,953,917 | 2,958,088 | 2,962,264 | 2,966,446 | 2,970,634 | 2,974,827 | 2,979,027 | 2,983,233 | 2,987,445 | 2,991,662 | 2,995,886 | 3,000,115 | 3,004,351 |
| **LIABILITIES** | 10,092,012 | 10,134,953 | 10,653,377 | 10,663,351 | 10,673,526 | 10,683,533 | 10,692,826 | 10,702,866 | 10,713,106 | 10,723,179 | 10,733,452 | 10,743,558 | 10,753,865 | 10,764,004 |
| **Shareholders Equity** | 377,910 | 458,776 | 474,684 | 481,609 | 489,572 | 464,711 | 458,569 | 452,084 | 448,008 | 435,004 | 411,038 | 402,922 | 394,822 | 369,682 |
| **Liabilities and Shareholders Equity** | 9,714,102 | 9,676,177 | 10,178,693 | 10,181,742 | 10,183,954 | 10,218,822 | 10,234,257 | 10,250,783 | 10,265,098 | 10,288,175 | 10,322,414 | 10,340,637 | 10,359,043 | 10,394,321 |

**Cash Flow**

| | | Dec 15 | Dec 22 | Dec 29 | Jan 5 | Jan 12 | Jan 19 | Jan 26 | Feb 2 | Feb 9 | Feb 16 | Feb 23 | Mar 1 | Mar 8 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income Prior to TD Debt Interest Payment | - | 77,949 | 12,990 | 4,009 | 5,046 | 22,778 | 9,059 | 9,402 | 6,992 | 15,921 | 26,883 | 11,034 | 11,017 | 28,056 | 46,149 |
| Depreciation | - | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 11,990 | 155,868 |
| Interest Payment to TD | - | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 37,917 |
| Change in Working Capital Assets | 328,215 | 106,176 | 8,253 | 79,331 | 70,314 | 41,543 | 71,501 | 45,800 | 117,976 | 43,239 | 91,199 | 43,239 | 91,199 | | 465,050 |
| Change in Working Capital Liabilities | 34,254 | 8,282 | 184 | 184 | 914 | 184 | 184 | 184 | 184 | 184 | | | | | 40,521 |
| Change in DIP | - | 501,442 | 1,446 | 1,451 | 1,455 | 1,459 | 1,463 | 1,467 | 1,472 | 1,476 | 1,480 | 1,484 | 1,489 | | 517,585 |
| Change in Debt | 8,687 | 8,699 | 8,712 | 8,724 | 8,736 | 8,748 | 8,760 | 8,773 | 8,785 | 8,797 | 8,809 | 8,822 | 8,834 | | 113,886 |
| **Net Change in Cash** | $ | 302,280 | 408,331 | 23,292 | 65,129 | 23,456 | 14,118 | 42,986 | 19,494 | 82,909 | 2,990 | 60,986 | 12,843 | 43,931 | 371,042 |
| Opening Cash | 230,242 | 532,521 | 940,852 | 964,144 | 899,014 | 875,558 | 861,440 | 818,454 | 798,959 | 716,051 | 719,040 | 658,053 | 645,210 | | 230,242 |
| Closing Cash | 532,521 | 940,852 | 964,144 | 899,014 | 875,558 | 861,440 | 818,454 | 798,959 | 716,051 | 719,040 | 658,053 | 645,210 | 601,279 | | 601,279 |
| **Net Source / (Use)** | $ | 302,280 | 408,331 | 23,292 | 65,130 | 23,456 | 14,118 | 42,986 | 19,494 | 82,909 | 2,990 | 60,987 | 12,843 | 43,931 | 371,038 |

# Exhibit E

## U.S. Debtors' Valuations



*Machinery and Equipment Appraisal of Lobsterboys - New York & Chicago*

*As of 9/12/22*

*File Number: VA-22 188852(3)*

Valuation and
Advisory Services



515 S. Flower St., Suite 1300                     Phone: 213-239-6000

Los Angeles, CA 90071

September 22, 2022

Taylor Cox
Chief Operating Officer
Lobsterboys LLC

Re: Machinery & Equipment Appraisal
Lobsterboys LLC
6620 West Dakin
Chicago, IL 60634

File Number:  VA-22-188853

Dear Mr. Taylor Cox,

At your request, we have prepared a machinery and equipment appraisal for the purpose of estimating the fair market value installed, the orderly liquidated value installed, the replacement cost new, and the insurable replacement cost of Lobsterboys assets (the "Equipment") owned and operated by Lobsterboys LLC, located at its New York (40 New York Ave., Huntington, NY 11743) and Chicago (6620 West Dakin, Chicago, IL 60634) locations.

We performed an on-site inspection of the Equipment that is the subject of this appraisal.  The appraisal relied on information provided to us by or on behalf of Lobsterboys LLC via e-mail on July 21, 2022, supplemented on August 8, 2022, and finalized on August 19, 2022.  We submit our findings in this report.

It is our practice to adhere to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation.

Lobsterboys – Machinery & Equipment

We understand that this appraisal will assist management in providing a basis of value for financial reporting the buildings, machinery and equipment, and furniture and fixtures of your facilities; it may be invalid if used for any other purpose.

Presented in this report are the descriptions of the assets valued, together with explanations of the valuation procedures used. The value opinion expressed in this appraisal is contingent upon the analyses, facts, and conditions presented in the accompanying report.

Respectfully submitted,

Anthony Vu, ASA
Vice President
Telephone: +1 213 369-7430
Email: Anthony.Vu@jll.com

John Oates
Managing Director
Telephone: +1 917 349-8008
Email: John.Oates@jll.com

# Table of Contents

Scope of Work ................................................................................................................... 2

Purpose and Intended Use .................................................................................................. 3

Standard of Value ............................................................................................................... 3

Identification of the Subject Assets .................................................................................... 4

Date of the Appraisal and Report ....................................................................................... 4

Valuation Definitions ......................................................................................................... 4

Description of the Subject Assets ....................................................................................... 5

Data Collection and Analysis .............................................................................................. 6

Valuation Procedures ......................................................................................................... 6

Basis of Value ..................................................................................................................... 7

FAIR MARKET VALUE – INSTALLED (IN PLACE) – 9/12/22 (OPINION 1) .................................... 9

ORDERLY LIQUIDATION VALUE INSTALLED (IN PLACE) – 9/12/22 (OPINION 2) ..................... 11

REPLACEMENT COST NEW AND INSURABLE REPLACEMENT COST – 9/12/22 (OPINION 3 & 4) ........... 12

Summary of Conclusions ................................................................................................... 14

Assumptions and Limiting Conditions ............................................................................... 15

Certification ..................................................................................................................... 20

***Exhibits*** ............................................................................................................................. 22

      A.  Summary of Valuation by Appraisal Class ..................................................... 23

      B.  Valuation Asset Detail ................................................................................... 24

      C.  Professional Qualifications ............................................................................ 25

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

## Scope of Work

On 8/10/22, JLL was engaged by Lobsterboys LLC ("Client") to appraise certain lobster distribution, process, and associated assets and buildings for financial review at all Client locations including site visits of the buildings and the assets located in New York and Chicago.

The scope of work shaped the appraiser's procedural approach to the methodology before commencing the appraisal. The scope described and defined the possible appraisal analysis and elements. The subject asset identification, the type and amount of data to be researched, and the analyses applied are all elements of the scope of work necessary to develop credible assignment results. While the appraiser determined the appropriateness of the scope, the client influenced and instructed the appraiser. The scope as agreed upon between the client and the appraiser established the following:

- Identified the purpose and intended use of the appraisal;
- Established a standard of value that is appropriate;
- Identified the subject assets appraised, coupled with the dates and definition of value;

The information provided by the client was applicable to the purpose of the report and conclusion of value. We gathered and analyzed analogous data relevant to developing a well-substantiated estimate of value by applicable valuation approaches.

The Appraisal relied, in part, on information provided to us. Lisa Colombani from Lobsterboys LLC assisted us in providing information relating to the equipment valued in this report.

The appraisal is prepared based on our understanding of the requirements set forth in the *Uniform Standards of Professional Appraisal Practice (USPAP)*.

JLL's appraisers have valued numerous manufacturing properties similar to the properties that are the subject of this Appraisal.

This *Appraisal Report* presents the results, opinions, and conclusions of our analysis. Our files retain additional supporting documentation to this report. This report is a recapitulation of the appraiser's data, analyses, and conclusions. This is an appraisal report prepared under Uniform Standards of Professional Appraisal Practices Standards.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved                                                2

## Purpose and Intended Use

This report was prepared for Lobsterboys LLC to determine fair market value installed, the orderly liquidated value installed, the replacement cost new, and the insurable replacement cost of the Equipment included in the financial reporting.  We understand our opinions will be used to support the financial reporting and cannot be used for any other purpose.

This appraisal provides our opinions of the following as of the ("Valuation Date") of 9/12/22:

1.  The fair market value installed (in place) of the Equipment as of the Valuation Date;
2.  The orderly liquidation value installed (in place) of the Equipment as of the Valuation Date;
3.  Replacement Cost New is the current cost of a similar new property having the nearest equivalent utility as the property being appraised, as of a specific date.[1]
4.  Insurable Replacement Cost is the replacement cost new less the cost new of the items specifically excluded in the insurance policy, if any.

It is our understanding that this appraisal is for financial value reporting; it may be invalid if used for any other purpose.

Lobsterboys LLC and its representatives are both the client and the intended users of this report.  This report may be invalid if used by any party other than the intended users described herein.

## Standard of Value

For this purpose, the standards of value are Fair Market value installed (in place), Orderly Liquidation value installed (in place), Replacement Cost New, and Insurable Replacement Cost.

The standard of value establishes a premise for the appraisal. These definitions are appropriate and consistent with financial reporting, as they consider as they consider no compulsion to sell and

---

[1] *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets*, 3rd Edition, American Society of Appraisers, 2011.

assume an orderly transaction between knowledgeable and willing participants and what the new cost of an asset would be in order to replace the subject asset with a new asset of like utility.

## Identification of the Subject Assets

The property valued in this report consists of Client's distributing and processing assets located at New York and Chicago.  A detailed listing of the assets is in the Exhibits of this report.

## Date of the Appraisal and Report

The effective date of the appraisal is 9/12/22.  The effective date of the report is 9/22/22

When the date of the information provided differs from the effective date of reported value, the appraiser has assumed no material change in the condition of the equipment unless otherwise noted in the report.

## Valuation Definitions

This appraisal and the methodology employed are based on the following definitions:

> The *Fair Market Value* Installed definition is synonymous with the term fair market value in place, defined as follows: when fair market value is established on an in-place (installed) basis, it is assumed that the buyer and seller would be contemplating retention of the property at its present location and use.  An estimate of fair market value arrived at on an in place/installed basis represents the current fair market value of the equipment, including installation cost.

> *Orderly Liquidation* is an opinion of the gross amount, expressed in terms of money, that typically could be realized from a liquidation sale, given a reasonable period of time to find a purchaser (or purchasers), with the seller being compelled to sell on an as-is, where-is basis, as of a specific date.[2]

---

[2] *Ibid. - page 3.*

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

*Replacement Cost New is the current cost of a similar new property having the nearest equivalent utility as the property being appraised, as of a specific date.[3]*

*Insurable Replacement Cost is the replacement cost new less the cost new of the items specifically excluded in the insurance policy, if any.*

In our investigation, we did not investigate any financial data pertaining to the present or prospective earning capacity of the operation in which the designated assets are used. It has been assumed that prospective earnings will provide a reasonable return on the appraised value of the designated assets, plus the value of any assets not included in the appraisal, and adequate net working capital. If prospective earnings will not be adequate to justify ownership of the assets at the appraised levels, then the concluded fair market value as reported in our appraisal must be reduced accordingly.

## Description of the Subject Assets

Lobsterboys' assets (the "Subject Assets") are located at New York and Chicago. Lobsterboys has been in operation since 2017. Lobsterboys distributes and processes lobsters from Canada for the food industry, which include products such as filtration, pumps, process equipment, which requires a significant investment in distribution and process machinery & equipment.

During the course of the valuation, it was determined that the subject assets consisted of the following personal property:

- Buildings & Improvements including all production structures and associated permanent structures.
- Machinery and Equipment including, but not limited to, seafood processing holding tanks, cold storage, hoists, and equipment, such as pumps, filtration, monitoring, and the like.
- Computers and Peripherals including, but not limited to, personal computers, laptops, printers, and the like.
- Furniture and Fixtures including, but not limited to, tables, chairs, desks, filing cabinets, and the like.

---

[3] *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets*, 3rd Edition, American Society of Appraisers, 2011.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

- Office Equipment including, but not limited to, fax machines, photocopiers, communication equipment, and the like.
- Warehouse Equipment including, but not limited to, any quality and test equipment, fork trucks, lifts, and the like.
- Vehicles including, but not limited to, trucks, cars, trailers, tractors, and the like.

We did not consider the following to be part of the Subject Assets to be valued: leased equipment, supplies, or working capital such as cash, cash equivalents, and the like. Our analysis is limited to only the assets detailed in the addendum to this report.

The subject assets were inspected in New York on 8/25/22, and Chicago on 8/23/22. The subject assets are assumed to be utilized as intended in the assets' design.

## Data Collection and Analysis

Lobsterboys LLC provided an electronic copy of the fixed asset listing report. After an internal review and discussions with the Client to assure that the updated asset listings provided accurately reflect quantities, historical costs, and acquisition dates, we have relied upon these listings to value the subject assets and have assumed that the listings fairly represent the assets belonging to the Subject.

## Valuation Procedures

In any appraisal, consideration must be given to the three basic approaches to value. These are the income, market, and cost approaches. These approaches are outlined as follows:

### The Income Approach

The income approach establishes the value of the property on the basis of capitalization of the net earnings or cash flow. The income approach is typically used in the valuation of assets that produce, or are capable of producing, an identifiable stream of income or cost savings that can be uniquely quantified.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

**The Market Approach**

The market approach establishes value through analysis of recent sales of comparable property. An analysis is made of the differences between the properties and the subject, and the sales prices are correspondingly adjusted to arrive at indications of the subject's value.

**The Cost Approach**

The foundation of the cost approach is the proposition that an informed purchaser would pay no more for a property than the cost of producing a substitute property with the same utility. When the approach is applied, property facts are assembled in an appraisal inventory, and data regarding costs and price-governing factors are gathered. The accumulated data are then employed to develop the cost of reproduction new or the cost of replacement of the subject property.

From the cost to reproduce the property as if new, an amount is deducted for accrued depreciation or physical deterioration, plus any functional and economic obsolescence that might exist. If the cost of replacement has been determined, no penalty for functional obsolescence is applied, since this cost represents that of a state-of-the-art property. The cost approach ordinarily supplies the most reliable indication of the fair market value of special structures, systems, and special machinery and equipment.

## Basis of Value

The nature of the assets to be appraised bears heavily on the selection of the appropriate valuation method. The premise of value and the purpose for which the value conclusions are developed are also factors in the decision.

Each of the three approaches was considered in our analysis.

In this situation, the income approach was not applicable as the subject capital assets are a fractional enterprise component and not separately identifiable as an income-producing asset from an investment viewpoint.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

For the market approach, sales prices for equipment of comparable type, capacity, configuration, and age are obtained and reviewed in an effort to establish values.

The cost approach is an accepted method of valuation, especially in instances where the subject asset is new or nearly new, or when no other approach is applicable.   We have contacted equipment manufacturers and used equipment dealers, and have referenced the following:

- eBay
- Taylor & Martin, Inc.
- Coronodo Equipment Sales
- Pentair
- Seagear Marine Supply

The sources above are just a sampling of the established marketplace for the Subject Assets. The Subject Assets are part of a consistent secondary market where participants often consider purchasing used equipment through these sources.

For those items where the quantity and quality of sales of similar equipment are abundant, the market approach was deemed the most appropriate approach to determine the value; for those items for which there is little or no comparable sales information, the cost approach was deemed the most appropriate approach to determine the values.

For the purpose of this analysis, a combination of the cost and market approaches to value was utilized, with an emphasis on the cost approach.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

## FAIR MARKET VALUE – INSTALLED (IN PLACE) – 9/12/22 (OPINION 1)

The Fair Market Value Installed (In Place) of the Equipment as of the Valuation Date was estimated assuming value to an unrelated third-party operator.

As previously mentioned, it is quite common with this type of equipment to use a blending of the various approaches to estimate value.  We considered both the market and cost approach to value, since the Equipment is fairly new, as of the Valuation date, and the reported cost of the Equipment is representative of both the market and the cost approach, both the market and cost approach were utilized.  We relied on the cost approach to value the Equipment with reported costs and the market approach where applicable, as of the Valuation Date.

The cost approach to value considers the current cost new of reproducing or replacing a property less an allowance for physical depreciation, functional obsolescence, and external obsolescence.  The cost of equipment can be divided into two distinct categories: direct (or hard) costs and indirect (or soft) costs.

The direct costs include only the costs of the physical components, while the indirect costs cover those items that provide support for the direct costs.  Elements of indirect costs principally include asset installation, freight, engineering, financing, and development costs.

Since the Equipment is not new, a deduction for accrued physical deterioration based on the effective age of the Equipment is subtracted from the cost of reproduction new.  The resulting amount (cost of reproduction new less depreciation) would reflect the indication of the current fair market value installed (in place) of the Equipment.  To determine an estimated factor representative of the anticipated physical deterioration that is expected to exist in the Equipment, a modified age/life analysis is utilized.

The next step in the valuation process is to add incremental inflation, from the in-service date to the Valuation Date, to the original cost data to arrive at the cost of reproduction new installed (in place) for

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved                                        9

the Equipment as of the Valuation Date.  Based on our previous analyses and research of similar equipment, we have determined that the inflation rate to be applied is 6% annually.

Again, as the assumption is that the Equipment has been properly maintained as of the Valuation Date, no deduction was taken for functional obsolescence.  We also found no external obsolescence in the Equipment; therefore, no additional deductions were taken.   The resulting amount (cost of reproduction new less depreciation) would reflect the indication of the fair market value installed (in place) of the Equipment as of the Valuation Date.

Based upon our application of the cost and market approach to value, it is our opinion that the fair market value installed (in place) of the Equipment as of the Valuation Date is equal to the reported cost and market cost of the Equipment and is reasonably represented by the amount of $500,410; a detail of which can be found in the Asset Detail Schedule of this report.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

## ORDERLY LIQUIDATION VALUE INSTALLED (IN PLACE) – 9/12/22 (OPINION 2)

The orderly liquidation value installed (in place) of the Equipment as of the Valuation Date was estimated assuming value to an unrelated third-party operator.

As previously mentioned, it is quite common with this type of equipment to use a blending of the cost and market approaches to estimate value.  In instances where an item is new or was found to have no used market resale exposure, we utilized the cost approach.  For items in which there is an active secondary market where recent sales comparables exist, the market approach was deemed the most appropriate.  In instances where market data was available but was deemed too incomplete to apply a complete market approach, we used the market relationship data available to influence, confirm, or adjust the cost approach analysis.  Overall, we relied primarily on the cost approach to value the Equipment.  For reasons previously stated in this report, we considered, but did not utilize, the income approach.

The fair market value installed (in place) of the Equipment as of the Valuation Date is the starting point for the orderly liquidation value installed (in place) of the Equipment as of the Valuation Date.  Starting with the fair market value installed (in place) as previously presented, an amount representative of the diminution in value due to an assumed liquidation scenario (limited time frame in which to dispose of the Equipment, with the seller being under a certain compulsion to sell) is deducted to arrive at an amount representative of the orderly liquidation value installed (in place) of the Equipment as of the Valuation Date.

The resulting amount, the fair market value installed (in place) less the amount representative of the diminution in value due to an assumed liquidation scenario, is representative of the orderly liquidation value installed (in place) of the Equipment as of the Valuation Date.

Based upon our application of the cost and market approaches as described, and the assumption that there is no depreciation in any form to be deducted, it is our opinion that the aggregate orderly liquidation value installed (in place) of the Equipment as of the Valuation Date is reasonably represented by the amount of $325,205.

## REPLACEMENT COST NEW AND INSURABLE REPLACEMENT COST – 9/12/22 (OPINION 3 & 4)

In determining the Replacement Cost New and Insurable Replacement Cost of the Subject Assets in this report, the applicable valuation techniques are the direct cost method and the indirect cost method of the Cost Approach.

The first step in the cost approach is to estimate the total replacement cost new ("RCN") of the subject assets. To arrive at the RCN, we utilized the direct cost method where available, and the indirect cost method. In the direct cost method, the RCN was estimated through discussions with management, or current cost information from manufacturers, distributors, and published cost data. For items not priced by current equipment manufacturers and for which market information was not available, we utilized indirect costing. The indirect cost method applies published price inflation index figures from sources described below. We have tested the indirect cost approach to verify its reasonableness by comparing the results of the trended analysis to the direct cost approach of similar subject assets in this report and concluded the indirect cost approach was acceptable. We arrived at an estimated RCN for the subject assets by multiplying their historical costs by these index figures.

An index is a percentage relation between the cost of an item at any stated time and its cost at a base period. Indices bring previously established costs of equipment up to date and compare typical costs across different periods. Indices have been widely used to trend original cost records to estimate replacement cost at prices prevailing at a certain date. The use of indices for an appropriate property item or group will provide a reliable guide to changes in cost.

An example of how an index brings a historical cost forward in time to current cost would use the formula that follows.

Multiplier (for known date) * Known Cost (as of a specific date) = Present Cost

The equipment indices are predominately from the Producers Price Index as published by the United States Department of Labor, Bureau of Labor Statistics, which reports on producer price movements

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

including text, tables, and technical notes.  We track several industries from this publication.  We also utilize indices produced by *Marshall Valuation Service,* which represents a composite of the equipment costs of an entire industry.  The cost of individual plants or pieces of equipment may deviate from the given index, but in a typical industry, the overall costs will follow the index.

The valuation of the subject assets utilizing the cost approach began with an estimate of the total replacement cost of the subject assets in place.  These costs include *(1)* the cost new of a similar asset or an asset having an equivalent capacity or usage; *(2)* the cost of freight, handling, and installation required to place this asset in operation; and *(3)* the engineering and design costs required to integrate the individual assets into a total operation.

Insurance exclusions or additions are computed on the basis of items specifically included or excluded from coverage by the policy.  In calculating insurance exclusions, we utilized Marshall Valuation Services in calculating adjustments by not including the cost of excluded items when the total replacement cost is computed.  The replacement cost new for items excluded from your insurance contract (normally excluded from insurance coverage, which are below ground and outside the building wall) have been identified and no deduction from the total replacement cost new was needed to estimate the insurable replacement cost.

All machinery and equipment assets were priced at their current replacement cost new.

When carrying replacement cost insurance, the insurable replacement cost should be used.

Our opinion of Replacement Cost New and the Insurable Replacement Cost of Lobsterboys is $568,644, as of 9/12/22

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

## Summary of Conclusions

Based on the data presented, our opinion of Fair Market Value (Installed), Orderly Liquidated Value (In place), Replacement Cost New, and Insurable Replacement Cost of Lobsterboys, as of 9/12/22 is as shown below and in the Addenda of this report.

| Appraisal Class | FAIR MARKET VALUE - INSTALLED | ORDERLY LIQUIDATION VALUE - INSTALLED ($ USD) | REPLACEMENT COST NEW ($ USD) |
|---|---|---|---|
| **LBCHI** | **223,660** | **131,605** | **251,466** |
| Assets Not Included | - | - | 2,040 |
| Building | 35,700 | 20,600 | 36,960 |
| Computer Equipment | 5,960 | 3,785 | 9,520 |
| Furniture & Fixtures | 8,400 | 4,750 | 12,238 |
| Machinery & Equipment | 137,750 | 78,950 | 150,178 |
| Office Equipment | 3,350 | 1,920 | 3,870 |
| Plant Vehicles | 11,000 | 9,100 | 12,910 |
| Storage Equipment | 21,500 | 12,500 | 23,750 |
| **LBNY** | **276,750** | **193,600** | **317,179** |
| Building | 20,000 | 11,500 | 20,700 |
| Computer Equipment | 4,900 | 3,100 | 8,040 |
| Furniture & Fixtures | 12,600 | 7,200 | 17,874 |
| Machinery & Equipment | 55,050 | 31,580 | 63,005 |
| Office Equipment | 2,600 | 1,470 | 3,080 |
| Plant Vehicles | 148,700 | 119,800 | 166,660 |
| Storage Equipment | 26,800 | 15,450 | 29,690 |
| Vehicles | 6,100 | 3,500 | 8,130 |
| **Total** | **500,410** | **325,205** | **568,644** |

After careful review of the assets, investigation of the utilization of the assets, we concluded that the values listed are accurate based on the information that we have received.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

## Assumptions and Limiting Conditions

1.  All reports and work product we deliver to you (collectively called "report") represents an opinion of value, based on historical information and forecasts of market conditions. Actual results may vary from those forecast in the report. There is no guaranty or warranty that the opinion of value reflects the actual value of the property.

2.  The conclusions stated in our report apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events. Assessed values may change significantly and unexpectedly over short periods. We are not liable for any conclusions in the report that may be different if there are subsequent changes in value. We are not liable for loss relating to reliance upon our report more than three months after its date.

3.  There may be differences between projected and actual results because events and circumstances frequently do not occur as predicted, and those differences may be material.  We are not liable for any loss arising from these differences.

4.  We are not obligated to predict future political, economic, or social trends.  We assume no responsibility for economic factors that may affect or alter the opinions in the report if the economic factors were not present as of the date of the letter of transmittal accompanying the report.

5.  The report reflects an appraisal of the property free of any liens or encumbrances unless otherwise stated.

6.  We assume responsible ownership and competent property management.

7.  The appraisal process requires information from a wide variety of sources. We have assumed that all information furnished by others is correct and complete, up to date and can be relied upon, but no warranty is given for its accuracy. We do not accept responsibility for erroneous information provided by others. We assume that no information that has a material effect on our appraisal has been withheld.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

8.      We assume the following, unless informed to the contrary in writing: Each property has a good and marketable title. All documentation is satisfactorily drawn and that there are no encumbrances, restrictions, easements, or other adverse title conditions, which would have a material effect on the value of the interest under consideration.  There is no material litigation pending involving the property.  All information provided by the Client, or its agents, is correct, up to date and can be relied upon. We are not responsible for considerations requiring expertise in other fields, including but not limited to legal descriptions, interpretation of legal documents and other legal matters, geologic considerations such as soils and seismic stability, engineering, or environmental and toxic contaminants.  We recommend that you engage suitable consultants to advise you on these matters.

9.      We assume that all engineering studies correct. The plot plans and illustrative material in the report are included only to help the reader visualize the property.

10.     We assume that there are no hidden or unapparent conditions of the property, subsoil or structures that render it more or less valuable. We are not responsible for such conditions or for obtaining the engineering studies that may be required to discover them.

11.     We assume that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the report. We have not made or requested any environmental impact studies in conjunction with the report. We reserve the right to revise or rescind any opinion of value that is based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the report assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

12.     Unless otherwise stated in the report, you should assume that we did not observe any hazardous materials on the property.  We have no knowledge of the existence of such materials on or in the property; however, we are not qualified to detect such substances, and we are not providing environmental services.  The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the property.  Our report assumes that there is no such material on or in the property that would cause a loss in value.  We do not assume responsibility for such conditions or for any

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

expertise or engineering knowledge required to discover them. We encourage you to retain an expert in this field, if desired. We are not responsible for any such environmental conditions that exist or for any engineering or testing that might be required to discover whether such conditions exist. We are not experts in the field of environmental conditions, and the report is not an environmental assessment of the property.

13. We may have reviewed available flood maps and may have noted in the report whether the property is generally located within or out of an identified Special Flood Hazard Area. However, we are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property. Any opinion of value we include in our report assumes that floodplain and/or wetlands interpretations are accurate.

14. We have not made a specific survey or analysis of the property to determine whether it is in compliance with the Americans with Disabilities Act ("ADA"), Stark law or any anti-kickback laws. We claim no expertise in such issues and render no opinion regarding compliance of you or the property with ADA, Stark law or anti-kickback law or regulations.

15. We assume that the property conforms to all applicable zoning and use regulations and restrictions unless we have identified, described, and considered a non-conformity in the report.

16. We assume that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in the report is based.

17. We assume that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

18. We have not made any investigation of the financial standing of actual or prospective tenants unless specifically noted in the report. Where properties are valued with the benefit of leasing, we assume, unless we are informed otherwise, that the tenants are capable of meeting their

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

financial obligations under the leases, all rent and other amounts payable under the leases have been paid when due, and that there are no undisclosed breaches of the leases.

19. We did not conduct a formal survey of the property and assume no responsibility for any survey matters. The Client has supplied the spatial data, including sketches and/or surveys included in the report, and we assume that data is correct, up to date and can be relied upon.

20. Unless otherwise stated, the opinion of value included in our report excludes any additional value attributable to goodwill, or to fixtures and fittings which are only of value, in situ, to the present occupier. We have made no allowance for any plant, machinery, or equipment unless they form an integral part of the building and would normally be included in a sale of the building. We do not normally carry out or commission investigations into the capacity or condition of services being provided to the property. We assume that the services, and any associated controls or software, are in working order and free from defect. We also assume that the services are of sufficient capacity to meet current and future needs.

21. In the case of property where construction work is in progress, such as refurbishment or repairs, or where developments are in progress, we have relied upon cost information supplied to us by the Client or its appointed experts or upon industry accepted cost guides. In the case of property where construction work is in progress, or has recently been completed, we do not make allowance for any liability already incurred, but not yet discharged, in respect of completed work, or obligations in favor of contractors, subcontractors or any members of the professional or design team. We assume the satisfactory completion of construction, repairs, or alterations in a workmanlike manner.

22. Any allocation in the report of value between the land and the improvements applies only under the stated program of utilization.  The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

23. The report is confidential to the party to whom it is addressed, and those other intended users specified in the report for the specific purpose to which it refers.  Use of the report for any other purpose or use by any party not identified as an intended user of the report without our prior written consent is prohibited, and we accept no responsibility for any use of the report in violation of the terms of this Agreement.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved                                                                18

24.   We are not required to testify or provide court-related consultation or to be in attendance in court unless we have agreed to do so in writing.

25.   Neither the whole report, nor any part, nor reference thereto, may be published in any manner without our prior written approval.

26.   We may rely on, and will not verify, the accuracy and sufficiency of documents, information and assumptions provided to it by the Client or others. We will not verify documents, information and assumptions derived from industry sources or that JLL or its affiliates have prepared in the regular course of business. We are not liable for any deficiency in the report arising from the inaccuracy or insufficiency of such information, documents, and assumptions. However, our report will be based on our professional evaluation of all such available sources of information.

27.   JLL IS NOT LIABLE TO ANY PERSON OR ENTITY FOR LOSS OF PROFITS, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR SIMILAR DAMAGES IN CONNECTION WITH THIS AGREEMENT. IN NO EVENT SHALL THE LIABILITY OF JLL AND ITS AFFILIATES IN CONNECTION WITH THIS AGREEMENT EXCEED THE FEE PAID TO JLL HEREUNDER.

28.   Unless expressly advised to the contrary, we assume that appropriate insurance coverage is and will continue to be available on commercially acceptable terms.

29.   We assume that no material changes in any applicable federal, state, or local laws, regulations, or codes (including, without limitation, the Internal Revenue Code) are anticipated.

30.   We may determine during the course of the assignment that additional Hypothetical Conditions and Extraordinary Assumptions may be required in order to complete the assignment. The report will be subject to those Hypothetical Conditions and Extraordinary Assumptions. Each person that is permitted to use the report agrees to be bound by all the Assumptions and Limiting Conditions and any Hypothetical Conditions and Extraordinary Assumptions stated in the report.

# Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective future interest in the property that is the subject of this report and have no personal interest with respect to the parties involved.

4. I have no bias with respect to the property that is the subject of this report, or to the parties involved with this assignment.

5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP).

8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice.

9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10. I certify sufficient competence to appraise this property through education and experience, in addition to the internal resources of the appraisal firm.

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

11. I have not previously appraised the property that is the subject of this within the three-year period immediately preceding acceptance of this assignment.

12. Data were obtained from sources believed to be reliable. All facts known to me that have bearing on the values of the property have been considered, and no facts of importance have been intentionally omitted herein.

13. No one provided significant appraisal assistance to the person(s) signing this certification.

14. John Oates and Chris Cheah of JLL performed inspections of the properties.


*Anthony Vu*
_____
Anthony Vu, ASA
Project Manager


*John F. Oates Jr.*
_____
John Oates
Appraiser

Copyright © Jones Lange LaSalle IP, Inc. 2022. All Rights Reserved

*Exhibits*

# *Exhibit A*

# Summary of Valuation by Appraisal Class

**Furniture, Fixtures, and Equipment**
**Valuation of Certain Machinery & Equipment for**
**Summary of Value by Class & Location**
**Valuation as of September 12, 2022**

| Appraisal Class | FAIR MARKET VALUE - INSTALLED | ORDERLY LIQUIDATION VALUE - INSTALLED ($ USD) | REPLACEMENT COST NEW ($ USD) |
|---|---|---|---|
| **LBCHI** | **223,660** | **131,605** | **251,466** |
| Assets Not Included | - | - | 2,040 |
| Building | 35,700 | 20,600 | 36,960 |
| Computer Equipment | 5,960 | 3,785 | 9,520 |
| Furniture & Fixtures | 8,400 | 4,750 | 12,238 |
| Machinery & Equipment | 137,750 | 78,950 | 150,178 |
| Office Equipment | 3,350 | 1,920 | 3,870 |
| Plant Vehicles | 11,000 | 9,100 | 12,910 |
| Storage Equipment | 21,500 | 12,500 | 23,750 |
| **LBNY** | **276,750** | **193,600** | **317,179** |
| Building | 20,000 | 11,500 | 20,700 |
| Computer Equipment | 4,900 | 3,100 | 8,040 |
| Furniture & Fixtures | 12,600 | 7,200 | 17,874 |
| Machinery & Equipment | 55,050 | 31,580 | 63,005 |
| Office Equipment | 2,600 | 1,470 | 3,080 |
| Plant Vehicles | 148,700 | 119,800 | 166,660 |
| Storage Equipment | 26,800 | 15,450 | 29,690 |
| Vehicles | 6,100 | 3,500 | 8,130 |
| **Total** | **500,410** | **325,205** | **568,644** |

# *Appendix B*

## Valuation Asset Detail

**Furniture, Fixtures, and Equipment**
**Valuation of Certain Machinery & Equipment for**
**Asset Detail**
**Valuation as of September 12, 2022**

| LOCATION NAME | Appraisal Class | Asset Description | Appraisal RUL | APPRAISAL PLACED | QTY | REPORTED COST ($ USD) | FAIR MARKET VALUE - INSTALLED ($ USD) | ORDERLY LIQUIDATION VALUE - INSTALLED ($ USD) | REPLACEMENT COST NEW ($ USD) |
|---|---|---|---|---|---|---|---|---|---|
| LBCHI | Furniture & Fixtures | Tools/Hardware | 11 | 2021 | 1 | 800 | 750 | 400 | 820 |
| | | 48"x40" Wood Pallets | 11 | 2021 | 50 | | 650 | 350 | 688 |
| | | Plastic lobster crates | 11 | 2021 | 200 | | 7,000 | 4,000 | 10,730 |
| | Machinery & Equipment | Sweetwater air blower | 11 | 2021 | 2 | 2,400 | 2,300 | 1,300 | 2,530 |
| | | CBI 200 Biofilter blower | 11 | 2021 | 1 | 5,000 | 4,800 | 2,800 | 5,280 |
| | | Sweetwater Bead Filter | 11 | 2021 | 4 | 12,000 | 11,500 | 6,700 | 12,670 |
| | | Verus 850 water pump | 11 | 2021 | 1 | 4,250 | 4,100 | 2,300 | 4,490 |
| | | Level Monitron V12.2 | 11 | 2021 | 1 | 3,000 | 2,900 | 1,600 | 3,170 |
| | | 1500 gallon water container | 11 | 2021 | 6 | 9,000 | 8,800 | 5,000 | 9,500 |
| | | 1100 gallon water container | 11 | 2021 | 11 | 15,400 | 15,000 | 8,600 | 16,260 |
| | | Custom skimmer | 11 | 2021 | 2 | 800 | 750 | 400 | 840 |
| | | Aquabiotech custom skimmer | 11 | 2021 | 1 | 8,500 | 8,300 | 4,700 | 8,970 |
| | | CES Crown 20WRTT Forklift S#6A166608 | 11 | 2021 | 1 | | 8,200 | 4,700 | 8,950 |
| | | PALL Filter X-100 7 Bar, S#20003539 | 11 | 2021 | 3 | | 800 | 450 | 900 |
| | | Pentair 460V Circulating Pump VREKT-30 | 11 | 2021 | 1 | | 4,100 | 2,300 | 4,458 |
| | | Pentair H3 2HP pump Plus-8 | 11 | 2021 | 2 | 2,300 | 2,200 | 1,200 | 2,430 |
| | | Pentair H3 5HP pump Plus-20 | 11 | 2021 | 2 | 3,000 | 2,900 | 1,600 | 3,170 |
| | | MT 12 ton chiller MT-12-460 Split, S# 29715, 29716 | 11 | 2021 | 1 | 50,000 | 48,500 | 28,000 | 52,790 |
| | | Oxygen Monitor / Generator SC200 | 11 | 2021 | 1 | 10,000 | 9,700 | 5,600 | 10,560 |
| | | Taurus 110 water pump / Pentair H3 TAET-2 | 11 | 2021 | 2 | 1,600 | 1,500 | 900 | 1,690 |
| | | Pentair H3 4HP Pump M#SST50, S#20180909 | 11 | 2021 | 1 | | 1,400 | 800 | 1,520 |
| | Office Equipment | 6' Conference table | 7 | 2021 | 1 | 800 | 750 | 400 | 850 |
| | | Hik Vision Modem w/ 15 security cameras | 7 | 2021 | 1 | 1,500 | 1,400 | 800 | 1,600 |
| | | Smart TV (70UM6970PUA) | 7 | 2021 | 1 | 1,200 | 1,100 | 650 | 1,280 |
| | | Samsung Tab A7 lite (SM-T220NQAAXAR) | 7 | 2021 | 1 | 130 | 100 | 70 | 140 |
| | Plant Vehicles | Hyster 5000lb Forklift Model S50FT; S# F187V26178M | 7 | 2021 | 1 | 11,000 | 11,000 | 9,100 | 12,910 |
| | Building | 2'x2' CFM exhaust fan | 39 | 2021 | 1 | | 8,600 | 4,700 | 8,500 |
| | | 8x7' 12R Insulated garage door | 39 | 2021 | 1 | 1,500 | 1,400 | 800 | 1,480 |
| | | Rapid roll up overhead door | 39 | 2021 | 2 | 10,000 | 9,600 | 5,500 | 9,880 |
| | | Lobster Holding Tank | 39 | 2021 | 1 | | 16,500 | 9,600 | 17,100 |
| | Storage Equipment | 40' Insulated freezer container, 06DR241BCC06C0 | 11 | 2021 | 1 | 22,000 | 21,500 | 12,500 | 23,750 |
| | Assets Not Included | Styrofoam Insulated Shipping Boxes | 0 | 2021 | 30 | | - | - | 1,380 |
| | | Frozen Gel Packs | 0 | 2021 | 60 | | - | - | 660 |
| | Computer Equipment | HP Printer | 4 | 2021 | 1 | 200 | 150 | 100 | 220 |
| | | Desktop PCs | 4 | 2021 | 3 | 1,200 | 1,000 | 650 | 1,290 |
| | | Laptop PCs | 4 | 2021 | 3 | 2,400 | 2,000 | 1,300 | 2,580 |
| | | APC Back-UPS 1500 (Backup Battery) | 4 | 2021 | 1 | | 100 | 80 | 200 |
| | | TP-Link 450 MPBS N Router, TL-WR940N | 4 | 2021 | 1 | | 10 | 5 | 50 |
| | | Unifi Switch 24 250w | 4 | 2021 | 1 | | 300 | 150 | 400 |
| | | Iphone 11/12 | 4 | 2021 | 4 | | 2,100 | 1,300 | 4,380 |
| | | HIK Vision Video Recorder | 4 | 2021 | 1 | | 300 | 200 | 400 |
| **LBCHI Total** | | | | | **411** | **188,580** | **223,660** | **131,605** | **251,466** |
| LBNY | Furniture & Fixtures | Pallet Jacks | 11 | 2021 | 2 | 1,200 | 1,100 | 650 | 1,240 |
| | | Power washer | 11 | 2021 | 1 | 350 | 300 | 150 | 360 |
| | | Tools/Hardware | 11 | 2021 | 1 | 1,200 | 1,100 | 650 | 1,240 |
| | | 48"x40" Wood Pallets | 11 | 2021 | 75 | | 1,000 | 550 | 1,031 |
| | | Plastic lobster crates | 11 | 2021 | 261 | | 9,100 | 5,200 | 14,003 |
| | Machinery & Equipment | Hayward 2HP | 11 | 2021 | 4 | 3,200 | 3,100 | 1,800 | 3,380 |
| | | Aquabead Vortex 36" dia. | 11 | 2021 | 2 | 6,000 | 5,800 | 3,300 | 6,340 |
| | | Custom Biofilter Beds | 11 | 2021 | 3 | 4,500 | 4,400 | 2,500 | 4,750 |
| | | 52" x 9' dia. Chiller barrels | 11 | 2021 | 4 | 6,000 | 5,800 | 3,300 | 6,340 |
| | | Sweetwater air blower | 11 | 2021 | 1 | 1,200 | 1,100 | 650 | 1,270 |
| | | Arctic-Temp 500 w/ 5hp condensing unit | 11 | 2021 | 1 | 14,000 | 13,500 | 7,800 | 14,780 |
| | | Universal Marine Industries Titanium Chiller - 6HP | 11 | 2021 | 1 | 5,000 | 4,800 | 2,800 | 5,280 |
| | | Maneurop Condensing unit - 6HP | 11 | 2021 | 1 | 6,000 | 5,800 | 3,300 | 6,340 |
| | | Bohn Condensing unit - 10HP | 11 | 2021 | 1 | 9,000 | 8,800 | 5,000 | 9,500 |
| | | Backup generator | 11 | 2021 | 1 | | 600 | 350 | 1,620 |
| | | HPS Backup transformer 3P 15KVA | 11 | 2021 | 1 | | 1,200 | 700 | 2,505 |
| | | 275 Gallon Water Storage Tote Tank | 11 | 2021 | 2 | | 150 | 80 | 900 |
| | Office Equipment | Samsung Smart TV | 7 | 2021 | 1 | 900 | 850 | 450 | 960 |
| | | Samsung Tab A7 lite | 7 | 2021 | 1 | 130 | 100 | 70 | 140 |
| | | DMSS Security System w/ 10 cameras | 7 | 2021 | 1 | 1,200 | 1,100 | 650 | 1,280 |
| | | Fezibo standing desk | 7 | 2021 | 2 | 400 | 350 | 200 | 430 |
| | | 6' Conference table | 7 | 2021 | 1 | 250 | 200 | 100 | 270 |
| | Vehicles | 2006 Chevy Silverado 1500 KNA2579, 1GCEK14V86E197751 | 3 | 2021 | 1 | 7,500 | 6,100 | 3,500 | 8,130 |
| | Plant Vehicles | Sweetster 25 Forklift | 7 | 2021 | 1 | 7,000 | 7,200 | 5,800 | 8,220 |
| | | 2016 Isuzu Refrigerated Box Truck 90418 ML | 7 | 2021 | 1 | 50,000 | 53,000 | 42,500 | 58,680 |
| | | 2018 Isuzu Refrigerated Box Truck NPR-HD 90417 ML, S4DC4W1C8JS8000592 | 7 | 2021 | 1 | 55,000 | 57,000 | 46,000 | 64,550 |
| | | 2008 Ford F450 Refrigerated Box Truck 90416ML, 1FDXF46Y68EC30864 | 7 | 2021 | 1 | 30,000 | 31,500 | 25,500 | 35,210 |
| | Building | Lobster Holding Tank w/filtration | 39 | 2021 | 1 | | 20,000 | 11,500 | 20,700 |
| | Storage Equipment | 40' dry, insulated shipping container | 11 | 2021 | 1 | 2,000 | 1,900 | 1,100 | 2,160 |
| | | 40' Insulated freezer container | 11 | 2021 | 1 | 24,000 | 23,500 | 13,500 | 25,910 |
| | | Russel Condensidg unit and evaporator | 11 | 2021 | 1 | 1,500 | 1,400 | 850 | 1,620 |
| | Computer Equipment | Desktop PC | 4 | 2021 | 1 | 400 | 300 | 200 | 430 |
| | | Laptop PC | 4 | 2021 | 3 | 2,400 | 2,000 | 1,300 | 2,580 |
| | | HP Printer | 4 | 2021 | 3 | 600 | 500 | 300 | 650 |
| | | Iphone 11/12 | 4 | 2021 | 4 | | 2,100 | 1,300 | 4,380 |
| **LBNY Total** | | | | | **388** | **240,930** | **276,750** | **193,600** | **317,179** |
| **Total** | | | | | **799** | **429,510** | **500,410** | **325,205** | **568,644** |

# *Appendix C*

## Professional Qualifications

## Qualifications



# Anthony Vu, ASA



**Vice President**
**Cost Segregation and Renewable Energy**
**Valuation Advisory, U.S.**

**Current responsibilities**
Anthony Vu specializes in Cost Segregation and Machinery & Equipment
Valuation services.

**Experience**
Mr. Vu has been active in the construction and valuation industry since
2004. He performs cost segregation analyses, fixed asset studies for
capitalization of tangible property, as well as opinions of value of
machinery, equipment, vehicles, furniture, fixtures, land improvement
and buildings. His analyses are used for financial reporting (purchase
price allocation), tax planning and reporting, grant applications,
insurance placement, investment tax credit applications, and property
tax reporting.

Mr. Vu's cost segregation engagements consist of new construction,
acquisitions and retroactive studies, including the implementation of
statistical analyses. Property types valued include auto dealerships,
healthcare, hospitality and gaming, manufacturing and distribution,
multifamily, office buildings, and renewable energy generation projects
(solar and wind farms), retail, and warehousing.

Mr. Vu also has direct construction experience having served as a project
engineer for a General Contractor.

**Education and affiliations**
Mr. Vu holds a B.S. from California State Polytechnic University, Pomona
where he majored in Construction Engineering and Technology.  He
holds the Accredited Senior Appraiser (ASA) designation in Machinery and
Technical Specialties from the American Society of Appraisers.

**Contact**
T +1 213-369-7430
Anthony.Vu@am.jll.com

[1] U.S. property valuation and tax consulting services are performed by JLL Valuation & Advisory
Services, LLC, a wholly owned indirect subsidiary of Jones Lang LaSalle Incorporated.

COPYRIGHT ® JONES LANG LASALLE IP, INC. 2022. All Rights Reserved.

Qualifications



# John Oates

**Managing Director
Renewable Energy
Valuation Advisory, U.S.**



**Current responsibilities**
John Oates serves as a Managing Director in Renewable
Energy. In this role, Mr. Oates is focused on valuation and consultation
regarding assets for leasing or project finance transactions.

**Experience**
Mr. Oates comes to JLL with over 50 years of experience that includes,
specialties such as electric generation (coal fired, gas, hydro-electric,
nuclear, and renewables (solar, wind, biomass, etc.) oil and gas,
automobile, infrastructure (airports, toll roads, waste water treatment
etc.) semiconductor, steel, paper and food processing to name a few.

**Education and affiliations**
Marquette University – Bachelors, History

**Contact**
T +1 917-349-8008
John.Oates@am.jll.com

[1] U.S. property valuation and tax consulting services are performed by JLL Valuation & Advisory
Services, LLC, a wholly owned indirect subsidiary of Jones Lang LaSalle Incorporated.

**Exhibit F**

**Canadian Appraisal 1**



a d v i s o r y

valuation

# DEKSTOP APPRAISAL OF REAL PROPERTY

5523-25 Highway #3,
Shag Harbour NS

DESKTOP APPRAISAL REPORT
As of March 20, 2023

Prepared For:
Lobsterboys
65 Dipper Harbour Road
Dipper Harbour, NB



Prepared By:
Cushman & Wakefield ULC
Valuation & Advisory
Halifax, NS
C&W File ID: 23-614-900294
CONFIDENTIAL





**Appraisal of:**

**5523-25 Highway #3,**

**Shag Harbour NS**



May 31, 2023

**Mr. Taylor Cox, Chief Financial Officer**
**Lobsterboys**
65 Dipper Harbour Road
Dipper Harbour, NB
E5J 1X3

Re:    Appraisal of Real Property
       In a Self-Contained Report

       **5523-25 Highway #3, Shag Harbour NS  – "Subject Property"**

       C&W File ID:23-614-900294

Dear Mr. Cox:

Cushman & Wakefield ULC is pleased to submit this desktop Appraisal Report, estimating the current market value of the above-referenced subject property.

By agreement, this is a Narrative Appraisal Report, which contains a summary of all of the data, reasoning and analysis upon which our value conclusion is based. This document has been prepared in accordance with the Code of Ethics & Standards of Professional Practice, and the Canadian Uniform Standards of Professional Appraisal Practice (The Standards) promulgated by the Appraisal Institute of Canada.

We have prepared this desktop appraisal report at the request of Lobsterboys for the general purpose of establishing market value for management planning use. The report is intended for the exclusive use of Lobsterboys (the "Group"). The report is addressed to Lobsterboys and can be relied on by the "Group".

The report is subject to the Assumptions and Limiting Conditions contained in The Addenda, in addition to any others that may be contained in the report.

## REAL PROPERTY VALUE CONCLUSION

The property was not inspected as per the terms of reference for the Desktop Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the real property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

<div align="center">

**FIVE HUNDRED FORTY THOUSAND DOLLARS**
**$540,000**

</div>

This estimate of market value is based on an exposure time of 12 months.



CUSHMAN & WAKEFIELD ULC

# MACHINERY & EQUIPMENT VALUE CONCLUSION

The property was not inspected as per the terms of reference for the Desktop Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the Machinery & Equipment subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**THREE MILLION FOUR HUNDRED THIRTY-TWO THOUSAND FIVE HUNDRED DOLLARS**
**$3,432,500**

The Addenda to this report contains the Machinery and Equipment appraisal report.

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and an Addendum.

Respectfully submitted,

**CUSHMAN & WAKEFIELD ULC**

Wayne MacDonald, B.Comm. AACI, P.App.
Vice President
NSREAA# 303157
wayne.macdonald@ca.cushwake.com
Phone Office Direct 902.877.2273



# EXECUTIVE SUMMARY

## PROPERTY IDENTIFICATION

| | | |
|---|---|---|
| Address | : | PID 80022197 -  5523-25 Highway #3 Shag Harbour NS |

## VALUE ESTIMATE

| | | |
|---|---|---|
| Valuation Methods Utilized | : | Cost Approach:<br>$540,000 |
| Valuation Date | : | March 20, 2023 |
| Value Conclusion | : | **$540,000** |
| Value Assumptions | : | This estimate of market value is based on an exposure time of 12 months. |

## PROPERTY DESCRIPTION

| | | |
|---|---|---|
| Type | : | Lobster Pound facility. |
| Location | : | The subject property is located along the Atlantic Ocean coastline and is situated approximately 400 feet east  along a right of way access from Lighthouse Route #3. This area is in Southwest Nova Scotia. |
| Site Area | : | PID  80022197- 1.177 acres |
| Land Use Designation | : | RD – Rural Development |

## LOCATIONAL CHARACTERISTICS

| | | |
|---|---|---|
| Surrounding Uses | : | Surrounding uses in the area are mainly rural agricultural in nature in nature. |
| Market Conditions | : | The reader should note that events in the financial and credit markets have previously and can continue to result in an uncertain and volatile economic environment.  This appraisal report reflects our estimate of value at a single point in time at the effective date.  Ongoing local and global changes in the economic and financial marketplace could seriously impact the reliability of this estimate at any point in time other than the effective date. |

## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined by CUSPAP (January 1, 2022 Edition) - "An assumption, directly related to a specific Assignment, which, if were not assumed to be true, could materially alter the opinions or conclusions. Extraordinary Assumptions presume uncertain information about or anticipated changes in: the physical, legal or economic characteristics of the subject property; or about: conditions external to the subject property such as market conditions or trends, or the integrity of data used in an analysis to be fact."

We assume for purposes of this appraisal that no wetlands or water lots form any part of the lands under consideration.

We assume the information provided to us in previous appraisal reports is accurate.

We have not been provided building heights for the buildings and have estimated them based on photos provided.

CUSHMAN & WAKEFIELD

## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined by CUSPAP (January 1, 2022 Edition) -"Hypothetical Conditions are a specific type of an Extraordinary Assumption that presumes, as fact, simulated but untrue information about physical, legal, or economic characteristics of the subject property or external conditions, and are imposed for purposes of reasonable analysis."

This appraisal does not employ any hypothetical conditions.



# PROPERTY PHOTOGRAPHS

## AERIAL MAP





# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ———————————————————————————————— **I**
  PROPERTY PHOTOGRAPHS -------------------------------------------------------------------------- 3
**TABLE OF CONTENTS** ———————————————————————————————— **4**
**INTRODUCTION** ——————————————————————————————————— **1**
  PURPOSE AND INTENDED USE OF THIS APPRAISAL ------------------------------------------- 1
  PROPERTY IDENTIFICATION -------------------------------------------------------------------------- 1
  PROPERTY OWNERSHIP ----------------------------------------------------------------------------- 1
  EFFECTIVE DATE OF APPRAISAL ------------------------------------------------------------------ 1
  PROPERTY RIGHTS APPRAISED -------------------------------------------------------------------- 1
  SCOPE OF THE APPRAISAL-------------------------------------------------------------------------- 1
  DEFINITION OF MARKET VALUE--------------------------------------------------------------------- 2
  REASONABLE EXPOSURE TIME--------------------------------------------------------------------- 2
**PROPERTY DETAILS** ——————————————————————————————— **3**
  NEIGHBORHOOD ANALYSIS ------------------------------------------------------------------------- 3
  SITE DESCRIPTION----------------------------------------------------------------------------------- 5
  LAND USE BYLAW ------------------------------------------------------------------------------------ 7
  REAL PROPERTY TAXES AND ASSESSMENTS -------------------------------------------------- 7
**VALUATION** ————————————————————————————————————— **8**
  HIGHEST AND BEST USE ----------------------------------------------------------------------------- 8
  VALUATION METHODS-------------------------------------------------------------------------------- 9
  DIRECT COMPARISON APPROACH ---------------------------------------------------------------- 11
  ANALYSIS----------------------------------------------------------------------------------------------- 13
  SUMMARY OF ANALYSIS ---------------------------------------------------------------------------- 15
  COST APPROACH------------------------------------------------------------------------------------- 16
**RECONCILIATION AND FINAL VALUE ESTIMATE** ————————————————— **17**
**ADDENDA CONTENTS** —————————————————————————————— **18**
  ADDENDUM A:    CERTIFICATION OF APPRAISAL ------------------------------------------------- 19
  ADDENDUM B:    GLOSSARY OF TERMS AND DEFINITIONS-------------------------------------- 21
  ADDENDUM C:    ASSUMPTIONS AND LIMITING CONDITIONS ----------------------------------- 23
  ADDENDUM D:    COST SHEETS -------------------------------------------------------------------- 27
  ADDENDUM E:    MACHINERY & EQUIPMENT APPRAISAL ---------------------------------------- 32



# INTRODUCTION

## PURPOSE AND INTENDED USE OF THIS APPRAISAL

The purpose of this appraisal is to estimate the current market value of the subject property. It is our understanding that the intended use of the appraisal is for first mortgage financing. This report may only be relied upon by Lobsterboys (the "Group")

## PROPERTY IDENTIFICATION

The subject property is municipally addressed as:

**Lot LB 1 - 5523-5525 Highway #3, Shag Harbour NS**

## PROPERTY OWNERSHIP

According to Nova Scotia Property Online the subject property is currently owned by Lobsterboys Ltd. It is our understanding that the subject property is not subject to a purchase and sale agreement. Based on our investigations PVSC indicates the subject property (Lot LB-1) was acquired by the current owner of record on October 5, 2018, for $150,000.

## EFFECTIVE DATE OF APPRAISAL

The effective date of the appraisal is March 20, 2023.

## PROPERTY RIGHTS APPRAISED

The legal interest appraised is the fee simple estate - defined as absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat.

## SCOPE OF THE APPRAISAL

In forming our opinion as to the market value of the subject as of the valuation date, we have relied on information which is detailed in this report, to the extent deemed appropriate, and carried out the following specific functions:

- Not required as our Terms of Reference. The client has requested a desktop appraisal.

- Considered information with respect to sales and listings, at or about the valuation date, of properties assess them as being relevant to our opinion, as set out herein. While we believe our review to be considered similar to the subject, where we have significant knowledge of such sales and listings and to reasonably complete, we cannot warrant that we have:

  i) uncovered and assessed every real property transaction at or about the valuation date that might be said to bear on the determination of the market value of the subject, or

  ii) fully discerned the motives behind the sales, listings and lease information considered in our analysis, such that our weighting of said information is without subjectivity;

- Reviewed land use regulations, in particular the Land Use By-Law, applicable to the subject;

- Examined the possibility of making any significant changes to the subject in terms of existing uses, land severance and/or additional development of the site;

- Ascertained the highest and best use of the property;



- Examined market conditions and analyzed their potential effect on the property; and

- Conducted discussions with market participants regarding future development of the property.

## DEFINITION OF MARKET VALUE

The Canadian Uniform Standards of Professional Appraisal Practice (The Standards) adopted by the Appraisal Institute of Canada define Market Value as:

> *The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised and acting in their own best interests;

- A reasonable time is allowed for exposure in the market;

- Payment is made in cash in Canadian dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

## REASONABLE EXPOSURE TIME

Exposure time is always presumed to precede the effective date of the appraisal.  It may be defined as:

> *The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.  It is a retrospective estimate based upon an analysis of past events assuming a competitive and open market.*

Based on discussions with various investors and real estate brokers familiar with assets such as the subject and based on an analysis of comparable sales utilized in this valuation and an analysis of current listings, it is our estimate that the subject would require a 12 month exposure period.



# PROPERTY DETAILS

## NEIGHBORHOOD ANALYSIS

### LOCATION

The subject property is located in Shag Harbour NS. This area is located in Southwest Nova Scotia. The subject site fronts along the Atlantic Ocean coastline and is situated approximately 400 feet east along a right of way access from Lighthouse Route #3.

### TRANSPORTATION SYSTEMS

Relatively, this location affords the subject very good access to the interprovincial highway # 103 which is an approximately 8km drive north west from the subject site.

### PLANNED CHANGES IN ROAD NETWORK

- None known.

### NEARBY AND ADJACENT USES

The immediate neighborhood is made up of a mix of rural residential development, vacancy land, light industrial (Kenney & Ross Limited as well as Metalco) and local commercial development (River Hills Golf & Country Club). The area offers very good access to the surrounding areas as well as the Trans-Canada Highway.

### LOCAL AREA CHARACTERISTICS

- Small rural location.
- Relatively close to larger provincial centres.

### LAND USE CHANGES

None known.

### CONCLUSIONS

The subject has a relatively favorable location with access to many important arterial routes.



LOT LB-1 5523-5525 HIGHWAY #3, SHAG HARBOUR NS                    PROPERTY DETAILS          4

## REGIONAL MAP



## NEIGHBOURHOOD MAP





# SITE DESCRIPTION

## SITE PLAN



| | |
|---|---|
| Location: | The subject property is located along the Atlantic Ocean coastline and is situated approximately 400 feet east along a right of way access from Lighthouse Route #3. This area is located in South west Nova Scotia. |
| Shape: | Irregular |
| Total Area: | Lot LB-1 (PID 80022197)- 1.177 acres |
| Topography: | Assumed generally at grade with adjacent properties. |
| Easements and/or Rights of Way: | None identified although any such documents are assumed not to have any impact on the marketability of the subject site. For greater certainty, a legal opinion should be obtained. |
| Frontage, Access, Visibility: | Frontage to Atlantic Ocean. |
| Sub Soil: | No soil analysis has been made in conjunction with this report. Soil bearing and drainage qualities are assumed to be adequate for the existing structures and typical for the area. We did not observe any evidence to the contrary during our physical inspection of the property. |
| Utilities: | Well & Septic service. |
| Environmental Matters: | Cushman & Wakefield ULC has no expertise or responsibility regarding environmental matters and it is assumed that there are not any environmental issues that would affect the market value or marketability of the subject property. |



**LOT LB-1 5523-5525 HIGHWAY #3, SHAG HARBOUR NS**                    **PROPERTY DETAILS**            6

Onsite Buildings

| BUILDING AREAS | | |
|---|---|---|
| Index | Building | Area (ft$^2$) |
| 1 | Tank House 1-2 w office | 4,207 |
| 2 | Tank House 3 | 2,626 |
| 3 | Tank House 4 | 2,305 |
| 4 | Main Electrical | 160 |
| 5 | Pump House | 196 |
| | **Totals** | **9,494** |

Hazardous Substances:    We observed no evidence of toxic or hazardous substances during our inspection of the site.  However, we are not trained to perform technical environmental inspections and recommend the services of a professional engineer for this purpose.

Overall Functionality:    The subject site appears functional for commercial resource fisheries.



## LAND USE BYLAW

Based on the information in the Municipality of the District of Barrington, the subject site is zoned RD – Rural Development Zone. This designation is designed to accommodate a wide variety of land uses that are common in rural coastal communities in Southwest Nova Scotia.

## REAL PROPERTY TAXES AND ASSESSMENTS

### CURRENT PROPERTY TAXES

The current assessment and taxes for the subject property are as follows.

| Tax Year | | 2023 |
|---|---|---|
| **5523-25 Highway #3** | PID 80022197 | $219,300 |
| | AAN 05546257 | |
| Tax Rate | | 2.5600% |
| Fire Area Rate | | 0.0172% |
| Fire Capital Rate | | 0.0150% |
| Total | | 2.5922% |
| **2023 Taxes est.** | | **$5,684.69** |

We have not been provided the property tax bill for the subject property and have calculated the tax based on the tax rates taken from The Municipality of Barrington website. We assume this to be correct but would defer to the actual tax bill.



# VALUATION

## HIGHEST AND BEST USE

### DEFINITION OF HIGHEST AND BEST USE

Fundamental to the concept of value is the principle of highest and best use, which may be defined as:

> *The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.*

### HIGHEST AND BEST USE CRITERIA

We have evaluated the site's highest and best use both as currently improved and as if vacant. In both cases, the property's highest and best use must meet four criteria. That use must be (1), legally permissible (2) physically possible, (3) financially feasible, and (4) maximally profitable.

#### LEGALLY PERMISSIBLE

According to the current Land Use By-law, the subject site is zoned RD Rural Development Zone. As mentioned earlier there are a variety of permitted and discretionary uses governed by this land use. The subject's use as commercial fisheries land is considered to be a permitted use.

#### PHYSICALLY POSSIBLE

The second test is what is physically possible. As discussed in the "Site Description," section of the report, the site's size, soil, topography, etc. do not physically limit its use. The subject site is of adequate shape and size to accommodate a commercial development.

#### FINANCIAL FEASIBILITY AND MAXIMUM PRODUCTIVITY

The third and fourth tests are what is financially feasible and what will produce the highest net return. After analyzing the physically possible and legally permissible uses of the property, the highest and best use must be considered in light of financial feasibility and maximum productivity. For a potential use to be seriously considered, it must have the potential to provide a sufficient return to attract investment capital over alternative forms of investment. A positive net income or acceptable rate of return would indicate that a use is financially feasible. Based on previous sales of land in the area tempered by current economic volatility, development as a commercial site in the short to mid appears financially feasible for the subject site.

### HIGHEST AND BEST USE OF SITE AS THOUGH VACANT

Considering the subject site's physical characteristics and location, as well as the state of the local commercial market, it is our opinion that the Highest and Best Use of the subject site as though vacant is as a commercial development site.



# VALUATION METHODS

There are six generally accepted methods of valuing vacant land: Direct Comparison; Abstraction; Extraction; Subdivision Development; Land Residual; and Ground Rent Capitalization.

1. The ***Direct Comparison Approach*** is based upon the premise that a prudent purchaser would not pay more for a property than what it would cost to acquire a suitable alternative property and that the market value of a property can be estimated by comparing sales, offers, and listings of properties which have similar characteristics to the property being appraised.

2. The ***Abstraction Method*** of valuing land is premised upon the Principal of Contribution. This method is premised on the assumption that within each category and type of real estate, there exists a typical ratio of land value to total property value.  By knowing what this ratio is from data compiled from areas where land and building values are available and applying it to the sales information regarding improved properties in a built up area, an estimate of land value can be abstracted.  The reliability of this method is diminished because it does not take into explicit consideration such relevant criteria as building age or quality of construction.

3. A method of land valuation similar to the Abstraction Method but which implicitly recognizes differences in building age and quality of construction is the ***Extraction Method***.  This method deducts the estimated depreciated reproduction or replacement cost of the improvements of an improved property for which the total property value is known to arrive at an estimate of land value as if vacant.

4. When valuing larger parcels for which the highest and best use is the parcel's subdivision into smaller sites, and for which sales information regarding similar larger sites is insufficient to undertake a Direct Comparison Approach, the ***Subdivision Development Method*** may be employed.  In applying this method, the first step is to establish market values for the smaller sites as though subdivided, the length of the development period, and an appropriate absorption period.  The second step is to determine the costs required to create and market the subdivided parcels which include engineering and construction costs associated with the site preparation, roadways, sidewalks and servicing; carrying costs such as insurance and taxes; and marketing costs.  These costs are then deducted from the projected gross revenue of the lots to arrive at an estimate of the net proceeds which, once discounted at an applicable rate to account for the risk associated with the time required to complete such a development, are indicative of the present market value of the larger, un-subdivided site.

5. Another method that may be employed in the absence of adequate comparable information is the ***Land Residual Technique***.  In this method the net income generated from the property is established.  From this is deducted a reasonable return on and recapture of capital invested in the improvements.  The residual income is considered to be ascribed from the land. This income is then capitalized at an appropriate rate to arrive at an estimate of land value.  An important assumption required in the application of this method is that the site is developed to its highest and best use such that the income from land and improvements are of the same type and sources.

6. A similar method as the Land Residual Technique is ***Ground Rent Capitalization***. Undertaking this method of site valuation requires the analysis of ground rents prevalent in the market and in consideration of the characteristics of the site being appraised.  From the analysis, a gross income is established from which any requisite expenses or anticipated losses are deducted to arrive at a net operating income. This net operating income is then capitalized at an applicable rate to arrive at an estimate of the vacant site.



The **Direct Comparison Approach** is based on the Principle of Substitution which maintains that a prudent purchaser would not pay more for a property than what it would cost to purchase a suitable alternative property, one that exhibits similar characteristics, and functional utility, etc.  Within this approach, the property being appraised is compared to similar properties that have sold recently or are currently offered for sale.

Some important factors to be given consideration in this analysis include location, access, site size, site configuration, topography, land use classification, servicing, etc.  When enough unimproved and comparable sales are available, the Direct Comparison Approach is the preferred technique and has been employed herein.



# DIRECT COMPARISON APPROACH

In the Direct Comparison Approach, we developed an opinion of value by comparing this property with similar, recently sold properties in the surrounding or competing area. Inherent in this approach is the principle of substitution, which states that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arm's-length transactions between willing and knowledgeable buyers and sellers, we can identify value and price trends. The basic steps of this approach are:

1.  Research recent, relevant property sales and current offerings throughout the competitive area;

2.  Select and analyze properties that are similar to the property appraised, analyzing changes in economic conditions that may have occurred between the sale date and the date of value, and other physical, functional, or locational factors;

3.  Identify sales that include favorable financing and calculate the cash equivalent price;

4.  Reduce the sale prices to a common unit of comparison such as price per square foot, price per unit or effective gross income multiplier;

5.  Make appropriate comparative adjustments to the prices of the comparable properties to relate them to the property being appraised; and

6.  Interpret the adjusted sales data and draw a logical value conclusion.

The Direct Comparison Approach is based on the Principle of Substitution which maintains that a prudent purchaser would not pay more for a property than what it would cost to purchase a suitable alternative property, one that exhibits similar characteristics, and functional utility, etc. Within this approach, the property being appraised is compared to similar properties that have sold recently or are currently offered for sale.  Typically, a unit of comparison (i.e. sale price per square foot, sale price per unit, etc.) is used to facilitate the analysis.  In the case of properties similar to the subject lands, the sale price per acre is the most commonly used unit of comparison.

In analyzing the comparable sales relative to the subject site, of particular relevance are characteristics such as location, site size, topography, developability, and land use regulations.  In this regard, the sales summarized in following are thought to be reasonably comparable to the subject site and to provide a reliable indication as to its current market value.



LOT LB-1 5523-5525 HIGHWAY #3, SHAG HARBOUR NS                                                    VALUATION      12

## Vacant Land Valuation

We have researched the general market areas for transactions involving similar vacant land sales. Based on our investigations, the following sale indices were examined. Details of the sales are presented below.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | SALES CHART | | | | | | |
| Index | Address | PID | PAN | Sale Date | Site Area m² | Site Area ft² | Site Area Acres | Sale Price | Sale Price / ft² | Sale Price / acre |
| 1 | 933 Port Latour Road, Thomasville NS | 80066707 | 04589998 | August 8, 2022 | 34,034 | 366,340 | 8.41 | $80,000 | $0.22 | $9,512 |
| 2 | Block R1 Sherose Island Road, Barrington NS | 80050602 | 04184602 | June 22, 2022 | 60,900 | 655,527 | 15.05 | $195,000 | $0.30 | $12,958 |
| 3 | 18 Port Road, Upper Port Latour NS | 80058027 | 00019437 | June 15, 2022 | 8,504 | 91,539 | 2.10 | $65,000 | $0.71 | $30,931 |
| 4 | 6593 Highway 3, Lower Woods Harbour NS | 82563065 | 01749293 | Listing | 6,600 | 71,040 | 1.63 | $69,000 | $0.97 | $42,309 |





# ANALYSIS

The major elements of comparison for an analysis of this type include the property rights conveyed, the financial terms incorporated into a particular transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its physical traits and the economic characteristics of the property.

## PROPERTY RIGHTS APPRAISED

All of the sales utilized in this analysis involved the transfer of the fee simple interest.

## FINANCIAL TERMS

To the best of our knowledge, all of the sales utilized in this analysis were accomplished with cash and/or cash and market-oriented financing.

## CONDITIONS OF SALE

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. However, all sales used in this analysis are considered to be "arms-length" market transactions between both knowledgeable buyers and sellers on the open market. Market listings should be treated caution as they may transfer at a lower unit value. This is particularly the case during declining or stabilizing market conditions



**LOT LB-1 5523-5525 HIGHWAY #3, SHAG HARBOUR NS**    **VALUATION**    **14**

## MARKET CONDITIONS

The sales that are included in this analysis are from 2022 with one listing included as well. During this time for the subject area, market conditions have improved as indicated by the sales. Therefore, the sales are somewhat inferior.

## LOCATION

The subject property is located oceanfront in Shag Harbour. Sales 1&2 are relatively similar with respect to location with 3 and 4 being considered to be superior.

## SIZE

The selected comparable sales range in size from 1.63 acres to 15.05 acres, while the subject consists of 1.177 acres. It should be noted that much larger parcels will typically transfer at lower unit prices than smaller parcels, all other things being equal, given the law of diminishing returns although the effect of this diminishes beyond a certain parcel size. There are also benefits associated with larger parcels in so much as assemblage is not required and infrastructure costs can be spread over a greater land area. In this case, Index No 1-2 are considered to represent a larger parcel (inferior) while 3 and 4 are considered similar in that regard..

## UTILITY

Overall Index No's 1-4 have similar utility.



**LOT LB-1 5523-5525 HIGHWAY #3, SHAG HARBOUR NS**                                          VALUATION     **15**

## PHYSICAL TRAITS

The comparable properties have varying degrees of comparability when measured against the subject property. The most important attributes of the subject property which need to be compared to other properties are similar physical make-up, location and exposure. The overall physical sites would be considered to be generally similar.

## SUMMARY OF ANALYSIS

The selected comparable indices represent 3 completed transactions in 2022 and one listing. The selected indices range from a low of 1.63 acres to 15.05 acres. Based on this and relying on information provided we have made the following adjustments for purposes of a desktop report.

| LAND SALES ADJUSTMENT CHART | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Economic Adjustments (Cumulative) | | | | | Property Characteristic Adjustments (Additive) | | | |
| Index | Price / Acre Date | Property Rights conveyed | Conditions of sale | Special Financing | Market conditions | Subtotal $ / Acre | Location | Size | Utility | Physical Traits | Indicated Price per Acre |
| 1 | $9,512 Aug-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $9,651 | Similar | Inferior | Similar | Similar | Higher than $9,651 |
| 2 | $12,958 Jun-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $13,180 | Similar | Inferior | Similar | Similar | Higher than $13,180 |
| 3 | $30,931 Jun-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $31,473 | Superior | Similar | Similar | Similar | Lower than $31,473 |
| 4 | $42,309 Listing | Fee Simple Similar | Arms-length similar | None similar | Inferior | $42,309 | Superior | Similar | Similar | Similar | Lower than $42,309 |

We believe the subject site possesses a good location in its local area while being in close proximity the Trans-Canada Highway. Given these characteristics we would estimate an overall rate of $35,000 per acre to be appropriate for the subject.

Application of this rate results in the following estimate of value:

1.177acres x $35,000 per acre = $41,195

**40,000 (Rounded)**



# COST APPROACH

## METHODOLOGY

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. We previously developed an opinion of land value of $40,000.

## REPLACEMENT COST NEW

The Marshall and Swift Estimator Valuation Service has been used to determine the replacement cost of the subject building.

## DEPRECIATION

Depreciation is generally broken down into three components; physical deterioration, functional obsolescence, and external obsolescence,

**Physical Deterioration** is caused by the wear and tear of the elements and the use of the improvements. In the summary table at the end of this section, we have presented estimates of the subject components' actual ages, effective ages, and total physical deterioration, based on the physical age/life methodology. The effective age may be more or less than the actual age, depending on the maintenance of the facility.

**Functional Obsolescence** is due to several factors, such as poor floor plan, limited or excessive space, flawed design or style, or a deficiency or super adequacy in the structure, materials, or design.

**External Obsolescence** is caused by conditions extraneous to the subject, which impairs or diminishes desirability. Included in this category are items such as legislative enactments that restrict or impair property rights, neighborhood deterioration, noxious enterprises and/or deteriorating market conditions.

We have utilized the age life method to address the depreciation within the subject. This entails comparing the effective age vs the expected useful life of the development. Based on the new construction of the subject and the improvements in the area in general we have not identified any forms of depreciation inherent in the property.

Based on the forgoing the value of the subject property based on the Cost Approach is shown in the chart below.

| Index | Building | Building Areas | Replacement Cost | Depreciation @ 50% | Depreciated Replacement Cost | $/ft² |
|---|---|---|---|---|---|---|
| | | | **DEPRECIATED REPLACEMENT COST - AVERAGE** | | | |
| 1 | Tank House 1-2 w office | 4,207 | $492,130 | $246,065 | $246,065 | $58 |
| 2 | Tank House 3 | 2,626 | $252,096 | $126,048 | $126,048 | $48 |
| 3 | Tank House 4 | 2,305 | $225,821 | $112,911 | $112,911 | $49 |
| 4 | Main Electrical | 160 | $13,112 | $6,556 | $6,556 | $41 |
| 5 | Pump House | 196 | $18,516 | $9,258 | $9,258 | $47 |
| 6 | Land Value | | | | $40,000 | |
| | **Totals** | **9,494** | **$1,001,675** | **$500,838** | **$540,838** | **$57** |
| | | | | Rounded | **$540,000** | **$57** |

Detailed Marshall & Swift / Corelogic cost sheets can be found in the addenda.

## CONCLUSION

Based on the above analysis the Market value estimate of the subject property based upon the Cost Approach is estimated to be **$540,000 (Rounded).**



# RECONCILIATION AND FINAL VALUE ESTIMATE

The property was not inspected as per the terms of reference for the Desktop Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the real property and the machinery & equipment subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

## REAL PROPERTY VALUE CONCLUSION

The property was not inspected as per the terms of reference for the Desktop Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the real property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**FIVE HUNDRED FORTY THOUSAND DOLLARS**
**$540,000**

This estimate of market value is based on an exposure time of 12 months.

## MACHINERY & EQUIPMENT VALUE CONCLUSION

The property was not inspected as per the terms of reference for the Desktop Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the Machinery & Equipment subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**THREE MILLION FOUR HUNDRED THIRTY-TWO THOUSAND FIVE HUNDRED DOLLARS**
**$3,432,500**

The Addenda to this report contains the Machinery and Equipment appraisal report.



# ADDENDA CONTENTS

ADDENDUM A:    CERTIFICATION OF APPRAISAL
ADDENDUM B:    GLOSSARY OF TERMS AND DEFINITIONS
ADDENDUM C:    ASSUMPTIONS AND LIMITING CONDITIONS
ADDENDUM D:    COST SHEETS
ADDENDUM E:    MACHINERY & EQUIPMENT APPRAISAL

CUSHMAN &
WAKEFIELD

# ADDENDUM A:  CERTIFICATION OF APPRAISAL

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

- Our compensation is not contingent upon the reporting of a predetermined value or direction in value that favours the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

- Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Canadian Uniform Standards.

- Wayne MacDonald has not made an inspection of the property as per the terms of reference (desktop reporting) that is the subject of this report effective March 20, 2023.

- The Appraisal Institute of Canada has a mandatory Continuing Professional Development program for designated members. As of the date of this report, Wayne MacDonald has fulfilled the requirements of the program and remained as a member in good standing.

- Wayne MacDonald is a licensed appraiser in the Province of Nova Scotia.

- No one provided significant professional assistance to the person signing this report.

- The value estimate contained in this report applies as of March 20, 2023. This date may be referred to as the *effective date of valuation*.



## FINAL ESTIMATE OF VALUE

Having regard to all of the information contained in this report, it is our professional opinion that the market value of **Lot LB-1 5523-5525 Highway #3, Shag Harbour NS** at the effective date of valuation based on the agreed to Scope of Work, and as outlined in the report, the current market value of the property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023 is estimated as follows:

## REAL PROPERTY VALUE CONCLUSION

The property was not inspected as per the terms of reference for the Desktop Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the real property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**FIVE HUNDRED FORTY THOUSAND DOLLARS**
**$540,000**

This estimate of market value is based on an exposure time of 12 months.

## MACHINERY & EQUIPMENT VALUE CONCLUSION

The property was not inspected as per the terms of reference for the Desktop Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the Machinery & Equipment subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**THREE MILLION FOUR HUNDRED THIRTY-TWO THOUSAND FIVE HUNDRED DOLLARS**
**$3,432,500**

The Addenda to this report contains the Machinery and Equipment appraisal report.

_____
Wayne MacDonald B.Comm, AACI P.App.
NSREAA #303157

May 31, 2023

_____
Date



# ADDENDUM B:          GLOSSARY OF TERMS AND DEFINITIONS

## DEFINITIONS OF VALUE, INTEREST APPRAISED AND OTHER TERMS

### MARKET VALUE

The Canadian Uniform Standards of Professional Appraisal Practice (The Standards) adopted by the Appraisal Institute of Canada define Market Value as:

> *"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.    Buyer and seller are typically motivated;

2.    Both parties are well informed or well advised and acting in their own best interests;

3.    A reasonable time is allowed for exposure in the market;

4.    Payment is made in cash in Canadian dollars or in terms of financial arrangements comparable thereto; and

5.    The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

### MARKET RENT

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the specified lease agreement including term, rental adjustment and revaluation, permitted uses, use restrictions, and expense obligations; the lessee and lessor each acting prudently and knowledgeably, and assuming consummation of a lease contract as of a specified date and the passing of the leasehold from lessor to lessee under conditions whereby:

1.    Lessee and lessor are typically motivated.

2.    Both parties are well informed or well advised and acting in what they consider their best interests.

3.    A reasonable time is allowed for exposure in the open market.

4.    The rent payment is made in terms of cash in Canadian dollars, and is expressed as an amount per time period consistent with the payment schedule of the lease contract.

5.    The rental amount represents the normal consideration for the property lease unaffected by special fees or concessions granted by anyone associated with the transaction.



## CONDOMINIUM INTEREST

An estate in real property consisting of an individual interest in a condominium unit, together with an undivided common interest in the common areas such as the land, parking areas, elevators, stairways, and the like.

## VALUE AS IS

The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning.

## CASH EQUIVALENCE

A price expressed in terms of cash, as distinguished from a price expressed totally or partly in terms of the face amounts of notes or other securities that cannot be sold at their face amounts. Calculating the cash-equivalent price requires an appraiser to compare transactions involving atypical financing to transactions involving comparable properties financed at typical market terms.

## EXPOSURE TIME AND MARKETING TIME

### EXPOSURE TIME

Under Paragraph 3 of the Definition of Market Value, the value opinion presumes that a reasonable time is allowed for exposure in the open market. Exposure time is defined as: *"The length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at the market value on the effective date of the appraisal."* Exposure time is presumed to precede the effective date of the appraisal.

The reasonable exposure period is a function of price, time and use. It is not an isolated opinion of time alone. Exposure time is different for various types of property and under various market conditions. It is a retrospective opinion based on an analysis of past events, assuming a competitive and open market. It assumes not only adequate, sufficient and reasonable time but adequate, sufficient and a reasonable marketing effort. Exposure time and conclusion of value are therefore interrelated.

Based on our review of investor surveys, discussions with market participants and information gathered during the sales verification process, a reasonable exposure time for the subject property at the value concluded within this report would have been 12 months.

This assumes the current owner would have employed an active and professional marketing plan.

### MARKETING TIME

Marketing time is an opinion of the time that might be required to sell a real property interest at the concluded market value level. Marketing time is presumed to start during the period immediately after the effective date of an appraisal. (Marketing time is subsequent to the effective date of the appraisal and exposure time is presumed to precede the effective date of the appraisal). The opinion of marketing time uses some of the same data analyzed in the process of developing a reasonable exposure time opinion as part of the appraisal process and it is not intended to be a prediction of a date of sale or a one-line statement.

We believe, based on the assumptions employed in our analysis and our selection of investment parameters for the subject, that our value conclusion represents a price achievable within 12 months.



# ADDENDUM C:
# ASSUMPTIONS AND LIMITING CONDITIONS

1.  This report has been prepared for ***Lobsterboys (the "Group").*** It is not reasonable for any person other than the person or those to whom this report is addressed to rely upon this report without first obtaining written authorization from the client and the author of this report.  This report has been prepared on the assumption that no other person will rely on it for any other purpose and all liability to all such persons is denied.

2.  This report has been prepared for ***the "Group"*** and for the exclusive (and confidential) use of the recipients as named herein and for the specific purpose and function as stated herein.  All copyright is reserved to the author and this report is considered confidential by the author and the client.  Possession of this report, or a copy thereof, does not carry with it the right to reproduction or publication in any manner, in whole or in part, nor may it be disclosed, quoted from or referred to in any manner, in whole or in part, without the prior written consent and approval of the author as to the purpose, form and content of any such disclosure, quotation or reference.

3.  Without limiting the generality of the foregoing, neither all nor any part of the contents of this report shall be disseminated or otherwise conveyed to the public in any manner whatsoever or through any media whatsoever or disclosed, quoted from or referred to in any letter, financial statement, prospectus, or offering memorandum of the client, or in any documents filed with any governmental agency without the prior written consent and approval of the author as to the purpose, form and content of such dissemination, disclosure, quotation or reference.

4.  The estimated prospective market value of the real property which is valued in this report pertains to the value of the Fee Simple or leasehold interest in the real estate, subject to terms and conditions of the existing tenancy as described in this report.  The property rights herein exclude mineral rights, if any.

5.  The Client has specifically requested an assignment with a limited scope of work and results in an abbreviated report format. By accepting this report, the Client and Intended User(s) understand that an inspection of the subject property has not been performed and accept the decrease in the reliability of this report, resulting in a higher level of risk assumed by a user of this report. The appraiser, the appraiser's firm and/or any employee, director, officer or partner of the appraiser's firm, as applicable, are limited in liability to $50,000 (fifty thousand dollars). Such limitation of liability applies in the event that anyone makes a claim that the appraiser is in any way liable for performing the appraisal or in preparing the appraisal report, including in respect of any allegations of negligence, breach of contract or for any other reason or claim.

6.  The estimate of value contained in this report is founded upon a thorough and diligent examination and analysis of information gathered and obtained from numerous sources.  Certain information has been accepted at face value; especially if there was no reason to doubt its accuracy.  Other empirical data required interpretive analysis pursuant to the objective of this assignment. Certain inquiries were outside the scope of this mandate.  For these reasons, the analyses, opinions and conclusions contained in this report are subject to all of the assumptions and limiting conditions.

7.  The property has been valued on the basis that title to the real property herein is good and marketable.



8.  The author of this report cannot accept responsibility for legal matters, questions of survey, opinions of title, hidden or unapparent conditions of the property, toxic wastes or contaminated materials, soil or sub-soil conditions, environmental, engineering or other technical matters which might render this property more or less valuable than as stated herein.

9.  The property has been valued on the basis that they are free and clear of all value influencing encumbrances, encroachments, restrictions or covenants except as may be noted in this report and that there are no pledges, charges, lien or social assessments outstanding against the property other than as stated and described herein.



10. The property has been valued on the basis that there are no outstanding liabilities except as expressly noted herein, pursuant to any agreement with a municipal or other government authority, pursuant to any contract or agreement pertaining to the ownership and operation of the real estate or pursuant to any lease or agreement to lease, which may affect the stated value or saleability of the subject property or any portion thereof.

11. The interpretation of the leases and other contractual agreements, pertaining to the operation and ownership of the property, as expressed herein, is solely the opinion of the author and should not be construed as a legal interpretation.

12. The property has been valued on the basis that the real estate complies in all material respects with any restrictive covenants affecting the site and have been built and is occupied and being operated, in all material respects, in full compliance with all requirements of law, including all zoning, land use classification, building, planning, fire and health by-laws, rules, regulations, orders and codes of all federal, provincial, regional and municipal governmental authorities having jurisdiction with respect thereto.

13. Investigations have been undertaken in respect of matters which regulate the use of land.  However, no inquiries have been placed with the fire department, the building inspector, the health department or any other government regulatory agency, unless such investigations are expressly represented to have been made in this report.  The property must comply with such regulations and, if it does not comply, its non-compliance may affect the market value of this property.  To be certain of such compliance, further investigations may be necessary.

14. The property has been valued on the basis that all rents referred to in this report are being paid in full and when due and payable under the terms and conditions of the attendant leases, agreements to lease or other contractual agreements.  Further, it is assumed that all rents referred to in this report represent the rental arrangements stipulated in the leases, agreements to lease or other contractual agreements pertaining to the tenants' occupancy, to the extent that such rents have not been prepaid, abated, or inflated to reflect extraordinary circumstances, and are fully enforceable notwithstanding that such documentation may not be fully executed by the parties thereto as at the effective date, unless such conditions have been identified and noted in this report.

15. The data and statistical information contained herein were gathered from reliable sources and are believed to be correct.  However, these data are not guaranteed for accuracy, even though every attempt has been made to verify the authenticity of this information as much as possible.

16. The estimated prospective market value of the property do not necessarily represent the value of the underlying shares, if the assets are so held, as the value of the shares could be affected by other considerations.  Further, the estimated prospective market values do not include consideration of any extraordinary market value.

17. Should title to the real property presently be held (or changed to a holding) by a partnership, in a joint venture, through a co-tenancy arrangement or by any other form of divisional ownership, the value of any fractional interest associated therewith may be more or less than the percentage of ownership appearing in the contractual agreement pertaining to the structure of such divisional ownership.



18. In the event of syndication, the aggregate value of the limited partnership interests may be greater than the value of the freehold or fee simple interest in the real estate, by reason of the possible contributory value of non-realty interests or benefits such as provision for tax shelter, potential for capital appreciation, special investment privileges, particular occupancy and income guarantees, special financing or extraordinary agreements for management services.

19. Should the author of this report be required to give testimony or appear in court or at any administrative proceeding relating to this report, prior arrangements shall be made therefore, including provisions for additional compensation to permit adequate time for preparation and for any appearances which may be required.  However, neither this nor any other of these assumptions and limiting conditions is an attempt to limit the use that might be made of this report should it properly become evidence in a judicial proceeding.  In such a case, it is acknowledged that it is the judicial body which will decide the use of this report which best serves the administration of justice.

20. Because market conditions, including economic, social and political factors, change rapidly and, on occasion, without notice or warning, the estimate of market value expressed herein, as of the effective date of this appraisal, cannot necessarily be relied upon as any other date without subsequent advice of the author of this report.

21. The value expressed herein is in Canadian dollars.

22. This report is only valid if it bears the original signature of the author.



LOT LB-1 5523-5525 HIGHWAY #3, SHAG HARBOUR NS — CERTIFICATION OF APPRAISAL — 27

# ADDENDUM D:        COST SHEETS

## CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Shag Harbour | Date Created: | 05-10-2023 |
| Property Owner: | | Date Updated: | 05-30-2023 |
| Property Address: | B0W 3B0 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 4207 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 494 Industrials, Light Mftg. | 100 | D | 20 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

| System : HVAC (Heating) | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 604 HVAC (Heating) : Hot Water | 40 | Occ. | | 2 |
| 601 HVAC (Heating) : Electric | 10 | Occ. | | 2 |
| 649 HVAC (Heating) : No HVAC | | Occ. | | |
| Total Percent for HVAC (Heating): | 50 | | | |

| System : Mezzanines | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 761 Mezzanines : Mezzanines-Office | 570 | Occ. | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 4,207 | $76.55 | $322,046 | $161,023 | $161,023 |
| Exterior Walls | 4,207 | $21.04 | $88,515 | $44,258 | $44,257 |
| Heating & Cooling | 2,104 | $16.12 | $33,923 | $16,962 | $16,961 |
| Mezzanine | 570 | $83.59 | $47,646 | $23,823 | $23,823 |
| **Basic Structure Cost** | 4,207 | $116.98 | $492,130 | $246,066 | $246,064 |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $246,066 | $246,064 |
| **Depreciated Cost** | 4,207 | $58.49 | | $246,066 | $246,064 |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under ◆Addition Details,◆ this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall &
Swift Licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***





# CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Shag Harbour | Date Created: | 05-10-2023 |
| Property Owner: | | Date Updated: | 05-30-2023 |
| Property Address: | B0W 3B0 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 2626 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 494 Industrials, Light Mftg. | 100 | D | 16 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

**System : HVAC (Heating)**

| | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 649 HVAC (Heating) : No HVAC | | Occ. | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 2,626 | $75.30 | $197,738 | $98,869 | $98,869 |
| Exterior Walls | 2,626 | $20.70 | $54,358 | $27,179 | $27,179 |
| **Basic Structure Cost** | **2,626** | **$96.00** | **$252,096** | **$126,048** | **$126,048** |
| | | | | | |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $126,048 | $126,048 |
| **Depreciated Cost** | **2,626** | **$48.00** | | **$126,048** | **$126,048** |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under ◆Addition Details,◆ this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall & Swift Licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***




CUSHMAN & WAKEFIELD

# CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Shag Harbour | Date Created: | 05-10-2023 |
| Property Owner: | | Date Updated: | 05-30-2023 |
| Property Address: | B0W 3B0 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 2305 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| | % | Class | Height | Quality |
|---|---|---|---|---|
| Occupancy | | | | |
| 494 Industrials, Light Mfg. | 100 | D | 16 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

**System : HVAC (Heating)**

| | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 649 HVAC (Heating) : No HVAC | | Occ. | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 2,305 | $76.85 | $177,139 | $88,570 | $88,569 |
| Exterior Walls | 2,305 | $21.12 | $48,682 | $24,341 | $24,341 |
| **Basic Structure Cost** | **2,305** | **$97.97** | **$225,821** | **$112,911** | **$112,910** |
| | | | | | |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $112,911 | $112,910 |
| **Depreciated Cost** | **2,305** | **$48.98** | | **$112,911** | **$112,910** |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under ◆Addition Details,◆ this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall & Swift Licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***





# CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Shag Harbour | Date Created: | 05-10-2023 |
| Property Owner: | | Date Updated: | 05-30-2023 |
| Property Address: | B0W 3B0 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 160 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 454 Shell, Industrial | 100 | D | 9 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

### System : HVAC (Heating)

| | %/Units | Quality Occ. | Depr % | Other |
|---|---|---|---|---|
| 649 HVAC (Heating) : No HVAC | | | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 160 | $58.72 | $9,395 | $4,698 | $4,697 |
| Exterior Walls | 160 | $23.23 | $3,717 | $1,858 | $1,859 |
| **Basic Structure Cost** | **160** | **$81.95** | **$13,112** | **$6,556** | **$6,556** |
| | | | | | |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $6,556 | $6,556 |
| **Depreciated Cost** | **160** | **$40.98** | | **$6,556** | **$6,556** |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under ◆Addition Details,◆ this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall & Swift Licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***





## CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Shag Harbour | Date Created: | 05-10-2023 |
| Property Owner: | | Date Updated: | 05-30-2023 |
| Property Address: | B0W 3B0 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 196 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 454 Shell, Industrial | 100 | D | 16 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

### System : HVAC (Heating)

| | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 649 HVAC (Heating) : No HVAC | | Occ. | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 196 | $67.69 | $13,267 | $6,634 | $6,633 |
| Exterior Walls | 196 | $26.78 | $5,249 | $2,624 | $2,625 |
| **Basic Structure Cost** | **196** | **$94.47** | **$18,516** | **$9,258** | **$9,258** |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $9,258 | $9,258 |
| **Depreciated Cost** | **196** | **$47.23** | | **$9,258** | **$9,258** |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under ◆Addition Details,◆ this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall & Swift Licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***




CUSHMAN & WAKEFIELD

**LOT LB-1 5523-5525 HIGHWAY #3, SHAG HARBOUR NS**  **CERTIFICATION OF APPRAISAL**  **32**

# ADDENDUM E:    MACHINERY & EQUIPMENT APPRAISAL





## APPRAISAL OF MACHINERY & EQUIPMENT

Lobsterboys SH Ltd.
5525 Hwy. 3
Shag Harbour, Nova Scotia B0W 3B0

## IN AN APPRAISAL REPORT

As of March 20, 2023

## Prepared For:

Lobsterboys
65 Dipper Harbour Road
Dipper Harbour, New Brunswick E5J 1X3

Client ID: 23-21001-900359

## Prepared By:

Cushman & Wakefield of Illinois, Inc.
Valuation & Advisory
200 S. Wacker Drive, Suite 2800
Chicago, IL 60606
Cushman & Wakefield File ID: PRJ0835894

**CUSHMAN &
WAKEFIELD**

May 30, 2023

Mr. Taylor Cox
Chief Financial Officer
**Lobsterboys**
65 Dipper Harbour Road
Dipper Harbour, New Brunswick E5J 1X3

Re:      Appraisal Report
         **Lobsterboys SH Ltd.**
         5525 Hwy. 3
         Shag Harbour, Nova Scotia B0W 3B0

         Cushman & Wakefield File ID:      PRJ0835894
         Client ID:                        23-21001-900359

Dear Mr. Cox:

In fulfillment of our agreement as outlined in the Letter of Engagement, dated February 17, 2023, Cushman & Wakefield is pleased to present the following Appraisal Report to assist Lobsterboys with the valuation of certain machinery & equipment of Lobsterboys SH Ltd., located at 5525 Hwy. 3, Shag Harbour, Nova Scotia as of March 20, 2023.

Our analysis was performed for management planning purposes. No other use is intended or should be inferred.

This Appraisal Report has been prepared in accordance with the *Uniform Standards of Professional Appraisal Practice* (USPAP).

Based on the agreed-to Scope of Work, and as outlined in the report, the following opinion of value was developed:

| Summary of Values in CAD | | |
| --- | --- | --- |
| Appraisal Premise | Date of Value | Value Conclusion |
| Fair Market Value | March 20, 2023 | $3,432,500 |

*Compiled by Cushman & Wakefield*

Our analysis is subject to the assumptions and limiting conditions, certifications, extraordinary and hypothetical conditions, if any, and definitions outlined in our report.  This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and Addenda.

Respectfully submitted,

**CUSHMAN & WAKEFIELD OF ILLINOIS, INC.**

David B. Koller, ASA, MRICS
Managing Director
david.koller@cushwake.com
312-470-3853 Office Direct

## Table of Contents

**Introduction and General Information** ................................................................................5

    Description of Assignment ........................................................................................ 5

    Scope of Work ........................................................................................................ 5

    Purpose, Intended Use & Intended Users ............................................................... 5

    Identification of Subject Assets ............................................................................... 5

    Standards of Compliance ........................................................................................ 5

    General Assumptions .............................................................................................. 6

    Extraordinary Assumptions ..................................................................................... 6

    Hypothetical Conditions .......................................................................................... 6

    Global Pandemic .................................................................................................... 6

    Quality Control Review ........................................................................................... 6

**Standard of Value** .............................................................................................................8

**Valuation Process** .............................................................................................................9

    Data Collection ....................................................................................................... 9

    Asset Classifications ............................................................................................... 9

    Desktop Analysis .................................................................................................... 9

    General Appraisal Methodology ............................................................................. 10

**Assumptions and Limiting Conditions** ...........................................................................14

**Certification** ....................................................................................................................16

**Addenda Contents** ..........................................................................................................17



# Introduction and General Information

## Description of Assignment

Cushman & Wakefield, Inc. was engaged to assist Lobsterboys (the "Client") with the appraisal of certain machinery & equipment ("Subject Assets") of Lobsterboys SH Ltd. (the "Company") as of March 20, 2023 (the "Valuation Date").

The scope of our engagement was developing an opinion of Fair Market Value of the Subject Assets for management planning purposes. We understand that the results of our appraisal will be used by Client management for internal planning purposes only. No other use is intended or should be inferred.

The Subject Assets are located at the following address, collectively (the "Subject Property"):

- 5525 Hwy. 3, Shag Harbour, Nova Scotia

## Scope of Work

The scope of work is determined by the intended use of the appraisal, the needs of the user, the relevant characteristics of the subject property, and related pertinent factors and included:

- Interviewing Client management to understand the Subject Assets.

- Obtaining the Client's fixed asset listing.

- Collecting, verifying, and analyzing other relevant data.

- Researching economic and market conditions of the subject industry.

- Obtaining comparable replacement cost and sales data of certain assets from various sources and confirming wherever possible.

- Performing an appraisal analysis and providing recommendations of the Fair Market Value ("FMV") of the Subject Assets as of the Valuation Date.

- In order to estimate the FMV of the Subject Assets, we considered three approaches to value: the cost, sales comparison, and income approaches. Based on the nature of the assets and information available, we concluded on the approach that was most appropriate to value the subject machinery and equipment. Please refer to the Glossary of Terms & Definitions for the definition of appraisal approaches and methods.

## Purpose, Intended Use & Intended Users

To develop an opinion of the FMV of the Subject Assets located at the Subject Property.  We understand the analysis will be used solely for management planning purposes and will not be used for any other purpose, nor will it be distributed to other parties without the prior written consent of Cushman & Wakefield, Inc.  The intended users are limited to the Client.

## Identification of Subject Assets

The Subject Assets represent machinery & equipment of  that are used in lobster harvesting. These items include licensed vehicles, computer equipment, furniture & fixtures, general machinery & equipment, office equipment, refrigeration equipment, scales, and seafood harvesting equipment.

## Standards of Compliance

This Appraisal Report has been prepared in accordance with our interpretation of the Uniform Standards of Professional Appraisal Practice ("USPAP").

USPAP identifies two written report options: Appraisal Report and Restricted Appraisal Report. This document is prepared as an Appraisal Report in accordance with USPAP guidelines. The terms "describe," summarize," and



"state" connote different levels of detail, with "describe" as the most comprehensive approach and "state" as the least detailed. As such, the following provides specific descriptions about the level of detail and explanation included within the report:

- Describes the Subject Assets that are the subject of the appraisal, including physical, economic, and other characteristics that are relevant
- States the type and definition of value and its source
- Describes the Scope of Work used to develop the appraisal
- Describes the information analyzed, the appraisal methods used, and the reasoning supporting the analyses and opinions; explains the exclusion of any appraisal approaches
- States the use of the Subject Assets as of the valuation date

## General Assumptions

This report presents information from third parties and bases its conclusions on analysis of that information. Information has been obtained from sources deemed to be reliable, but it is an assumption of this report that the information is accurate.  We issue no warranty or other form of assurance regarding its accuracy.

No information has been audited or verified for accuracy by the appraiser, and no forensic accounting has been performed.  It is assumed that the Client's management has accurately disclosed all assets, liabilities and income streams that pertain to the subject, and its underlying assets and liabilities.

## Extraordinary Assumptions

An extraordinary assumption is defined by USPAP as an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions.  Extraordinary assumptions assume as fact otherwise uncertain information about physical, legal, or economic characteristics of the property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in the analysis.

This analysis does not employ any extraordinary assumptions.

## Hypothetical Conditions

A hypothetical condition is defined by USPAP as a condition which is contrary to what exists but is supposed for the purpose of analysis.  Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

This analysis does not employ any hypothetical conditions.

## Global Pandemic

The financial market is driven by investor demand and strong liquidity. We are monitoring the impacts on both factors from the Federal Reserve's recent and forecasted interest rate hikes, inflation, and other macroeconomic factors, which have increased uncertainty in the financial markets. Since its onset in March 2020, the COVID-19 pandemic has also had a dramatic effect on both investor demand and liquidity as the market navigated COVID's actual and perceived impacts. The market perceives that we are near the end of the pandemic. As we have throughout the pandemic, Cushman & Wakefield is closely monitoring the latest developments resulting from the COVID-19 pandemic and recovery, as well as its effects on the subject and its market.

## Quality Control Review

Cushman & Wakefield of Illinois, Inc. has an internal Quality Control Oversight Program. This Program mandates a "second read" of all appraisals. Assignments prepared and signed solely by designated members (Accredited Senior Appraisers or "ASA") are read by another ASA who is not participating in the assignment. Assignments prepared, in whole or in part, by non-designated appraisers require ASA participation, Quality Control Oversight, and signature.



For this assignment, Quality Control Oversight was provided by Lee Dorf.



# Standard of Value

The standard of value establishes the guiding principle for the appraisal. For the purpose of this report, the standards of value are "Fair Market Value" as defined by the American Society of Appraisers:

*Fair Market Value*

> An opinion, expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, considering market conditions for the asset being valued, as of a specific date.[1]

---

[1]    *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets*, 4th Edition, American Society of Appraisers, 2020.



# Valuation Process

The appraisal of the Subject Assets included, but was not necessarily limited to, the following:

- Data collection
- Identification of asset classifications
- Desktop Analysis
- Appraisal methodology selection
- Estimating the FMV of the Subject Assets

## Data Collection

We relied on information provided by the Client and have assumed it to be true and correct.  We have not performed independent auditing procedures and provide no assurances, expressed or implied, regarding the accuracy of the information provided by others. Information provided by the Client and obtained through due diligence include, but are not limited to the following:

- Lobster Boys Shag Harbour Equipment.xls
- Lobsterboys SH Ltd Equipment Appraisal.pdf
- Lobsterboys SH Ltd Equipment.xls

Certain items found in the Equipment listing contained costs in CAD. For valuation purposes, we historically converted these original costs to USD using data provided by the International Monetary Fund ("IMF") and valued using the approaches below. The concluded value was converted to CAD using the IMF spot rate, as of the valuation date.

## Asset Classifications

Based on the personal property identified, we categorized the line items within the asset register to arrive at asset classes that have similar economic service lives, functionality, and market characteristics. We grouped the Subject Assets into personal property categories, as follows:

- Automobiles, including but not limited to pickup trucks, box trucks, vans, and the like.
- Computer Equipment, including laptop computers.
- Forklifts & Trailers, including forklifts and refrigerated trailers.
- Furniture & Fixtures, including desks, filing cabinets, and the like.
- General M&E, including but not limited to generators, heat exchangers, pumps, and the like.
- Office Equipment, including but not limited to printers, fax machines, and the like.
- Refrigeration, including but not limited to chiller units, chiller barrels, and the like.
- Scales, including grading and weighing scales.
- Seafood Harvesting Equipment, including but not limited to tanks, lobster trays, lobster crates, and the like.

## Desktop Analysis

As part of this analysis, we did not conduct site visits. The basis of this analysis was from information provided by Management. No verification by the Appraiser was performed and personal property that is the subject of this report is included as indicated and described by Management.  We utilized the data provided to us to gain an understanding of the facility. We also held telephone conversations and corresponded with the Company personnel to collect information on the major assets, including their actual and effective age, general condition, maintenance, utility, anticipated future use, and other factors that might impact the functional use or economic viability of the assets.

In the following paragraphs we discuss general appraisal methodologies and the specific techniques employed to measure the FMV of the assets discussed above.



## General Appraisal Methodology

There are three generally accepted approaches to developing an opinion of value: Cost, Sales Comparison, and Income Capitalization. We have considered each in this appraisal to develop an opinion of the FMV of the machinery and equipment. In appraisal practice, an approach to value is included or eliminated based on its applicability to the property type being valued and the quality of information available. The reliability of each approach depends on the availability and comparability of market data.

The appraisal process is concluded by analyzing each approach to value used in the appraisal. When more than one approach is used, each approach is judged based on its applicability, reliability, and the quantity and quality of its data. A final value opinion is chosen that either corresponds to one of the approaches to value or is a correlation of all the approaches used in the appraisal.

We have considered each approach in developing our opinion of the FMV of the Subject Assets.  We discuss each approach below and conclude with a summary of their applicability.

### Cost Approach

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility.

In the Cost Approach, the appraiser starts with the current replacement cost new of the property being appraised and then deducts for the loss in value caused by physical deterioration, functional obsolescence, and economic obsolescence.

### Sales Comparison Approach

The Sales Comparison (Market) Approach uses sales of comparable properties, adjusted for differences, to estimate a value for the subject property. This approach involves the comparison of comparable recent sales (or offerings) of similar assets to the subject. If the comparable sales are not exactly like the subject, adjustments must be made to the price of the comparable sales (or offerings) to make the comparables reflect the subject property.

### Income Capitalization Approach

The Income Capitalization Approach considers value in relation to the present worth of future benefits derived from ownership and is usually measured through the capitalization of a specific level of income. The appraiser determines the present value of the future economic benefits of owning the property.

## Application of Valuation Approaches

In this analysis, we considered the three approaches to value:  Cost, Sales Comparison, and Income Approaches. Based on the nature of the assets and information available, our analysis relied on the cost and sales comparison approaches to value.

### Application of the Cost Approach

In applying the Cost Approach, we first identified current reproduction or replacement cost estimates for the applicable assets using either an indirect (trending) or direct method.

The Cost Approach includes the following steps:

- Estimate the reproduction / replacement cost new
- Estimate depreciation
- Conclude on the FMV of the assets

### Calculation of the Reproduction Cost New Under the Indirect Method

Under the indirect method of the Cost Approach, the reproduction cost new for each asset or group of assets was estimated by indexing historical costs recorded in the fixed asset register based on asset type and acquisition date. These costs generally included the base cost of the asset, any additional considerations regarding freight, installation,



and delivery, as well as indirect costs such as, engineering and design costs required to integrate the individual assets into a total operation.

The indices applied to the trending method in this report are developed from the Producers Price Index as published by the United States Department of Labor, Bureau of Labor Statistics ("BLS") and Marshall Valuation Service ("MVS"). The BLS reports fluctuations in price on a monthly basis, and Marshall Valuation Service provides a composite of the machinery & equipment costs by industry segments. Although costs of individual plants or pieces of machinery & equipment may deviate from an index, overall costs typically follow these indices. Additionally, the movement of data from both sources and the trend data used in this report are monitored as of the appraisal date.

For this report, the indices utilized are as follows:

| Appraiser Asset Class Description | Index Description | Source | Series ID |
|---|---|---|---|
| Automobiles | Automobile, light truck and utility vehicle mfg | BLS | PCU336110336110 |
| Computer Equipment | Computer & peripheral equipment mfg | BLS | PCU3341--3341-- |
| Forklifts & Trailers | Industrial Truck/Trailer and stacker (Forklifts) | BLS | PCU333924333924 |
| Furniture & Fixtures | Office furniture (including fixtures) mfg. | BLS | PCU33721--33721-- |
| General M&E | Other general purpose machinery manufacturing | BLS | PCU3339--3339-- |
| Office Equipment | Office Equipment | MVS | MVS |
| Refrigeration | Refrigeration | MVS | MVS |
| Scales | Scale and balance mfg | MVS | PCU3339983339987 |
| Seafood Harvesting Equipment | Seafood product preparation and packaging | BLS | PCU311710311710 |

We assessed the reasonableness of the indirect method of the cost approach analysis based upon on our discussions with on-site Management who are familiar with the assets as well as recent purchases by Management.

## Calculation of the Replacement Cost New Under the Direct Method

The direct method where available was utilized to estimate the replacement cost new. The direct method assesses the replacement cost new by researching current cost information from manufacturers, vendors, distributors, and published cost data. Additionally, the analysis included quotations, invoices, and certain new cost data provided by Management.

## Depreciation

Depreciation is the estimated loss in value caused by a combination of physical deterioration, functional obsolescence, and economic obsolescence in order to reflect the change in value of the assets from replacement cost new.

Physical deterioration was estimated utilizing an age/life calculation based on the relationship between the estimated economic useful life and estimated effective age of the Subject Assets. In order to develop estimates of physical deterioration, we considered the chronological ages, effective ages, normal economic useful lives, and remaining useful lives of the machinery and equipment.

- Chronological Age ("CA") – the age of the asset between the date an asset was placed into service and the Valuation Date.

- Effective age ("EA") - the age of the asset indicated by its actual condition.

- Normal Useful Life ("NUL") - the life, usually in terms of years, that an asset will be used before it deteriorates to an unusable condition or is retired from service.

- Remaining useful life ("RUL") - the estimated period during which an asset of a certain effective age is expected to actually be used before it is retired from service.



Normal useful life by appraisal class was based on discussions with Management, industry research, our experience valuing similar assets and data provided in published guidelines such as *Marshall Valuation Service* ("MVS") and the American Society of Appraiser's Estimated Normal Useful Life Study.

The assumptions used in the analysis to determine the NUL are listed below:

| Appraiser Asset Class Description | Normal Useful Life | Hold Factor |
|---|---|---|
| Automobiles | 5 | 10% |
| Computer Equipment | 3 | 3% |
| Forklifts & Trailers | 12 | 10% |
| Furniture & Fixtures | 10 | 5% |
| General M&E | 15 | 10% |
| Office Equipment | 7 | 12% |
| Refrigeration | 15 | 8% |
| Scales | 15 | 10% |
| Seafood Harvesting Equipment | 15 | 10% |

When an asset has exceeded its estimated NUL, we utilized a minimum depreciation hold factor when estimating physical deterioration so that all the assets that are in-use are included in the appraisal with at least a minimal contributory value.

The normal useful life of the tanks is estimated to be 30 years. In 2018/2019, there was a tank refurbishment project of between CAD$150,000 to CAD$200,000. Effective age was estimated based on chronological age, except the tanks, where the Client identified improvements and refurbishments. The effective age of these tanks is estimated to be 15 years.

Functional obsolescence is an internal measurement of an asset's loss in value based on inefficiencies or inadequacies when compared to a more efficient or less costly replacement. New technology, improvements in production methods, changes in construction costs, capacity improvements, and excess operating costs may affect the value of an asset. An investigation of the functional obsolescence of the Subject Assets was performed. We did not find evidence of any excess capital costs and the assets are expected to continue to be used in an operating capacity. Therefore, no adjustments for functional obsolescence were necessary.

Economic obsolescence is an external measurement of an asset's loss in value caused by legislative change, industry economics, supply and demand of the end product, and increased cost of raw materials, any of which may affect the value of an asset. An investigation of the economic obsolescence of the Subject Assets was performed. No known external variables that could impose a loss in value of the Subject Assets were identified today, and no known external variables have been considered as of the as complete date. Therefore, no adjustments for economic obsolescence were necessary.

## Application of the Sales Comparison Approach

The Sales Comparison Approach includes the collection of sales and offering data similar to the subject assets being valued. By analyzing the sales for compatibility, the relevant relationship can be adjusted and applied to the assets being valued to arrive at an indication of the most probable selling price. Adjustments to equate the comparables utilized in this analysis included direct and indirect costs based on the sales data available at the time of this report.

When there is an active marketplace for used equipment, independent offerings and transactions occur under free market conditions. Identifying these transactions provide comparable sales of the subject equipment. Comparable sales transactions are adjusted by equating the comparable asset to the subject asset being appraised and include variables such as differences in age, capacity, condition, and size. These adjustments are a determination of what



the transaction amount would have been if the comparable and subject assets were identical. The result measures all forms of obsolescence and depreciation inherent in the asset.

Sources such as used machinery & equipment dealers and remarketers were utilized and referenced as follows:

- Price Digests
- Equipment Watch
- Machinio
- J.D. Power

## Application of the Income Approach

The income approach considers value in relation to the present value of future economic benefits of ownership. Typically, the income approach includes a rate of return, discount rate, capitalization rate, the magnitude and timing of future benefits and expenses, annual operating expenses versus annual revenue, salvage value, and present value of the annual net cash flow.

In this situation, the income approach was considered to be inappropriate and was not used because individual income streams could not be allocated reasonably and effectively to each of the individual assets.

## Summary of Conclusions

Based on the data presented in this report, the opinion of the Subject Assets under analysis presented herein, as of Valuation Date, is as shown in the table below.

| Summary of Values in CAD | | |
| --- | --- | --- |
| Appraisal Premise | Date of Value | Value Conclusion |
| Fair Market Value | March 20, 2023 | $3,432,500 |

*Compiled by Cushman & Wakefield*



# Assumptions and Limiting Conditions

"Report" means the appraisal or consulting report and conclusions stated therein, to which these Assumptions and Limiting Conditions are annexed.

"Property" means the subject of the Report.

"Cushman & Wakefield" means Cushman & Wakefield, Inc. or its subsidiary that issued the Report.

"Appraiser(s)" means the employee(s) of Cushman & Wakefield who prepared and signed the Report.

The Report has been made subject to the following assumptions and limiting conditions:

- No opinion is intended to be expressed and no responsibility is assumed for the legal description or for any matters that are legal in nature or require legal expertise or specialized knowledge beyond that of a real estate appraiser. Title to the Property is assumed to be good and marketable and the Property is assumed to be free and clear of all liens unless otherwise stated. No survey of the Property was undertaken.

- The information contained in the Report or upon which the Report is based has been gathered from sources the Appraiser assumes to be reliable and accurate. The owner of the Property may have provided some of such information. Neither the Appraiser nor Cushman & Wakefield shall be responsible for the accuracy or completeness of such information, including the correctness of estimates, opinions, dimensions, sketches, exhibits and factual matters. Any authorized user of the Report is obligated to bring to the attention of Cushman & Wakefield any inaccuracies or errors that it believes are contained in the Report.

- The opinions are only as of the date stated in the Report. Changes since that date in external and market factors or in the Property itself can significantly affect the conclusions in the Report.

- The Report is to be used in whole and not in part. No part of the Report shall be used in conjunction with any other analyses. Publication of the Report or any portion thereof without the prior written consent of Cushman & Wakefield is prohibited. Reference to the Appraisal Institute or to the MAI designation is prohibited. Except as may be otherwise stated in the letter of engagement, the Report may not be used by any person(s) other than the party(ies) to whom it is addressed or for purposes other than that for which it was prepared. No part of the Report shall be conveyed to the public through advertising, or used in any sales, promotion, offering or SEC material without Cushman & Wakefield's prior written consent. Any authorized user(s) of this Report who provides a copy to, or permits reliance thereon by, any person or entity not authorized by Cushman & Wakefield in writing to use or rely thereon, hereby agrees to indemnify and hold Cushman & Wakefield, its affiliates and their respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the Report by any such unauthorized person(s) or entity(ies).

- Except as may be otherwise stated in the letter of engagement, the Appraiser shall not be required to give testimony in any court or administrative proceeding relating to the Property or the Appraisal.

- The Report assumes (a) responsible ownership and competent management of the Property; (b) there are no hidden or unapparent conditions of the Property, subsoil or structures that render the Property more or less valuable (no responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them); (c) full compliance with all applicable federal, state and local zoning and environmental regulations and laws, unless noncompliance is stated, defined and considered in the Report; and (d) all required licenses, certificates of occupancy and other governmental consents have been or can be obtained and renewed for any use on which the value opinion contained in the Report is based.

- The physical condition of the machinery & equipment is an assumption in this Report an no visual inspection by the Appraiser was performed.

- Unless otherwise stated in the Report, the existence of potentially hazardous or toxic materials that may have been used in the construction or maintenance of the improvements or may be located at or about the Property was not considered in arriving at the opinion of value. These materials (such as formaldehyde foam insulation, asbestos insulation and other potentially hazardous materials) may adversely affect the value of the Property. The Appraisers are not qualified to detect such substances. Cushman & Wakefield recommends that an environmental expert be employed to determine the impact of these matters on the opinion of value.



- Unless otherwise stated in the Report, compliance with the requirements of the Americans with Disabilities Act of 1990 (ADA) has not been considered in arriving at the opinion of value. Failure to comply with the requirements of the ADA may adversely affect the value of the Property. Cushman & Wakefield recommends that an expert in this field be employed to determine the compliance of the Property with the requirements of the ADA and the impact of these matters on the opinion of value.

- If the Report is submitted to a lender or investor with the prior approval of Cushman & Wakefield, such party should consider this Report as only one factor, together with its independent investment considerations and underwriting criteria, in its overall investment decision. Such lender or investor is specifically cautioned to understand all Extraordinary Assumptions and Hypothetical Conditions and the Assumptions and Limiting Conditions incorporated in this Report.

- In the event of a claim against Cushman & Wakefield or its affiliates or their respective officers or employees or the Appraisers in connection with or in any way relating to this Report or this engagement, the maximum damages recoverable shall be the amount of the monies actually collected by Cushman & Wakefield or its affiliates for this Report and under no circumstances shall any claim for consequential damages be made.

- If the Report is referred to or included in any offering material or prospectus, the Report shall be deemed referred to or included for informational purposes only and Cushman & Wakefield, its employees and the Appraiser have no liability to such recipients. Cushman & Wakefield disclaims any and all liability to any party other than the party that retained Cushman & Wakefield to prepare the Report.

- Unless otherwise noted, we were not given a title report to review. We do not know of any easements, encroachments, or restrictions that would adversely affect the site's use. However, we recommend a title search to determine whether any adverse conditions exist.

- Unless otherwise noted, we were provided no evidence of toxic or hazardous substances of the site. We are not trained to perform technical environmental inspections and recommend the hiring of a professional engineer with expertise in this field.

- By use of this Report each party that uses this Report agrees to be bound by all of the Assumptions and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.

- The machinery and equipment is assumed to be installed and operating at manufacturer's specifications. We recommend an engineer be employed in the final determination regarding the condition and maintenance of the machinery and equipment.



# Certification

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- We have no present or prospective interest in the subject assets that are the subject of this report, and no personal interest with respect to the parties involved.
- We have no bias with respect to the subject assets that are the subject of this report or to the parties involved with this assignment.
- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Practice of the American Society of Appraisers, which include the Uniform Standards of Professional Appraisal Practice.
- Data were obtained from sources believed to be reliable. All facts known to me that have bearing on the values of the Subject Assets have been considered, and no facts of importance have been intentionally omitted herein.
- No inspection of the Subject Assets was performed.
- David Koller has not provided prior services within the three-year period immediately preceding acceptance of this assignment.
- No one provided significant appraisal assistance to the persons signing this report.
- The American Society of Appraisers has a mandatory recertification program for all of its senior members. As of the date of this report, has complied with the requirements of that program.



David B. Koller, ASA, MRICS
Managing Director
david.koller@cushwake.com
312-470-3853 Office Direct



# Addenda Contents

**Addendum A:**    Glossary of Terms & Definitions
**Addendum B:**    Summary of Valuation by Appraisal Class
**Addendum C:**    Valuation Asset Detail
**Addendum D:**    Certifications & Qualifications of the Appraiser



# Addendum A:
## Glossary of Terms & Definitions

The following definitions of pertinent terms are taken from Valuing Machinery and Equipment, Third Edition, published by the American Society of Appraisers and from the 2020--2021 Uniform Standards of Professional Appraisal Practice (USPAP) effective January 1, 2021, through December 31, 2023.

### Acquisition Date

The effective purchase date of an asset.

### Appraisal Date

The specific point in time as of which the valuator's opinion of value applies (also referred to as "Effective Date" or "Valuation Date").

### Appraisal Report

The report must communicate each analysis, opinion, and conclusion in a manner that is not misleading and contain sufficient information to enable the intended users of the appraisal to understand the report properly and clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment and must be prepared as a Self-Contained Appraisal Report, Summary Appraisal Report, or Restricted Use Appraisal Report (USPAP page U-61).

### As-is, Where-is

A term reflecting the purchase of an item in its present condition and location. Any costs associated with dismantling and removal are not considered.

### Assumption

That which is taken to be true (USPAP page U-2).

### Comparable

Properties with characteristics that are similar to a subject property whose value is being sought.

### Cost

Total dollar expenditure for any asset. This includes labor, materials, legal services, architectural design, financing, taxes during construction, interest, contractor's overhead and profit, and entrepreneurial overhead and profit. The cost of a particular asset may be higher than, lower than, or equal to the asset's value.

### Cost Approach

One of the three recognized approaches used in appraisal analysis. The appraiser starts with the current replacement cost new of the property being appraised and then deducts for the loss in value caused by physical deterioration, functional obsolescence, and economic obsolescence. The logic behind this approach is the principle of substitution; a prudent buyer will not pay more for a property than the cost of acquiring a substitute property of equivalent utility.

### Depreciation

The actual loss in value or worth of a property from all causes including those resulting from physical deterioration, functional obsolescence, and economic obsolescence. Depreciation may be curable or incurable. The estimated loss in value of an asset.

### Economic Obsolescence

A form of depreciation where the loss in value or usefulness of a property is caused by factors external to the property. These may include such things as the economics of the industry; availability of financing; loss of material and/or labor sources; passage of new legislation; changes in ordinances; increased cost of raw materials, labor or



utilities (without an offsetting increase in product price); reduced demand for the product; increased competition; inflation or high interest rates; or similar factors.

## Economic Useful Life

The estimated period of time that a new property may be profitably used for the purpose for which it was intended. Stated another way, economic life is the estimated number of years that a new property can be used before it would pay the owner to replace it with the most economical replacement property that could perform an equivalent service. Functional or economic obsolescence factors may limit a property's economic life. An asset's economic life will often be less than its normal useful life.

## Effective Age

The apparent age of a property in comparison with a new property of like kind; that is, the age indicated by the actual condition of a property.

## Functional Obsolescence

A form of depreciation in which the loss in value or usefulness of a property is caused by inefficiencies or inadequacies inherent in the property itself, when compared to a more efficient or less costly replacement property that new technology and changes in design, materials, or process that results in inadequacy, overcapacity, excess construction, lack of functional utility, excess operating costs, etc. has developed. Symptoms suggesting the presence of functional obsolescence are excess operating cost, excess construction (excess capital cost), over-capacity, inadequacy, lack of utility, or similar conditions.

## Income Approach

One of the three recognized approaches used in appraisal analysis. (This approach considers value in relation to the present worth of future benefits derived from ownership and is usually measured through the capitalization of a specific level of income.) The appraiser determines the present value of the future economic benefits of owning the property.

## Indexing

A method used to estimate current cost in which an index factor is applied to the historical cost of an item reflecting the movement of cost over time.

## Intended Use

The use or uses of an appraiser's reported appraisal, appraisal review, or appraisal consulting assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment (USPAP page U-3).

## Intended User

The client or any other party as identified, by name or type, as users of the appraisal, appraisal review, or appraisal consulting report by the appraiser on the basis of communication with the client at the time of the assignment (USPAP page U-3).

## Machinery and Equipment

The physical facilities available for production, including the installation and service facilities appurtenant, together with all other equipment designed for or necessary to its manufacturing and industrial purposes, regardless of method of installation, including all those items of furniture and fixtures necessary for the administration and proper operation of the enterprise.

## Normal Useful Life

The physical life, usually estimated in terms of years, that a new property will actually be used before it is retired from service.



## Obsolescence

A loss in value due to a decrease in the usefulness of property caused by decay, changes in technology, changes in people's behavioral pattern and tastes, or environmental changes.

## Original Cost

The initial capitalized cost of an asset in the hands of its present owner.

## Physical Depreciation

A form of depreciation where the loss in value or usefulness of a property is due to the using up or expiration of its useful life caused by wear and tear, deterioration, exposure to various elements, physical stresses, and similar factors. Physical depreciation may be curable (or partially curable), by replacement or rebuilding, to some percentage of its full physical life. If curable, the remaining life would go no lower than a core or re-buildable life. Cure or partial cure may then change the Effective Age of the property. If no replacement or rebuilding is economically feasible the physical depreciation will be 100%.

## Premise of Value

A statement identifying the assumptions, criteria or conditions surrounding the definition of value under which the appraisal estimate value is being determined.

## Principle of Substitution

A theory whereby a prudent purchaser would pay no more for a property than the cost of acquiring an equally desirable substitute in the market.

## Purpose of the Appraisal

A statement clearly identifying the value(s) to be estimated that are consistent with the intended use of the appraisal.

## Remaining Useful Life (RUL)

The estimated period during which a property of a certain effective age is expected to actually be used before it is retired from service.

## Replacement Cost New (RCN)

The current cost of a similar new property having the nearest equivalent utility as the property being appraised, as of a specific date.

## Reproduction Cost New

The cost of reproducing a new replica of a property on the basis of current prices with the same or closely similar materials, as of a specific date.

## Salvage Value

An opinion of the amount, expressed in terms of money that may be expected for the whole property or a component of the whole property that is retired from service for possible use elsewhere, as of a specific date of reproducing a new replica of a property on the basis of current prices with the same or closely similar materials, as of a specific date.

## Sales Comparison Approach

This is one of the three recognized approaches used in appraisal analysis to lead to an indication of the most probable selling price of a property (also known as the market approach). This approach involves the comparison of comparable recent sales (or offerings) of similar assets to the subject. If the comparable sales are not exactly like the subject, adjustments must be made to the price of the comparable sales (or offerings) to make the comparables reflect the subject property.



## Scope of Work

The type and extent of research and analyzing in an assignment (USPAP page U-4).

## Signature

Personalized evidence indicating authentication of the work performed by the appraiser and the acceptance of the responsibility for content, analyses, and the conclusions in the report (USPAP page U-4).

## Standard of Value

The identification of the type of value being used in a specific engagement; e.g. fair market value, fair value, investment value, liquidation value, insurable value, et al.

## Trending

A method of estimating a property's reproduction cost new (not replacement cost new) in which an index or trend factor is applied to the property's historical cost to convert the known cost into an indication of current cost. Simply put, trending reflects the movement of price over time.

## Uniform Standards of Professional Appraisal Practice (USPAP)

A set of professional appraisal standards established by the Appraisal Standards Board of the Appraisal Foundation. Developed in 1986–87 by the Ad Hoc Committee on Uniform Standards, they have been adopted by major appraisal organizations and federal agencies in North America and are generally recognized as the accepted standards of appraisal practice.

## Useful Life

The period of time over which property may reasonably be expected to perform the function for which it was designed.



# Addendum B:
## Summary of Valuation by Appraisal Class

| Detailed Appraiser Asset Class | Fair Market Value |
|---|---|
| Automobiles | $    565,000 |
| Computer Equipment | $    6,000 |
| Forklifts & Trailers | $    264,000 |
| Furniture & Fixtures | $    4,200 |
| General M&E | $    348,800 |
| Office Equipment | $    5,500 |
| Refrigeration | $    863,000 |
| Scales | $    6,000 |
| Seafood Harvesting Equipment | $    1,370,000 |
| **Total** | **$    3,432,500** |

*Values in CAD*



# Addendum C:
## Valuation Asset Detail

| CWID | Asset Description | Make | Model | Serial Number | Detailed Appraisal Class Description | Concluded FMV in CAD |
|---|---|---|---|---|---|---|
| 1 | 30' x 60' (4' deep) Tank 2 | | | | Seafood Harvesting Equipment | $ 140,000 |
| 2 | 30' x 60' (4' deep) Tank 3 | | | | Seafood Harvesting Equipment | $ 140,000 |
| 3 | 30' x 60' (4' deep) Tank 4 | | | | Seafood Harvesting Equipment | $ 140,000 |
| 4 | 26' X 60' (8' deep) Tank 1 | | | | Seafood Harvesting Equipment | $ 200,000 |
| 5 | Kohler Generator (500RE0ZJ) w/ transfer switch | Kohler | 500RE0ZJ | 33GLGMHH0013 | General M&E | $ 160,000 |
| 6 | 20' shippping container (1) for storage | | | F14899 | Forklifts & Trailers | $ 5,000 |
| 7 | 40' HC shipping container | | | | Forklifts & Trailers | $ 7,000 |
| 8 | 40ft HC Storage Container | | | | Forklifts & Trailers | $ 8,000 |
| 9 | 40ft HC Storage Container | | | | Forklifts & Trailers | $ 8,000 |
| 10 | 40' HC freezer | | 20240585 | QM09-10568 | Refrigeration | $ 3,000 |
| 11 | 40ft Insulated HC Freezer Container (Blanford) | | | | Forklifts & Trailers | $ 19,000 |
| 12 | 40ft Insulated HC Freezer Container (Ingomar) | | | | Forklifts & Trailers | $ 19,000 |
| 13 | Forklift | Toyota | 8FGU18 | 60646 | Forklifts & Trailers | $ PPSA 38,000 |
| 14 | Toyota 8FGU25 Propane Forklift with Rotator (S/N: 92813) 873 HRS | Toyota | 8FGU25 | 92813 | Forklifts & Trailers | $ PPSA 50,000 |
| 15 | 53' reefer trailer (1) | | | | Forklifts & Trailers | $ PPSA 110,000 |
| 16 | 2019 Ford E450 | Ford | F450 | 1FDWE4F62KDC39202 | Automobiles | $ 41,000 |
| 17 | 2019 Kenworth T370 (6 wheeler) | Kenworth | T370 | 2NKHHM7H4LM962533 | Automobiles | $ 110,000 |
| 18 | 2011 GMC Sierra pickup | GMC | Sierra 1500 SLE | 1GTR2VE33BZ422943 | Automobiles | $ 24,000 |
| 19 | 2016 Freightliner M2 (10 wheeler) | Freightliner | M2 | 1FVHCYCY9GHGW9008 | Automobiles | $ PPSA 90,000 |
| 20 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 2024001975 | Refrigeration | $ 60,000 |
| 21 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 2024001974 | Refrigeration | $ 60,000 |
| 22 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202401976 | Refrigeration | $ 60,000 |
| 23 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202401977 | Refrigeration | $ 60,000 |
| 24 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202401972 | Refrigeration | $ 60,000 |
| 25 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202401973 | Refrigeration | $ 60,000 |
| 26 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202401978 | Refrigeration | $ 60,000 |

| | | | | |
|---|---|---|---|---|
| Add: 2013 Chevrolet Silverado | | | | $12,000 |
| Add: 2022 Kenworth T880 10 Wheeler Sleeper | | 1NKZLJ9X9NJ983930 | | $198,000 |
| Add: 2020 Hyundai FV Reefer | | 3H3V533C2LT588010 | | $75,000 |
| Add: 2020 Hyundai FV Reefer | | 3H3V533C6LT588009 | | $75,000 |

CUSHMAN & WAKEFIELD

| CWID | Asset Description | Make | Model | Serial Number | Detailed Appraisal Class Description | Concluded FMV in CAD |
|---|---|---|---|---|---|---|
| 27 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202102725 | Refrigeration | $    60,000 |
| 28 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202102724 | Refrigeration | $    60,000 |
| 29 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202102722 | Refrigeration | $    60,000 |
| 30 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202102726 | Refrigeration | $    60,000 |
| 31 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202102727 | Refrigeration | $    60,000 |
| 32 | Keep Rite Refrigeration Units with valves | Keep Rite | KESQA150H8-HT50-30013 | 202102723 | Refrigeration | $    60,000 |
| 33 | Heat Exchangers | | | J5654.201 5521 | General M&E | $    16,000 |
| 34 | Heat Exchangers | | | J5654.200004 | General M&E | $    16,000 |
| 35 | Heat Exchangers | | | J56545.2008 | General M&E | $    16,000 |
| 36 | Heat Exchangers | | | J5657.20.1 | General M&E | $    16,000 |
| 37 | Recirculating pumps | | | 1912260576 | General M&E | $    2,000 |
| 38 | Recirculating pumps | | | 1912260571 | General M&E | $    2,000 |
| 39 | Recirculating pumps | | | 1910210348 | General M&E | $    2,000 |
| 40 | Recirculating pumps | | | 2003290265 | General M&E | $    2,000 |
| 41 | Recirculating pumps | | | 1906090292 | General M&E | $    2,000 |
| 42 | Recirculating pumps | | | 2003290215 | General M&E | $    2,000 |
| 43 | Recirculating pumps | | | 1911150561 | General M&E | $    2,000 |
| 44 | Recirculating pumps | | | | General M&E | $    2,000 |
| 45 | Recirculating pumps | | | | General M&E | $    2,000 |
| 46 | Recirculating pumps | | | 1912260563 | General M&E | $    2,000 |
| 47 | Recirculating pumps | | | | General M&E | $    2,000 |
| 48 | Recirculating pumps | | | | General M&E | $    2,000 |
| 49 | Recirculating pumps | | | | General M&E | $    2,000 |
| 50 | Incoming water pumps | | | 3700255200001V | General M&E | $    17,000 |
| 51 | Incoming water pumps | | | 3700154210001U | General M&E | $    17,000 |
| 52 | Pool pumps | Hayward | | 2.1102E+16 | General M&E | $    800 |
| 53 | Pool pumps | Hayward | | 2.11021E+16 | General M&E | $    800 |
| 54 | Pool pumps | Super 2 | | 2.1212E+16 | General M&E | $    1,000 |
| 55 | Pool pumps | Super 2 | | | General M&E | $    1,000 |
| 56 | Flow meters | Blu-White Industries | RB100MI-GPM2 | | General M&E | $    700 |
| 57 | Chiller Barrells | Tank Doctor Aquatic Systems | | | Refrigeration | $    80,000 |



| CWID | Asset Description | Make | Model | Serial Number | Detailed Appraisal Class Description | Concluded FMV in CAD |
|------|-------------------|------|-------|---------------|--------------------------------------|----------------------|
| 58 | Air blowers | Fuji | VFZ701A-5W | | General M&E | $ 5,000 |
| 59 | Air blowers | | | Z8C712058537Y0004 | General M&E | $ 5,000 |
| 60 | Air blowers | | | Z7C70CD57876Y0002 | General M&E | $ 5,000 |
| 61 | Air blowers | | | Z7C70CD57876Y0004 | General M&E | $ 5,000 |
| 62 | Priming pump | Gast | 0523-V4-G588NDX | | General M&E | $ 2,000 |
| 63 | Nema TechTop BLA0052FP-C Motor for Pump (New in Box) | Nema | TechTop BLA0052FP-C | | General M&E | $ 4,000 |
| 64 | Sand filters | Hayward | S360T2 | 2.1122E+16 | General M&E | $ 2,000 |
| 65 | Sand filters | Hayward | S360T2 | 2.1122E+16 | General M&E | $ 2,000 |
| 66 | Sand filters | Hayward | S360T2 | 2.11206E+16 | General M&E | $ 2,000 |
| 67 | Sand filters | Hayward | S360T2 | 2.1122E+16 | General M&E | $ 2,000 |
| 68 | IPL trays (4550 trays) | IPL | | | Seafood Harvesting Equipment | $ 300,000 |
| 69 | IPL crates | IPL | | | Seafood Harvesting Equipment | $ 450,000 |
| 70 | Sedna water quality monitoring system | Sedna | | | General M&E | $ 12,000 |
| 71 | security cameras | Superior Alarms | | | Office Equipment | $ 5,000 |
| 73 | Grading scales | | | | Scales | $ 1,000 |
| 74 | weighing scales | Yamato | PPC-300WP | | Scales | $ 4,000 |
| 75 | Systec 17-115 IT3 Scale | Systec | 17-115 IT3 | | Scales | $ 1,000 |
| 76 | pallet jacks | | | | General M&E | $ 9,000 |
| 77 | racks/rollers | | | | General M&E | $ 3,000 |
| 78 | racks/rollers | | | | General M&E | $ 2,000 |
| 79 | 8ft x 40in Aluminum 2-Tier Crate Rack | | | | General M&E | $ 500 |
| 81 | computers | Lenovo | Thinkbook | | Computer Equipment | $ 3,000 |
| 82 | computers | Lenovo | Thinkbook | | Computer Equipment | $ 3,000 |
| 83 | printers/fax | Brother | MFC-J6530DW | | Office Equipment | $ 500 |
| 84 | filing cabinets | | | | Furniture & Fixtures | $ 500 |
| 85 | filing cabinets | | | | Furniture & Fixtures | $ 200 |
| 86 | filing cabinets | | | | Furniture & Fixtures | $ 800 |
| 87 | desks | | | | Furniture & Fixtures | $ 1,000 |
| 88 | desks | | | | Furniture & Fixtures | $ 500 |
| 89 | desks | | | | Furniture & Fixtures | $ 500 |
| 90 | desks | | | | Furniture & Fixtures | $ 700 |



LOBSTERBOYS SH LTD.                                                                                          ADDENDUM C          26

| CWID | Asset Description | Make | Model | Serial Number | Detailed Appraisal Class Description | Concluded FMV in CAD |
|---|---|---|---|---|---|---|
| 160 | Kenworth W900 | Kenworth | T-880 | 1XKWD40XXPR988174 | Automobiles | $  220,000 |
| 161 | International Durastar | International | Durastar | 3HAMMMMN0HL151739 | Automobiles | $  80,000 |
| | | | | | Total: | $  3,432,500 |



# Addendum D:
## Certifications & Qualifications of the Appraiser



### David Koller, ASA, MRICS

Managing Director | Valuation & Advisory
Advisory Services Lead | Machinery & Equipment
Cushman & Wakefield of Illinois, Inc.

### Professional Expertise

Mr. Koller has been active in the appraisal industry since 1998, and now specializes in the allocation of purchase price, insurance valuation, fresh start accounting, lease and collateral evaluation, litigation support, and property tax analysis.

He has extensive industry experience valuing equipment utilized in: agriculture, asphalt and concrete, automotive, banks, broadcast and communications, chemicals, data centers, energy, entertainment, food production, foundries, general manufacturing, healthcare, hospitality, injection molding, Internet infrastructure, life sciences, medical device, metalworking, packaging, paper, petroleum, pharmaceutical, plastics, restaurants, steel service, and telecommunications.

Mr. Koller began his career focusing in appraisal, end of lease transactions, and asset management for equipment leasing and financing institutions. He has expertise in the appraisal & recovery/resale of equipment in high technology industries including broadcast, data networking, and communications infrastructure. Before joining Cushman & Wakefield, he was the National Practice Leader of Marshall & Stevens' Capital Asset Valuation Group.

Mr. Koller's appraisal work has involved projects throughout the United States, as well as in Brazil, Canada, Columbia, Costa Rica, France, Germany, Italy, Mexico, Nicaragua, Panama, Poland, Russia, Spain, Switzerland, and the United Kingdom.

### Memberships, Licenses, Professional Affiliations and Education

- Accredited Senior Appraiser, American Society of Appraiser Institute (ASA #32374). As of the current date, David Koller, ASA has completed the requirements of the continuing education program of the American Society of Appraisers.
- Member of the Royal Institution of Chartered Surveyors (RICS #6779454). As of the current date, David Koller, MRICS has completed the requirements of the continuing education program of the Royal Institution of Chartered Surveyors.
- Certificate of Completion, American Society of Appraisers – Advanced Multidisciplinary Healthcare Valuation Education Program.
- Past President of the Chicago Chapter of the American Society of Appraisers
- Bachelor of Arts, University of Wisconsin – Madison



**Exhibit G**
**Canadian Valuation 2**



a d v i s o r y

v a l u a t i o n

# PROPERTY APPRAISAL

**61-67 Dipper Harbour Road,**
**Dipper Harbour NB**

**APPRAISAL REPORT**
**As of March 20, 2023**

**Prepared For:**
**Lobsterboys**
**65 Dipper Harbour Road**
**Dipper Harbour, NB**



**Prepared By:**
**Cushman & Wakefield ULC**
**Valuation & Advisory**
**Halifax, NS**
**C&W File ID: 23-614-900294**
**CONFIDENTIAL**





**Appraisal of:**

**61-67 Dipper Harbour Road,**

**Dipper Harbour NB**



July 19, 2023


**Mr. Taylor Cox, Chief Financial Officer**
**Lobsterboys**
65 Dipper Harbour Road
Dipper Harbour, NB
E5J 1X3


Re:     Appraisal of Real Property
        In a Narrative Report

        **61-67 Dipper Harbour Road, Dipper Harbour NB   – "Subject Property"**

        C&W File ID:     23-614-900294

Dear Mr. Cox,

Cushman & Wakefield ULC is pleased to submit this Appraisal Report, estimating the current market value of the above-referenced subject property.

By agreement, this is a Appraisal Report, which contains a summary of all of the data, reasoning and analysis upon which our value conclusion is based. This document has been prepared in accordance with the Code of Ethics & Standards of Professional Practice, and the Canadian Uniform Standards of Professional Appraisal Practice (The Standards) promulgated by the Appraisal Institute of Canada.

We have prepared this appraisal report at the request of Lobsterboys for the general purpose of establishing market value for internal use. The report is intended for the exclusive use of Lobsterboys (the "Group"). The report is addressed to Lobsterboys and can be relied on by the "Group".

The report is subject to the Assumptions and Limiting Conditions contained in The Addenda, in addition to any others that may be contained in the report.

## REAL PROPERTY VALUE CONCLUSION

The property was inspected June 27, 2023 as per the terms of reference for the Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the real property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

<div align="center">

**SEVEN HUNDRED THOUSAND DOLLARS**
**$700,000**

</div>

This estimate of market value is based on an exposure time of 12 months.



# MACHINERY & EQUIPMENT VALUE CONCLUSION

The property was inspected June 27, 2023 as per the terms of reference for the Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the Machinery & Equipment subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**ONE MILLION SIX HUNDRED SEVENTY-SIX THOUSAND NINE HUNDRED DOLLARS**
**$1,676,900**

The Addenda to this report contains the Machinery and Equipment appraisal report.

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and an Addendum.

Respectfully submitted,

**CUSHMAN & WAKEFIELD ULC**

Wayne MacDonald, B.Comm. AACI, P.App.
Vice President
NBAREA# 303157
wayne.macdonald@cushwake.com
Phone Office Direct 902.877.2273



# EXECUTIVE SUMMARY

| | | |
|---|---|---|
| **PROPERTY IDENTIFICATION** | | |
| Address | : | PID 00275412 - Dipper Harbour Road, Dipper Harbour NB<br>PID 00275404 - Dipper Harbour Road, Dipper Harbour NB<br>PID 55195762 - Dipper Harbour Road, Dipper Harbour NB<br>PID 55116131 - Dipper Harbour Road, Dipper Harbour NB |
| **VALUE ESTIMATE** | | |
| Valuation Methods Utilized | : | Cost Approach:<br>$700,000 |
| Valuation Date | : | June 27, 2023 |
| Value Conclusion | : | **$700,000** |
| Value Assumptions | : | This estimate of market value is based on an exposure time of 12 months. |
| **PROPERTY DESCRIPTION** | | |
| Type | : | Lobster Pound facility |
| Location | : | The subject property is located along the Atlantic Ocean coastline and is situated approximately 400 feet east along a right of way access from Lighthouse Route #3. This area is located in South West Nova Scotia. |
| Site Area | : | PID 00275412 - 2,148 m² - 23,120.88 ft²<br>PID 00275404 - 1,078 m² - 11,603.50 ft²<br>PID 55195762 - 384 m² - 4,133.34 ft²<br>PID 55116131 - 799 m² - 8,600.36 ft²<br>Total 4,409 m² - 47,458.08 ft² |
| Land Use Designation | : | MU - Mixed Use Zone |
| **LOCATIONAL CHARACTERISTICS** | | |
| Surrounding Uses | : | Surrounding uses in the area are mainly rural agricultural in nature in nature. |
| Market Conditions | : | The reader should note that events in the financial and credit markets have previously and can continue to result in an uncertain and volatile economic environment. This appraisal report reflects our estimate of value at a single point in time at the effective date. Ongoing local and global changes in the economic and financial marketplace could seriously impact the reliability of this estimate at any point in time other than the effective date. |

## Extraordinary Assumptions

An extraordinary assumption is defined by CUSPAP (January 1, 2022 Edition) - "An assumption, directly related to a specific Assignment, which, if were not assumed to be true, could materially alter the opinions or conclusions. Extraordinary Assumptions presume uncertain information about or anticipated changes in: the physical, legal or economic characteristics of the subject property; or about: conditions external to the subject property such as market conditions or trends, or the integrity of data used in an analysis to be fact."

We assume for purposes of this appraisal that no wetlands or water lots (ie. all upland) form any part of the lands under consideration.

We have assumed that all information provided on the subject property is accurate as our estimates of value have relied on this information.

## Hypothetical Conditions

A hypothetical condition is defined by CUSPAP (January 1, 2022 Edition) -"Hypothetical Conditions are a specific type of an Extraordinary Assumption that presumes, as fact, simulated but untrue information about physical, legal, or economic characteristics of the subject property or external conditions, and are imposed for purposes of reasonable analysis."

This appraisal does not employ any hypothetical conditions.



# PROPERTY PHOTOGRAPHS

## AERIAL MAP





# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ——————————————————————————— **I**
    PROPERTY PHOTOGRAPHS--------------------------------------------------------- 3
**TABLE OF CONTENTS** ——————————————————————————— **4**
**INTRODUCTION** ——————————————————————————————— **1**
    PURPOSE AND INTENDED USE OF THIS APPRAISAL --------------------------- 1
    PROPERTY IDENTIFICATION ----------------------------------------------------- 1
    PROPERTY OWNERSHIP ---------------------------------------------------------- 1
    EFFECTIVE DATE OF APPRAISAL ----------------------------------------------- 1
    PROPERTY RIGHTS APPRAISED ------------------------------------------------ 1
    SCOPE OF THE APPRAISAL------------------------------------------------------ 1
    DEFINITION OF MARKET VALUE------------------------------------------------- 2
    REASONABLE EXPOSURE TIME-------------------------------------------------- 2
**PROPERTY DETAILS** ——————————————————————————— **3**
    NEIGHBORHOOD ANALYSIS ---------------------------------------------------- 3
    SITE DESCRIPTION--------------------------------------------------------------- 4
    MARKET OVERVIEW -------------------------------------------------------------- 7
    NEW BRUNSWICK– NO SIGNS OF WEAKENING… YET ----------------------- 7
    MUNICIPAL DATA ----------------------------------------------------------------- 8
    ZONING----------------------------------------------------------------------------- 8
    REAL PROPERTY TAXES AND ASSESSMENTS --------------------------------- 8
**VALUATION** ———————————————————————————————— **9**
    HIGHEST AND BEST USE -------------------------------------------------------- 9
    VALUATION METHODS------------------------------------------------------------ 10
    DIRECT COMPARISON APPROACH -------------------------------------------- 12
    ANALYSIS-------------------------------------------------------------------------- 14
    SUMMARY OF ANALYSIS -------------------------------------------------------- 16
    COST APPROACH----------------------------------------------------------------- 17
**RECONCILIATION AND FINAL VALUE ESTIMATE** ——————————————— **18**
**ADDENDA CONTENTS** ——————————————————————————— **19**
    ADDENDUM A:    CERTIFICATION OF APPRAISAL --------------------------- 20
    ADDENDUM B:    GLOSSARY OF TERMS AND DEFINITIONS---------------- 22
    ADDENDUM C:    PROFESSIONAL PROFILE----------------------------------- 25
    ADDENDUM D:    ASSUMPTIONS AND LIMITING CONDITIONS ------------- 26
    ADDENDUM E:    COST SHEETS -------------------------------------------- 30
    ADDENDUM F:     MACHINERY & EQUIPMENT APPRAISAL ---------------- 38



# INTRODUCTION

## PURPOSE AND INTENDED USE OF THIS APPRAISAL

The purpose of this appraisal appraisal is to estimate the current market value of the subject property.  It is our understanding that the intended use of the appraisal is for internal reporting. This report may only be relied upon by Lobsterboys (the "Group")

## PROPERTY IDENTIFICATION

The subject property is municipally addressed as:

**61 – 67 Dipper Harbour Road, Dipper Harbour NB**

## PROPERTY OWNERSHIP

According to NS property online the subject property is currently owned by Lobsterboys Ltd.  It is our understanding that the subject property is not subject to a purchase and sale agreement. Based on our investigations PVSC indicates the subject property (Lot LB-1) was acquired by the current owner of record on October 5, 2018, for $150,000.

## EFFECTIVE DATE OF APPRAISAL

The effective date of the appraisal is March 20, 2023.

## PROPERTY RIGHTS APPRAISED

The legal interest appraised is the fee simple estate - defined as absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat.

## SCOPE OF THE APPRAISAL

In forming our opinion as to the market value of the subject as of the valuation date, we have relied on information which is detailed in this report, to the extent deemed appropriate, and carried out the following specific functions:

- Inspected the subject property.

- Considered information with respect to sales and listings, at or about the valuation date, of properties assess them as being relevant to our opinion, as set out herein. While we believe our review to be considered similar to the subject, where we have significant knowledge of such sales and listings and to reasonably complete, we cannot warrant that we have:

  i)  uncovered and assessed every real property transaction at or about the valuation date that might be said to bear on the determination of the market value of the subject, or

  ii) fully discerned the motives behind the sales, listings and lease information considered in our analysis, such that our weighting of said information is without subjectivity;

We have

- Reviewed land use regulations, in particular the Land Use By-Law, applicable to the subject;

- Examined the possibility of making any significant changes to the subject in terms of existing uses, land severance and/or additional development of the site;

- We ascertained the highest and best use of the property;

- Examined market conditions and analyzed their potential effect on the property; and

- Completed cost approach to value on the subject properties.

- Completed appraisal report.

## DEFINITION OF MARKET VALUE

The Canadian Uniform Standards of Professional Appraisal Practice (The Standards) adopted by the Appraisal Institute of Canada define Market Value as:

> ***The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.***

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised and acting in their own best interests;

- A reasonable time is allowed for exposure in the market;

- Payment is made in cash in Canadian dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

## REASONABLE EXPOSURE TIME

Exposure time is always presumed to precede the effective date of the appraisal.  It may be defined as:

> ***The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.  It is a retrospective estimate based upon an analysis of past events assuming a competitive and open market.***

Based on discussions with various investors and real estate brokers familiar with assets such as the subject and based on an analysis of comparable sales utilized in this valuation and an analysis of current listings, it is our estimate that the subject would require a  12 month exposure period.



# PROPERTY DETAILS

## NEIGHBORHOOD ANALYSIS

### LOCATION

The subject property is located in the community of Dipper Harbour NB which is located in southwestern New Brunswick .  The subject property has frontage to Dipper Harbour Road.

### TRANSPORTATION SYSTEMS

Relatively, this location affords the subject good access to the Highway #1 which is a 13km drive north from the subject site.

### PLANNED CHANGES IN ROAD NETWORK

- None known.

### NEARBY AND ADJACENT USES

The immediate neighborhood is made up of a mix of rural residential development, vacancy land, and small business development.

### LOCAL AREA CHARACTERISTICS

- Small rural location.
- Relatively close to larger provincial centres.

### LAND USE CHANGES

None known.

### CONCLUSIONS

The subject has a relatively favorable location with access to many important arterial routes.



**61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                    PROPERTY DETAILS        **4**

## REGIONAL MAP



## NEIGHBOURHOOD MAP



# SITE DESCRIPTION



**61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                    PROPERTY DETAILS          **5**

## SITE PLAN



| Location: | The subject property is located in the community of Dipper NB which is located in southwestern New Brunswick . The subject property has frontage to Dipper Harbour Road. |
|---|---|
| Shape: | Irregular |
| Total Area: | PID 00275412 - 2,148 m² - 23,120.88 ft²<br>PID 00275404 - 1,078 m² - 11,603.50 ft²<br>PID 55195762 - 384 m² - 4,133.34 ft²<br>PID 55116131 - 799 m² - 8,600.36 ft²<br>Total          4,409 m²  - 47,458.08 ft² |
| Topography: | Assumed generally at grade with adjacent properties. |
| Easements and/or Rights of Way: | None identified although any such documents are assumed not to have any impact on the marketability of the subject site.  For greater certainty, a legal opinion should be obtained. |
| Frontage, Access, Visibility: | Frontage to Atlantic Ocean. |



| | |
|---|---|
| Sub Soil: | No soil analysis has been made in conjunction with this report.  Soil bearing and drainage qualities are assumed to be adequate for the existing structures and typical for the area.  We did not observe any evidence to the contrary during our physical inspection of the property. |
| Utilities: | The subject has access Well & Septic services. |
| Environmental Matters: | Cushman & Wakefield ULC has no expertise or responsibility regarding environmental matters and it is assumed that there are not any environmental issues that would affect the market value or marketability of the subject property. |
| Hazardous Substances: | We observed no evidence of toxic or hazardous substances during our inspection of the site.  However, we are not trained to perform technical environmental inspections and recommend the services of a professional engineer for this purpose. |
| Overall Functionality: | The subject site appears functional for commercial resource fisheries use. |



# MARKET OVERVIEW

## NEW BRUNSWICK – NO SIGNS OF WEAKENING… YET

In spite of recession talks in Canada, New Brunswick's economy hasn't showed signs of weakening just yet. Exceptionally high levels of in-migration and a solid labour market have supported residential investment and household spending.  Nevertheless, RBC Economics expects that the sharp rise in interest rates and contractionary conditions in export markets will cools things down this year, slicing GDP growth in the province in half from 2.0% in 2022 to 1.0%.

The province's booming population has supported labour force growth in recent quarters, which has eased (albeit slightly) labour market conditions.  The provincial unemployment rate is up more than a percentage point since reaching an all-time low of 6.2% in June 2022.  But upward pressure on wages remains intense after increasing the most on record (+7%) this past year.  RBC Economics anticipates that the rising cost of labour will eventually incentivize employers invest in machinery and equipment (to boost productivity) and cut back on hiring.  For now, though, businesses continue to focus on addressing their worker shortages.  Employment in New Brunswick soared 4.8% in the 12 months ending January, representing one of the largest gains among the provinces.

RBC Economics' forecast calls for the economy to recalibrate to a lower growth trajectory in 2023.  With goods purchases to be among the first to contract during a recession, New Brunswick's manufacturing sector is likely to be a sore spot in 2023.



# MUNICIPAL DATA

## ZONING

The subject site is zoned MU Mixed Use as per the Southwest New Brunswick Service Commission zoning map.

Permitted uses include  residential, agricultural, institutional, fishery, recreational as well as tourism;

## REAL PROPERTY TAXES AND ASSESSMENTS

### CURRENT PROPERTY TAXES

The current assessment and taxes for the subject property are as follows.

| Tax Year | | 2023 |
|---|---|---|
| **61 Dipper Harbour Road** | PID 00275412 | $25,800 |
| | AAN 01481665 | |
| Tax Rate | | 1.53% |
| **Taxes** | | **$394.28** |
| **65-67 Dipper Harbour Road** | PID 00275404 | $287,700 |
| | PID 55195762 | |
| | PID 55116131 | |
| | AAN 1486720 | |
| Tax Rate | | 2.63% |
| **Taxes** | | **$7,574.27** |
| **Taxes Payable Estimate** | | **$7,968.55** |



# VALUATION

## HIGHEST AND BEST USE

### DEFINITION OF HIGHEST AND BEST USE

Fundamental to the concept of value is the principle of highest and best use, which may be defined as:

> *The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.*

### HIGHEST AND BEST USE CRITERIA

We have evaluated the site's highest and best use both as currently improved and as if vacant. In both cases, the property's highest and best use must meet four criteria. That use must be (1), legally permissible (2) physically possible, (3) financially feasible, and (4) maximally profitable.

#### LEGALLY PERMISSIBLE

According to the current Land Use By-law, the subject site is zoned MU-Mixed Use. The subject's use as fisheries related land is considered to be a permitted use.

#### PHYSICALLY POSSIBLE

The second test is what is physically possible. As discussed in the "Site Description," section of the report, the site's size, soil, topography, etc. do not physically limit its use. The subject site is of adequate shape and size to accommodate a residential development.

#### FINANCIAL FEASIBILITY AND MAXIMUM PRODUCTIVITY

The third and fourth tests are what is financially feasible and what will produce the highest net return. After analyzing the physically possible and legally permissible uses of the property, the highest and best use must be considered in light of financial feasibility and maximum productivity. For a potential use to be seriously considered, it must have the potential to provide a sufficient return to attract investment capital over alternative forms of investment. A positive net income or acceptable rate of return would indicate that a use is financially feasible. Based on previous sales of land in the area tempered by current economic volatility, residential development appears financially feasible for the subject site.

### HIGHEST AND BEST USE OF SITE AS THOUGH VACANT

Considering the subject site's physical characteristics and location, as well as the state of the local commercial market, it is our opinion that the Highest and Best Use of the subject site as though vacant is as a commercial fisheries related development site.



# VALUATION METHODS

There are six generally accepted methods of valuing vacant land: Direct Comparison; Abstraction; Extraction; Subdivision Development; Land Residual; and Ground Rent Capitalization.

1. The ***Direct Comparison Approach*** is based upon the premise that a prudent purchaser would not pay more for a property than what it would cost to acquire a suitable alternative property and that the market value of a property can be estimated by comparing sales, offers, and listings of properties which have similar characteristics to the property being appraised.

2. The ***Abstraction Method*** of valuing land is premised upon the Principal of Contribution. This method is premised on the assumption that within each category and type of real estate, there exists a typical ratio of land value to total property value.  By knowing what this ratio is from data compiled from areas where land and building values are available and applying it to the sales information regarding improved properties in a built up area, an estimate of land value can be abstracted.  The reliability of this method is diminished because it does not take into explicit consideration such relevant criteria as building age or quality of construction.

3. A method of land valuation similar to the Abstraction Method but which implicitly recognizes differences in building age and quality of construction is the ***Extraction Method***.  This method deducts the estimated depreciated reproduction or replacement cost of the improvements of an improved property for which the total property value is known to arrive at an estimate of land value as if vacant.

4. When valuing larger parcels for which the highest and best use is the parcel's subdivision into smaller sites, and for which sales information regarding similar larger sites is insufficient to undertake a Direct Comparison Approach, the ***Subdivision Development Method*** may be employed.  In applying this method, the first step is to establish market values for the smaller sites as though subdivided, the length of the development period, and an appropriate absorption period.  The second step is to determine the costs required to create and market the subdivided parcels which include engineering and construction costs associated with the site preparation, roadways, sidewalks and servicing; carrying costs such as insurance and taxes; and marketing costs.  These costs are then deducted from the projected gross revenue of the lots to arrive at an estimate of the net proceeds which, once discounted at an applicable rate to account for the risk associated with the time required to complete such a development, are indicative of the present market value of the larger, un-subdivided site.

5. Another method that may be employed in the absence of adequate comparable information is the ***Land Residual Technique***.  In this method the net income generated from the property is established.  From this is deducted a reasonable return on and recapture of capital invested in the improvements.  The residual income is considered to be ascribed from the land. This income is then capitalized at an appropriate rate to arrive at an estimate of land value.   An important assumption required in the application of this method is that the site is developed to its highest and best use such that the income from land and improvements are of the same type and sources.

6. A similar method as the Land Residual Technique is ***Ground Rent Capitalization***. Undertaking this method of site valuation requires the analysis of ground rents prevalent in the market and in consideration of the characteristics of the site being appraised.  From the analysis, a gross income is established from which any requisite expenses or anticipated losses are deducted to arrive at a net operating income. This net operating income is then capitalized at an applicable rate to arrive at an estimate of the vacant site.



The **Direct Comparison Approach** is based on the Principle of Substitution which maintains that a prudent purchaser would not pay more for a property than what it would cost to purchase a suitable alternative property, one that exhibits similar characteristics, and functional utility, etc.  Within this approach, the property being appraised is compared to similar properties that have sold recently or are currently offered for sale.

Some important factors to be given consideration in this analysis include location, access, site size, site configuration, topography, land use classification, servicing, etc.  When enough unimproved and comparable sales are available, the Direct Comparison Approach is the preferred technique and has been employed herein.



# DIRECT COMPARISON APPROACH

In the Direct Comparison Approach, we developed an opinion of value by comparing this property with similar, recently sold properties in the surrounding or competing area. Inherent in this approach is the principle of substitution, which states that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arm's-length transactions between willing and knowledgeable buyers and sellers, we can identify value and price trends. The basic steps of this approach are:

1. Research recent, relevant property sales and current offerings throughout the competitive area;

2. Select and analyze properties that are similar to the property appraised, analyzing changes in economic conditions that may have occurred between the sale date and the date of value, and other physical, functional, or locational factors;

3. Identify sales that include favorable financing and calculate the cash equivalent price;

4. Reduce the sale prices to a common unit of comparison such as price per square foot, price per unit or effective gross income multiplier;

5. Make appropriate comparative adjustments to the prices of the comparable properties to relate them to the property being appraised; and

6. Interpret the adjusted sales data and draw a logical value conclusion.

The Direct Comparison Approach is based on the Principle of Substitution which maintains that a prudent purchaser would not pay more for a property than what it would cost to purchase a suitable alternative property, one that exhibits similar characteristics, and functional utility, etc. Within this approach, the property being appraised is compared to similar properties that have sold recently or are currently offered for sale.  Typically, a unit of comparison (i.e. sale price per square foot, sale price per unit, etc.) is used to facilitate the analysis.  In the case of properties similar to the subject lands, the sale price per acre is the most commonly used unit of comparison.

In analyzing the comparable sales relative to the subject site, of particular relevance are characteristics such as location, site size, topography, developability, and land use regulations.  In this regard, the sales summarized in following are thought to be reasonably comparable to the subject site and to provide a reliable indication as to its current market value.



61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB                                                                           VALUATION        13

## VACANT LAND VALUATION

We have researched several market areas for transactions involving similar vacant commercial land sales. Based on our investigations, the following sale indices were examined. Details of the sales are presented below.

| SALES CAHRT | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Index | Address | PID | PAN | Sale Date | Site Area m$^2$ | Site Area ft$^2$ | Site Area Acres | Sale Price | Sale Price / ft$^2$ | Sale Price / acre |
| 1 | Dipper Harbour Road, Dipper Harbour NB | 00275495 | 01481746 | May 2, 2022 | 3,997 | 43,024 | 0.99 | $181,250 | $4.21 | $183,509 |
| 2 | Highway 790, Dipper Harbour NB | 00271486 | 01476783 | March 14, 2022 | 1,490 | 16,038 | 0.37 | $23,000 | $1.43 | $62,468 |
| 3 | Dipper Harbour Corner, Dipper Harbour NB | 00275545 | 01481796 | May 29, 2018 | 1,945 | 20,936 | 0.48 | $114,000 | $5.45 | $237,192 |
| 4 | Highway 790, Dipper Harbour NB | 55019954 | 01486796 | August 30, 2016 | 4,050 | 43,594 | 1.00 | $122,724 | $2.82 | $122,628 |





# ANALYSIS

The major elements of comparison for an analysis of this type include the property rights conveyed, the financial terms incorporated into a particular transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its physical traits and the economic characteristics of the property.

### PROPERTY RIGHTS APPRAISED

All of the sales utilized in this analysis involved the transfer of the fee simple interest.

### FINANCIAL TERMS

To the best of our knowledge, all of the sales utilized in this analysis were accomplished with cash and/or cash and market-oriented financing.

### CONDITIONS OF SALE

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. However, all sales used in this analysis are considered to be "arms-length" market transactions between both knowledgeable buyers and sellers on the open market.  Market listings should be treated caution as they may transfer at a lower unit value.  This is particularly the case during declining or stabilizing market conditions



**61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                                        VALUATION        15

## MARKET CONDITIONS

The sales that are included in this analysis date between 2016 and 2022. During this time for the subject area, market conditions have improved as indicated by the sales. Therefore, the sales are somewhat inferior and an upward adjustment would be required to reflect today. We have inflated the sales by a compounded 2% factor.

## LOCATION

Based on the somewhat unique waterfront location we have utilized available sales in this immediate area for purposes of our analysis.  Based on this we assume that there would be no locational adjustments required.

## SIZE

The selected comparable sales range in size from 0.37 acres to 1.0 acre, while the subject consists of 1.37 acres. It should be noted that much larger parcels will typically transfer at lower unit prices than smaller parcels, all other things being equal, given the law of diminishing returns although the effect of this diminishes beyond a certain parcel size. There are also benefits associated with larger parcels in so much as assemblage is not required and infrastructure costs can be spread over a greater land area. In this case, Index No 2 & 3 are considered to represent a smaller parcel (superior). Index 1 & 4 would be considered to be generally similar.

## UTILITY

Overall Index No's 1-4 are all zoned mixed use and would be considered to be have similar utility.



61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB                                    VALUATION        16

## PHYSICAL TRAITS

The comparable properties have varying degrees of comparability when measured against the subject property. The most important attributes of the subject property which need to be compared to other properties are similar physical make-up, location and exposure. The overall physical sites would be considered to be generally similar.

## SUMMARY OF ANALYSIS

The selected comparable indices represent 4 completed transactions between and 2016 and 2022. The selected indices range from a low of 0.37acres to 1.0 acre.

| | | Economic Adjustments (Cumulative) | | | | | Property Characteristic Adjustments (Additive) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Index** | **Price / Acre Date** | **Property Rights conveyed** | **Conditions of sale** | **Special Financing** | **Market conditions** | **Subtotal $ / Acre** | **Location** | **Size** | **Utility** | **Physical Traits** | **Indicated Price per Acre** |
| 1 | $183,509 May-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $187,169 | Similar | Similar | Similar | Similar | Similar to $187,169 |
| 2 | $62,468 Mar-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $63,883 | Similar | Superior | Similar | Similar | Higher than $63,883 |
| 3 | $237,192 May-18 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $261,495 | Similar | Superior | Similar | Similar | Lower than $261,495 |
| 4 | $122,628 Aug-16 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $139,947 | Similar | Similar | Similar | Similar | Higher than $139,947 |

We believe the subject site possesses a good location in an area of future development in close proximity to downtown and the Trans-Canada Highway. Given these characteristics and recognizing the large size of the site and that different portions of the site carry more value than other areas and we would estimate an overall rate of $125,000 per acre to be appropriate for the subject.

Application of this rate results in the following estimate of value:

<div align="center">

1.08 acres x $125,000 per acre = $136,185

**$140,000**

</div>



# COST APPROACH

## METHODOLOGY

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. We previously developed an opinion of land value of $140,000.

## REPLACEMENT COST NEW

The Marshall and Swift Estimator Valuation Service has been used to determine the replacement cost of the subject building.

## DEPRECIATION

Depreciation is generally broken down into three components; physical deterioration, functional obsolescence, and external obsolescence,

**Physical Deterioration** is caused by the wear and tear of the elements and the use of the improvements. In the summary table at the end of this section, we have presented estimates of the subject components' actual ages, effective ages, and total physical deterioration, based on the physical age/life methodology. The effective age may be more or less than the actual age, depending on the maintenance of the facility.

**Functional Obsolescence** is due to several factors, such as poor floor plan, limited or excessive space, flawed design or style, or a deficiency or super adequacy in the structure, materials, or design.

**External Obsolescence** is caused by conditions extraneous to the subject, which impairs or diminishes desirability. Included in this category are items such as legislative enactments that restrict or impair property rights, neighborhood deterioration, noxious enterprises and/or deteriorating market conditions.

We have utilized the age life method to address the depreciation within the subject. This entails comparing the effective age vs the expected useful life of the development. Based on the new construction of the subject and the improvements in the area in general we have not identified any forms of depreciation inherent in the property.

Based on the forgoing the value of the subject property based on the Cost Approach is shown in the chart below.

| | | | DEPRECIATED REPLACEMENT COST - AVERAGE | | | |
|---|---|---|---|---|---|---|
| Index | Building | Building Areas | Replacement Cost | Depreciation @ 50% | Depreciated Replacement Cost | $/ft² |
| 1 | Office & Processing | 3,120 | $384,041 | $192,021 | $192,021 | $62 |
| 2 | Tank House | 5,920 | $552,099 | $276,050 | $276,050 | $47 |
| 3 | Ice House | 273 | $52,141 | $26,071 | $26,071 | $95 |
| 4 | Generator Building | 220 | $30,010 | $15,005 | $15,005 | $68 |
| 5 | Workshop | 280 | $38,195 | $19,098 | $19,098 | $68 |
| 6 | Storage Building | 480 | $65,477 | $32,739 | $32,739 | $68 |
| 7 | Land Value | | | | $140,000 | |
| | Totals | 10,293 | $1,121,963 | $560,982 | $700,982 | $68 |
| | | | | Rounded | $700,000 | $68 |

Detailed Marshall & Swift / Corelogic cost sheets can be found in the addenda.

## CONCLUSION

Based on the above analysis the Market value estimate of the subject property based upon the Cost Approach is estimated to be **$700,000 (Rounded).**



# RECONCILIATION AND FINAL VALUE ESTIMATE

The property was inspected June 27, 2023 as per the terms of reference for the Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the real property and the machinery & equipment subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

## REAL PROPERTY VALUE CONCLUSION

The property was inspected June 27, 2023 inspected as per the terms of reference for the Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the real property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**SEVEN HUNDRED THOUSAND DOLLARS**
**$700,000**

This estimate of market value is based on an exposure time of 12 months.

## MACHINERY & EQUIPMENT VALUE CONCLUSION

The property was inspected June 27, 2023 as per the terms of reference for the Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the Machinery & Equipment subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**ONE MILLION SIX HUNDRED SEVENTY-SIX THOUSAND NINE HUNDRED DOLLARS**
**$1,676,900**

The Addenda to this report contains the Machinery and Equipment appraisal report.



# ADDENDA CONTENTS

ADDENDUM A:    CERTIFICATION OF APPRAISAL
ADDENDUM B:    GLOSSARY OF TERMS AND DEFINITIONS
ADDENDUM C:    PROFESSIONAL PROFILE
ADDENDUM D:    ASSUMPTIONS AND LIMITING CONDITIONS
ADDENDUM E:    COST SHEETS
ADDENDUM F:MACHINERY & EQUIPMENT APPRAISAL



# ADDENDUM A:        CERTIFICATION OF APPRAISAL

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

- Our compensation is not contingent upon the reporting of a predetermined value or direction in value that favours the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

- Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Canadian Uniform Standards.

- Wayne MacDonald has not made an inspection of the property as per the terms of reference that is the subject of this report effective Ma5rch 20, 2023. David Koller ASA MRICS made an inspection o the subject property on June 27, 2023.

- The Appraisal Institute of Canada has a mandatory Continuing Professional Development program for designated members. As of the date of this report, Wayne MacDonald has fulfilled the requirements of the program and remained as a member in good standing.

- Wayne MacDonald is a licensed appraiser in the Province of New Brunswick.

- No one provided significant professional assistance to the person signing this report.

- The value estimate contained in this report applies as of March 20, 2023. This date may be referred to as the *effective date of valuation*.



## FINAL ESTIMATE OF VALUE

Having regard to all of the information contained in this report, it is our professional opinion that the market value of **61-67 Dipper Harbour Road, Dipper Harbour NB** at the effective date of valuation based on the agreed to Scope of Work, and as outlined in the report, the current market values of the property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023 are estimated as follows:

## REAL PROPERTY VALUE CONCLUSION

The property was inspected June 27, 2023 inspected as per the terms of reference for the Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the real property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

<div align="center">

**SEVEN HUNDRED THOUSAND DOLLARS**
**$700,000**

</div>

This estimate of market value is based on an exposure time of 12 months.

## MACHINERY & EQUIPMENT VALUE CONCLUSION

The property was inspected June 27, 2023 inspected as per the terms of reference for the Appraisal. Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the Machinery & Equipment subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

<div align="center">

**ONE MILLION SIX HUNDRED SEVENTY-SIX THOUSAND NINE HUNDRED DOLLARS**
**$1,676,900**

</div>

The Addenda to this report contains the Machinery and Equipment appraisal report.

May 31, 2023

_____
Wayne MacDonald B.Comm, AACI P.App.
NBAREA #303157

_____
Date



# ADDENDUM B:        GLOSSARY OF TERMS AND DEFINITIONS

## DEFINITIONS OF VALUE, INTEREST APPRAISED AND OTHER TERMS

### MARKET VALUE

The Canadian Uniform Standards of Professional Appraisal Practice (The Standards) adopted by the Appraisal Institute of Canada define Market Value as:

> *"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.    Buyer and seller are typically motivated;

2.    Both parties are well informed or well advised and acting in their own best interests;

3.    A reasonable time is allowed for exposure in the market;

4.    Payment is made in cash in Canadian dollars or in terms of financial arrangements comparable thereto; and

5.    The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

### MARKET RENT

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the specified lease agreement including term, rental adjustment and revaluation, permitted uses, use restrictions, and expense obligations; the lessee and lessor each acting prudently and knowledgeably, and assuming consummation of a lease contract as of a specified date and the passing of the leasehold from lessor to lessee under conditions whereby:

1.    Lessee and lessor are typically motivated.

2.    Both parties are well informed or well advised and acting in what they consider their best interests.

3.    A reasonable time is allowed for exposure in the open market.

4.    The rent payment is made in terms of cash in Canadian dollars, and is expressed as an amount per time period consistent with the payment schedule of the lease contract.

5.    The rental amount represents the normal consideration for the property lease unaffected by special fees or concessions granted by anyone associated with the transaction.



## CONDOMINIUM INTEREST

An estate in real property consisting of an individual interest in a condominium unit, together with an undivided common interest in the common areas such as the land, parking areas, elevators, stairways, and the like.

## VALUE AS IS

The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning.

## CASH EQUIVALENCE

A price expressed in terms of cash, as distinguished from a price expressed totally or partly in terms of the face amounts of notes or other securities that cannot be sold at their face amounts. Calculating the cash-equivalent price requires an appraiser to compare transactions involving atypical financing to transactions involving comparable properties financed at typical market terms.

# EXPOSURE TIME AND MARKETING TIME

## EXPOSURE TIME

Under Paragraph 3 of the Definition of Market Value, the value opinion presumes that a reasonable time is allowed for exposure in the open market. Exposure time is defined as: *"The length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at the market value on the effective date of the appraisal."* Exposure time is presumed to precede the effective date of the appraisal.

The reasonable exposure period is a function of price, time and use. It is not an isolated opinion of time alone. Exposure time is different for various types of property and under various market conditions. It is a retrospective opinion based on an analysis of past events, assuming a competitive and open market. It assumes not only adequate, sufficient and reasonable time but adequate, sufficient and a reasonable marketing effort. Exposure time and conclusion of value are therefore interrelated.

Based on our review of investor surveys, discussions with market participants and information gathered during the sales verification process, a reasonable exposure time for the subject property at the value concluded within this report would have been three to nine months.

This assumes the current owner would have employed an active and professional marketing plan.

## MARKETING TIME

Marketing time is an opinion of the time that might be required to sell a real property interest at the concluded market value level. Marketing time is presumed to start during the period immediately after the effective date of an appraisal. (Marketing time is subsequent to the effective date of the appraisal and exposure time is presumed to precede the effective date of the appraisal). The opinion of marketing time uses some of the same data analyzed in the process of developing a reasonable exposure time opinion as part of the appraisal process and it is not intended to be a prediction of a date of sale or a one-line statement.



We believe, based on the assumptions employed in our analysis and our selection of investment parameters for the subject, that our value conclusion represents a price achievable within 12 months.

CUSHMAN & WAKEFIELD

# ADDENDUM C:            PROFESSIONAL PROFILE

## WAYNE MACDONALD AACI, P.APP.

### VICE PRESIDENT | VALUATION & ADVISORY
### CUSHMAN & WAKEFIELD ULC

Wayne MacDonald is a Vice President with Cushman & Wakefield ULC. Wayne has 27+ years of experience in real estate valuation and advisory services with 18+ years as a designated AACI which includes the valuation of a variety of investment property types. These valuation and advisory assignments include single assets and portfolios of property. Wayne's direct involvement includes the appraisal of property both individually and as part of a valuation team.

### EXPERIENCE

Experience in real estate consulting and appraising includes a wide range of asset types including office, industrial, retail, multifamily as well as development land throughout Atlantic Canada.

Major clients have included financial institutions, public sector entities, as well as asset and investment management companies. Clients for which appraisal work has been done include CT REIT, BMW, Plaza REIT, Mount Saint Vincent University, and Hazelview Properties.

### EDUCATION

- Saint Mary's University (Halifax, Nova Scotia) –(1990)
  – Degree: Bachelor of Commerce – Major - Marketing

### APPRAISAL EDUCATION

- University of British Columbia (Vancouver BC) / Appraisal Institute of Canada
  – AACI, P.App. (2004)

### MEMBERSHIPS, LICENSES AND PROFESSIONAL AFFILIATIONS

- Designated Member, Appraisal Institute of Canada ( #303157)
- Nova Scotia Real Estate Appraisers Association
- New Brunswick Association of Real Estate Appraisers
  – As of the current date, Wayne MacDonald AACI, P.App has completed the requirements of the continuing education program of the Appraisal Institute of Canada.



# ADDENDUM D:        ASSUMPTIONS AND LIMITING CONDITIONS

1. This report has been prepared for **Lobsterboys (the "Group").** It is not reasonable for any person other than the person or those to whom this report is addressed to rely upon this report without first obtaining written authorization from the client and the author of this report.  This report has been prepared on the assumption that no other person will rely on it for any other purpose and all liability to all such persons is denied.

2. This report has been prepared for **the "Group"** and for the exclusive (and confidential) use of the recipients as named herein and for the specific purpose and function as stated herein.  All copyright is reserved to the author and this report is considered confidential by the author and the client.  Possession of this report, or a copy thereof, does not carry with it the right to reproduction or publication in any manner, in whole or in part, nor may it be disclosed, quoted from or referred to in any manner, in whole or in part, without the prior written consent and approval of the author as to the purpose, form and content of any such disclosure, quotation or reference.

3. Without limiting the generality of the foregoing, neither all nor any part of the contents of this report shall be disseminated or otherwise conveyed to the public in any manner whatsoever or through any media whatsoever or disclosed, quoted from or referred to in any letter, financial statement, prospectus, or offering memorandum of the client, or in any documents filed with any governmental agency without the prior written consent and approval of the author as to the purpose, form and content of such dissemination, disclosure, quotation or reference.

4. The estimated prospective market value of the real property which is valued in this report pertains to the value of the Fee Simple or leasehold interest in the real estate, subject to terms and conditions of the existing tenancy as described in this report.  The property rights herein exclude mineral rights, if any.

5. The Client has specifically requested an assignment with a limited scope of work and results in an abbreviated report format. By accepting this report, the Client and Intended User(s) understand that an inspection of the subject property has not been performed and accept the decrease in the reliability of this report, resulting in a higher level of risk assumed by a user of this report. The appraiser, the appraiser's firm and/or any employee, director, officer or partner of the appraiser's firm, as applicable, are limited in liability to $50,000 (fifty thousand dollars). Such limitation of liability applies in the event that anyone makes a claim that the appraiser is in any way liable for performing the appraisal or in preparing the appraisal report, including in respect of any allegations of negligence, breach of contract or for any other reason or claim.

6. The estimate of value contained in this report is founded upon a thorough and diligent examination and analysis of information gathered and obtained from numerous sources.  Certain information has been accepted at face value; especially if there was no reason to doubt its accuracy.  Other empirical data required interpretive analysis pursuant to the objective of this assignment. Certain inquiries were outside the scope of this mandate.  For these reasons, the analyses, opinions and conclusions contained in this report are subject to all of the assumptions and limiting conditions.

7. The property has been valued on the basis that title to the real property herein is good and marketable.

8. The author of this report cannot accept responsibility for legal matters, questions of survey, opinions of title, hidden or unapparent conditions of the property, toxic wastes or contaminated materials, soil or sub-



soil conditions, environmental, engineering or other technical matters which might render this property more or less valuable than as stated herein.

9.  The property has been valued on the basis that they are free and clear of all value influencing encumbrances, encroachments, restrictions or covenants except as may be noted in this report and that there are no pledges, charges, lien or social assessments outstanding against the property other than as stated and described herein.



10. The property has been valued on the basis that there are no outstanding liabilities except as expressly noted herein, pursuant to any agreement with a municipal or other government authority, pursuant to any contract or agreement pertaining to the ownership and operation of the real estate or pursuant to any lease or agreement to lease, which may affect the stated value or saleability of the subject property or any portion thereof.

11. The interpretation of the leases and other contractual agreements, pertaining to the operation and ownership of the property, as expressed herein, is solely the opinion of the author and should not be construed as a legal interpretation.

12. The property has been valued on the basis that the real estate complies in all material respects with any restrictive covenants affecting the site and have been built and is occupied and being operated, in all material respects, in full compliance with all requirements of law, including all zoning, land use classification, building, planning, fire and health by-laws, rules, regulations, orders and codes of all federal, provincial, regional and municipal governmental authorities having jurisdiction with respect thereto.

13. Investigations have been undertaken in respect of matters which regulate the use of land. However, no inquiries have been placed with the fire department, the building inspector, the health department or any other government regulatory agency, unless such investigations are expressly represented to have been made in this report. The property must comply with such regulations and, if it does not comply, its non-compliance may affect the market value of this property. To be certain of such compliance, further investigations may be necessary.

14. The property has been valued on the basis that all rents referred to in this report are being paid in full and when due and payable under the terms and conditions of the attendant leases, agreements to lease or other contractual agreements. Further, it is assumed that all rents referred to in this report represent the rental arrangements stipulated in the leases, agreements to lease or other contractual agreements pertaining to the tenants' occupancy, to the extent that such rents have not been prepaid, abated, or inflated to reflect extraordinary circumstances, and are fully enforceable notwithstanding that such documentation may not be fully executed by the parties thereto as at the effective date, unless such conditions have been identified and noted in this report.

15. The data and statistical information contained herein were gathered from reliable sources and are believed to be correct. However, these data are not guaranteed for accuracy, even though every attempt has been made to verify the authenticity of this information as much as possible.

16. The estimated prospective market value of the property do not necessarily represent the value of the underlying shares, if the assets are so held, as the value of the shares could be affected by other considerations. Further, the estimated prospective market values do not include consideration of any extraordinary market value.

17. Should title to the real property presently be held (or changed to a holding) by a partnership, in a joint venture, through a co-tenancy arrangement or by any other form of divisional ownership, the value of any fractional interest associated therewith may be more or less than the percentage of ownership appearing in the contractual agreement pertaining to the structure of such divisional ownership.



18. In the event of syndication, the aggregate value of the limited partnership interests may be greater than the value of the freehold or fee simple interest in the real estate, by reason of the possible contributory value of non-realty interests or benefits such as provision for tax shelter, potential for capital appreciation, special investment privileges, particular occupancy and income guarantees, special financing or extraordinary agreements for management services.

19. Should the author of this report be required to give testimony or appear in court or at any administrative proceeding relating to this report, prior arrangements shall be made therefore, including provisions for additional compensation to permit adequate time for preparation and for any appearances which may be required.  However, neither this nor any other of these assumptions and limiting conditions is an attempt to limit the use that might be made of this report should it properly become evidence in a judicial proceeding.  In such a case, it is acknowledged that it is the judicial body which will decide the use of this report which best serves the administration of justice.

20. Because market conditions, including economic, social and political factors, change rapidly and, on occasion, without notice or warning, the estimate of market value expressed herein, as of the effective date of this appraisal, cannot necessarily be relied upon as any other date without subsequent advice of the author of this report.

21. The value expressed herein is in Canadian dollars.

22. This report is only valid if it bears the original signature of the author



# ADDENDUM E:          COST SHEETS

## CoreLogic – SwiftEstimator
## Commercial Estimator – Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Dipper Harbour | Date Created: | 05-16-2023 |
| Property Owner: | | Date Updated: | 05-29-2023 |
| Property Address: | E5J 1X1 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 3,120 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 494 Industrials - Light Mfg. | 100 | D | 16 | 3.0 |
| Occupancy Total Percentage | 100 | | | |

| System : HVAC (Heating) | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 695 HVAC (Heating) : Hot Water Radiant | 50 | Occ. | | |
| 691 HVAC (Heating) : Electric | 50 | Occ. | | |
| Total Percent for HVAC (Heating): | 100 | | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 3,120 | $79.10 | $246,782 | $123,396 | $123,396 |
| Exterior Walls | 3,120 | $21.74 | $67,829 | $33,915 | $33,914 |
| Heating & Cooling | 3,120 | $22.25 | $69,420 | $34,710 | $34,710 |
| Basic Structure Cost | 3,120 | $123.09 | $384,041 | $192,021 | $192,020 |
| | | | | | |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $192,021 | $192,020 |
| Depreciated Cost | 3,120 | $61.54 | | $192,021 | $192,020 |

Cost data by CoreLogic, Inc.

*Except for items and costs listed under "Addition Details" this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall & Swift Licensee User Certificate. This report authenticates the user as a current Marshall & Swift user.*



**61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**   **CERTIFICATION OF APPRAISAL**   31

## CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Dipper Harbour | Date Created: | 05-18-2023 |
| Property Owner: | | Date Updated: | 05-29-2023 |
| Property Address: | E5J 1X1 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 5820 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 494 Industrials, Light Mfg. | 100 | D | 16 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

| System : HVAC (Heating) | | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|---|
| GAS HVAC (Heating) ; No HVAC | | | Occ | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| Basic Structure | | | | | |
| Base Cost | 5,820 | $73.19 | $433,048 | $216,524 | $216,524 |
| Exterior Walls | 5,820 | $20.11 | $119,051 | $59,526 | $59,525 |
| Basic Structure Cost | 5,820 | $93.26 | $552,099 | $276,050 | $276,049 |
| | | | | | |
| Less Depreciation | | | | | |
| Physical & Functional | 50.0% | | | $276,050 | $276,049 |
| Depreciated Cost | 5,820 | $46.83 | | $276,050 | $276,049 |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under "Addition Details" this SwiftEstimate report has been produced utilizing software with capabilities in compliance with the identified Swift licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***



**61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                    **CERTIFICATION OF APPRAISAL**              32

## CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Dipper Harbour | Date Created: | 05-16-2023 |
| Property Owner: | | Date Updated: | 05-29-2023 |
| Property Address: | E5J 1X1 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 273 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 447 Cold Storage Facility | 100 | D | 16 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

**System : HVAC (Heating)**

| | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 617 HVAC (Heating) : Complete HVAC | 100 | Occ. | | 2 |
| Total Percent for HVAC (Heating): | 100 | | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 273 | $117.23 | $32,004 | $16,002 | $16,002 |
| Exterior Walls | 273 | $38.24 | $10,440 | $5,220 | $5,220 |
| Heating & Cooling | 273 | $35.52 | $9,697 | $4,848 | $4,849 |
| **Basic Structure Cost** | **273** | **$190.99** | **$52,141** | **$26,070** | **$26,071** |
| | | | | | |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $26,070 | $26,071 |
| **Depreciated Cost** | **273** | **$95.50** | | **$26,070** | **$26,071** |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under ◆Addition Details,◆ this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall & Swift Licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***



CUSHMAN & WAKEFIELD

## CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Dipper Harbour | Date Created: | 05-16-2023 |
| Property Owner: | | Date Updated: | 05-29-2023 |
| Property Address: | E5J 1X1 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 220 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 494 Industrials, Light Mfg. | 100 | D | 16 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

| System : HVAC (Heating) | %/Units | Quality Occ | Depr % | Other |
|---|---|---|---|---|
| 649 HVAC (Heating)  No HVAC | | | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 220 | $107.00 | $23,540 | $11,770 | $11,770 |
| Exterior Walls | 220 | $29.41 | $6,470 | $3,235 | $3,235 |
| **Basic Structure Cost** | 220 | $136.41 | $30,010 | $15,005 | $15,005 |
| | | | | | |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $15,005 | $15,005 |
| **Depreciated Cost** | 220 | $68.20 | | $15,005 | $15,005 |

Cost data by CoreLogic, Inc.

Except where an applicable law under a License Details of the SwiftEstimator report has been produced utilizing cost calculations or ... in compliance with the Marshall & Swift License User Certificate. This report dates/notes the data as a current Marshall & Swift user.



CUSHMAN & WAKEFIELD

**61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**          CERTIFICATION OF APPRAISAL    **34**

## CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Dipper Harbour | Date Created: | 05-16-2023 |
| Property Owner: | | Date Updated: | 05-23-2023 |
| Property Address: | ESJ 1#1 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 280 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 494 Industrials, Light Mfg | 100 | D | 16 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

| System : HVAC (Heating) | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 649 HVAC (Heating)   No HVAC | | Occ | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 280 | $107.00 | 29,960 | $14,980 | $14,980 |
| Exterior Walls | 280 | $29.41 | 56,235 | $4,118 | $4,117 |
| Basic Structure Cost | 280 | $136.41 | $38,195 | $19,098 | $19,097 |
| | | | | | |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $19,098 | $19,097 |
| Depreciated Cost | 280 | $68.20 | $19,098 | $19,098 | $19,097 |

Cost data by CoreLogic, Inc.

***Except for items and cases listed under [Addition Details] this SwiftEstimator report has been produced using current cost data and is in compliance with the Version 8 Swift licensed user Certificate. This report qualifies/issues that use as a current Marshall & Swift user***



CUSHMAN & WAKEFIELD

## CoreLogic - SwiftEstimator
## Commercial Estimator - Summary Report

### General Information

| | | | |
|---|---|---|---|
| Estimate ID: | Lobsterboys Dipper Harbour | Date Created: | 05-16-2023 |
| Property Owner: | | Date Updated: | 05-29-2023 |
| Property Address: | E5J 1X1 | Date Calculated: | 05-31-2023 |
| Local Multiplier: | | Cost Data As Of: | 05-2023 |
| Architects Fee: | | Report Date: | using default |

### Section 1

| | | | |
|---|---|---|---|
| Area | 480 | Overall Depreciation % | 50 |
| Stories in Section | 1 | Physical Depreciation % | |
| Stories in Building | 1 | Functional Depreciation % | |
| Shape | rectangular | External Depreciation % | |
| Perimeter | (auto-calc) | | |
| Effective Age | 0 | | |

### Occupancy Details

| Occupancy | % | Class | Height | Quality |
|---|---|---|---|---|
| 494 Industrials, Light Mftg. | 100 | D | 16 | 2.0 |
| Occupancy Total Percentage | 100 | | | |

**System : HVAC (Heating)**

| | %/Units | Quality | Depr % | Other |
|---|---|---|---|---|
| 649 HVAC (Heating) : No HVAC | | Occ. | | |

### Calculation Information (All Sections)

| | Units | Unit Cost | Total Cost New | Less Depreciation | Total Cost Depreciated |
|---|---|---|---|---|---|
| **Basic Structure** | | | | | |
| Base Cost | 480 | $107.00 | $51,360 | $25,680 | $25,680 |
| Exterior Walls | 480 | $29.41 | $14,117 | $7,059 | $7,058 |
| **Basic Structure Cost** | **480** | **$136.41** | **$65,477** | **$32,739** | **$32,738** |
| | | | | | |
| **Less Depreciation** | | | | | |
| Physical & Functional | 50.0% | | | $32,739 | $32,738 |
| **Depreciated Cost** | **480** | **$68.20** | | **$32,739** | **$32,738** |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under ◆Addition Details,◆ this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall & Swift Licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***



CUSHMAN & WAKEFIELD

# ADDENDUM E: PHOTOS








**61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**          CERTIFICATION OF APPRAISAL          37








CUSHMAN & WAKEFIELD

**61-67 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**          **CERTIFICATION OF APPRAISAL**          38

# ADDENDUM F: MACHINERY & EQUIPMENT APPRAISAL





APPRAISAL OF MACHINERY & EQUIPMENT

Lobsterboys New Brunswick
65 Dipper Harbour Road
Dipper Harbour, New Brunswick E5J 1X3

## IN AN APPRAISAL REPORT

As of March 20, 2023

### Prepared For:

Lobsterboys
65 Dipper Harbour Road
Dipper Harbour, New Brunswick E5J 1X3

Client ID: 23-21001-900359

### Prepared By:

Cushman & Wakefield of Illinois, Inc.
Valuation & Advisory
200 S. Wacker Drive, Suite 2800
Chicago, IL 60606
Cushman & Wakefield File ID: PRJ0835894

# CUSHMAN & WAKEFIELD

July 19, 2023

Mr. Taylor Cox
Chief Financial Officer
**Lobsterboys**
65 Dipper Harbour Road
Dipper Harbour, New Brunswick E5J 1X3

Re:      Appraisal Report
        **Lobsterboys New Brunswick**
        65 Dipper Harbour Road
        Dipper Harbour, New Brunswick E5J 1X3

        Cushman & Wakefield File ID:      PRJ0835894
        Client ID:                23-21001-900359

Dear Mr. Cox:

In fulfillment of our agreement as outlined in the Letter of Engagement, dated February 17, 2023, Cushman & Wakefield is pleased to present the following Appraisal Report to assist Lobsterboys with the valuation of certain machinery & equipment of Lobsterboys New Brunswick, located at 65 Dipper Harbour Road, Dipper Harbour, New Brunswick as of March 20, 2023.

Our analysis was performed for management planning purposes. No other use is intended or should be inferred.

This Appraisal Report has been prepared in accordance with the *Uniform Standards of Professional Appraisal Practice* (USPAP).

Based on the agreed-to Scope of Work, and as outlined in the report, the following opinion of value was developed:

| Summary of Values in CAD | | |
|---|---|---|
| **Appraisal Premise** | **Date of Value** | **Value Conclusion** |
| Fair Market Value | March 20, 2023 | $1,676,900 |

*Compiled by Cushman & Wakefield*

Our analysis is subject to the assumptions and limiting conditions, certifications, extraordinary and hypothetical conditions, if any, and definitions outlined in our report.  This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and Addenda.

Respectfully submitted,

**CUSHMAN & WAKEFIELD OF ILLINOIS, INC.**

David B. Koller, ASA, MRICS
Managing Director
david.koller@cushwake.com
312-470-3853 Office Direct

## Table of Contents

**Introduction and General Information** ................................................................5

    Description of Assignment ........................................................................ 5

    Scope of Work ........................................................................................ 5

    Purpose, Intended Use & Intended Users ................................................ 5

    Identification of Subject Assets ............................................................... 5

    Standards of Compliance ........................................................................ 5

    General Assumptions ............................................................................. 6

    Extraordinary Assumptions ..................................................................... 6

    Hypothetical Conditions ......................................................................... 6

    Global Pandemic ................................................................................... 6

    Quality Control Review .......................................................................... 6

**Standard of Value** ..........................................................................................8

**Valuation Process** .........................................................................................9

    Data Collection ..................................................................................... 9

    Asset Classifications .............................................................................. 9

    Desktop Analysis ................................................................**Error! Bookmark not defined.**

    General Appraisal Methodology ............................................................10

**Assumptions and Limiting Conditions** ............................................................14

**Certification** ...............................................................................................16

**Addenda Contents** ......................................................................................17



# Introduction and General Information

## Description of Assignment

Cushman & Wakefield, Inc. was engaged to assist Lobsterboys (the "Client") with the appraisal of certain machinery & equipment ("Subject Assets") of Lobsterboys New Brunswick (the "Company") as of March 20, 2023 (the "Valuation Date").

The scope of our engagement was developing an opinion of Fair Market Value of the Subject Assets for management planning purposes. We understand that the results of our appraisal will be used by Client management for internal planning purposes only. No other use is intended or should be inferred.

The Subject Assets are located at the following address, collectively (the "Subject Property"):

- 65 Dipper Harbour Road, Dipper Harbour, New Brunswick

## Scope of Work

The scope of work is determined by the intended use of the appraisal, the needs of the user, the relevant characteristics of the subject property, and related pertinent factors and included:

- Interviewing Client management to understand the Subject Assets.

- Obtaining the Client's fixed asset listing.

- Collecting, verifying, and analyzing other relevant data.

- Researching economic and market conditions of the subject industry.

- Obtaining comparable replacement cost and sales data of certain assets from various sources and confirming wherever possible.

- Performing an appraisal analysis and providing recommendations of the Fair Market Value ("FMV") of the Subject Assets as of the Valuation Date.

- In order to estimate the FMV of the Subject Assets, we considered three approaches to value: the cost, sales comparison, and income approaches. Based on the nature of the assets and information available, we concluded on the approach that was most appropriate to value the subject machinery and equipment. Please refer to the Glossary of Terms & Definitions for the definition of appraisal approaches and methods.

## Purpose, Intended Use & Intended Users

To develop an opinion of the FMV of the Subject Assets located at the Subject Property.  We understand the analysis will be used solely for management planning purposes and will not be used for any other purpose, nor will it be distributed to other parties without the prior written consent of Cushman & Wakefield, Inc.  The intended users are limited to the Client.

## Identification of Subject Assets

The Subject Assets represent machinery & equipment of that are used in lobster harvesting. These items include licensed vehicles, computer equipment, furniture & fixtures, general machinery & equipment, office equipment, refrigeration equipment, scales, and seafood harvesting equipment.

## Standards of Compliance

This Appraisal Report has been prepared in accordance with our interpretation of the Uniform Standards of Professional Appraisal Practice ("USPAP").



USPAP identifies two written report options: Appraisal Report and Restricted Appraisal Report. This document is prepared as an Appraisal Report in accordance with USPAP guidelines. The terms "describe," summarize," and "state" connote different levels of detail, with "describe" as the most comprehensive approach and "state" as the least detailed. As such, the following provides specific descriptions about the level of detail and explanation included within the report:

- Describes the Subject Assets that are the subject of the appraisal, including physical, economic, and other characteristics that are relevant
- States the type and definition of value and its source
- Describes the Scope of Work used to develop the appraisal
- Describes the information analyzed, the appraisal methods used, and the reasoning supporting the analyses and opinions; explains the exclusion of any appraisal approaches
- States the use of the Subject Assets as of the valuation date

## General Assumptions

This report presents information from third parties and bases its conclusions on analysis of that information. Information has been obtained from sources deemed to be reliable, but it is an assumption of this report that the information is accurate.  We issue no warranty or other form of assurance regarding its accuracy.

No information has been audited or verified for accuracy by the appraiser, and no forensic accounting has been performed.  It is assumed that the Client's management has accurately disclosed all assets, liabilities and income streams that pertain to the subject, and its underlying assets and liabilities.

## Extraordinary Assumptions

An extraordinary assumption is defined by USPAP as an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions.  Extraordinary assumptions assume as fact otherwise uncertain information about physical, legal, or economic characteristics of the property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in the analysis.

This analysis does not employ any extraordinary assumptions.

## Hypothetical Conditions

A hypothetical condition is defined by USPAP as a condition which is contrary to what exists but is supposed for the purpose of analysis.  Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

This analysis does not employ any hypothetical conditions.

## Global Pandemic

The financial market is driven by investor demand and strong liquidity. We are monitoring the impacts on both factors from the Federal Reserve's recent and forecasted interest rate hikes, inflation, and other macroeconomic factors, which have increased uncertainty in the financial markets. Since its onset in March 2020, the COVID-19 pandemic has also had a dramatic effect on both investor demand and liquidity as the market navigated COVID's actual and perceived impacts. The market perceives that we are near the end of the pandemic. As we have throughout the pandemic, Cushman & Wakefield is closely monitoring the latest developments resulting from the COVID-19 pandemic and recovery, as well as its effects on the subject and its market.

## Quality Control Review

Cushman & Wakefield of Illinois, Inc. has an internal Quality Control Oversight Program. This Program mandates a "second read" of all appraisals. Assignments prepared and signed solely by designated members (Accredited Senior



Appraisers or "ASA") are read by another ASA who is not participating in the assignment. Assignments prepared, in whole or in part, by non-designated appraisers require ASA participation, Quality Control Oversight, and signature.

For this assignment, Quality Control Oversight was provided by Lee Dorf.



# Standard of Value

The standard of value establishes the guiding principle for the appraisal. For the purpose of this report, the standards of value are "Fair Market Value" as defined by the American Society of Appraisers:

*Fair Market Value*

> An opinion, expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, considering market conditions for the asset being valued, as of a specific date.[1]

---

[1]  *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets*, 4th Edition, American Society of Appraisers, 2020.



# Valuation Process

The appraisal of the Subject Assets included, but was not necessarily limited to, the following:

- Data collection
- Identification of asset classifications
- Desktop Analysis
- Appraisal methodology selection
- Estimating the FMV of the Subject Assets
- Site inspection

## Data Collection

We relied on information provided by the Client and have assumed it to be true and correct. We have not performed independent auditing procedures and provide no assurances, expressed or implied, regarding the accuracy of the information provided by others. Information provided by the Client and obtained through due diligence include, but are not limited to the following:

- Lobster Boys Dipper Harbour Equipment.xls
- Lobsterboys New Brunswick Equipment Appraisal Report.pdf
- Dipper Harbour.pdf

Certain items found in the Equipment listing contained costs in CAD. For valuation purposes, we historically converted these original costs to USD using data provided by the International Monetary Fund ("IMF") and valued using the approaches below. The concluded value was converted to CAD using the IMF spot rate, as of the valuation date.

## Asset Classifications

Based on the personal property identified, we categorized the line items within the asset register to arrive at asset classes that have similar economic service lives, functionality, and market characteristics. We grouped the Subject Assets into personal property categories, as follows:

- Automobiles, including but not limited to pickup trucks, box trucks, vans, and the like.
- Computer Equipment, including laptop computers.
- Forklifts & Trailers, including forklifts and refrigerated trailers.
- Furniture & Fixtures, including desks, filing cabinets, and the like.
- General M&E, including but not limited to generators, heat exchangers, pumps, and the like.
- Office Equipment, including but not limited to printers, fax machines, and the like.
- Refrigeration, including but not limited to chiller units, chiller barrels, and the like.
- Scales, including grading and weighing scales.
- Seafood Harvesting Equipment, including but not limited to tanks, lobster trays, lobster crates, and the like.

## Site Inspection

Information was compiled by Cushman & Wakefield during a site inspection conducted on June 27, 2023. During our site visit, we performed a physical verification of the Subject Assets and reviewed any asset information with onsite personnel to understand the nature, condition and operations of the equipment onsite. Information collected during the site visit involves data related to actual and effective age, general condition, maintenance, utility, anticipated future use, and other factors that might impact the functional use or economic viability of the assets.

In the following paragraphs we discuss general appraisal methodologies and the specific techniques employed to measure the FMV of the assets discussed above.



## General Appraisal Methodology

There are three generally accepted approaches to developing an opinion of value: Cost, Sales Comparison, and Income Capitalization. We have considered each in this appraisal to develop an opinion of the FMV of the machinery and equipment. In appraisal practice, an approach to value is included or eliminated based on its applicability to the property type being valued and the quality of information available. The reliability of each approach depends on the availability and comparability of market data.

The appraisal process is concluded by analyzing each approach to value used in the appraisal. When more than one approach is used, each approach is judged based on its applicability, reliability, and the quantity and quality of its data. A final value opinion is chosen that either corresponds to one of the approaches to value or is a correlation of all the approaches used in the appraisal.

We have considered each approach in developing our opinion of the FMV of the Subject Assets.  We discuss each approach below and conclude with a summary of their applicability.

### Cost Approach

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility.

In the Cost Approach, the appraiser starts with the current replacement cost new of the property being appraised and then deducts for the loss in value caused by physical deterioration, functional obsolescence, and economic obsolescence.

### Sales Comparison Approach

The Sales Comparison (Market) Approach uses sales of comparable properties, adjusted for differences, to estimate a value for the subject property. This approach involves the comparison of comparable recent sales (or offerings) of similar assets to the subject. If the comparable sales are not exactly like the subject, adjustments must be made to the price of the comparable sales (or offerings) to make the comparables reflect the subject property.

### Income Capitalization Approach

The Income Capitalization Approach considers value in relation to the present worth of future benefits derived from ownership and is usually measured through the capitalization of a specific level of income. The appraiser determines the present value of the future economic benefits of owning the property.

## Application of Valuation Approaches

In this analysis, we considered the three approaches to value:  Cost, Sales Comparison, and Income Approaches. Based on the nature of the assets and information available, our analysis relied on the cost and sales comparison approaches to value.

### Application of the Cost Approach

In applying the Cost Approach, we first identified current reproduction or replacement cost estimates for the applicable assets using either an indirect (trending) or direct method.

The Cost Approach includes the following steps:

- Estimate the reproduction / replacement cost new

- Estimate depreciation

- Conclude on the FMV of the assets

### Calculation of the Reproduction Cost New Under the Indirect Method

Under the indirect method of the Cost Approach, the reproduction cost new for each asset or group of assets was estimated by indexing historical costs recorded in the fixed asset register based on asset type and acquisition date. These costs generally included the base cost of the asset, any additional considerations regarding freight, installation,



and delivery, as well as indirect costs such as, engineering and design costs required to integrate the individual assets into a total operation.

The indices applied to the trending method in this report are developed from the Producers Price Index as published by the United States Department of Labor, Bureau of Labor Statistics ("BLS") and Marshall Valuation Service ("MVS"). The BLS reports fluctuations in price on a monthly basis, and Marshall Valuation Service provides a composite of the machinery & equipment costs by industry segments. Although costs of individual plants or pieces of machinery & equipment may deviate from an index, overall costs typically follow these indices. Additionally, the movement of data from both sources and the trend data used in this report are monitored as of the appraisal date.

For this report, the indices utilized are as follows:

| Appraiser Asset Class Description | Index Description | Source | Series ID |
|---|---|---|---|
| Automobiles | Automobile, light truck and utility vehicle mfg | BLS | PCU336110336110 |
| Computer Equipment | Computer & peripheral equipment mfg | BLS | PCU3341--3341-- |
| Forklifts & Trailers | Industrial Truck/Trailer and stacker (Forklifts) | BLS | PCU333924333924 |
| Furniture & Fixtures | Office furniture (including fixtures) mfg. | BLS | PCU33721--33721-- |
| General M&E | Other general purpose machinery manufacturing | BLS | PCU3339--3339-- |
| Office Equipment | Office Equipment | MVS | MVS |
| Refrigeration | Refrigeration | MVS | MVS |
| Scales | Scale and balance mfg | MVS | PCU3339983339987 |
| Seafood Harvesting Equipment | Seafood product preparation and packaging | BLS | PCU311710311710 |

We assessed the reasonableness of the indirect method of the cost approach analysis based upon on our discussions with on-site Management who are familiar with the assets as well as recent purchases by Management.

## Calculation of the Replacement Cost New Under the Direct Method

The direct method where available was utilized to estimate the replacement cost new. The direct method assesses the replacement cost new by researching current cost information from manufacturers, vendors, distributors, and published cost data. Additionally, the analysis included quotations, invoices, and certain new cost data provided by Management.

## Depreciation

Depreciation is the estimated loss in value caused by a combination of physical deterioration, functional obsolescence, and economic obsolescence in order to reflect the change in value of the assets from replacement cost new.

Physical deterioration was estimated utilizing an age/life calculation based on the relationship between the estimated economic useful life and estimated effective age of the Subject Assets. In order to develop estimates of physical deterioration, we considered the chronological ages, effective ages, normal economic useful lives, and remaining useful lives of the machinery and equipment.

- Chronological Age ("CA") – the age of the asset between the date an asset was placed into service and the Valuation Date.

- Effective age ("EA") - the age of the asset indicated by its actual condition.

- Normal Useful Life ("NUL") - the life, usually in terms of years, that an asset will be used before it deteriorates to an unusable condition or is retired from service.

- Remaining useful life ("RUL") - the estimated period during which an asset of a certain effective age is expected to actually be used before it is retired from service.



Normal useful life by appraisal class was based on discussions with Management, industry research, our experience valuing similar assets and data provided in published guidelines such as *Marshall Valuation Service* ("MVS") and the American Society of Appraiser's Estimated Normal Useful Life Study.

The assumptions used in the analysis to determine the NUL are listed below:

| Appraiser Asset Class Description | Normal Useful Life | Hold Factor |
|---|---|---|
| Automobiles | 5 | 10% |
| Computer Equipment | 3 | 3% |
| Forklifts & Trailers | 12 | 10% |
| Furniture & Fixtures | 10 | 5% |
| General M&E | 15 | 10% |
| Office Equipment | 7 | 12% |
| Refrigeration | 15 | 8% |
| Scales | 15 | 10% |
| Seafood Harvesting Equipment | 15 | 10% |

When an asset has exceeded its estimated NUL, we utilized a minimum depreciation hold factor when estimating physical deterioration so that all the assets that are in-use are included in the appraisal with at least a minimal contributory value.

Functional obsolescence is an internal measurement of an asset's loss in value based on inefficiencies or inadequacies when compared to a more efficient or less costly replacement. New technology, improvements in production methods, changes in construction costs, capacity improvements, and excess operating costs may affect the value of an asset. An investigation of the functional obsolescence of the Subject Assets was performed.  We did not find evidence of any excess capital costs and the assets are expected to continue to be used in an operating capacity. Therefore, no adjustments for functional obsolescence were necessary.

Economic obsolescence is an external measurement of an asset's loss in value caused by legislative change, industry economics, supply and demand of the end product, and increased cost of raw materials, any of which may affect the value of an asset.  An investigation of the economic obsolescence of the Subject Assets was performed. No known external variables that could impose a loss in value of the Subject Assets were identified today, and no known external variables have been considered as of the as complete date.  Therefore, no adjustments for economic obsolescence were necessary.

### Application of the Sales Comparison Approach

The Sales Comparison Approach includes the collection of sales and offering data similar to the subject assets being valued.  By analyzing the sales for compatibility, the relevant relationship can be adjusted and applied to the assets being valued to arrive at an indication of the most probable selling price. Adjustments to equate the comparables utilized in this analysis included direct and indirect costs based on the sales data available at the time of this report.

When there is an active marketplace for used equipment, independent offerings and transactions occur under free market conditions. Identifying these transactions provide comparable sales of the subject equipment. Comparable sales transactions are adjusted by equating the comparable asset to the subject asset being appraised and include variables such as differences in age, capacity, condition, and size. These adjustments are a determination of what the transaction amount would have been if the comparable and subject assets were identical. The result measures all forms of obsolescence and depreciation inherent in the asset.

Sources such as used machinery & equipment dealers and remarketers were utilized and referenced as follows:

- Price Digests
- Equipment Watch



- Machinio
- J.D. Power

## Application of the Income Approach

The income approach considers value in relation to the present value of future economic benefits of ownership. Typically, the income approach includes a rate of return, discount rate, capitalization rate, the magnitude and timing of future benefits and expenses, annual operating expenses versus annual revenue, salvage value, and present value of the annual net cash flow.

In this situation, the income approach was considered to be inappropriate and was not used because individual income streams could not be allocated reasonably and effectively to each of the individual assets.

## Summary of Conclusions

Based on the data presented in this report, the opinion of the Subject Assets under analysis presented herein, as of Valuation Date, is as shown in the table below.

| Summary of Values in CAD | | |
|---|---|---|
| Appraisal Premise | Date of Value | Value Conclusion |
| Fair Market Value | March 20, 2023 | $1,676,900 |

*Compiled by Cushman & Wakefield*



# Assumptions and Limiting Conditions

"Report" means the appraisal or consulting report and conclusions stated therein, to which these Assumptions and Limiting Conditions are annexed.

"Property" means the subject of the Report.

"Cushman & Wakefield" means Cushman & Wakefield, Inc. or its subsidiary that issued the Report.

"Appraiser(s)" means the employee(s) of Cushman & Wakefield who prepared and signed the Report.

The Report has been made subject to the following assumptions and limiting conditions:

- No opinion is intended to be expressed and no responsibility is assumed for the legal description or for any matters that are legal in nature or require legal expertise or specialized knowledge beyond that of a real estate appraiser. Title to the Property is assumed to be good and marketable and the Property is assumed to be free and clear of all liens unless otherwise stated. No survey of the Property was undertaken.

- The information contained in the Report or upon which the Report is based has been gathered from sources the Appraiser assumes to be reliable and accurate. The owner of the Property may have provided some of such information. Neither the Appraiser nor Cushman & Wakefield shall be responsible for the accuracy or completeness of such information, including the correctness of estimates, opinions, dimensions, sketches, exhibits and factual matters. Any authorized user of the Report is obligated to bring to the attention of Cushman & Wakefield any inaccuracies or errors that it believes are contained in the Report.

- The opinions are only as of the date stated in the Report. Changes since that date in external and market factors or in the Property itself can significantly affect the conclusions in the Report.

- The Report is to be used in whole and not in part. No part of the Report shall be used in conjunction with any other analyses. Publication of the Report or any portion thereof without the prior written consent of Cushman & Wakefield is prohibited. Reference to the Appraisal Institute or to the MAI designation is prohibited. Except as may be otherwise stated in the letter of engagement, the Report may not be used by any person(s) other than the party(ies) to whom it is addressed or for purposes other than that for which it was prepared. No part of the Report shall be conveyed to the public through advertising, or used in any sales, promotion, offering or SEC material without Cushman & Wakefield's prior written consent. Any authorized user(s) of this Report who provides a copy to, or permits reliance thereon by, any person or entity not authorized by Cushman & Wakefield in writing to use or rely thereon, hereby agrees to indemnify and hold Cushman & Wakefield, its affiliates and their respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the Report by any such unauthorized person(s) or entity(ies).

- Except as may be otherwise stated in the letter of engagement, the Appraiser shall not be required to give testimony in any court or administrative proceeding relating to the Property or the Appraisal.

- The Report assumes (a) responsible ownership and competent management of the Property; (b) there are no hidden or unapparent conditions of the Property, subsoil or structures that render the Property more or less valuable (no responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them); (c) full compliance with all applicable federal, state and local zoning and environmental regulations and laws, unless noncompliance is stated, defined and considered in the Report; and (d) all required licenses, certificates of occupancy and other governmental consents have been or can be obtained and renewed for any use on which the value opinion contained in the Report is based.

- The physical condition of the machinery & equipment is an assumption in this Report an no visual inspection by the Appraiser was performed.

- Unless otherwise stated in the Report, the existence of potentially hazardous or toxic materials that may have been used in the construction or maintenance of the improvements or may be located at or about the Property was not considered in arriving at the opinion of value. These materials (such as formaldehyde foam insulation, asbestos insulation and other potentially hazardous materials) may adversely affect the value of the Property. The Appraisers are not qualified to detect such substances. Cushman & Wakefield recommends that an environmental expert be employed to determine the impact of these matters on the opinion of value.



- Unless otherwise stated in the Report, compliance with the requirements of the Americans with Disabilities Act of 1990 (ADA) has not been considered in arriving at the opinion of value. Failure to comply with the requirements of the ADA may adversely affect the value of the Property. Cushman & Wakefield recommends that an expert in this field be employed to determine the compliance of the Property with the requirements of the ADA and the impact of these matters on the opinion of value.

- If the Report is submitted to a lender or investor with the prior approval of Cushman & Wakefield, such party should consider this Report as only one factor, together with its independent investment considerations and underwriting criteria, in its overall investment decision. Such lender or investor is specifically cautioned to understand all Extraordinary Assumptions and Hypothetical Conditions and the Assumptions and Limiting Conditions incorporated in this Report.

- In the event of a claim against Cushman & Wakefield or its affiliates or their respective officers or employees or the Appraisers in connection with or in any way relating to this Report or this engagement, the maximum damages recoverable shall be the amount of the monies actually collected by Cushman & Wakefield or its affiliates for this Report and under no circumstances shall any claim for consequential damages be made.

- If the Report is referred to or included in any offering material or prospectus, the Report shall be deemed referred to or included for informational purposes only and Cushman & Wakefield, its employees and the Appraiser have no liability to such recipients. Cushman & Wakefield disclaims any and all liability to any party other than the party that retained Cushman & Wakefield to prepare the Report.

- Unless otherwise noted, we were not given a title report to review. We do not know of any easements, encroachments, or restrictions that would adversely affect the site's use. However, we recommend a title search to determine whether any adverse conditions exist.

- Unless otherwise noted, we were provided no evidence of toxic or hazardous substances of the site. We are not trained to perform technical environmental inspections and recommend the hiring of a professional engineer with expertise in this field.

- By use of this Report each party that uses this Report agrees to be bound by all of the Assumptions and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.

- The machinery and equipment is assumed to be installed and operating at manufacturer's specifications. We recommend an engineer be employed in the final determination regarding the condition and maintenance of the machinery and equipment.



# Certification

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the subject assets that are the subject of this report, and no personal interest with respect to the parties involved.

- We have no bias with respect to the subject assets that are the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Practice of the American Society of Appraisers, which include the Uniform Standards of Professional Appraisal Practice.

- Data were obtained from sources believed to be reliable. All facts known to me that have bearing on the values of the Subject Assets have been considered, and no facts of importance have been intentionally omitted herein.

- The assets that are the subject of this report were inspected June 27, 2023.

- David Koller has not provided prior services within the three-year period immediately preceding acceptance of this assignment.

- No one provided significant appraisal assistance to the persons signing this report.

- The American Society of Appraisers has a mandatory recertification program for all of its senior members. As of the date of this report, has complied with the requirements of that program.



David B. Koller, ASA, MRICS
Managing Director
david.koller@cushwake.com
312-470-3853 Office Direct



# Addenda Contents

**Addendum A:**    Glossary of Terms & Definitions
**Addendum B:**    Summary of Valuation by Appraisal Class
**Addendum C:**    Valuation Asset Detail
**Addendum D:**    Site Inspection Photographs
**Addendum E:**    Certifications & Qualifications of the Appraiser



# Addendum A:
## Glossary of Terms & Definitions

The following definitions of pertinent terms are taken from Valuing Machinery and Equipment, Third Edition, published by the American Society of Appraisers and from the 2020--2021 Uniform Standards of Professional Appraisal Practice (USPAP) effective January 1, 2021, through December 31, 2023.

### Acquisition Date

The effective purchase date of an asset.

### Appraisal Date

The specific point in time as of which the valuator's opinion of value applies (also referred to as "Effective Date" or "Valuation Date").

### Appraisal Report

The report must communicate each analysis, opinion, and conclusion in a manner that is not misleading and contain sufficient information to enable the intended users of the appraisal to understand the report properly and clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment and must be prepared as a Self-Contained Appraisal Report, Summary Appraisal Report, or Restricted Use Appraisal Report (USPAP page U-61).

### As-is, Where-is

A term reflecting the purchase of an item in its present condition and location. Any costs associated with dismantling and removal are not considered.

### Assumption

That which is taken to be true (USPAP page U-2).

### Comparable

Properties with characteristics that are similar to a subject property whose value is being sought.

### Cost

Total dollar expenditure for any asset. This includes labor, materials, legal services, architectural design, financing, taxes during construction, interest, contractor's overhead and profit, and entrepreneurial overhead and profit. The cost of a particular asset may be higher than, lower than, or equal to the asset's value.

### Cost Approach

One of the three recognized approaches used in appraisal analysis. The appraiser starts with the current replacement cost new of the property being appraised and then deducts for the loss in value caused by physical deterioration, functional obsolescence, and economic obsolescence. The logic behind this approach is the principle of substitution; a prudent buyer will not pay more for a property than the cost of acquiring a substitute property of equivalent utility.

### Depreciation

The actual loss in value or worth of a property from all causes including those resulting from physical deterioration, functional obsolescence, and economic obsolescence. Depreciation may be curable or incurable. The estimated loss in value of an asset.

### Economic Obsolescence

A form of depreciation where the loss in value or usefulness of a property is caused by factors external to the property. These may include such things as the economics of the industry; availability of financing; loss of material and/or labor sources; passage of new legislation; changes in ordinances; increased cost of raw materials, labor or



utilities (without an offsetting increase in product price); reduced demand for the product; increased competition; inflation or high interest rates; or similar factors.

## Economic Useful Life

The estimated period of time that a new property may be profitably used for the purpose for which it was intended. Stated another way, economic life is the estimated number of years that a new property can be used before it would pay the owner to replace it with the most economical replacement property that could perform an equivalent service. Functional or economic obsolescence factors may limit a property's economic life. An asset's economic life will often be less than its normal useful life.

## Effective Age

The apparent age of a property in comparison with a new property of like kind; that is, the age indicated by the actual condition of a property.

## Functional Obsolescence

A form of depreciation in which the loss in value or usefulness of a property is caused by inefficiencies or inadequacies inherent in the property itself, when compared to a more efficient or less costly replacement property that new technology and changes in design, materials, or process that results in inadequacy, overcapacity, excess construction, lack of functional utility, excess operating costs, etc. has developed. Symptoms suggesting the presence of functional obsolescence are excess operating cost, excess construction (excess capital cost), over-capacity, inadequacy, lack of utility, or similar conditions.

## Income Approach

One of the three recognized approaches used in appraisal analysis. (This approach considers value in relation to the present worth of future benefits derived from ownership and is usually measured through the capitalization of a specific level of income.) The appraiser determines the present value of the future economic benefits of owning the property.

## Indexing

A method used to estimate current cost in which an index factor is applied to the historical cost of an item reflecting the movement of cost over time.

## Intended Use

The use or uses of an appraiser's reported appraisal, appraisal review, or appraisal consulting assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment (USPAP page U-3).

## Intended User

The client or any other party as identified, by name or type, as users of the appraisal, appraisal review, or appraisal consulting report by the appraiser on the basis of communication with the client at the time of the assignment (USPAP page U-3).

## Machinery and Equipment

The physical facilities available for production, including the installation and service facilities appurtenant, together with all other equipment designed for or necessary to its manufacturing and industrial purposes, regardless of method of installation, including all those items of furniture and fixtures necessary for the administration and proper operation of the enterprise.

## Normal Useful Life

The physical life, usually estimated in terms of years, that a new property will actually be used before it is retired from service.



## Obsolescence

A loss in value due to a decrease in the usefulness of property caused by decay, changes in technology, changes in people's behavioral pattern and tastes, or environmental changes.

## Original Cost

The initial capitalized cost of an asset in the hands of its present owner.

## Physical Depreciation

A form of depreciation where the loss in value or usefulness of a property is due to the using up or expiration of its useful life caused by wear and tear, deterioration, exposure to various elements, physical stresses, and similar factors. Physical depreciation may be curable (or partially curable), by replacement or rebuilding, to some percentage of its full physical life. If curable, the remaining life would go no lower than a core or re-buildable life. Cure or partial cure may then change the Effective Age of the property. If no replacement or rebuilding is economically feasible the physical depreciation will be 100%.

## Premise of Value

A statement identifying the assumptions, criteria or conditions surrounding the definition of value under which the appraisal estimate value is being determined.

## Principle of Substitution

A theory whereby a prudent purchaser would pay no more for a property than the cost of acquiring an equally desirable substitute in the market.

## Purpose of the Appraisal

A statement clearly identifying the value(s) to be estimated that are consistent with the intended use of the appraisal.

## Remaining Useful Life (RUL)

The estimated period during which a property of a certain effective age is expected to actually be used before it is retired from service.

## Replacement Cost New (RCN)

The current cost of a similar new property having the nearest equivalent utility as the property being appraised, as of a specific date.

## Reproduction Cost New

The cost of reproducing a new replica of a property on the basis of current prices with the same or closely similar materials, as of a specific date.

## Salvage Value

An opinion of the amount, expressed in terms of money that may be expected for the whole property or a component of the whole property that is retired from service for possible use elsewhere, as of a specific date of reproducing a new replica of a property on the basis of current prices with the same or closely similar materials, as of a specific date.

## Sales Comparison Approach

This is one of the three recognized approaches used in appraisal analysis to lead to an indication of the most probable selling price of a property (also known as the market approach). This approach involves the comparison of comparable recent sales (or offerings) of similar assets to the subject. If the comparable sales are not exactly like the subject, adjustments must be made to the price of the comparable sales (or offerings) to make the comparables reflect the subject property.



## Scope of Work

The type and extent of research and analyzing in an assignment (USPAP page U-4).

## Signature

Personalized evidence indicating authentication of the work performed by the appraiser and the acceptance of the responsibility for content, analyses, and the conclusions in the report (USPAP page U-4).

## Standard of Value

The identification of the type of value being used in a specific engagement; e.g. fair market value, fair value, investment value, liquidation value, insurable value, et al.

## Trending

A method of estimating a property's reproduction cost new (not replacement cost new) in which an index or trend factor is applied to the property's historical cost to convert the known cost into an indication of current cost. Simply put, trending reflects the movement of price over time.

## Uniform Standards of Professional Appraisal Practice (USPAP)

A set of professional appraisal standards established by the Appraisal Standards Board of the Appraisal Foundation. Developed in 1986–87 by the Ad Hoc Committee on Uniform Standards, they have been adopted by major appraisal organizations and federal agencies in North America and are generally recognized as the accepted standards of appraisal practice.

## Useful Life

The period of time over which property may reasonably be expected to perform the function for which it was designed.



# Addendum B:
## Summary of Valuation by Appraisal Class

| Detailed Appraiser Asset Class | Fair Market Value |
|---|---|
| Automobiles | $          211,000 |
| Computer Equipment | $              200 |
| Forklifts & Trailers | $          128,000 |
| Furniture & Fixtures | $              500 |
| General M&E | $           53,300 |
| Office Equipment | $              900 |
| Refrigeration | $          330,100 |
| Scales | $            1,900 |
| Seafood Harvesting Equipment | $          951,000 |
| **Total** | **$        1,676,900** |

*Values in CAD*



# Addendum C:
## Valuation Asset Detail

| CWID | Asset Description | Make | Model | Serial Number | Detailed Appraisal Class Description | Concluded FMV in CAD |
|---|---|---|---|---|---|---|
| 91 | 4 tanks 27'x33' (5.5' deep) | | | | Seafood Harvesting Equipment | $ 110,000 |
| 91.1 | 4 tanks 27'x33' (5.5' deep) | | | | Seafood Harvesting Equipment | $ 110,000 |
| 91.2 | 4 tanks 27'x33' (5.5' deep) | | | | Seafood Harvesting Equipment | $ 110,000 |
| 91.3 | 4 tanks 27'x33' (5.5' deep) | | | | Seafood Harvesting Equipment | $ 110,000 |
| 93 | spray system over tanks | | | | Seafood Harvesting Equipment | $ 1,000 |
| 94 | Cummins generator | Cummins | DSHAD-1339212 | J130584296 | General M&E | $ 23,000 |
| 95 | Storage container 40' | | | | Forklifts & Trailers | $ 3,000 |
| 96 | Storage container 40' | | | | Forklifts & Trailers | $ 1,000 |
| 97 | Storage container 20' | | | | Forklifts & Trailers | $ 2,000 |
| 98 | Freezer 40' | Carrier | Transicold Thinline | | Forklifts & Trailers | $ 38,000 |
| 99 | Forklift | Toyota | 8FGU18 | 60800 | Forklifts & Trailers | $ 42,000 |
| 100 | Forklift | Toyota | 8FGU18 | C0689 | Forklifts & Trailers | $ 42,000 |
| 101 | 2015 Dodge 5500 | Dodge | Ram 5500 | 3C7WRMD15FG509406 | Automobiles | $ 47,000 |
| 102 | 2016 Ford F150 | Ford | E450 | 1FDWEYFL6GDC29365 | Automobiles | $ 30,000 |
| 103 | 2017 International straight truck | International | | 3HAMMMMN0HL151739 | Automobiles | $ 90,000 |
| 104 | 2016 Ford E450 | Ford | F450 XLT | 1FDUF4HT0GED33779 | Automobiles | $ 44,000 |
| 105 | Chiller units | | | | Refrigeration | $ 31,000 |
| 106 | Chiller units | | | | Refrigeration | $ 31,000 |
| 107 | Chiller units | | | | Refrigeration | $ 31,000 |
| 108 | Chiller units | | | | Refrigeration | $ 31,000 |
| 109 | Chiller units | | | | Refrigeration | $ 31,000 |
| 110 | Chiller units | | | | Refrigeration | $ 17,000 |
| 111 | Chiller units | | | | Refrigeration | $ 17,000 |
| 112 | Chiller units | | | | Refrigeration | $ 17,000 |
| 113 | Chiller units | | | | Refrigeration | $ 17,000 |
| 114 | Chiller units | | | | Refrigeration | $ 17,000 |
| 115 | Chiller units | | | | Refrigeration | $ 17,000 |



| CWID | Asset Description | Make | Model | Serial Number | Detailed Appraisal Class Description | Concluded FMV in CAD |
|------|-------------------|------|-------|---------------|--------------------------------------|----------------------|
| 116 | Chiller units | | | | Refrigeration | $ 17,000 |
| 117 | Chiller units | | | | Refrigeration | $ 17,000 |
| 118 | Heat exchangers | | | | General M&E | $ 8,000 |
| 119 | chiller barrells | | | | Refrigeration | $ 1,000 |
| 120 | chiller barrells | | | | Refrigeration | $ 1,000 |
| 121 | chiller barrells | | | | Refrigeration | $ 1,000 |
| 122 | chiller barrells | | | | Refrigeration | $ 1,000 |
| 123 | chiller barrells | | | | Refrigeration | $ 1,000 |
| 124 | chiller barrells | | | | Refrigeration | $ 600 |
| 125 | chiller barrells | | | | Refrigeration | $ 600 |
| 126 | chiller barrells | | | | Refrigeration | $ 600 |
| 127 | chiller barrells | | | | Refrigeration | $ 600 |
| 128 | chiller barrells | | | | Refrigeration | $ 600 |
| 129 | chiller barrells | | | | Refrigeration | $ 600 |
| 130 | chiller barrells | | | | Refrigeration | $ 600 |
| 131 | chiller barrells | | | | Refrigeration | $ 600 |
| 132 | spray system pumps | | | | General M&E | $ 1,000 |
| 133 | incoming water pumps | | | | General M&E | $ 7,000 |
| 134 | pool pumps | | | | General M&E | $ 400 |
| 135 | flow meters | | | | General M&E | $ 400 |
| 136 | air blowers | | | | General M&E | $ 3,000 |
| 137 | priming pumps | | | | General M&E | $ 900 |
| 138 | sand filter (8) /bead filters | | | | General M&E | $ 800 |
| 139 | bead filter pumps | | | | General M&E | $ 200 |
| 140 | Chiller puimps | | | | Refrigeration | $ 300 |
| 141 | heat exchanger pumps | | | | General M&E | $ 300 |
| 142 | IPL trays | IPL | | | Seafood Harvesting Equipment | $ 100,000 |
| 143 | IPL crates | IPL | | | Seafood Harvesting Equipment | $ 400,000 |
| 144 | UV Light | | | | General M&E | $ 300 |
| 145 | security cameras | Diital Watchdog | VMAX A1 | | Office Equipment | $ 300 |
| 146 | 2ft x 3ft Metal Lobster Crate | | | | Seafood Harvesting Equipment | $ 10,000 |



| CWID | Asset Description | Make | Model | Serial Number | Detailed Appraisal Class Description | Concluded FMV in CAD |
|---|---|---|---|---|---|---|
| 147 | Grading Room Walk In cooler, holds 20,000lbs of lobster | | | | Refrigeration | $ - |
| 149 | Ice Shack, saltwater ice maker | | | | Refrigeration | $ 29,000 |
| 150 | Ice room, for holding new ice, 40,000lbs | | | | Refrigeration | $ - |
| 151 | Freezer, for holding crates of 10,000lbs of ice | | | | Refrigeration | $ - |
| 152 | grading scales | | | | Scales | $ 1,000 |
| 153 | weighing scales | | | | Scales | $ 900 |
| 154 | pallet jacks | | | | General M&E | $ 6,000 |
| 155 | racks/rollers | | | | General M&E | $ 2,000 |
| 156 | computer | | | | Computer Equipment | $ 200 |
| 157 | printer | HP | LaserJet Pro MFP-M227FN | | Office Equipment | $ 300 |
| 158 | fax | | | | Office Equipment | $ 300 |
| 159 | desks | | | | Furniture & Fixtures | $ 500 |

Total:  $ 1,676,900



LOBSTERBOYS SH LTD.                                                    ADDENDUM D        26

# Addendum D:
## Site Inspection Photographs









23-11986-mg    Doc 5-1    Filed 12/13/23    Entered 12/13/23 10:53:12    Declaration
Pg 268 of 341

LOBSTERBOYS SH LTD.                                                                ADDENDUM E        27

# Addendum E:    Certifications & Qualifications of the Appraiser



## David Koller, ASA, MRICS

Managing Director | Valuation & Advisory
Advisory Services Lead | Machinery & Equipment
Cushman & Wakefield of Illinois, Inc.

## Professional Expertise

Mr. Koller has been active in the appraisal industry since 1998, and now specializes in the allocation of purchase price, insurance valuation, fresh start accounting, lease and collateral evaluation, litigation support, and property tax analysis.

He has extensive industry experience valuing equipment utilized in: agriculture, asphalt and concrete, automotive, banks, broadcast and communications, chemicals, data centers, energy, entertainment, food production, foundries, general manufacturing, healthcare, hospitality, injection molding, Internet infrastructure, life sciences, medical device, metalworking, packaging, paper, petroleum, pharmaceutical, plastics, restaurants, steel service, and telecommunications.

Mr. Koller began his career focusing in appraisal, end of lease transactions, and asset management for equipment leasing and financing institutions. He has expertise in the appraisal & recovery/resale of equipment in high technology industries including broadcast, data networking, and communications infrastructure. Before joining Cushman & Wakefield, he was the National Practice Leader of Marshall & Stevens' Capital Asset Valuation Group.

Mr. Koller's appraisal work has involved projects throughout the United States, as well as in Brazil, Canada, Columbia, Costa Rica, France, Germany, Italy, Mexico, Nicaragua, Panama, Poland, Russia, Spain, Switzerland, and the United Kingdom.

## Memberships, Licenses, Professional Affiliations and Education

- Accredited Senior Appraiser, American Society of Appraiser Institute (ASA #32374). As of the current date, David Koller, ASA has completed the requirements of the continuing education program of the American Society of Appraisers.
- Member of the Royal Institution of Chartered Surveyors (RICS #6779454). As of the current date, David Koller, MRICS has completed the requirements of the continuing education program of the Royal Institution of Chartered Surveyors.
- Certificate of Completion, American Society of Appraisers – Advanced Multidisciplinary Healthcare Valuation Education Program.
- Past President of the Chicago Chapter of the American Society of Appraisers
- Bachelor of Arts, University of Wisconsin – Madison



# Exhibit H

# Canadian Valuation 3



valuation

a d v i s o r y

## DESKTOP APPRAISAL

**49 Dipper Harbour Road,**
**Dipper Harbour NB**

**FULL NARRATIVE APPRAISAL REPORT**
**As of March 20, 2023**

**Prepared For:**
**Lobsterboys**
**65 Dipper Harbour Road**
**Dipper Harbour, NB**



**Prepared By:**
**Cushman & Wakefield ULC**
**Valuation & Advisory**
**Halifax, NS**
**C&W File ID:**
 **CONFIDENTIAL**





**Appraisal of:**
**49 Dipper Harbour Road,**
**Dipper Harbour NB**



May 15, 2023


**Mr. Taylor Cox, Chief Financial Officer**
**Lobsterboys**
65 Dipper Harbour Road
Dipper Harbour, NB
E5J 1X3


Re:    Appraisal of Real Property
        In a Desktop Report

       **49 Dipper Harbour Road, Dipper Harbour NB (PID 00275420 & 00275438& 00275446)– "Subject Property"**

       C&W File ID:

Dear Mr. Cox:

Cushman & Wakefield ULC is pleased to submit this Desktop Appraisal Report, estimating the current market value of the above-referenced subject property.

By agreement, this is a Desktop Appraisal Report, which contains a summary of all of the data, reasoning and analysis upon which our value conclusion is based. This document has been prepared in accordance with the Code of Ethics & Standards of Professional Practice, and the Canadian Uniform Standards of Professional Appraisal Practice (The Standards) promulgated by the Appraisal Institute of Canada.

We have prepared this appraisal report at the request of Lobsterboys for the general purpose of establishing market value for Management Planning use. The report is intended for the exclusive use of Lobsterboys (the "Group"). The report is addressed to Lobsterboys and can be relied on by the "Group".

The report is subject to the Assumptions and Limiting Conditions contained in The Addenda, in addition to any others that may be contained in the report.

The Direct Sales Comparison Approach to Value was utilized to estimate the value of the land and the Cost Approach was utilized based on criteria provided by the client. We would recommend that a residential appraiser complete a full appraisal on the house prior to any business decision as the house was not part of the original terms of reference.

Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

<div align="center">

**TWO HUNDRED SEVENTY THOUSAND DOLLARS**
**$270,000**

</div>

This estimate of market value is based on an exposure time of six to nine months.



CUSHMAN & WAKEFIELD ULC

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and an Addendum.

Respectfully submitted,

**CUSHMAN & WAKEFIELD ULC**

**DRAFT**
_____

Wayne MacDonald, B.Comm. AACI, P.App.
Vice President
NBAREA# 303157
wayne.macdonald@cushwake.com
Phone Office Direct 902.877.2273



# EXECUTIVE SUMMARY

## PROPERTY IDENTIFICATION

| | | |
|---|---|---|
| Address | : | PID 00275446 -    49 Dipper Harbour Road, Dipper Harbour NB |
| | | PID 00275420 -    Dipper Harbour Road, Dipper Harbour NB |
| | | PID 00275438 -    Dipper Harbour Road, Dipper Harbour NB |

## VALUE ESTIMATE

| | | |
|---|---|---|
| Valuation Methods Utilized | : | <u>Direct Comparison Approach (Land)+Replacement Cost (House):</u><br>$270,000 |
| Valuation Date | : | March 20, 2023 |
| Value Conclusion | : | **$270,000** |
| Value Assumptions | : | This estimate of market value is based on an exposure time of six to nine months. |

## PROPERTY DESCRIPTION

| | | |
|---|---|---|
| Type | : | Appraised as Vacant Land plus replacement cost estimate of a house. |
| Location | : | The subject property is located on the north side of Dipper Harbour Road in Dipper Harbour NS. |
| Site Area | : | PID 00275446 -   23,960.46 square feet |
| | | PID 00275420 -     3,552.09 square feet |
| | | <u>PID 00275438 –   32,076.45 square feet</u> |
| | | Total              59,589.00 square feet |
| Land Use Designation | : | None identified. |

## LOCATIONAL CHARACTERISTICS

| | | |
|---|---|---|
| Surrounding Uses | : | Surrounding uses in the area are mainly rural in nature. |
| Market Conditions | : | The reader should note that events in the financial and credit markets have previously and can continue to result in an uncertain and volatile economic environment. This appraisal report reflects our estimate of value at a single point in time at the effective date. Ongoing local and global changes in the economic and financial marketplace could seriously impact the reliability of this estimate at any point in time other than the effective date. |

### EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined by CUSPAP (January 1, 2022 Edition) - "An assumption, directly related to a specific Assignment, which, if were not assumed to be true, could materially alter the opinions or conclusions. Extraordinary Assumptions presume uncertain information about or anticipated changes in: the physical, legal or economic characteristics of the subject property; or about: conditions external to the subject property such as market conditions or trends, or the integrity of data used in an analysis to be fact."



This appraisal assumes the house onsite is 2,500 square feet in size, and is 80% depreciated. Our value in contingent on these estimates.

## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined by CUSPAP (January 1, 2022 Edition) - "Hypothetical Conditions are a specific type of an Extraordinary Assumption that presumes, as fact, simulated but untrue information about physical, legal, or economic characteristics of the subject property or external conditions, and are imposed for purposes of reasonable analysis."

This appraisal does not employ any hypothetical conditions.



**49 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                              **EXECUTIVE SUMMARY**        iii

# PROPERTY PHOTOGRAPHS

## AERIAL MAP





# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ I
    PROPERTY PHOTOGRAPHS -------------------------------------------------------------------- 3
**TABLE OF CONTENTS** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ 4
**INTRODUCTION** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ 1
    PURPOSE AND INTENDED USE OF THIS APPRAISAL ----------------------------------- 1
    PROPERTY IDENTIFICATION ------------------------------------------------------- 1
    PROPERTY OWNERSHIP ----------------------------------------------------------- 1
    EFFECTIVE DATE OF APPRAISAL --------------------------------------------------- 1
    PROPERTY RIGHTS APPRAISED ---------------------------------------------------- 1
    SCOPE OF THE APPRAISAL------------------------------------------------------- 1
    DEFINITION OF MARKET VALUE---------------------------------------------------- 2
    REASONABLE EXPOSURE TIME---------------------------------------------------- 2
**PROPERTY DETAILS** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ 3
    NEIGHBORHOOD ANALYSIS -------------------------------------------------------- 3
    SITE DESCRIPTION-------------------------------------------------------------- 5
    LAND USE BYLAW --------------------------------------------------------------- 6
    REAL PROPERTY TAXES AND ASSESSMENTS --------------------------------------- 7
**VALUATION** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ 8
    HIGHEST AND BEST USE --------------------------------------------------------- 8
    VALUATION METHODS------------------------------------------------------------ 9
    DIRECT COMPARISON APPROACH ----------------------------------------------- 11
    ANALYSIS--------------------------------------------------------------------- 13
    SUMMARY OF ANALYSIS--------------------------------------------------------- 15
**RECONCILIATION AND FINAL VALUE ESTIMATE** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ 18
**ADDENDA CONTENTS** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ 19
    ADDENDUM A:    ASSUMPTIONS AND LIMITING CONDITIONS --------------------------- 20
**GLOSSARY OF TERMS AND DEFINITIONS** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ 24
**CERTIFICATION OF APPRAISAL** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ 26



# INTRODUCTION

## PURPOSE AND INTENDED USE OF THIS APPRAISAL

The purpose of this appraisal is to estimate the current market value of the subject property. It is our understanding that the intended use of the appraisal is for Management Planning purposes. This report may only be relied upon by Lobsterboys (the "Group")

## PROPERTY IDENTIFICATION

The subject property is municipally addressed as:

### 49 Dipper Harbour Road, Dipper Harbour NB

## PROPERTY OWNERSHIP

According to SNB Planet the subject property PID 00275420 is currently owned by Lobsterboys SH Ltd. It is our understanding that the subject property is not subject to a purchase and or sale agreement. Based on our investigations the was acquired by the current owner of record on March 29, 2022, for $10,000.

According to SNB Planet the subject property PID 00275446 & 00275438 is currently owned by L.B. Land Trust Inc. It is our understanding that the subject property is not subject to a purchase and or sale agreement. Based on our investigations the was acquired by the current owner of record on September 22, 2020, for $155,000.

## EFFECTIVE DATE OF APPRAISAL

The effective date of the appraisal is March 20, 2023.

## PROPERTY RIGHTS APPRAISED

The legal interest appraised is the fee simple estate - defined as absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat.

## SCOPE OF THE APPRAISAL

In forming our opinion as to the market value of the subject as of the valuation date, we have relied on information which is detailed in this report, to the extent deemed appropriate, and carried out the following specific functions:

- No inspection required as our Terms of Reference. The client has requested a desktop appraisal.

- Considered information with respect to sales and listings, at or about the valuation date, of properties assess them as being relevant to our opinion, as set out herein. While we believe our review to be considered similar to the subject, where we have significant knowledge of such sales and listings and to reasonably complete, we cannot warrant that we have:

    i) uncovered and assessed every real property transaction at or about the valuation date that might be said to bear on the determination of the market value of the subject, or

    ii) fully discerned the motives behind the sales, listings and lease information considered in our analysis, such that our weighting of said information is without subjectivity;

- Reviewed land use regulations, in particular the Land Use By-Law, applicable to the subject;



- Examined the possibility of making any significant changes to the subject in terms of existing uses, land severance and/or additional development of the site;

- Ascertained the highest and best use of the property;

- Examined market conditions and analyzed their potential effect on the property; and

- Conducted discussions with market participants regarding future development of the property.

## DEFINITION OF MARKET VALUE

The Canadian Uniform Standards of Professional Appraisal Practice (The Standards) adopted by the Appraisal Institute of Canada define Market Value as:

> *The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised and acting in their own best interests;

- A reasonable time is allowed for exposure in the market;

- Payment is made in cash in Canadian dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

## REASONABLE EXPOSURE TIME

Exposure time is always presumed to precede the effective date of the appraisal. It may be defined as:

> *The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. It is a retrospective estimate based upon an analysis of past events assuming a competitive and open market.*

Based on discussions with various investors and real estate brokers familiar with assets such as the subject and based on an analysis of comparable sales utilized in this valuation and an analysis of current listings, it is our estimate that the subject would require a three to nine month exposure period.



# PROPERTY DETAILS

## NEIGHBORHOOD ANALYSIS

### LOCATION

The subject property is located in the community of Dipper Harbour NB which is located in southwestern New Brunswick .  The subject property has frontage to Dipper Harbour Road.

### TRANSPORTATION SYSTEMS

Relatively, this location affords the subject good access to the Highway #1 which is a 13km drive north from the subject site.

### PLANNED CHANGES IN ROAD NETWORK

- None known.

### NEARBY AND ADJACENT USES

The immediate neighborhood is made up of a mix of rural residential development, vacancy land, and small business development.

### LOCAL AREA CHARACTERISTICS

- Small rural location.
- Relatively close to larger provincial centres.

### LAND USE CHANGES

None known.

### CONCLUSIONS

The subject has a relatively favorable location with access to many important arterial routes.



**49 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**     PROPERTY DETAILS     **4**

## REGIONAL MAP



## NEIGHBOURHOOD MAP





# SITE DESCRIPTION

| SITE PLAN | |
|---|---|
| | |
| Location: | The subject property is located in the community of Dipper NB which is located in southwestern New Brunswick . The subject property has frontage to Dipper Harbour Road. |
| Shape: | Irregular |
| Total Area: | PID 00275446 -   23,960.46 square feet<br>PID 00275420 -     3,552.09 square feet<br>PID 00275438 –  32,076.45 square feet<br>59,589.00 square feet |
| Topography: | Assumed generally at grade with adjacent properties. |
| Easements and/or Rights of Way: | None identified although any such documents are assumed not to have any impact on the marketability of the subject site.  For greater certainty, a legal opinion should be obtained. |
| Frontage, Access, Visibility: | Frontage to Dipper Harbour Road and The Atlantic Ocean. |
| Sub Soil: | No soil analysis has been made in conjunction with this report.  Soil bearing and drainage qualities are assumed to be adequate for the existing structures and typical for the area.  We did not observe any evidence to the contrary during our physical inspection of the property. |
| Utilities: | The subject is assumed to have access to electricity as well as well and septic services. |
| Environmental Matters: | Cushman & Wakefield ULC has no expertise or responsibility regarding environmental matters and it is assumed that there are not any environmental issues that would affect the market value or marketability of the subject property. |
| Hazardous Substances: | We observed no evidence of toxic or hazardous substances during our inspection of the site.  However, we are not trained to perform technical environmental inspections and recommend the services of a professional engineer for this purpose. |
| Overall Functionality: | The subject site is assumed functional for residential and perhaps tourism uses. |



**49 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                    PROPERTY DETAILS        6

# MARKET OVERVIEW

## NEW BRUNSWICK– NO SIGNS OF WEAKENING… YET

In spite of recession talks in Canada, New Brunswick's economy hasn't showed signs of weakening just yet. Exceptionally high levels of in-migration and a solid labour market have supported residential investment and household spending.   Nevertheless, RBC Economics expects that the sharp rise in interest rates and contractionary conditions in export markets will cools things down this year, slicing GDP growth in the province in half from 2.0% in 2022 to 1.0%.

The province's booming population has supported labour force growth in recent quarters, which has eased (albeit slightly) labour market conditions.   The provincial unemployment rate is up more than a percentage point since reaching an all-time low of 6.2% in June 2022.   But upward pressure on wages remains intense after increasing the most on record (+7%) this past year.   RBC Economics anticipates that the rising cost of labour will eventually incentivize employers invest in machinery and equipment (to boost productivity) and cut back on hiring.   For now, though, businesses continue to focus on addressing their worker shortages.   Employment in New Brunswick soared 4.8% in the 12 months ending January, representing one of the largest gains among the provinces.

RBC Economics' forecast calls for the economy to recalibrate to a lower growth trajectory in 2023.   With goods purchases to be among the first to contract during a recession, New Brunswick's manufacturing sector is likely to be a sore spot in 2023.

## LAND USE BYLAW

The subject site is zoned MU Mixed Use as per the Southwest New Brunswick Service Commission zoning map.

Permitted uses include  residential, agricultural, institutional, fishery, recreational as well as tourism;



**49 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                    **PROPERTY DETAILS**        <span style="color:red">7</span>

# REAL PROPERTY TAXES AND ASSESSMENTS

## CURRENT PROPERTY TAXES

The current assessment and taxes as indicated on Service New Brunswick for the subject property are as follows.

| Tax Year | | 2023 |
|---|---|---|
| **49 Dipper Harbour Road** | PID 00275420 | $160,000 |
| | AAN 1481673 | |
| Tax Rate | | 1.10% |
| **Taxes** | | **$1,766.40** |
| **Dipper Harbour Road** | PID 00275420 | $33,900 |
| | AAN 1481673 | |
| Tax Rate | | 2.63% |
| **Taxes** | | **$892.48** |
| **Dipper Harbour Road** | PID 00275438 | $25,800 |
| | AAN 1486720 | |
| Tax Rate | | 1.53% |
| **Taxes** | | **$394.28** |
| **Taxes Payable Estimate** | | **$3,053.16** |

We have not been provided with current tax bills on the subject property.



# VALUATION

## HIGHEST AND BEST USE

### DEFINITION OF HIGHEST AND BEST USE

Fundamental to the concept of value is the principle of highest and best use, which may be defined as:

> *The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.*

### HIGHEST AND BEST USE CRITERIA

We have evaluated the site's highest and best use both as currently improved and as if vacant.  In both cases, the property's highest and best use must meet four criteria.  That use must be (1), legally permissible (2) physically possible, (3) financially feasible, and (4) maximally profitable.

#### LEGALLY PERMISSIBLE

According to the current Land Use By-law, the subject site is zoned MU – Mixed Use. The subject's use as residential land is considered to be a permitted use.

#### PHYSICALLY POSSIBLE

The second test is what is physically possible. As discussed in the "Site Description," section of the report, the site's size, soil, topography, etc. do not physically limit its use. The subject site is of adequate shape and size to accommodate a residential development.

#### FINANCIAL FEASIBILITY AND MAXIMUM PRODUCTIVITY

The third and fourth tests are what is financially feasible and what will produce the highest net return. After analyzing the physically possible and legally permissible uses of the property, the highest and best use must be considered in light of financial feasibility and maximum productivity.  For a potential use to be seriously considered, it must have the potential to provide a sufficient return to attract investment capital over alternative forms of investment.  A positive net income or acceptable rate of return would indicate that a use is financially feasible.  Based on previous sales of land in the area tempered by current economic volatility, residential development appears financially feasible for the subject site.

## HIGHEST AND BEST USE OF SITE AS THOUGH VACANT

Considering the subject site's physical characteristics and location, as well as the state of the local commercial market, it is our opinion that the Highest and Best Use of the subject site as though vacant is for a holding as a future residential / tourism development site.



**49 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                                    VALUATION          **9**

## VALUATION METHODS

There are six generally accepted methods of valuing vacant land: Direct Comparison; Abstraction; Extraction; Subdivision Development; Land Residual; and Ground Rent Capitalization.

1.  The ***Direct Comparison Approach*** is based upon the premise that a prudent purchaser would not pay more for a property than what it would cost to acquire a suitable alternative property and that the market value of a property can be estimated by comparing sales, offers, and listings of properties which have similar characteristics to the property being appraised.

2.  The ***Abstraction Method*** of valuing land is premised upon the Principal of Contribution. This method is premised on the assumption that within each category and type of real estate, there exists a typical ratio of land value to total property value.  By knowing what this ratio is from data compiled from areas where land and building values are available and applying it to the sales information regarding improved properties in a built up area, an estimate of land value can be abstracted.  The reliability of this method is diminished because it does not take into explicit consideration such relevant criteria as building age or quality of construction.

3.  A method of land valuation similar to the Abstraction Method but which implicitly recognizes differences in building age and quality of construction is the ***Extraction Method***.  This method deducts the estimated depreciated reproduction or replacement cost of the improvements of an improved property for which the total property value is known to arrive at an estimate of land value as if vacant.

4.  When valuing larger parcels for which the highest and best use is the parcel's subdivision into smaller sites, and for which sales information regarding similar larger sites is insufficient to undertake a Direct Comparison Approach, the ***Subdivision Development Method*** may be employed.  In applying this method, the first step is to establish market values for the smaller sites as though subdivided, the length of the development period, and an appropriate absorption period.  The second step is to determine the costs required to create and market the subdivided parcels which include engineering and construction costs associated with the site preparation, roadways, sidewalks and servicing; carrying costs such as insurance and taxes; and marketing costs.  These costs are then deducted from the projected gross revenue of the lots to arrive at an estimate of the net proceeds which, once discounted at an applicable rate to account for the risk associated with the time required to complete such a development, are indicative of the present market value of the larger, un-subdivided site.

5.  Another method that may be employed in the absence of adequate comparable information is the ***Land Residual Technique***.  In this method the net income generated from the property is established.  From this is deducted a reasonable return on and recapture of capital invested in the improvements.  The residual income is considered to be ascribed from the land. This income is then capitalized at an appropriate rate to arrive at an estimate of land value.  An important assumption required in the application of this method is that the site is developed to its highest and best use such that the income from land and improvements are of the same type and sources.

6.  A similar method as the Land Residual Technique is ***Ground Rent Capitalization***. Undertaking this method of site valuation requires the analysis of ground rents prevalent in the market and in consideration of the characteristics of the site being appraised.  From the analysis, a gross income is established from which any requisite expenses or anticipated losses are deducted to arrive at a net operating income. This net operating income is then capitalized at an applicable rate to arrive at an estimate of the vacant site.



The **Direct Comparison Approach** is based on the Principle of Substitution which maintains that a prudent purchaser would not pay more for a property than what it would cost to purchase a suitable alternative property, one that exhibits similar characteristics, and functional utility, etc.  Within this approach, the property being appraised is compared to similar properties that have sold recently or are currently offered for sale.

Some important factors to be given consideration in this analysis include location, access, site size, site configuration, topography, land use classification, servicing, etc.  When enough unimproved and comparable sales are available, the Direct Comparison Approach is the preferred technique and has been employed herein.



# DIRECT COMPARISON APPROACH

In the Direct Comparison Approach, we developed an opinion of value by comparing this property with similar, recently sold properties in the surrounding or competing area. Inherent in this approach is the principle of substitution, which states that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arm's-length transactions between willing and knowledgeable buyers and sellers, we can identify value and price trends. The basic steps of this approach are:

1.  Research recent, relevant property sales and current offerings throughout the competitive area;

2.  Select and analyze properties that are similar to the property appraised, analyzing changes in economic conditions that may have occurred between the sale date and the date of value, and other physical, functional, or locational factors;

3.  Identify sales that include favorable financing and calculate the cash equivalent price;

4.  Reduce the sale prices to a common unit of comparison such as price per square foot, price per unit or effective gross income multiplier;

5.  Make appropriate comparative adjustments to the prices of the comparable properties to relate them to the property being appraised; and

6.  Interpret the adjusted sales data and draw a logical value conclusion.

The Direct Comparison Approach is based on the Principle of Substitution which maintains that a prudent purchaser would not pay more for a property than what it would cost to purchase a suitable alternative property, one that exhibits similar characteristics, and functional utility, etc. Within this approach, the property being appraised is compared to similar properties that have sold recently or are currently offered for sale.  Typically, a unit of comparison (i.e. sale price per square foot, sale price per unit, etc.) is used to facilitate the analysis.  In the case of properties similar to the subject lands, the sale price per acre is the most commonly used unit of comparison.

In analyzing the comparable sales relative to the subject site, of particular relevance are characteristics such as location, site size, topography, developability, and land use regulations.  In this regard, the sales summarized in following are thought to be reasonably comparable to the subject site and to provide a reliable indication as to its current market value.



## Vacant Land Valuation

We have researched several market areas for transactions involving similar vacant commercial land sales. Based on our investigations, the following sale indices were examined. Details of the sales are presented below.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **SALES CAHRT** | | | | | | | | | | |
| Index | Address | PID | PAN | Sale Date | Site Area m$^2$ | Site Area ft$^2$ | Site Area Acres | Sale Price | Sale Price / ft$^2$ | Sale Price / acre |
| 1 | Dipper Harbour Road, Dipper Harbour NB | 00275495 | 01481746 | May 2, 2022 | 3,997 | 43,024 | 0.99 | $181,250 | $4.21 | $183,509 |
| 2 | Highway 790, Dipper Harbour NB | 00271486 | 01476783 | March 14, 2022 | 1,490 | 16,038 | 0.37 | $23,000 | $1.43 | $62,468 |
| 3 | Dipper Harbour Corner, Dipper Harbour NB | 00275545 | 01481796 | May 29, 2018 | 1,945 | 20,936 | 0.48 | $114,000 | $5.45 | $237,192 |
| 4 | Highway 790, Dipper Harbour NB | 55019954 | 01486796 | August 30, 2016 | 4,050 | 43,594 | 1.00 | $122,724 | $2.82 | $122,628 |





# ANALYSIS

The major elements of comparison for an analysis of this type include the property rights conveyed, the financial terms incorporated into a particular transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its physical traits and the economic characteristics of the property.

## PROPERTY RIGHTS APPRAISED

All of the sales utilized in this analysis involved the transfer of the fee simple interest.

## FINANCIAL TERMS

To the best of our knowledge, all of the sales utilized in this analysis were accomplished with cash and/or cash and market-oriented financing.

## CONDITIONS OF SALE

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. However, all sales used in this analysis are considered to be "arms-length" market transactions between both knowledgeable buyers and sellers on the open market.  Market listings should be treated caution as they may transfer at a lower unit value.  This is particularly the case during declining or stabilizing market conditions



**49 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**    VALUATION    14

## MARKET CONDITIONS

The sales that are included in this analysis date between 2016 and 2022. During this time for the subject area, market conditions have improved as indicated by the sales. Therefore, the sales are somewhat inferior and an upward adjustment would be required to reflect today. We have inflated the sales by a compounded 2% factor.

## LOCATION

Based on the somewhat unique waterfront location we have utilized available sales in this immediate area for purposes of our analysis.  Based on this we assume that there would be no locational adjustments required.

## SIZE

The selected comparable sales range in size from 0.37 acres to 1.0 acre, while the subject consists of 1.37 acres. It should be noted that much larger parcels will typically transfer at lower unit prices than smaller parcels, all other things being equal, given the law of diminishing returns although the effect of this diminishes beyond a certain parcel size. There are also benefits associated with larger parcels in so much as assemblage is not required and infrastructure costs can be spread over a greater land area. In this case, Index No 2 & 3 are considered to represent a smaller parcel (superior). Index 1 & 4 would be considered to be generally similar.

## UTILITY

Overall Index No's 1-4 are all zoned mixed use and would be considered to be have similar utility.



**49 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                                    VALUATION    **15**

## PHYSICAL TRAITS

The comparable properties have varying degrees of comparability when measured against the subject property. The most important attributes of the subject property which need to be compared to other properties are similar physical make-up, location and exposure. The overall physical sites would be considered to be generally similar.

## SUMMARY OF ANALYSIS

The selected comparable indices represent 4 completed transactions between and 2016 and 2022. The selected indices range from a low of 0.37acres to 1.0 acre.

| | | Economic Adjustments (Cumulative) | | | | | Property Characteristic Adjustments (Additive) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Index | Price / Acre Date | Property Rights conveyed | Conditions of sale | Special Financing | Market conditions | Subtotal $ / Acre | Location | Size | Utility | Physical Traits | Indicated Price per Acre |
| 1 | $183,509 May-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $187,169 | Similar | Similar | Similar | Similar | Similar to $187,169 |
| 2 | $62,468 Mar-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $63,883 | Similar | Superior | Similar | Similar | Higher than $63,883 |
| 3 | $237,192 May-18 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $261,495 | Similar | Superior | Similar | Similar | Lower than $261,495 |
| 4 | $122,628 Aug-16 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $139,947 | Similar | Similar | Similar | Similar | Higher than $139,947 |

*Table title: LAND SAES ADJUSTMENT CHART*

We believe the subject site possesses a good location in the area with both commercial as well as residential development. As well the site is in relatively close proximity to the Trans-Canada Highway. Given these characteristics and recognizing the size of the site and that different portions of the site may carry more value than other areas and we would estimate an overall rate of $125,000 per acre to be appropriate for the subject.

Application of this rate results in the following estimate of value:

1.37 acres x $125,000 per acre = $171,250

**$170,000**



# DEPRECIATED REPLACEMENT COST

While appraisal of houses is not a service we offer, we have been asked by the client to provide a cost estimate on a house which will be added to our land value based on the following criteria provided.

The house is assumed to be;

- 2,500 square feet
- 80% depreciated

# COST APPROACH

### METHODOLOGY

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. We previously developed an opinion of land value of $170,000.

### REPLACEMENT COST NEW

The Marshall and Swift Estimator Valuation Service has been used to determine the replacement cost of the subject building.

### DEPRECIATION

Depreciation is generally broken down into three components; physical deterioration, functional obsolescence, and external obsolescence,

> **Physical Deterioration** is caused by the wear and tear of the elements and the use of the improvements. In the summary table at the end of this section, we have presented estimates of the subject components' actual ages, effective ages, and total physical deterioration, based on the physical age/life methodology. The effective age may be more or less than the actual age, depending on the maintenance of the facility.

> **Functional Obsolescence** is due to several factors, such as poor floor plan, limited or excessive space, flawed design or style, or a deficiency or super adequacy in the structure, materials, or design.

> **External Obsolescence** is caused by conditions extraneous to the subject, which impairs or diminishes desirability. Included in this category are items such as legislative enactments that restrict or impair property rights, neighborhood deterioration, noxious enterprises and/or deteriorating market conditions.

We have utilized the age life method to address the depreciation within the subject. This entails comparing the effective age vs the expected useful life of the development. Based on the new construction of the subject and the improvements in the area in general we have not identified any forms of depreciation inherent in the property.

Based on the forgoing the value of the subject property based on the Cost Approach is shown in the chart below.



## CoreLogic - SwiftEstimator
## Residential Estimator - Standard Report

| | | |
|---|---|---|
| Estimate ID | Dipper Harbour | |
| Property Owner | | |
| Address | | |
| City | Dipper Harbour NB | |
| State/Province | NB | |
| ZIP/Postal Code | E5J1X2 | |
| Surveyed By | | |
| Survey Date | | |
| Appraisal For | Desktop Depreciated Replacement Cost | |
| Single-family Residence | Floor Area | 2500 Square Feet |
| Effective Age | Quality | 4 Good |
| Cost as of | 05/2023 | Condition | 4 Good |
| Style | Two Story | |
| Exterior Wall | Frame, Hardboard Sheets 100% | |
| Plumbing Fixtures | 11 | |

### Cost Data

| Description | Units | Unit Cost | Total |
|---|---|---|---|
| Base Cost | 2,500 | $122.70 | $306,750 |
|    Plumbing Fixtures | 11 | $3,996.25 | $43,959 |
|    Wood Shingle | 2,500 | $4.43 | $11,075 |
|    Raised Subfloor | 2,500 | $22.38 | $55,950 |
|    Floor Cover Allowance | 2,500 | $13.50 | $33,750 |
|    Forced Air Furnace | 2,500 | $7.78 | $19,450 |
|    Plumbing Rough-ins | 1 | $1,278.80 | $1,279 |
|    Appliance Allowance | 1 | $9,521.50 | $9,522 |
| Basic Structure Total Cost | 2,500 | $192.69 | $481,735 |
| *Section: Basement* | | | |
|    Minimal Finish Area | 1,250 | $18.30 | $22,875 |
| Basement | 1,250 | $18.30 | $22,875 |
| Subtotal Basement | | | $22,875 |
| Replacement Cost New | 2,500 | $201.84 | $504,610 |
| Physical + Functional Depreciation 80.0% | | | $403,689 |
| Total Depreciated Cost | | | $100,921 |
| Land | | | $170,000 |
| Non Building | | | $170,000 |
| Total | | | $270,921 |

Cost data by CoreLogic, Inc.

***Except for items and costs listed under "Addition Details," this SwiftEstimator report has been produced utilizing current cost data and is in compliance with the Marshall & Swift Licensed User Certificate. This report authenticates the user as a current Marshall & Swift user.***



## CONCLUSION

Based on the above analysis the Market value estimate of the subject property based upon the Cost Approach is estimated to be $270,000 (Rounded).

# RECONCILIATION AND FINAL VALUE ESTIMATE

In the methodology section of this report we indicated that the Direct Comparison Approach is the preferred approach when valuing vacant land, providing there is sufficient and comparable activity. Since there is sufficient comparable activity, it was the only method employed.

Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**TWO HUNDRED SEVENTY THOUSAND DOLLARS**
**$270,000**

This estimate of market value is based on an exposure of three to nine months.



# ADDENDA CONTENTS

ADDENDUM A:  ASSUMPTIONS AND LIMITING CONDITIONS————————————————24

ADDENDUM B:  GLOSSARY OF TERMS AND DEFINITIONS————————————————27

ADDENDUM C:  CERTIFICATION OF APPRAISAL————————————————————29

CUSHMAN &
WAKEFIELD

# ADDENDUM A:
# ASSUMPTIONS AND LIMITING CONDITIONS

1. This report has been prepared for **Lobsterboys (the "Group").** It is not reasonable for any person other than the person or those to whom this report is addressed to rely upon this report without first obtaining written authorization from the client and the author of this report.  This report has been prepared on the assumption that no other person will rely on it for any other purpose and all liability to all such persons is denied.

2. This report has been prepared for **the "Group"** and for the exclusive (and confidential) use of the recipients as named herein and for the specific purpose and function as stated herein.  All copyright is reserved to the author and this report is considered confidential by the author and the client.  Possession of this report, or a copy thereof, does not carry with it the right to reproduction or publication in any manner, in whole or in part, nor may it be disclosed, quoted from or referred to in any manner, in whole or in part, without the prior written consent and approval of the author as to the purpose, form and content of any such disclosure, quotation or reference.

3. Without limiting the generality of the foregoing, neither all nor any part of the contents of this report shall be disseminated or otherwise conveyed to the public in any manner whatsoever or through any media whatsoever or disclosed, quoted from or referred to in any letter, financial statement, prospectus, or offering memorandum of the client, or in any documents filed with any governmental agency without the prior written consent and approval of the author as to the purpose, form and content of such dissemination, disclosure, quotation or reference.

4. The estimated prospective market value of the real property which is valued in this report pertains to the value of the Fee Simple or leasehold interest in the real estate, subject to terms and conditions of the existing tenancy as described in this report.  The property rights herein exclude mineral rights, if any.

5. The Client has specifically requested an assignment with a limited scope of work and results in an abbreviated report format. By accepting this report, the Client and Intended User(s) understand that an inspection of the subject property has not been performed and accept the decrease in the reliability of this report, resulting in a higher level of risk assumed by a user of this report. The appraiser, the appraiser's firm and/or any employee, director, officer or partner of the appraiser's firm, as applicable, are limited in liability to $50,000 (fifty thousand dollars). Such limitation of liability applies in the event that anyone makes a claim that the appraiser is in any way liable for performing the appraisal or in preparing the appraisal report, including in respect of any allegations of negligence, breach of contract or for any other reason or claim.

6. The estimate of value contained in this report is founded upon a thorough and diligent examination and analysis of information gathered and obtained from numerous sources.  Certain information has been accepted at face value; especially if there was no reason to doubt its accuracy.  Other empirical data required interpretive analysis pursuant to the objective of this assignment. Certain inquiries were outside the scope of this mandate.  For these reasons, the analyses, opinions and conclusions contained in this report are subject to all of the assumptions and limiting conditions.

7. The property has been valued on the basis that title to the real property herein is good and marketable.

8. The author of this report cannot accept responsibility for legal matters, questions of survey, opinions of title, hidden or unapparent conditions of the property, toxic wastes or contaminated materials, soil or sub-



soil conditions, environmental, engineering or other technical matters which might render this property more or less valuable than as stated herein.

9.  The property has been valued on the basis that they are free and clear of all value influencing encumbrances, encroachments, restrictions or covenants except as may be noted in this report and that there are no pledges, charges, lien or social assessments outstanding against the property other than as stated and described herein.



10. The property has been valued on the basis that there are no outstanding liabilities except as expressly noted herein, pursuant to any agreement with a municipal or other government authority, pursuant to any contract or agreement pertaining to the ownership and operation of the real estate or pursuant to any lease or agreement to lease, which may affect the stated value or saleability of the subject property or any portion thereof.

11. The interpretation of the leases and other contractual agreements, pertaining to the operation and ownership of the property, as expressed herein, is solely the opinion of the author and should not be construed as a legal interpretation.

12. The property has been valued on the basis that the real estate complies in all material respects with any restrictive covenants affecting the site and have been built and is occupied and being operated, in all material respects, in full compliance with all requirements of law, including all zoning, land use classification, building, planning, fire and health by-laws, rules, regulations, orders and codes of all federal, provincial, regional and municipal governmental authorities having jurisdiction with respect thereto.

13. Investigations have been undertaken in respect of matters which regulate the use of land.  However, no inquiries have been placed with the fire department, the building inspector, the health department or any other government regulatory agency, unless such investigations are expressly represented to have been made in this report.  The property must comply with such regulations and, if it does not comply, its non-compliance may affect the market value of this property.  To be certain of such compliance, further investigations may be necessary.

14. The property has been valued on the basis that all rents referred to in this report are being paid in full and when due and payable under the terms and conditions of the attendant leases, agreements to lease or other contractual agreements.  Further, it is assumed that all rents referred to in this report represent the rental arrangements stipulated in the leases, agreements to lease or other contractual agreements pertaining to the tenants' occupancy, to the extent that such rents have not been prepaid, abated, or inflated to reflect extraordinary circumstances, and are fully enforceable notwithstanding that such documentation may not be fully executed by the parties thereto as at the effective date, unless such conditions have been identified and noted in this report.

15. The data and statistical information contained herein were gathered from reliable sources and are believed to be correct.  However, these data are not guaranteed for accuracy, even though every attempt has been made to verify the authenticity of this information as much as possible.

16. The estimated prospective market value of the property do not necessarily represent the value of the underlying shares, if the assets are so held, as the value of the shares could be affected by other considerations.  Further, the estimated prospective market values do not include consideration of any extraordinary market value.

17. Should title to the real property presently be held (or changed to a holding) by a partnership, in a joint venture, through a co-tenancy arrangement or by any other form of divisional ownership, the value of any fractional interest associated therewith may be more or less than the percentage of ownership appearing in the contractual agreement pertaining to the structure of such divisional ownership.



18. In the event of syndication, the aggregate value of the limited partnership interests may be greater than the value of the freehold or fee simple interest in the real estate, by reason of the possible contributory value of non-realty interests or benefits such as provision for tax shelter, potential for capital appreciation, special investment privileges, particular occupancy and income guarantees, special financing or extraordinary agreements for management services.

19. Should the author of this report be required to give testimony or appear in court or at any administrative proceeding relating to this report, prior arrangements shall be made therefore, including provisions for additional compensation to permit adequate time for preparation and for any appearances which may be required.  However, neither this nor any other of these assumptions and limiting conditions is an attempt to limit the use that might be made of this report should it properly become evidence in a judicial proceeding.  In such a case, it is acknowledged that it is the judicial body which will decide the use of this report which best serves the administration of justice.

20. Because market conditions, including economic, social and political factors, change rapidly and, on occasion, without notice or warning, the estimate of market value expressed herein, as of the effective date of this appraisal, cannot necessarily be relied upon as any other date without subsequent advice of the author of this report.

21. The value expressed herein is in Canadian dollars.

22. This report is only valid if it bears the original signature of the author.



# GLOSSARY OF TERMS AND DEFINITIONS

## DEFINITIONS OF VALUE, INTEREST APPRAISED AND OTHER TERMS

### MARKET VALUE

The Canadian Uniform Standards of Professional Appraisal Practice (The Standards) adopted by the Appraisal Institute of Canada define Market Value as:

*"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  Buyer and seller are typically motivated;

2.  Both parties are well informed or well advised and acting in their own best interests;

3.  A reasonable time is allowed for exposure in the market;

4.  Payment is made in cash in Canadian dollars or in terms of financial arrangements comparable thereto; and

5.  The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

### MARKET RENT

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the specified lease agreement including term, rental adjustment and revaluation, permitted uses, use restrictions, and expense obligations; the lessee and lessor each acting prudently and knowledgeably, and assuming consummation of a lease contract as of a specified date and the passing of the leasehold from lessor to lessee under conditions whereby:

1.  Lessee and lessor are typically motivated.

2.  Both parties are well informed or well advised and acting in what they consider their best interests.

3.  A reasonable time is allowed for exposure in the open market.

4.  The rent payment is made in terms of cash in Canadian dollars, and is expressed as an amount per time period consistent with the payment schedule of the lease contract.

5.  The rental amount represents the normal consideration for the property lease unaffected by special fees or concessions granted by anyone associated with the transaction.



## CONDOMINIUM INTEREST

An estate in real property consisting of an individual interest in a condominium unit, together with an undivided common interest in the common areas such as the land, parking areas, elevators, stairways, and the like.

## VALUE AS IS

The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning.

## CASH EQUIVALENCE

A price expressed in terms of cash, as distinguished from a price expressed totally or partly in terms of the face amounts of notes or other securities that cannot be sold at their face amounts. Calculating the cash-equivalent price requires an appraiser to compare transactions involving atypical financing to transactions involving comparable properties financed at typical market terms.

# EXPOSURE TIME AND MARKETING TIME

## EXPOSURE TIME

Under Paragraph 3 of the Definition of Market Value, the value opinion presumes that a reasonable time is allowed for exposure in the open market. Exposure time is defined as: *"The length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at the market value on the effective date of the appraisal."* Exposure time is presumed to precede the effective date of the appraisal.

The reasonable exposure period is a function of price, time and use. It is not an isolated opinion of time alone. Exposure time is different for various types of property and under various market conditions. It is a retrospective opinion based on an analysis of past events, assuming a competitive and open market. It assumes not only adequate, sufficient and reasonable time but adequate, sufficient and a reasonable marketing effort. Exposure time and conclusion of value are therefore interrelated.

Based on our review of investor surveys, discussions with market participants and information gathered during the sales verification process, a reasonable exposure time for the subject property at the value concluded within this report would have been three to nine months.

This assumes the current owner would have employed an active and professional marketing plan.

## MARKETING TIME

Marketing time is an opinion of the time that might be required to sell a real property interest at the concluded market value level. Marketing time is presumed to start during the period immediately after the effective date of an appraisal. (Marketing time is subsequent to the effective date of the appraisal and exposure time is presumed to precede the effective date of the appraisal). The opinion of marketing time uses some of the same data analyzed in the process of developing a reasonable exposure time opinion as part of the appraisal process and it is not intended to be a prediction of a date of sale or a one-line statement.

We believe, based on the assumptions employed in our analysis and our selection of investment parameters for the subject, that our value conclusion represents a price achievable within three to nine months.



**49 DIPPER HARBOUR ROAD, DIPPER HARBOUR NB**                    **CERTIFICATION OF APPRAISAL**           26

# CERTIFICATION OF APPRAISAL

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

- Our compensation is not contingent upon the reporting of a predetermined value or direction in value that favours the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

- Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Canadian Uniform Standards.

- Wayne MacDonald has not made an inspection of the property as per the terms of reference (desktop reporting) that is the subject of this report effective March 20, 2023.

- The Appraisal Institute of Canada has a mandatory Continuing Professional Development program for designated members. As of the date of this report, Wayne MacDonald has fulfilled the requirements of the program and remained as a member in good standing.

- Wayne MacDonald is a licensed appraiser in the Province of Nova Scotia.

- No one provided significant professional assistance to the person signing this report.

- The value estimate contained in this report applies as of March 20, 2023. This date may be referred to as the *effective date of valuation*.



## FINAL ESTIMATE OF VALUE

Having regard to all of the information contained in this report, it is our professional opinion that the market value of **49 Dipper Harbour Road, Dipper Harbour NB** at the effective date of valuation based on the agreed to Scope of Work, and as outlined in the report, the current market value of the property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023 is estimated as follows:

<div align="center">

**TWO HUNDRED SEVENTY THOUSAND DOLLARS**
**$270,000**

</div>

The estimate of the value is based on an exposure time of six to nine months.

**DRAFT**

_____          _____
Wayne MacDonald B.Comm, AACI P.App.
NBAREA #303157                                          Date



# WAYNE MACDONALD AACI, P.APP.

## VICE PRESIDENT | VALUATION & ADVISORY
## CUSHMAN & WAKEFIELD ULC

Wayne MacDonald is a Vice President with Cushman & Wakefield ULC. Wayne has 27+ years of experience in real estate valuation and advisory services with 18+ years as a designated AACI which includes the valuation of a variety of investment property types. These valuation and advisory assignments include single assets and portfolios of property. Wayne's direct involvement includes the appraisal of property both individually and as part of a valuation team.

## EXPERIENCE

Experience in real estate consulting and appraising includes a wide range of asset types including office, industrial, retail, multifamily as well as development land throughout Atlantic Canada.

Major clients have included financial institutions, public sector entities, as well as asset and investment management companies. Clients for which appraisal work has been done include CT REIT, BMW, Plaza REIT, Mount Saint Vincent University, and Hazelview Properties.

## EDUCATION

- Saint Mary's University (Halifax, Nova Scotia) –(1990)
  - Degree: Bachelor of Commerce – Major - Marketing

## APPRAISAL EDUCATION

- University of British Columbia (Vancouver BC) / Appraisal Institute of Canada
  - AACI, P.App. (2004)

## MEMBERSHIPS, LICENSES AND PROFESSIONAL AFFILIATIONS

- Designated Member, Appraisal Institute of Canada ( #303157)
- Nova Scotia Real Estate Appraisers Association
- New Brunswick Association of Real Estate Appraisers
  - As of the current date, Wayne MacDonald AACI, P.App has completed the requirements of the continuing education program of the Appraisal Institute of Canada.



**Exhibit I**
**Canadian Valuation 4**



advisory

valuation

# DESKTOP APPRAISAL

**Lot 100 & Lot 101 Shore Road,**
**Port Saxon NS**

**As of March 20, 2023**

**Prepared For:**
**Lobsterboys**
**65 Dipper Harbour Road**
**Dipper Harbour, NB**



**Prepared By:**
**Cushman & Wakefield ULC**
**Valuation & Advisory**
**Halifax, NS**
**C&W File ID:23-614-900294**
 **CONFIDENTIAL**





**Appraisal of:**
**Lot 100 & Lot 101 Shore Road,**
**Port Saxon NS**



CUSHMAN & WAKEFIELD ULC

May 15, 2023

**Mr. Taylor Cox, Chief Financial Officer**
**Lobsterboys**
65 Dipper Harbour Road
Dipper Harbour, NB
E5J 1X3

Re:     Appraisal of Real Property
        In a Self-Contained Report

        **Lot 100 & Lot 101 Shore Road, Port Saxon NS – "Subject Property"**

        C&W File ID:23-614-900294

Dear Mr. Cox:

Cushman & Wakefield ULC is pleased to submit this Desktop Appraisal Report, estimating the current market value of the above-referenced subject property.

By agreement, this is a Desktop Appraisal Report, which contains a summary of all of the data, reasoning and analysis upon which our value conclusion is based. This document has been prepared in accordance with the Code of Ethics & Standards of Professional Practice, and the Canadian Uniform Standards of Professional Appraisal Practice (The Standards) promulgated by the Appraisal Institute of Canada.

We have prepared this appraisal report at the request of Lobsterboys for the general purpose of establishing market value for management planning purposes. The report is intended for the exclusive use of Lobsterboys (the "Group"). The report is addressed to Lobsterboys and can be relied on by the "Group".

The report is subject to the Assumptions and Limiting Conditions contained in The Addenda, in addition to any others that may be contained in the report.

The property was not inspected as per the terms of reference for the Desktop Appraisal. The Direct Sales Comparison Approach to Value was utilized to estimate the value of the property.

Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**ONE HUNDRED SIXTY THOUSAND DOLLARS**
**$160,000**

This estimate of market value is based on an exposure time of six to nine months.



CUSHMAN & WAKEFIELD ULC

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and an Addendum.

Respectfully submitted,

**CUSHMAN & WAKEFIELD ULC**


_____

Wayne MacDonald, B.Comm. AACI, P.App.
Vice President
NSREAA# 303157
wayne.macdonald@ca.cushwake.com
Phone Office Direct 902.877.2273

# EXECUTIVE SUMMARY

## PROPERTY IDENTIFICATION

| | | |
|---|---|---|
| Address | : | PID 80082845 & 90082852 -  Lot 100 & 101 Shore Road, Port Saxon NS |

## VALUE ESTIMATE

| | | |
|---|---|---|
| Valuation Methods Utilized | : | <u>Direct Comparison Approach:</u><br>$200,000 |
| Valuation Date | : | March 20, 2023 |
| Value Conclusion | : | **$200,000** |
| Value Assumptions | : | This estimate of market value is based on an exposure time of three to nine months. |

## PROPERTY DESCRIPTION

| | | |
|---|---|---|
| Type | : | Appraised as Vacant Land |
| Location | : | The subject property is located on the east side of Shore Road fronting on Greenwood Lake in Port Saxon NS. |
| Site Area | : | Lot 100  (PID 80082845)- 19.88 acres<br><u>Lot 101 (PID  80082852)- 60.21 acres</u><br>Total                    - 80.09 acres |
| Land Use Designation | : | None identified. |

## LOCATIONAL CHARACTERISTICS

| | | |
|---|---|---|
| Surrounding Uses | : | Surrounding uses in the area are mainly rural agricultural in nature in nature. |
| Market Conditions | : | The reader should note that events in the financial and credit markets have previously and can continue to result in an uncertain and volatile economic environment.  This appraisal report reflects our estimate of value at a single point in time at the effective date.  Ongoing local and global changes in the economic and financial marketplace could seriously impact the reliability of this estimate at any point in time other than the effective date. |

### EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined by CUSPAP (January 1, 2022 Edition) - "An assumption, directly related to a specific Assignment, which, if were not assumed to be true, could materially alter the opinions or conclusions. Extraordinary Assumptions presume uncertain information about or anticipated changes in: the physical, legal or economic characteristics of the subject property; or about: conditions external to the subject property such as market conditions or trends, or the integrity of data used in an analysis to be fact."

This appraisal assumes a vacant site for purposes of this desktop appraisal.



## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined by CUSPAP (January 1, 2022 Edition) -"Hypothetical Conditions are a specific type of an Extraordinary Assumption that presumes, as fact, simulated but untrue information about physical, legal, or economic characteristics of the subject property or external conditions, and are imposed for purposes of reasonable analysis."

This appraisal does not employ any hypothetical conditions.



**LOT 100 & 101 SHORE ROAD, PORT SAXON NS**                    **EXECUTIVE SUMMARY**       **iii**

# PROPERTY PHOTOGRAPHS

## AERIAL MAP



*estimated boundary lines



**LOT 100 & 101 SHORE ROAD, PORT SAXON NS**               TABLE OF CONTENTS

# TABLE OF CONTENTS

| | |
|---|---|
| EXECUTIVE SUMMARY | I |
| PROPERTY PHOTOGRAPHS | 3 |
| TABLE OF CONTENTS | 4 |
| INTRODUCTION | 1 |
| PURPOSE AND INTENDED USE OF THIS APPRAISAL | 1 |
| PROPERTY IDENTIFICATION | 1 |
| PROPERTY OWNERSHIP | 1 |
| EFFECTIVE DATE OF APPRAISAL | 1 |
| PROPERTY RIGHTS APPRAISED | 1 |
| SCOPE OF THE APPRAISAL | 1 |
| DEFINITION OF MARKET VALUE | 2 |
| REASONABLE EXPOSURE TIME | 2 |
| PROPERTY DETAILS | 3 |
| NEIGHBORHOOD ANALYSIS | 3 |
| SITE DESCRIPTION | 5 |
| LAND USE BYLAW | 6 |
| REAL PROPERTY TAXES AND ASSESSMENTS | 6 |
| VALUATION | 7 |
| HIGHEST AND BEST USE | 7 |
| VALUATION METHODS | 8 |
| DIRECT COMPARISON APPROACH | 10 |
| ANALYSIS | 12 |
| SUMMARY OF ANALYSIS | 13 |
| RECONCILIATION AND FINAL VALUE ESTIMATE | 15 |
| ADDENDA CONTENTS | 16 |
| ADDENDUM A:    ASSUMPTIONS AND LIMITING CONDITIONS | 17 |
| GLOSSARY OF TERMS AND DEFINITIONS | 21 |
| CERTIFICATION OF APPRAISAL | 23 |



# INTRODUCTION

## PURPOSE AND INTENDED USE OF THIS APPRAISAL

The purpose of this appraisal is to estimate the current market value of the subject property. It is our understanding that the intended use of the appraisal is for management planning purposes. This report may only be relied upon by Lobsterboys (the "Group")

## PROPERTY IDENTIFICATION

The subject property is municipally addressed as:

**Lot 100 & 101 Shore Road, Port Saxon NS**

## PROPERTY OWNERSHIP

According to NS Property Online the subject property is currently owned by 100 Shore Road, Ltd. It is our understanding that the subject property is not subject to a purchase and or sale agreement. Based on our investigations PVSC indicates the subject property (Lot 100 & 101) was acquired by the current owner of record on April 8, 2021, for $141,000.

## EFFECTIVE DATE OF APPRAISAL

The effective date of the appraisal is March 20, 2023.

## PROPERTY RIGHTS APPRAISED

The legal interest appraised is the fee simple estate - defined as absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat.

## SCOPE OF THE APPRAISAL

In forming our opinion as to the market value of the subject as of the valuation date, we have relied on information which is detailed in this report, to the extent deemed appropriate, and carried out the following specific functions:

- Not required as our Terms of Reference. The client has requested a desktop appraisal.

- Considered information with respect to sales and listings, at or about the valuation date, of properties assess them as being relevant to our opinion, as set out herein. While we believe our review to be considered similar to the subject, where we have significant knowledge of such sales and listings and to reasonably complete, we cannot warrant that we have:

  i)  uncovered and assessed every real property transaction at or about the valuation date that might be said to bear on the determination of the market value of the subject, or

  ii) fully discerned the motives behind the sales, listings and lease information considered in our analysis, such that our weighting of said information is without subjectivity;

- Reviewed land use regulations, in particular the Land Use By-Law, applicable to the subject;

- Examined the possibility of making any significant changes to the subject in terms of existing uses, land severance and/or additional development of the site;

- Ascertained the highest and best use of the property;



- Examined market conditions and analyzed their potential effect on the property; and

- Conducted discussions with market participants regarding future development of the property.

## DEFINITION OF MARKET VALUE

The Canadian Uniform Standards of Professional Appraisal Practice (The Standards) adopted by the Appraisal Institute of Canada define Market Value as:

> ***The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.***

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised and acting in their own best interests;

- A reasonable time is allowed for exposure in the market;

- Payment is made in cash in Canadian dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

## REASONABLE EXPOSURE TIME

Exposure time is always presumed to precede the effective date of the appraisal. It may be defined as:

> ***The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. It is a retrospective estimate based upon an analysis of past events assuming a competitive and open market.***

Based on discussions with various investors and real estate brokers familiar with assets such as the subject and based on an analysis of comparable sales utilized in this valuation and an analysis of current listings, it is our estimate that the subject would require a three to nine month exposure period.



# PROPERTY DETAILS

## NEIGHBORHOOD ANALYSIS

### LOCATION

The subject property is located in the community of Port Saxon NS which is located in Shelburne County NS . The subject property has frontage to Shore Road as well as along Greenwood Lake.

### TRANSPORTATION SYSTEMS

Relatively, this location affords the subject very good access to the interprovincial highway # 103 which is an approximately 8km drive north west from the subject site.

### PLANNED CHANGES IN ROAD NETWORK

- None known.

### NEARBY AND ADJACENT USES

The immediate neighborhood is made up of a mix of rural residential development, vacancy land, light industrial (Kenney & Ross Limited as well as Metalco) and local commercial development (River Hills Golf & Country Club). The area offers very good access to the surrounding areas as well as the Trans-Canada Highway.

### LOCAL AREA CHARACTERISTICS

- Small rural location.
- Relatively close to larger provincial centres.

### LAND USE CHANGES

None known.

### CONCLUSIONS

The subject has a relatively favorable location with access to many important arterial routes.



LOT 100 & 101 SHORE ROAD, PORT SAXON NS                    PROPERTY DETAILS        4

## REGIONAL MAP



## NEIGHBOURHOOD MAP





# SITE DESCRIPTION

| SITE PLAN | |
|---|---|
| | |
| Location: | The subject property is located on the east side of Shore Road fronting on Greenwood Lake in Port Saxon NS. |
| Shape: | Irregular |
| Total Area: | Lot 100 (PID 80082845)-  19.88 acres |
| | Lot 101 (PID  80082852)- 60.21 acres |
| | Total                        - 80.09 acres |
| Topography: | Assumed generally at grade with adjacent properties. |
| Easements and/or Rights of Way: | None identified although any such documents are assumed not to have any impact on the marketability of the subject site.  For greater certainty, a legal opinion should be obtained. |
| Frontage, Access, Visibility: | Frontage to Shore Road as well as Greenwood Lake. |
| Sub Soil: | No soil analysis has been made in conjunction with this report.  Soil bearing and drainage qualities are assumed to be adequate for the existing structures and typical for the area.  We did not observe any evidence to the contrary during our physical inspection of the property. |
| Utilities: | The subject is assumed to have access to electricity as well as well and septic services. |
| Environmental Matters: | Cushman & Wakefield ULC has no expertise or responsibility regarding environmental matters and it is assumed that there are not any environmental issues that would affect the market value or marketability of the subject property. |
| Hazardous Substances: | We observed no evidence of toxic or hazardous substances during our inspection of the site. However, we are not trained to perform technical environmental inspections and recommend the services of a professional engineer for this purpose. |
| Overall Functionality: | The subject site appears functional for residential and perhaps resource agricultural uses . |



**LOT 100 & 101 SHORE ROAD, PORT SAXON NS**                                    **PROPERTY DETAILS**          **6**

## LAND USE BYLAW

The land use bylaw from the Municipality of the District of Shelburne County, the subject is zoned General Development Zone (GD). While we would recommend that prior to any business decisions the municipality be contacted with respect to what can be developed on the subject site. the land use section states that all developments are permitted in the general development zone.

## REAL PROPERTY TAXES AND ASSESSMENTS

### CURRENT PROPERTY TAXES

The current assessment and taxes for the subject property are as follows.

| Tax Year | | 2023 |
|---|---|---|
| **Lot 100** | PID 80082852 | $93,200 |
| | AAN 00728756 | |
| **Lot 101** | PID 80082845 | $18,100 |
| | AAN 00728691 | |
| Total Assessed Value | | $111,300 |
| Tax Rate | | 1.28% |
| **2023 Taxes est.** | | **$1,424.64** |

We have not been provided the property tax bill for the subject property and have calculated the tax based on the tax rates taken from The Municipality of the District of Shelburne County website. We assume this to be correct but would defer to the actual tax bill.

We have not been provided with a current tax bill on the subject property.



# VALUATION

## HIGHEST AND BEST USE

### DEFINITION OF HIGHEST AND BEST USE

Fundamental to the concept of value is the principle of highest and best use, which may be defined as:

> *The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.*

### HIGHEST AND BEST USE CRITERIA

We have evaluated the site's highest and best use both as currently improved and as if vacant. In both cases, the property's highest and best use must meet four criteria. That use must be (1), legally permissible (2) physically possible, (3) financially feasible, and (4) maximally profitable.

#### LEGALLY PERMISSIBLE

According to the current Land Use By-law, the subject site is zoned General Development Zone (GD). This zoning permits all development uses.

#### PHYSICALLY POSSIBLE

The second test is what is physically possible. As discussed in the "Site Description," section of the report, the site's size, soil, topography, etc. do not physically limit its use. The subject site is of adequate shape and size to accommodate a variety of developments.

#### FINANCIAL FEASIBILITY AND MAXIMUM PRODUCTIVITY

The third and fourth tests are what is financially feasible and what will produce the highest net return. After analyzing the physically possible and legally permissible uses of the property, the highest and best use must be considered in light of financial feasibility and maximum productivity. For a potential use to be seriously considered, it must have the potential to provide a sufficient return to attract investment capital over alternative forms of investment. A positive net income or acceptable rate of return would indicate that a use is financially feasible. Based on previous sales of land in the area tempered by current economic volatility, residential as well as commercial development appears financially feasible for the subject site.

### HIGHEST AND BEST USE OF SITE AS THOUGH VACANT

Considering the subject site's physical characteristics and location, as well as the state of the local market, it is our opinion that the Highest and Best Use of the subject site as though vacant is as a mixed use development site. Based on the broad spectrum of permitted uses we would recommend a feasibility study in order to determine the best option for this land.



# VALUATION METHODS

There are six generally accepted methods of valuing vacant land: Direct Comparison; Abstraction; Extraction; Subdivision Development; Land Residual; and Ground Rent Capitalization.

1. The **Direct Comparison Approach** is based upon the premise that a prudent purchaser would not pay more for a property than what it would cost to acquire a suitable alternative property and that the market value of a property can be estimated by comparing sales, offers, and listings of properties which have similar characteristics to the property being appraised.

2. The **Abstraction Method** of valuing land is premised upon the Principal of Contribution. This method is premised on the assumption that within each category and type of real estate, there exists a typical ratio of land value to total property value. By knowing what this ratio is from data compiled from areas where land and building values are available and applying it to the sales information regarding improved properties in a built up area, an estimate of land value can be abstracted. The reliability of this method is diminished because it does not take into explicit consideration such relevant criteria as building age or quality of construction.

3. A method of land valuation similar to the Abstraction Method but which implicitly recognizes differences in building age and quality of construction is the **Extraction Method**. This method deducts the estimated depreciated reproduction or replacement cost of the improvements of an improved property for which the total property value is known to arrive at an estimate of land value as if vacant.

4. When valuing larger parcels for which the highest and best use is the parcel's subdivision into smaller sites, and for which sales information regarding similar larger sites is insufficient to undertake a Direct Comparison Approach, the **Subdivision Development Method** may be employed. In applying this method, the first step is to establish market values for the smaller sites as though subdivided, the length of the development period, and an appropriate absorption period. The second step is to determine the costs required to create and market the subdivided parcels which include engineering and construction costs associated with the site preparation, roadways, sidewalks and servicing; carrying costs such as insurance and taxes; and marketing costs. These costs are then deducted from the projected gross revenue of the lots to arrive at an estimate of the net proceeds which, once discounted at an applicable rate to account for the risk associated with the time required to complete such a development, are indicative of the present market value of the larger, un-subdivided site.

5. Another method that may be employed in the absence of adequate comparable information is the **Land Residual Technique**. In this method the net income generated from the property is established. From this is deducted a reasonable return on and recapture of capital invested in the improvements. The residual income is considered to be ascribed from the land. This income is then capitalized at an appropriate rate to arrive at an estimate of land value. An important assumption required in the application of this method is that the site is developed to its highest and best use such that the income from land and improvements are of the same type and sources.

6. A similar method as the Land Residual Technique is **Ground Rent Capitalization**. Undertaking this method of site valuation requires the analysis of ground rents prevalent in the market and in consideration of the characteristics of the site being appraised. From the analysis, a gross income is established from which any requisite expenses or anticipated losses are deducted to arrive at a net operating income. This net operating income is then capitalized at an applicable rate to arrive at an estimate of the vacant site.



The **Direct Comparison Approach** is based on the Principle of Substitution which maintains that a prudent purchaser would not pay more for a property than what it would cost to purchase a suitable alternative property, one that exhibits similar characteristics, and functional utility, etc.  Within this approach, the property being appraised is compared to similar properties that have sold recently or are currently offered for sale.

Some important factors to be given consideration in this analysis include location, access, site size, site configuration, topography, land use classification, servicing, etc.  When enough unimproved and comparable sales are available, the Direct Comparison Approach is the preferred technique and has been employed herein.



LOT 100 & 101 SHORE ROAD, PORT SAXON NS                                    VALUATION          10

## DIRECT COMPARISON APPROACH

In the Direct Comparison Approach, we developed an opinion of value by comparing this property with similar, recently sold properties in the surrounding or competing area. Inherent in this approach is the principle of substitution, which states that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arm's-length transactions between willing and knowledgeable buyers and sellers, we can identify value and price trends. The basic steps of this approach are:

1.   Research recent, relevant property sales and current offerings throughout the competitive area;

2.   Select and analyze properties that are similar to the property appraised, analyzing changes in economic conditions that may have occurred between the sale date and the date of value, and other physical, functional, or locational factors;

3.   Identify sales that include favorable financing and calculate the cash equivalent price;

4.   Reduce the sale prices to a common unit of comparison such as price per square foot, price per unit or effective gross income multiplier;

5.   Make appropriate comparative adjustments to the prices of the comparable properties to relate them to the property being appraised; and

6.   Interpret the adjusted sales data and draw a logical value conclusion.

The Direct Comparison Approach is based on the Principle of Substitution which maintains that a prudent purchaser would not pay more for a property than what it would cost to purchase a suitable alternative property, one that exhibits similar characteristics, and functional utility, etc. Within this approach, the property being appraised is compared to similar properties that have sold recently or are currently offered for sale.  Typically, a unit of comparison (i.e. sale price per square foot, sale price per unit, etc.) is used to facilitate the analysis.  In the case of properties similar to the subject lands, the sale price per acre is the most commonly used unit of comparison.

In analyzing the comparable sales relative to the subject site, of particular relevance are characteristics such as location, site size, topography, developability, and land use regulations.  In this regard, the sales summarized in following are thought to be reasonably comparable to the subject site and to provide a reliable indication as to its current market value.



**LOT 100 & 101 SHORE ROAD, PORT SAXON NS**                                      VALUATION        11

## Vacant Land Valuation

We have researched several market areas for transactions involving relatively similar vacant land sales as well as two listings. Based on our investigations, the following indices were examined. Details of the sales are presented below.

| Index | Address | PID | PAN | Sale Date | Site Area m² | Site Area ft² | Site Area Acres | Sale Price | Sale Price / ft² | Sale Price / acre |
|-------|---------|-----|-----|-----------|------------|-------------|----------------|-----------|-----------------|------------------|
| | | | | SALES CAHRT | | | | | | |
| 1 | Red Head Road, Atlantic NS | 80086325 | 01916394 | September 16, 2022 | 76,525 | 823,720 | 18.91 | $24,500 | $0.03 | $1,296 |
| 2 | 7194 Shore Road, Port Clyde NS | 80081565 | 04248171 | July 20, 2022 | 43,301 | 466,092 | 10.70 | $69,000 | $0.15 | $6,449 |
| 3 | Port Latbur Road, Port Latour NS | 80060684 | 09871330 | September 15, 2021 | 80,936 | 871,200 | 20.00 | $134,000 | $0.15 | $6,700 |
| 4 | Highway 103, Port Clyde NS | 82580390 | 11013831 | Listing | 384,448 | 4,138,200 | 95.00 | $155,000 | $0.04 | $1,632 |
| 5 | Black Point Road, Ingomar NS | 80086002 | 03115925 | Listing | 113,311 | 1,219,680 | 28.00 | $90,000 | $0.07 | $3,214 |



**LOT 100 & 101 SHORE ROAD, PORT SAXON NS**                    VALUATION        12



# ANALYSIS

The major elements of comparison for an analysis of this type include the property rights conveyed, the financial terms incorporated into a particular transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its physical traits and the economic characteristics of the property.

## PROPERTY RIGHTS APPRAISED

All of the sales utilized in this analysis involved the transfer of the fee simple interest.

## FINANCIAL TERMS

To the best of our knowledge, all of the sales utilized in this analysis were accomplished with cash and/or cash and market-oriented financing.

## CONDITIONS OF SALE

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. However, all sales used in this analysis are considered to be "arms-length" market transactions between both knowledgeable buyers and sellers on the open market.  Market listings should be treated caution as they may transfer at a lower unit value.  This is particularly the case during declining or stabilizing market conditions



## MARKET CONDITIONS

The sales that are included in this analysis date between February 2017 and September 2019. During this time for the subject area, market conditions have improved as indicated by the sales. Therefore, the sales are somewhat inferior.

## LOCATION

The subject property is located on the west side of Vaughn Harvey Boulevard. Index No's 2 & 4 would be considered to be similar with the other sales considered to be relatively inferior.

## SIZE

The selected comparable sales range in size from 10.7 acres to 95 acres, while the subject consists of 80.09 acres.  It should be noted that much larger parcels will typically transfer at lower unit prices than smaller parcels, all other things being equal, given the law of diminishing returns although the effect of this diminishes beyond a certain parcel size. There are also benefits associated with larger parcels in so much as assemblage is not required and infrastructure costs can be spread over a greater land area. In this case, Index No 1,2,3 & 5 are considered to represent a smaller parcel (superior) with index #4 being similar.

## UTILITY

Overall Index No's 1-5 considered to have similar utility.

## PHYSICAL TRAITS

The comparable properties have varying degrees of comparability when measured against the subject property. The most important attributes of the subject property which need to be compared to other properties are similar physical make-up, location and exposure. The overall physical sites would be considered to be generally similar.

## SUMMARY OF ANALYSIS

The selected comparable indices represent 3 completed transactions between and 2021 and 2022. As well we have 2 current listings. The indices are all located in the same general area as the subject property. The selected indices range from a low of 10.7 acres to a high of 95 acres.

| LAND SALES ADJUSTMENT CHART | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Economic Adjustments (Cumulative) | | | | | Property Characteristic Adjustments (Additive) | | | |
| Index | Price / Acre Date | Property Rights conveyed | Conditions of sale | Special Financing | Market conditions | Subtotal $ / Acre | Location | Size | Utility | Physical Traits | Indicated Price per Acre |
| 1 | $1,296 Sep-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $1,312 | Similar | Superior | Inferior | Inferior | Higher than $1,312 |
| 2 | $6,449 Jul-22 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $6,549 | Superior | Superior | Similar | Superior | Lower than $6,549 |
| 3 | $6,700 Sep-21 | Fee Simple Similar | Arms-length similar | None similar | Inferior | $6,919 | Superior | Superior | Similar | Similar | Lower than $6,919 |
| 4 | $1,632 Listing | Fee Simple Similar | Arms-length similar | None similar | Similar | $1,632 | Similar | Similar | Similar | Inferior | Higher than $1,632 |
| 5 | $3,214 Listing | Fee Simple Similar | Arms-length similar | None similar | Similar | $3,214 | Superior | Superior | Similar | Similar | Lower than $3,214 |



We believe the subject site possesses a relatively good location. Given these characteristics and recognizing the large size of the site and that different portions of the site carry more value than other areas and we would estimate an overall rate of $2,000 per acre to be appropriate for the subject.

Application of this rate results in the following estimate of value:

80.09 acres x $2,000 per acre = $160,180

**$160,000**



# RECONCILIATION AND FINAL VALUE ESTIMATE

In the methodology section of this report we indicated that the Direct Comparison Approach is the preferred approach when valuing vacant land, providing there is sufficient and comparable activity.

Based on the agreed to Scope of Work, and as outlined in the report, the current market value of the property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023, is estimated as follows:

**ONE HUNDRED SIXTY THOUSAND DOLLARS**
**$160,000**

This estimate of market value is based on an exposure of three to nine months.



# ADDENDA CONTENTS

ADDENDUM A:  ASSUMPTIONS AND LIMITING CONDITIONS———————————————24

ADDENDUM B:  GLOSSARY OF TERMS AND DEFINITIONS———————————————27

ADDENDUM C:  CERTIFICATION OF APPRAISAL———————————————————29

CUSHMAN & WAKEFIELD

# ADDENDUM A:
# ASSUMPTIONS AND LIMITING CONDITIONS

1. This report has been prepared for **Lobsterboys (the "Group").** It is not reasonable for any person other than the person or those to whom this report is addressed to rely upon this report without first obtaining written authorization from the client and the author of this report.  This report has been prepared on the assumption that no other person will rely on it for any other purpose and all liability to all such persons is denied.

2. This report has been prepared for *the "Group"* and for the exclusive (and confidential) use of the recipients as named herein and for the specific purpose and function as stated herein.  All copyright is reserved to the author and this report is considered confidential by the author and the client.  Possession of this report, or a copy thereof, does not carry with it the right to reproduction or publication in any manner, in whole or in part, nor may it be disclosed, quoted from or referred to in any manner, in whole or in part, without the prior written consent and approval of the author as to the purpose, form and content of any such disclosure, quotation or reference.

3. Without limiting the generality of the foregoing, neither all nor any part of the contents of this report shall be disseminated or otherwise conveyed to the public in any manner whatsoever or through any media whatsoever or disclosed, quoted from or referred to in any letter, financial statement, prospectus, or offering memorandum of the client, or in any documents filed with any governmental agency without the prior written consent and approval of the author as to the purpose, form and content of such dissemination, disclosure, quotation or reference.

4. The estimated prospective market value of the real property which is valued in this report pertains to the value of the Fee Simple or leasehold interest in the real estate, subject to terms and conditions of the existing tenancy as described in this report.  The property rights herein exclude mineral rights, if any.

5. The Client has specifically requested an assignment with a limited scope of work and results in an abbreviated report format. By accepting this report, the Client and Intended User(s) understand that an inspection of the subject property has not been performed and accept the decrease in the reliability of this report, resulting in a higher level of risk assumed by a user of this report. The appraiser, the appraiser's firm and/or any employee, director, officer or partner of the appraiser's firm, as applicable, are limited in liability to $50,000 (fifty thousand dollars). Such limitation of liability applies in the event that anyone makes a claim that the appraiser is in any way liable for performing the appraisal or in preparing the appraisal report, including in respect of any allegations of negligence, breach of contract or for any other reason or claim.

6. The estimate of value contained in this report is founded upon a thorough and diligent examination and analysis of information gathered and obtained from numerous sources.  Certain information has been accepted at face value; especially if there was no reason to doubt its accuracy.  Other empirical data required interpretive analysis pursuant to the objective of this assignment. Certain inquiries were outside the scope of this mandate.  For these reasons, the analyses, opinions and conclusions contained in this report are subject to all of the assumptions and limiting conditions.

7. The property has been valued on the basis that title to the real property herein is good and marketable.

8. The author of this report cannot accept responsibility for legal matters, questions of survey, opinions of title, hidden or unapparent conditions of the property, toxic wastes or contaminated materials, soil or sub-



soil conditions, environmental, engineering or other technical matters which might render this property more or less valuable than as stated herein.

9.  The property has been valued on the basis that they are free and clear of all value influencing encumbrances, encroachments, restrictions or covenants except as may be noted in this report and that there are no pledges, charges, lien or social assessments outstanding against the property other than as stated and described herein.



10. The property has been valued on the basis that there are no outstanding liabilities except as expressly noted herein, pursuant to any agreement with a municipal or other government authority, pursuant to any contract or agreement pertaining to the ownership and operation of the real estate or pursuant to any lease or agreement to lease, which may affect the stated value or saleability of the subject property or any portion thereof.

11. The interpretation of the leases and other contractual agreements, pertaining to the operation and ownership of the property, as expressed herein, is solely the opinion of the author and should not be construed as a legal interpretation.

12. The property has been valued on the basis that the real estate complies in all material respects with any restrictive covenants affecting the site and have been built and is occupied and being operated, in all material respects, in full compliance with all requirements of law, including all zoning, land use classification, building, planning, fire and health by-laws, rules, regulations, orders and codes of all federal, provincial, regional and municipal governmental authorities having jurisdiction with respect thereto.

13. Investigations have been undertaken in respect of matters which regulate the use of land.  However, no inquiries have been placed with the fire department, the building inspector, the health department or any other government regulatory agency, unless such investigations are expressly represented to have been made in this report.  The property must comply with such regulations and, if it does not comply, its non-compliance may affect the market value of this property.  To be certain of such compliance, further investigations may be necessary.

14. The property has been valued on the basis that all rents referred to in this report are being paid in full and when due and payable under the terms and conditions of the attendant leases, agreements to lease or other contractual agreements.  Further, it is assumed that all rents referred to in this report represent the rental arrangements stipulated in the leases, agreements to lease or other contractual agreements pertaining to the tenants' occupancy, to the extent that such rents have not been prepaid, abated, or inflated to reflect extraordinary circumstances, and are fully enforceable notwithstanding that such documentation may not be fully executed by the parties thereto as at the effective date, unless such conditions have been identified and noted in this report.

15. The data and statistical information contained herein were gathered from reliable sources and are believed to be correct.  However, these data are not guaranteed for accuracy, even though every attempt has been made to verify the authenticity of this information as much as possible.

16. The estimated prospective market value of the property do not necessarily represent the value of the underlying shares, if the assets are so held, as the value of the shares could be affected by other considerations.  Further, the estimated prospective market values do not include consideration of any extraordinary market value.

17. Should title to the real property presently be held (or changed to a holding) by a partnership, in a joint venture, through a co-tenancy arrangement or by any other form of divisional ownership, the value of any fractional interest associated therewith may be more or less than the percentage of ownership appearing in the contractual agreement pertaining to the structure of such divisional ownership.



18. In the event of syndication, the aggregate value of the limited partnership interests may be greater than the value of the freehold or fee simple interest in the real estate, by reason of the possible contributory value of non-realty interests or benefits such as provision for tax shelter, potential for capital appreciation, special investment privileges, particular occupancy and income guarantees, special financing or extraordinary agreements for management services.

19. Should the author of this report be required to give testimony or appear in court or at any administrative proceeding relating to this report, prior arrangements shall be made therefore, including provisions for additional compensation to permit adequate time for preparation and for any appearances which may be required.  However, neither this nor any other of these assumptions and limiting conditions is an attempt to limit the use that might be made of this report should it properly become evidence in a judicial proceeding.  In such a case, it is acknowledged that it is the judicial body which will decide the use of this report which best serves the administration of justice.

20. Because market conditions, including economic, social and political factors, change rapidly and, on occasion, without notice or warning, the estimate of market value expressed herein, as of the effective date of this appraisal, cannot necessarily be relied upon as any other date without subsequent advice of the author of this report.

21. The value expressed herein is in Canadian dollars.

22. This report is only valid if it bears the original signature of the author.

CUSHMAN & WAKEFIELD

# GLOSSARY OF TERMS AND DEFINITIONS

## DEFINITIONS OF VALUE, INTEREST APPRAISED AND OTHER TERMS

### MARKET VALUE

The Canadian Uniform Standards of Professional Appraisal Practice (The Standards) adopted by the Appraisal Institute of Canada define Market Value as:

> *"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised and acting in their own best interests;

3. A reasonable time is allowed for exposure in the market;

4. Payment is made in cash in Canadian dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

### MARKET RENT

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the specified lease agreement including term, rental adjustment and revaluation, permitted uses, use restrictions, and expense obligations; the lessee and lessor each acting prudently and knowledgeably, and assuming consummation of a lease contract as of a specified date and the passing of the leasehold from lessor to lessee under conditions whereby:

1. Lessee and lessor are typically motivated.

2. Both parties are well informed or well advised and acting in what they consider their best interests.

3. A reasonable time is allowed for exposure in the open market.

4. The rent payment is made in terms of cash in Canadian dollars, and is expressed as an amount per time period consistent with the payment schedule of the lease contract.

5. The rental amount represents the normal consideration for the property lease unaffected by special fees or concessions granted by anyone associated with the transaction.



## CONDOMINIUM INTEREST

An estate in real property consisting of an individual interest in a condominium unit, together with an undivided common interest in the common areas such as the land, parking areas, elevators, stairways, and the like.

## VALUE AS IS

The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning.

## CASH EQUIVALENCE

A price expressed in terms of cash, as distinguished from a price expressed totally or partly in terms of the face amounts of notes or other securities that cannot be sold at their face amounts. Calculating the cash-equivalent price requires an appraiser to compare transactions involving atypical financing to transactions involving comparable properties financed at typical market terms.

# EXPOSURE TIME AND MARKETING TIME

## EXPOSURE TIME

Under Paragraph 3 of the Definition of Market Value, the value opinion presumes that a reasonable time is allowed for exposure in the open market. Exposure time is defined as: *"The length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at the market value on the effective date of the appraisal."* Exposure time is presumed to precede the effective date of the appraisal.

The reasonable exposure period is a function of price, time and use. It is not an isolated opinion of time alone. Exposure time is different for various types of property and under various market conditions. It is a retrospective opinion based on an analysis of past events, assuming a competitive and open market. It assumes not only adequate, sufficient and reasonable time but adequate, sufficient and a reasonable marketing effort. Exposure time and conclusion of value are therefore interrelated.

Based on our review of investor surveys, discussions with market participants and information gathered during the sales verification process, a reasonable exposure time for the subject property at the value concluded within this report would have been three to nine months.

This assumes the current owner would have employed an active and professional marketing plan.

## MARKETING TIME

Marketing time is an opinion of the time that might be required to sell a real property interest at the concluded market value level. Marketing time is presumed to start during the period immediately after the effective date of an appraisal. (Marketing time is subsequent to the effective date of the appraisal and exposure time is presumed to precede the effective date of the appraisal). The opinion of marketing time uses some of the same data analyzed in the process of developing a reasonable exposure time opinion as part of the appraisal process and it is not intended to be a prediction of a date of sale or a one-line statement.

We believe, based on the assumptions employed in our analysis and our selection of investment parameters for the subject, that our value conclusion represents a price achievable within three to nine months.



# CERTIFICATION OF APPRAISAL

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

- Our compensation is not contingent upon the reporting of a predetermined value or direction in value that favours the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

- Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Canadian Uniform Standards.

- Wayne MacDonald has not made an inspection of the property as per the terms of reference (desktop reporting) that is the subject of this report effective March 20, 2023.

- The Appraisal Institute of Canada has a mandatory Continuing Professional Development program for designated members. As of the date of this report, Wayne MacDonald has fulfilled the requirements of the program and remained as a member in good standing.

- Wayne MacDonald is a licensed appraiser in the Province of Nova Scotia.

- No one provided significant professional assistance to the person signing this report.

- The value estimate contained in this report applies as of March 20, 2023. This date may be referred to as the *effective date of valuation*.



**LOT 100 & 101 SHORE ROAD, PORT SAXON NS**             **CERTIFICATION OF APPRAISAL**          **24**

## FINAL ESTIMATE OF VALUE

Having regard to all of the information contained in this report, it is our professional opinion that the market value of **Lot 100 & 101 Shore Road, Port Saxon NS** at the effective date of valuation based on the agreed to Scope of Work, and as outlined in the report, the current market value of the property subject to the assumptions, limiting conditions, certifications and definitions contained herein, as of March 20, 2023 is estimated as follows:

**ONE HUNDRED SIXTY THOUSAND DOLLARS**
**$160,000**

The estimate of the value is based on an exposure time of three to nine months.

May 15, 2023

_____              _____
Wayne MacDonald B.Comm, AACI P.App.
NSREAA #303157                                                    Date



# WAYNE MACDONALD AACI, P.APP.

### VICE PRESIDENT | VALUATION & ADVISORY
### CUSHMAN & WAKEFIELD ULC

Wayne MacDonald is a Vice President with Cushman & Wakefield ULC. Wayne has 27+ years of experience in real estate valuation and advisory services with 18+ years as a designated AACI which includes the valuation of a variety of investment property types. These valuation and advisory assignments include single assets and portfolios of property. Wayne's direct involvement includes the appraisal of property both individually and as part of a valuation team.

## EXPERIENCE

Experience in real estate consulting and appraising includes a wide range of asset types including office, industrial, retail, multifamily as well as development land throughout Atlantic Canada.

Major clients have included financial institutions, public sector entities, as well as asset and investment management companies. Clients for which appraisal work has been done include CT REIT, BMW, Plaza REIT, Mount Saint Vincent University, and Hazelview Properties.

## EDUCATION

- Saint Mary's University (Halifax, Nova Scotia) –(1990)
    - Degree: Bachelor of Commerce – Major - Marketing

## APPRAISAL EDUCATION

- University of British Columbia (Vancouver BC) / Appraisal Institute of Canada
    - AACI, P.App. (2004)

## MEMBERSHIPS, LICENSES AND PROFESSIONAL AFFILIATIONS

- Designated Member, Appraisal Institute of Canada ( #303157)
- Nova Scotia Real Estate Appraisers Association
- New Brunswick Association of Real Estate Appraisers
    - As of the current date, Wayne MacDonald AACI, P.App has completed the requirements of the continuing education program of the Appraisal Institute of Canada.



**Exhibit J**

**Canadian Debtors' Cash and A/R Balances**

**Cash Balance:**    $230,242.00 CAD ($169,296 USD)

**A/R Balance:**    $810,820.00 CAD ($596,192 USD)